Gregg M. Galardi
Dienna Corrado
Arkady A. Goldinstein
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501

*Proposed Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| dELiA*s, INC., *et al.*, | Case No. 14- ___ (___) |
| Debtors.[1] | Joint Administration Requested |

**DEBTORS' EMERGENCY MOTION FOR
ENTRY OF INTERIM AND FINAL ORDERS
(A)(I) APPROVING THE DEBTORS' ASSUMPTION OF
AGENCY AGREEMENT, (II) AUTHORIZING THE DEBTORS
TO SELL CERTAIN ASSETS THROUGH STORE CLOSING SALES,
(III) AUTHORIZING THE DEBTORS TO ABANDON UNSOLD PROPERTY,
(IV) WAIVING COMPLIANCE WITH CONTRACTUAL STORE CLOSING SALE
RESTRICTIONS AND EXEMPTING THE DEBTORS FROM STATE AND LOCAL
WAGE REQUIREMENTS AND LAWS RESTRICTING STORE CLOSING SALES,
<u>(V) GRANTING RELATED RELIEF, AND (VI) SCHEDULING A FINAL HEARING</u>**

dELiA*s, Inc. and its debtor affiliates, as debtors and debtors in possession in the

above-captioned cases (collectively, the "<u>Debtors</u>") hereby submit this emergency motion (the

"<u>Motion</u>") for entry of an interim order, substantially in the form attached hereto as <u>Exhibit A</u>

(the "<u>Interim Order</u>"), (i) approving the Debtors' assumption of the Agency Agreement, attached

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  dELiA*s, Inc. (7172); dELiA*s Distribution Company (9076); A Merchandise, LLC (7639); dELiA*s Operating Company (3765); dELiA*s Retail Company (0036); dELiA*s Group Inc. (4035); AMG Direct, LLC (9236); dELiA*s Assets Corp. (3754); DACCS, Inc. (0225).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  50 West 23rd Street, New York, NY 10010.

to the Interim Order as <u>Exhibit 1</u> with a joint venture composed of Gordon Brothers Retail

Partners, LLC and Hilco Merchant Resources, LLC (the "<u>Liquidating Agent</u>"), (ii) authorizing

the Debtors to conduct store closings and going out of business sales and, authorizing the

Liquidating Agent to sell Store Inventory (as defined below) located at the closing stores (the

"<u>Closing Stores</u>") through store closing and going out of business sales (the "<u>Store Closing</u>

<u>Sales</u>"), and Direct Inventory (as defined below) for their direct business platform (the "<u>Direct</u>

<u>Business Platform</u>"), immediately upon entry of the Interim Order, (iii) authorizing the Debtors

to abandon unsold property consisting of merchandise and certain owned fixtures, furniture and

equipment ("<u>Owned FF&E</u>") located at the closing stores (the "<u>Closing Stores</u>"), (iv) waiving

compliance with contractual store closing sale restrictions (the "<u>Contractual Restrictions</u>") and

exempting the Debtors from state and local wage pay requirements (the "<u>Wage Requirements</u>")

and laws restricting store closing sales (the "<u>Applicable Law Restrictions</u>"), (v) approving the

form and manner of service of the Motion and (vi) scheduling (a) an interim hearing on or before

December 12, 2014 and (b) a final hearing on the merits of the Motion on or prior to December

24, 2014 for entry of a final order (the "<u>Final Order</u>" and together with the Interim Order, the

"<u>Orders</u>") granting the relief requested herein on an interim basis on or before December 12,

2014, and on a final basis on or prior to December 24, 2014; and (vi)  granting related relief.  In

support of the Motion, the Debtors, by and through their proposed undersigned counsel,

respectfully represent:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and

1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion

in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The legal predicates for the relief

requested herein are sections 105(a), 363, 365 and 554 of title 11 of the United States Code, as

amended (the "Bankruptcy Code") and Rules 2002, 6003, and 6004(h) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

2.      On the date hereof (the "Petition Date"), the Debtors commenced these

bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under Chapter

11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as

debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      No trustee, examiner or official committee of unsecured creditors has been

appointed in these Chapter 11 Cases.  Concurrently with the filing of this Motion, the Debtors

filed a motion requesting joint administration of these Chapter 11 Cases pursuant to Bankruptcy

Rule 1015(b).

4.      The factual background regarding the Debtors, including their business

operations, their capital and debt structures, and the events leading to the filing of these Chapter

11 Cases, is set forth in detail in the *Declaration of Edward Brennan Pursuant to Local*

*Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and First Day Motions* (the

"First Day Declaration"), filed concurrently herewith and fully incorporated herein by reference.[2]

In further support of the Motion, the Debtors also submit the Declaration of Lee A. Diercks in

support of the Motion (the "Diercks Declaration") attached hereto as Exhibit B and fully

incorporated herein by reference.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day
Declaration.

**RELIEF REQUESTED**

5.      By this Motion, the Debtors seek entry of the Orders (i) approving the Debtors'

assumption of the Agency Agreement, (ii) authorizing the Debtors to conduct store closings and

going out of business sales and, through the Liquidating Agent, to sell the Total Inventory and

Owned FF&E at the Distribution Center and Closing Stores through the Store Closing Sales

pursuant to the Agency Agreement, free and clear of all liens, claims and encumbrances

immediately upon entry of the Interim Order, (iii) authorizing the Debtors to abandon unsold

merchandise and Owned FF&E at the Closing Stores following the conclusion of the Store

Closing Sales, (iv) waiving compliance with Contractual Restrictions, (v) exempting the Debtors

from Applicable Laws Restrictions and Wage Requirements, (v) scheduling a final hearing; and

(vi) granting related relief.

**THE STORE CLOSINGS AND SALE OF TOTAL INVENTORY**

6.      The Debtors operate a multi-channel retail company comprised of lifestyle brands

marketed to teen girls and young women.  dELiA*s products and merchandise are sold in the

Debtors' retail store locations and their Direct Business Platform .

- Retail Stores.  The Debtors own and operate 92 stores in 29 states.  The inventory
  for the retail stores (the "Store Inventory") is located at the Closing Stores and the
  Debtors' distribution center located in Hanover, Pennsylvania (the "Distribution
  Center").

- Direct Business Platform.  Through the Direct Business Platform, the Debtors sell
  dELiA*s products and merchandise via direct mail catalogs and e-commerce
  websites.  The inventory for the Direct Business Platform (the "Direct Inventory,"
  and together with the Store Inventory, and Additional Agent Merchandise (as
  defined in the Agency Agreement), the "Total Inventory") is also located at the
  Distribution Center.

7.      Prior to the Petition Date, the Debtors and their advisors considered various

strategic options with respect to the sale of the retail stores and the Direct Business Platform.  It

was ultimately concluded that the Debtors' stores could not sustain continued operations and were not saleable as going concerns and therefore, it was in the best interests of the Debtors and their stakeholders to close their retail stores and liquidate all Store Inventory.  Separately, the Debtors also explored a potential sale with respect to the Direct Business Platform, but, with the exception of inquiries the Debtors received with respect to the designation of rights to intellectual property, the Direct Business Platform did not generate much interest from the market.

8.      Thus, the Debtors, with input from their financial advisor and, based on the results of efforts by their investment banker to obtain "going concern" transactions that included the Debtors' retail stores as well as obtaining additional financing, determined that conducting Store Closing Sales by one or more experienced and reputable liquidators would achieve the maximum values for the Total Inventory and would minimize administrative expenses.  Given the breadth of the Store Closing Sales and the need to obtain maximum value for the inventory, and to do so during the holiday season, the Debtors determined that the use of an outside liquidator would provide the highest and best value for the Total Inventory for the Debtors' creditors.  As described in further detail below, the Debtors initially negotiated with potential bidders with respect to the liquidation of Store Inventory and Direct Inventory separately.

9.      The Debtors also determined that it was critical to commence the Store Closing Sales as soon as possible to take advantage of the upcoming holiday shopping season in order to maximize the guaranteed recovery that the Debtors would receive from the Liquidating Agent for the Store Inventory.  In addition, the sooner the Debtors commenced liquidating the Store Inventory, the sooner they would be able to reject the corresponding leases at the Closing Stores,

eliminating significant expenses, and in turn maximizing value and possibly providing some

recovery to their unsecured creditors.

10.     The Debtors have consulted with Salus Capital Partners, LLC ("Salus"), as

administrative and collateral agent and as lender, and together with the lenders that are from time

to time a party (the "Lenders") under that certain Credit Agreement, dated June 14, 2013 (the

"Credit Agreement") with respect to the decision to conduct Store Closing Sales.  With the

exception of certain assets located in three stores which are allegedly subject to a pre-existing

lien held by the Pyramid Lessors (as defined below), in which Salus holds a second lien, Salus

holds a first lien on substantially all of the remaining assets of the Debtors.

**THE SOLICITATION PROCESS AND ENTRY INTO THE AGENCY AGREEMENT**

11.     In order to maximize the value of the Total Inventory and to efficiently and

effectively liquidate such merchandise, the Debtors determined it was in their best interests to

retain a professional liquidating agent.  Accordingly, prior to the Petition Date, the Debtors and

their advisors engaged in a strategic process to solicit bids to select a liquidation agent to sell the

Store Inventory and/or the Direct Inventory.

12.     To do so, the Debtors through their advisors began contacting the nation's largest

liquidation firms to gauge interest in a process to solicit bids to conduct Store Closing Sales.  In

mid-November, the Debtors concluded that the possibility of a going concern sale was no longer

likely to occur.  On November 25, 2014, the Debtors through their advisors transmitted bid

solicitation packages containing a draft of the Agency Agreement and a bid solicitation letter

informing parties of the Debtors' intentions to conduct Store Closing Sales and setting forth clear

procedures for parties to request more information and to submit bids.  Out of the parties

contacted, the Debtors received three bids.  The Debtors scheduled the auction (the "Auction") to

commence on December 2, 2014 at 1:00 p.m. (Eastern).  A copy of the transcript from the

Auction is attached hereto as <u>Exhibit C</u> (the "<u>Auction Transcript</u>").

13.     Based on the differences in the bids, the Debtors commenced negotiations with

the parties regarding their bids on December 2, 2014 and conducted those negotiations until near

midnight.  Initially, negotiations with bidders involved primarily the conduct of the sale of Store

Inventory through the Closing Stores, with the option to elect to include the sale of the Direct

Inventory through the Direct Business Platform, which option was to be exercised on or before

December 12, 2014.

14.     These negotiations resulted in the Agency Agreement that was circulated to the

other bidders to commence the Auction.  Based on its review, one bidder dropped out of the

process.  Notwithstanding the fact that the bidder had dropped out before the commencement of

the Auction, the negotiated Agency Agreement was circulated to them and they were invited to

participate in the Auction.  With respect to the other bidder, the Debtors and their advisors

responded to their questions.  It was ultimately determined that the Auction would be adjourned

until December 3, 2014 at 9:30 a.m. (Eastern), providing the potential other bidder with time to

determine whether to bid.  On the morning of December 3, 2014, after further information was

circulated and questions answered, the Debtors commenced the Auction.

15.     As evidenced by the Auction Transcript, the Debtors solicited bids for the Total

Inventory.  Ultimately, the highest bid for the Store Inventory was $.80 of the cost value of the

merchandise.  In that same bid the Debtors only received a bid of $.85 for all of the Total

Inventory.  Believing they might obtain higher bids, the Debtors requested bidders to submit a

bid on Total Inventory without a back-up bid on Store Inventory.  After meeting with both

bidders, the Debtors received a bid of $.91 with such bid including, among other things, a sale of

(i) certain of the Debtors' Owned FF&E, and (ii) designation rights with respect to the Debtors'

intellectual property.  The Debtor announced that bid on the record of the Auction as the highest

and best bid based on the value received.  The Auction concluded.  Subsequently, the Successful

Bidder agreed to provide the Debtors with 25% of the net recovery from any sale of the

intellectual property in excess of $2,000,000, and on December 4, 2014, the Debtors entered into

the Agency Agreement.

16.     The Agency Agreement has been shared with Salus, who has provided comments

to the Agency Agreement and has been fully informed about the Debtors' solicitation efforts and

the economics of the Agency Agreement.

## THE AGENCY AGREEMENT

17.     The pertinent terms of the Agency Agreement are set forth below for summary

and notice purposes only.  To the extent any terms are inconsistent with the Agency Agreement,

the Agency Agreement controls.[3]

| Merchandise: | "Merchandise" as defined in the Agency Agreement, means all new, first quality (other than as expressly set forth below), finished goods inventory that is owned by Merchant and customarily sold to customers in the ordinary course of Merchant's business, including, but not limited to, (i) Merchandise subject to Gross Rings; (ii) Merchandise located in the Stores on the Sale Commencement Date (other than Direct Business Merchandise); (iii) Direct Business Merchandise; (iv) Distribution Center Merchandise received in the Stores on or before the date that is twenty-one (21) days after Agent's delivery of the Merchandise Allocation to Merchant (the "Receipt Deadline"); (v) In-Transit Merchandise received at the Stores on or before the Receipt Deadline, (vi) Aged Merchandise; (vii) Defective Merchandise (to the extent Merchant and Agent can mutually agree on the Cost Value applicable thereto). Notwithstanding the foregoing, "Merchandise" shall not include (i) goods that belong to sublessees, licensees, or |

---

[3] Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to them in the Agency Agreement annexed to the proposed Interim Order as Exhibit 1.

| | |
|---|---|
| | concessionaires of Merchant; (ii) goods held by Merchant on memo, on consignment, or as bailee; (iii) Excluded Defective Merchandise; (iv) Additional Agent Merchandise; and (v) furnishings, trade fixtures furniture, and equipment and improvements to real property that are located in the Closing Locations or the corporate offices; (vi) if applicable, Distribution Center Merchandise that is not received at the Stores on or before the Receipt Deadline; and/or (vii) In-Transit Merchandise that is not received at the Stores on or before to the Receipt Deadline. |
| **Additional Agent Merchandise** | The Agent shall have the right to include Additional Agent Merchandise (of like, kind and quality as currently being sold by the Debtor, the substantial majority of which to be acquired from the Debtor's existing vendors.   The costs of the such Additional Agent Merchandise shall be an Expense of the Sale, and the proceeds from the sale of the Additional Agent Merchandise shall constitute "Proceeds" and shall be retained by the Agent. |
| **Guaranteed Amount:** | Provided the Approval Order is entered no later than December 24, 2014, as a guaranty of Agent's performance hereunder, in addition to the payment of Expenses (as provided for in Section 4.1 hereof), Agent guarantees that Merchant shall receive an amount (the "Guaranteed Amount") equal to ninety-one percent (91%) (the "Guaranty Percentage") of the aggregate Cost Value of Merchandise (including the Direct Business Merchandise) included in the Sale.  The Guaranteed Amount will decrease daily in accordance with the Agency Agreement if the Interim Order is not entered by December 12, 2014. |
| **Sale of Owned FF&E:** | In partial consideration, and as a material component of the payment of the Guaranteed Amount, with respect to any furniture, fixtures and equipment (including, but not limited to (i) machinery, rolling stock, office equipment, computers, servers, and hardware used or utilized in connection with or associated with the Direct Business Platform, and personal property owned by Merchant and located at the Stores or Merchant's corporate offices and, solely with respect to computers, servers, and hardware used or utilized in connection with or associated with the Direct Business Platform, at the Distribution Centers; and (ii) such other items in the file entitled "FF&E Assets" provided by Merchant to Agent (exclusive in all instances of Owned DC FF&E referenced in such file (collectively, the "Owned FF&E"), Agent shall have the sole and exclusive right to sell the Owned FF&E for Agent's sole and exclusive benefit and at Agent's sole cost and expense (other than rent and other occupancy expenses associated with the corporate office, which amounts shall be paid by Merchant); provided, further, that, in that regard, Agent shall be entitled to retain all proceeds (which for the avoidance |

| | |
|---|---|
| | of doubt shall not constitute Proceeds or Asset Proceeds) from the sale or other disposition of the Owned FF&E, and Agent shall be responsible for the payment of all costs and expenses associated with the sale or other disposition of the Owned FF&E (other than rent and other occupancy expenses associated with the corporate office, which amounts shall be paid by Merchant). |
| **Expenses of Sale:** | Subject to the entry of the Approval Order by December 24, 2014, the Agent shall be unconditionally responsible for all Expenses in accordance with Section 4.2 of the Agency Agreement.  Effective from and after the Payment Date, Agent shall be obligated to pre-fund (i) any payroll related expenses consistent with Merchant's customary payroll funding practices and timing; and (ii) Occupancy Expenses for the Stores weekly in advance. |
| **Inventory Taking:** | Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU level and Retail Price physical inventory of the Merchandise located in the Stores and shall count the Distribution Centers in accordance with the Agency Agreement (collectively, the "Inventory Taking"). |
| **Sale Term:** | The Sale commenced on December 4, 2014 (the "Sale Commencement Date"). Agent shall complete the Sale and vacate the premises of each Store and the Direct Business Platform in favor of Merchant or its representative or assignee on or before the date that is the earlier of (i) April 15, 2015; and (ii) the date that is 120 twenty days after entry of an order for relief in Merchant's bankruptcy case (the earlier of (i) and (ii), the "Sale Termination Date"). The period beginning on the Sale Commencement Date through and including the Sale Termination Date shall be referred to herein as the "Sale Term".  The Sale Termination Date as to any Store or Distribution Center may be (a) extended by mutual written agreement of Agent and Merchant, in consultation with the Lender or (b) accelerated by Agent, in which case Agent shall provide Merchant and the Lender with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date (each such notice being a "Vacate Notice"). If Agent fails to provide Merchant and the Lender with timely notice of an acceleration of the Sale Termination Date for a Store, Agent shall be liable for and shall pay any Occupancy Expenses resulting from such untimely notice. |
| **Sale Guidelines:** | The Sale Guidelines are attached to the Agency Agreement as Exhibit 8.1. |
| **Merchandise Returns** | During the first thirty (30) days of the Sale, Agent shall accept returns of Merchandise sold by Merchant prior to the Sale Commencement Date in accordance with Merchant's return |

| | policies in effect at the time of purchase (to the extent presented in accordance with the foregoing terms, each such item being defined herein as "Returned Merchandise"). Merchant shall reimburse Agent in cash or credit against the following week's payment for the amount of any store credit or refund given to any customer in respect of Returned Merchandise. |
|---|---|
| **Gift Cards** | During the period between the Sale Commencement Date and the date that is thirty (30) days after entry of the Approval Order, Agent shall accept Merchant's gift cards, gift certificates, merchandise credits and other similar Merchant-issued credits, if any. Merchant shall reimburse Agent in cash for gift card, gift certificate, merchandise credit, and other similar Merchant issued credit amounts redeemed during the Sale Term as part of the weekly sale reconciliation provided for in the Agency Agreement. |
| **Letter of Credit/Security Interests** | To secure payment of the balance of any unpaid portion of the Guaranteed Amount, Expenses and other amounts due to Merchant hereunder, on the first business day following the entry of the Interim Approval Order, Agent shall deliver to Lender, as Merchant's designee, an irrevocable standby letter of credit, substantially in the form of Exhibit 3.3(h) to the Agency Agreement, in an original stated amount equal to the aggregate of (x) twenty percent (20%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course as of the date immediately preceding the Payment Date), and (y) three (3) weeks' estimated Expenses (the "Letter of Credit"). The Letter of Credit shall name Merchant as beneficiary. |

The Debtors believe that the terms of the Agency Agreement are typical, customary and reasonable under the circumstances in the exercise of their prudent business judgment.

**BASIS FOR RELIEF**

**A.    ASSUMPTION OF THE AGENCY AGREEMENT IS AUTHORIZED UNDER SECTION 365 OF THE BANKRUPTCY CODE AND IS AN EXERCISE OF THE DEBTORS' SOUND BUSINESS JUDGMENT.**

18.    Section 365 of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).

19.     In determining whether an executory contract or unexpired lease should be assumed, courts apply the "business judgment" test.  NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993); Control Data Corp. v. Zelman (In re Minges), 602 F.2d 38, 43 (2d Cir. 1979).  Under this test, a court should approve the assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor exercised its sound business judgment in determining that assumption of the agreement is in the best interests of its estate.

20.     The Debtors believe, in the exercise of their business judgment, that assumption of the Agency Agreement is in the best interests of their estates because it will allow the Debtors to continue to conduct the Store Closing Sales as presently being conducted in the Closing Stores, and upon entry of the Interim Order and Final Order by the targeted deadlines set forth in the Agency Agreement, the larger Guaranteed Amount will be payable to the Debtors by the Liquidating Agent.  The Debtors, in consultation with their advisors and key constituents, having determined that there was no viable going concern buyer, further determined that in order to maximize what it would be receiving for Store Inventory (and Direct Inventory), the Store Closing Sales had to commence immediately in order to take advantage of the critically short holiday season.

21.     Not taking advantage of the holiday season and waiting until January to begin the Store Closing Sales would have resulted in a significantly reduced recovery to the Debtors for the Total Inventory.  Furthermore, the Liquidating Agent has agreed to a Guaranteed Amount of 91% of the cost value of the Total Inventory to be sold which is based on the amount of inventory.  The sooner the Debtors are able to assume the Agency Agreement, the larger the Guaranteed Amount will be payable to the Debtors by the Liquidating Agent.

22.     Moreover, the Auction, through its competitive bidding process, ensured that the Liquidating Agent was chosen in good faith and that the terms and conditions of the Agency Agreement are fair and reasonable and represent the highest and best offer for the Total Inventory.  In light of the foregoing, the Debtors submit that the assumption of the Agency Agreement represents a reasonable exercise of the Debtors' business judgment, is in the best interest of their estates, and should be approved.

23.     As of the Petition Date, the Debtors do not have any defaults to cure under section 365(b) of the Bankruptcy Code.

**B.     APPROVAL OF STORE CLOSINGS AND STORE CLOSING SALES UNDER SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE IS WARRANTED.**

24.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . ."  11 U.S.C. § 363(b)(1); see also In re Ames Dept. Stores, Inc. (Ames I), 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that "going-out-of-business" sales are governed by section 363(b)).  Moreover, section 105(a) of the Bankruptcy Code provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

25.     The decision to sell assets outside the ordinary course of business is based upon the sound business judgment of the debtor.  See, e.g., In re Chateaugay Corp., 973 F.2d 141, 145 (2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (stating

"the business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company," and has continued applicability in bankruptcy ) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).

26.    Ample business justification exists in this case to approve the Debtors' closing of their retail store locations and conducting, through the Liquidating Agent, the proposed Store Closing Sales for the sale of Total Inventory, Owned FF&E and intellectual property.  As stated above, the Debtors, in consultation with their advisors and their key constituents, concluded that it was in the best interests of the Debtors and their stakeholders conduct store closures and going out of business sales because neither the Direct Business Platform nor the Closing Stores could sustain continued operations and were not saleable as going concerns.  The Debtors also determined that time is of the essence to preserve and maximize the value of the Debtors' assets, especially in light of the upcoming holiday season, and to minimize the Debtors' expenses.  The realization of value for these assets as promptly as possible will inure to the benefit of all parties in interest.

27.    Store closing or liquidation sales are a routine occurrence in Chapter 11 cases involving retail debtors.  See Ames Dept. Stores, Inc. (Ames I), 136 B.R. at 359) (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring [a] debtor to maximize estate assets"); see also In re Ames Dept. Stores, Inc. (Ames II), Case No. 01-42217 (REG) (Bankr. S.D.N.Y. Aug. 20, 2001) (approving store closing sales and agency agreement on first day).  Bankruptcy Courts have approved similar requests by debtors to conduct store closing sales, finding the debtors' requested relief consistent with applicable

provisions of the Bankruptcy Code.  See, e.g., In re Linens Holding Co., Case No. 08-10832

(Bankr. D. Del. May 30, 2008) (approving store closing sales of certain closing locations),

(Bankr. Del. Oct. 16, 2008) (approving store closing sales for all remaining store locations); In re

Blockbuster Inc., Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011) (authorizing

debtors to continue self-administered going out of business sales); In re Steve & Barry's

Manhattan LLC, Ch. 11 Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008)

(authorizing store closing sales and related relief).

28.     Accordingly, the Debtors, in the sound exercise of their business judgment, and in

consultation with their advisors, have determined that it is in the best interests of their estates and

creditors to conduct store closures and, through the Liquidating Agent, sell the Total Inventory in

the Store Closing Sales.  Based on the applicable precedent, the Court should authorize the

Debtors to do so immediately upon entry of the Interim Order to enable the estates to recover as

much as possible from the Store Closing Sales.

**C.     ASSETS SHOULD BE SOLD FREE AND CLEAR OF LIENS, CLAIMS AND
        ENCUMBRANCES.**

29.     The Debtors request approval to sell assets, through their Liquidating Agent,

subject to the Agency Agreement on a final "as is" basis, free and clear of any and all liens,

claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code.  A debtor

in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest

in such property of an entity other than the estate" if any one of the following conditions is

satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear
  of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is a *bona fide* dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)(5); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since Section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).

30.    As an initial matter, Salus, the Debtors' DIP Lender, has consented to the Store Closing Sales, and particularly, to the sale of the Total Inventory and Owned FF&E free and clear of liens, claims and encumbrances, with all such obligations to attach to the proceeds of the Store Closing Sales with the same validity, and priority that such liens, claims, encumbrances, or interests had against the assets.  Salus' agreement is subject in all respects to the Liquidating Agent's performance of its obligations under the Agency Agreement.

31.    Other than the liens granted to the DIP Lender, the only other entities that may have liens on the Total Inventory that will be liquidated through the Store Closing Sale pursuant to the Agency Agreement are allegedly liens held by Holyoke Mall Company LP, Eklecco Newco LLC, and Pyramid Walden Company, L.P. (collectively, the "Pyramid Lessors") who may have a first lien on all of the inventory and merchandise in the three store locations that they rent to the Debtors.  The Debtors are not aware of any other liens relating to the Total Inventory that will be liquidated through the Store Closing Sales.

32.    Furthermore, parties in interest will have received notice of the Motion and will be given sufficient opportunity to object to the relief requested.  Any such entity that does not object to the sale will be deemed to have consented.  See Hargrave v. Township of Pemberton

(In re Tabone, Inc.), 175 B.R. 855, 858 (Bank. D.N.J. 1994) (finding that failure to object to sale

after receiving notice of such sale constitutes consent and satisfies section 363(f)); Elliot, 94 B.R.

at 345 (same); see also In re Enron Corp., No. 01-16034, 2003 WL 21755006, at *2 (Bankr.

S.D.N.Y. July 28, 2003) (order deeming all parties who did not object to proposed sale to have

consented under section 363(f)(2)).  As such, to the extent that no party holding a lien objects to

the relief requested by this Motion, the sale of the purchased assets free and clear of all liens,

claims, and encumbrances satisfies section 363(f)(2) of the Bankruptcy Code.  In any event, all

liens on the Total Inventory will attach to the proceeds with the same validity and priority that

such liens had against such assets.

33.     Accordingly, the Debtors submit that the Court should authorize the Debtors to

sell their assets, namely the Total Inventory, intellectual property and Owned FF&E at the

Closing Stores and corporate offices, through the Liquidating Agent, in connection with the

Store Closing Sales free and clear of any liens, claims, encumbrances, or other interests that may

exist, with all obligations of any lienholder to attach to the Guaranteed Amount and other

amounts paid to the Liquidating Agent under the Agency Agreement with the same validity, and

priority that such liens, claims, encumbrances, or interests had against the assets.

## D.     THE LIQUIDATING AGENT AND ANY DESIGNEE SHOULD BE AFFORDED ALL PROTECTIONS UNDER SECTION 363(M) OF THE BANKRUPTCY CODE.

34.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest

in property purchased from the debtor notwithstanding that authorization of the sale conducted

under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m)

provides, in relevant part, as follows:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] . . . does not affect the validity of a sale . . . to an

> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale or lease were stayed pending appeal.

Section 363(m) "reflects the . . . 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147 (3d Cir. 1986) (quoting Hoese Corp. v. Vetter Corp. (In re Vetter Corp.), 724 F.2d 52, 55 (7th Cir. 1983)). See also United States v. Salerno, 932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m) furthers the policy of finality in bankruptcy sales and "assists bankruptcy courts in maximizing the price for assets sold in such proceedings"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) (same).

35.      As discussed above, the selection of the Liquidating Agent, sale of the designation rights to the Agent, and the terms and conditions of the Agency Agreement was the product of arm's length, good faith negotiations after an extensive and highly competitive bidding process. Based on the foregoing, the Debtors request that the Court determine that the Liquidating Agent (and, upon entry of the Final Order, any designee of the intellectual property), is a good faith purchaser entitled to protections of section 363(m) of the Bankruptcy Code.

**E.      THE DESIGNATION OF INTELLECTUAL PROPERTY REQUIRES THE APPOINTMENT OF A CONSUMER PRIVACY OMBUDSMAN.**

36.      Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or lease personally identifiable information unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman (an "Ombudsman") pursuant to section 332 of the Bankruptcy Code.  Section 332 of the Bankruptcy Code provides, in part, that

> If a hearing is required under section 363(b)(1)(B), the court shall
> order the United States trustee to appoint, not later than 7 days
> before the commencement of the hearing, 1 disinterested person . .
> . to serve as the consumer privacy ombudsman in the case . . . .

37. Section 332(b) further provides that the consumer privacy ombudsman may appear and be heard at such hearing and "shall provide to the court information to assist the court in its consideration of the facts and circumstances, and conditions of the sale of the personally identifiable information." 11 U.S.C. § 332(b).

38. Here, under the Agency Agreement, the Debtors are transferring "Customer Lists" (as defined in the Agency Agreement), which contain personally identifiable information. The Debtors have been in contact with the U.S. Trustee prior to the filing of the Motion and have requested the immediate appointment of an Ombudsman. Therefore, the Court should order the U.S. Trustee to appoint an Ombudsman.

**F.     THE COURT SHOULD INVALIDATE ANY CONTRACTUAL RESTRICTIONS THAT MAY IMPAIR THE DEBTORS' ABILITY TO CONDUCT STORE CLOSING SALES.**

39. The Debtors respectfully request a waiver of any contractual restrictions (the "Contractual Restrictions") that could otherwise inhibit or prevent the Debtors' ability to maximize recovery through the Store Closing Sales. The Closing Stores are located on properties that are leased by the Debtors. In certain cases, the contemplated Store Closing Sales may be inconsistent with certain provisions of leases, subleases or other documents with respect to any such leased premises, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go-dark" provisions and landlord recapture rights), or other similar documents or provisions.

40. Store closing or liquidation sales are a routine part of chapter 11 cases involving retail debtors. Such sales are consistently approved by courts, despite provisions of recorded documents or agreements purporting to forbid such sales. Indeed, courts in this district and others have deemed such restrictive contractual provisions unenforceable in other chapter 11

cases as impermissible restraints on a debtor's ability to maximize the value of its assets under

section 363 of the Bankruptcy Code.  See In re Blockbuster Inc., Case No. 10-14997 (BRL)

(Bankr. S.D.N.Y. Jan. 20, 2011) (any restrictions in leases or comparable documents purporting

to limit the debtors' ability to conduct store closing sales are unenforceable); In re Bradlees

Stores, Inc., Case No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan. 4, 2001) (authorizing debtors to

conduct "going out of business" sales notwithstanding restrictive lease provisions restricting

debtors' ability to conduct such sales); In re R.H. Macy & Co., 170 B.R. 69, 77 (Bankr. S.D.N.Y.

1994) (finding anti-store closing sale covenant in lease unenforceable against debtor "because it

conflicts with the debtor's fiduciary duty to maximize estate assets").

41.    Based on well-established precedent, the Court should ensure that no Contractual

Restriction is an impediment to the Store Closing Sales, the closing of the Stores, or the activities

in connection therewith.  To the extent such Contractual Restrictions exist, they should not be

permitted to interfere with, or otherwise restrict, the Debtors from conducting Store Closing

Sales or the closing of any Stores.

## G.    THE DEBTORS SHOULD BE EXEMPT FROM CERTAIN FEDERAL, STATE, AND LOCAL LAWS, STATUTES, RULES AND ORDINANCES RELATED TO WAGE REQUIREMENTS, STORE CLOSING AND LIQUIDATION SALES.

42.    Many states in which the Debtors operate have laws and regulations that require

the Debtors to pay an employee substantially contemporaneously with his or her termination.  In

many cases, these laws require the payment to occur either immediately or within a period of

only a few days from the date such employee is terminated.  The nature of the Store Closing

Sales contemplated by this Motion will result in a substantial number of employees being

terminated during the Store Closing Sales.  The Debtors' payroll systems will likely be unable to

process the payroll information associated with these terminations in a manner that will be compliant with these state laws and regulations.

43.    While the Debtors intend to pay their terminated employees as expeditiously as possible, the requirements imposed by these state laws and regulations are unworkable in light of these extraordinary circumstances.  If the Debtors are required to comply with these state laws and regulations, their efforts to wind down their operations and mitigate unnecessary payroll costs will be hampered.  Indeed, if forced to comply, the Debtors will face the choice of (a) having to incur the costs of keeping employees employed after the conclusion of the Store Closing Sales while payroll is being prepared, or (b) staging terminations to the detriment of the Debtors' estates.  Both of these options will provide no benefit to the Debtors' estates and will only increase the administrative costs of conducting the Store Closing Sales.  Accordingly, the Debtors respectfully submit that in this instance, the Wage Requirements are at odds with the underlying policies of the Bankruptcy Code and therefore the Debtors should be granted relief from these requirements.  See In re Linens Holding Co., Case No. 08-10832 (Bankr. D. Del. Oct. 28, 2008) (waiving "fast pay" laws and regulations in connection with approval of store closing sales).

44.    Moreover, certain states in which the Closing Stores are located have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) state, and local laws, statutes, rules, regulations, and ordinances related to store closings and liquidation sales, establishing licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions and augmentation limitations that would otherwise apply to the Store Closing Sales, or consumer fraud laws, with the exception of deceptive advertising laws (the "Liquidation Sale Laws").

Typical statutes and regulations provide that if a liquidation or bankruptcy sale is court authorized, then a company need not comply with these Liquidation Sale Laws.  Moreover, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Store Closing Sales to proceed notwithstanding contrary Liquidation Sale Laws.

45.    Accordingly, the Debtors request that, pursuant to section 105(a) of the Bankruptcy Code, this Court authorize the Debtors to conduct the Store Closing Sales without the necessity of, and the delay associated with, complying with the Liquidation Sale Laws.

46.    This Court will be able to supervise the Store Closing Sales because the Debtors and their assets are subject to this Court's exclusive jurisdiction.  *See* 28 U.S.C. § 1334.  The Store Closing Sales are legitimate methods by which the Debtors can maximize the return from the sale of the merchandise for the benefit of the Debtors and their estate.  Further, creditors and the public interest are adequately protected by the notice of this Motion and the ongoing jurisdiction and supervision of this Court.

47.    Moreover, 28 U.S.C. § 959, which requires trustees (and, thus, debtors in possession) to comply with state and other laws in performance of their duties, does not apply to the Store Closing Sales.  Courts have held that 28 U.S.C. § 959 does not apply to debtors or their agents when they are liquidating assets.  See e.g., In re Borne Chemical Co., 54 B.R. 126, 135 (Bankr. D.N.J. 1984) (holding that 28 U.S.C. § 959(b) is only applicable when property is being managed or operated for the purpose of continuing operations).

48.    Even if a state or local law does not expressly except bankruptcy sales from its ambit, the Debtors submit that, to the extent that such state or local law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution.  To hold otherwise would severely impair the relief otherwise available under section 363 of the

Bankruptcy Code. Consistent with this premise, bankruptcy courts have recognized that federal bankruptcy laws preempt state and local laws that contravene the underlying policies of the Bankruptcy Code. See e.g., Belculfine v. Aloe (In re Shenango Grp., Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . [A] state statute [ ] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."). While preemption of state law is not always appropriate, as when the protection of public health and safety is involved, see Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake), 35 F.3d 1348, 1353-54 (9th Cir. 1994) (finding no preemption when state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate when, as here, the only state laws involved concern economic regulation. Id. at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

49.    Here, section 363 of the Bankruptcy Code, which requires the Debtors to operate their business in a way that maximizes recoveries for creditors, will be undermined if the Court does not provide for the waiver of Liquidation Sale Laws because Liquidation Sale Laws may constrain the Debtors' ability to marshal and maximize assets for the benefit of its estate. Similar relief has been granted in bankruptcy cases in this district. See In re Blockbuster Inc., Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011) (authorizing the debtors to conduct store closing sales notwithstanding federal, state, and local laws governing the conduct of store closing and liquidation sales); In re Finlay Enters., Inc., Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 25, 2009) (authorizing debtors to conduct "going out of business" sales "without the necessity of compliance" with certain "going out of business" laws); In re Steve & Barry's

Manhattan LLC, Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008) (authorizing store closing sales without requiring compliance with laws affecting store closing or liquidation sales).

50.    Importantly, given the supervision of this Court, the requested waiver will not unduly undermine state and local requirements that otherwise would apply to the Store Closing Sales.  The Debtors only request that this Court authorize the Debtors to conduct the Store Closing Stores without the necessity of, and the delay associated with, obtaining various state licenses or permits, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising, conducting such transactions as store closings or similar type sales, or transferring merchandise to or between the closing locations. The Debtors fully intend to be bound by and comply with remaining statutes and regulations, such as environment, health, and safety laws.

51.    The Debtors also request that no other person or entity, including (but not limited to) any lessor or federal, state, or local agency, department, or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales or the advertising and promotion (including through the posting of signs) of Store Closing Sales.

## H.    THE DEBTORS SHOULD BE GRANTED AUTHORITY TO ABANDON UNSOLD PROPERTY FOLLOWING STORE CLOSING SALES.

52.    Section 554(a) of the Bankruptcy Code provides that after notice and a hearing, the trustee, and therefore the debtor in possession, "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  See Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir. 1974) (a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim"); In re Grossinger's Assoc., 184 B.R. 429, 432 (Bankr. S.D.N.Y. 1995).

53.     To the extent that the Liquidating Agent does not sell any remaining Total
Inventory or Owned FF&E upon the conclusion of the Store Closing Sales, the Debtors request
that they be authorized to abandon same without incurring liability to any person or entity.  The
Debtors submit that if they are unable to sell or dispose of any such assets following the Store
Closing sales, it would be costly and burdensome to the estate to retain them.

54.     In the event of such abandonment, the Debtors request that the applicable landlord
be authorized to dispose of such property without any liability to any individual or entity that
may claim an interest in such abandoned property and that such abandonment be without
prejudice to any landlord's right to assert any claims based on such abandonment and without
prejudice to right of the Debtors or other party-in-interest to object thereto.

55.     Notwithstanding the foregoing, the Debtors will utilize all commercially
reasonable efforts to remove or cause to be removed any confidential or personal identifying
information (which means information which alone or in conjunction with other information
identifies an individual, including, but not limited to, an individual's name, social security
number, date of birth, government-issued identification number, account number, and credit or
debit card number) in any of the Debtors' hardware, software, computers or cash registers or
similar equipment that are to be sold or abandoned.

## THE NEED FOR EXPEDITED RELIEF

56.     The Debtors respectfully request that the Court hold an expedited hearing on this
Motion and grant related relief.  Expediency is warranted in this case because the Debtors will
realize greater benefits under the Agency Agreement if the Interim Order is entered immediately
and by no later than December 12, 2014, authorizing the Store Closing Sales.  Pursuant to
Schedule 3.1(a) of the Agency Agreement, if the Interim Order is not entered by December 12,

2014, for every day that the Interim Order is not entered, the Guaranteed Amount payable to the Debtors is reduced by 1%-1.5% on a daily basis. If the Interim Order is not entered by December 24, 2014, the cumulative reduction in the Guaranteed Amount is 16%. This means that unsecured creditors, who are currently projected to receive a recovery if the Interim Order is entered by December 12, 2014, would not receive anything.

57.     Moreover, any delay in the liquidation of the Total Inventory will decrease value because the Guaranteed Amount payable to the Debtors assumes a minimum level of Total Inventory. If the level of Total Inventory drops below such minimum, the Guaranty Percentage will be reduced as to all inventory. Because the Debtors' inventory levels will decline with every day that the Store Closing Sales are postponed, it is important that the Debtors be authorized to conduct its Store Closing Sales as expeditiously as possible to ensure that the Debtors receive the full value of their bargain and maximize the estate assets available for distribution to the Debtors' creditors.

58.     Although the Debtors anticipate access to the proceeds of the loan from the DIP Lender, the proceeds of the Agency Agreement will provide the Debtors with additional liquidity and flexibility. The earlier the Debtors obtain such liquidity, the better positioned the Debtors will be throughout the course of these Chapter 11 Cases.

## THE COURT SHOULD GRANT THE DEBTORS
## RELIEF FROM BANKRUPTCY RULE 6003

59.     Bankruptcy Rule 6003 provides that, to the extent the relief requested is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve "a motion to assume or assign an executory contract or unexpired lease in accordance with § 365" or "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate" prior to 21 days after the commencement date.

60.    As discussed more fully above, the Debtors and their estates and creditors will be
irreparably harmed if entry of the Interim Order is delayed for 21 days after the Petition Date.
The Debtors submit that Bankruptcy Rule 6003 has been satisfied and the relief requested herein
should be granted.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

61.    Pursuant to Bankruptcy Rule 6004(h), unless a court orders otherwise, all orders
authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are
automatically stayed for 14 days after entry of the order. Fed. R. Bankr. P. 6004(h).  The Debtors
request that any order authorizing the Store Closing Sales and approving the assumption of the
Agency Agreement be effective immediately by providing that the 14-day stay under Bankruptcy
Rule 6004(h) is waived.  As discussed above, the Liquidating Agent requires the ability to
commence the Store Closing Sales right away.  Moreover, the Debtors face severe prejudice each
day that the Closing Stores continue to operate, as those locations are unprofitable and drain
liquidity, and are being quickly depleted of inventory which will not be replenished.

62.    The Debtors submit that given the description of the Store Closing Sales provided
herein, the requirements of Rule 6004-1 of the Local Bankruptcy Rules of the Southern District
of New York (the "Local Rules") have been satisfied.  Alternatively, to the extent the Court finds
that the Debtors have not met any applicable provision of Local Rule 6004-1, the Debtors
respectfully request that the Court waive such requirement with respect to this Motion.

## NOTICE AND SCHEDULING OF FINAL HEARING

63.    No trustee, examiner or official committee of unsecured creditors has been
appointed in these Chapter 11 Cases.  Notice of this Motion has been given to:  (i) the Office of
the United States Trustee for the Southern District of New York; (ii) counsel to Salus Capital

Partners, LLC, as the administrative agent under the Debtors' prepetition credit facility;

(iii) counsel to General Electric Capital Corporation as the issuer of the prepetition letter of

credit agreement; (iv) the parties included on the Debtors' consolidated list of fifty (50) largest

unsecured creditors; (v) the Internal Revenue Service; (vi) the United States Attorney for the

Southern District of New York; (vii) the U.S. Securities and Exchange Commission; (viii) all

parties who are known to assert a security interest, lien, or claim in any of the Total Inventory,

including the Pyramid Lessors; (ix) all the Debtors' landlords; (x) all applicable federal, state,

and local taxing authorities; (xi) all applicable county and state consumer protection agencies;

(xii) all applicable state attorneys general; and (xiii) any such other party entitled to notice

pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(b) (the "Notice Parties").  The

Debtors submit that no other or further notice need be given.

64.     The Debtors further respectfully request that the Court schedule the Final Hearing

on the Motion on or before December 24, 2014 and authorize them to mail copies of the signed

Interim Order, which fixes the time, date and manner for the filing of objections, to the Notice

Parties.  Under the Agency Agreement, the Final Order must be entered on or prior to December

24, 2014 in order for the Debtors to receive the Guaranteed Amount.  The Debtors thus request

that the Court consider such notice of the Final Hearing to be sufficient notice.

## NO PRIOR REQUEST

65.     No previous request for the relief sought herein has been made to this or any other

Court.

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested

in the Motion and such other and further relief as may be just and proper.


Dated:  New York, New York
       December 7, 2014

_/s/ Gregg M. Galardi_

Gregg M. Galardi
Dienna Corrado
Arkady A. Goldinstein
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501

_Proposed Counsel for the Debtors and Debtors_
_in Possession_

**EXHIBIT A**

**Proposed Interim Order**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| dELiA*s, INC., *et al.*, | Case No. 14- ___ (___) |
| Debtors.[1] | Joint Administration Requested |

**INTERIM ORDER (A) (I) APPROVING THE DEBTORS' ASSUMPTION OF AGENCY AGREEMENT, (II) AUTHORIZING THE DEBTORS TO SELL CERTAIN ASSETS THROUGH STORE CLOSING SALES, (III) AUTHORIZING THE DEBTORS TO ABANDON UNSOLD PROPERTY, (IV) WAIVING COMPLIANCE WITH CONTRACTUAL STORE CLOSING SALE RESTRICTIONS AND EXEMPTING THE DEBTORS FROM STATE AND LOCAL WAGE REQUIREMENTS AND LAWS RESTRICTING STORE CLOSING SALES, (V) GRANTING RELATED RELIEF, AND (VI) SCHEDULING A FINAL HEARING**

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"); and it appearing that the relief requested is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion having been given and it appearing that no other notice need be given; and the Debtors and a joint venture composed of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (collectively, the "Agent") having agreed upon terms and conditions for the Agent to act as the Debtors' exclusive agent to conduct sales (the "Sale") of certain of the Debtors' assets,

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  dELiA*s, Inc. (7172); dELiA*s Distribution Company (9076); A Merchandise, LLC (7639); dELiA*s Operating Company (3765); dELiA*s Retail Company (0036); dELiA*s Group Inc. (4035); AMG Direct, LLC (9236); dELiA*s Assets Corp. (3754); DACCS, Inc. (0225).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  50 West 23rd Street, New York, NY 10010.

[2] All capitalized terms not otherwise defined in this Order have the meaning ascribed to them in the Motion or in the Agency Agreement.

including, without limitation, the Merchandise, the Assets, the Additional Agent Merchandise, the Merchant Consignment Goods, the designation rights described in Section 7.3 of the Agency Agreement (the "Designation Rights"), the Owned FF&E, and the Owned DC FF&E (all of the foregoing merchandise, assets, goods and rights, collectively, the "Transferred Assets"), which terms and conditions are set forth in that certain Agency Agreement, by and between the Agent and Debtors, an executed copy of which is attached hereto as Exhibit 1 (the "Agency Agreement"); and the Sale having commenced on or about December 4, 2014; and the Agency Agreement requiring its interim approval by the Court no later than December 12, 2014 to facilitate the conduct and advertising of the Sale; and the Court having scheduled a sale hearing to be held on _____, 201_ (the "Final Hearing") to consider the entry of a Order approving on a final basis the Agency Agreement and the Debtors' assumption thereof (a "Final Sale Order"); and the Court having held a hearing to consider approval of the Sale on an interim basis (the "Interim Hearing"); and appearances of all interested parties having been noted on the record of the Interim Hearing; and upon the First Day Declaration and the Diercks Declaration; and upon all of the proceedings had before the Court (including but not limited to the testimony and other evidence proffered or adduced at the Interim Hearing); and the Court having found and determined that the interim relief sought is in the best interests of the Debtors, their estates, their creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT**:[3]

A.    **Jurisdiction:**  This Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1134.  Approval of the Debtors' entry into the Agency Agreement, and the transactions contemplated thereby is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (D), (N) and (O).

B.    **Venue:**  Venue of these cases in this district is proper pursuant to 28 U.S.C. § 1409(a).

C.    **Statutory Predicates:**  The statutory predicates for the interim approval of the Sale as set forth in the Agency Agreement and transactions contemplated therein are sections 105, 363, 364, 365 and 554 of the Bankruptcy Code and Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

D.    **Notice:**  Proper, timely, adequate and sufficient notice of the Motion and the Interim Hearing has been provided in accordance with sections 102(1), 105(a), and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003 and 6004.  No other or further notice is required.

E.    **Opportunity to be Heard:**  A reasonable opportunity to object or be heard regarding the interim relief requested in the Motion and the transactions pursuant thereto has been afforded to all interested persons and entities, including, without limitation, the following: (i) the Office of the United States Trustee for the Southern District of New York; (ii) counsel to Salus Capital Partners, LLC, as the administrative agent under the Debtors' prepetition credit facility; (iii) counsel to General Electric Capital Corporation as the issuer of the prepetition letter

---

[3] The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

of credit agreement; (iv) the parties included on the Debtors' consolidated list of fifty (50) largest unsecured creditors; (v) the Internal Revenue Service; (vi) the United States Attorney for the Southern District of New York; (vii) the U.S. Securities and Exchange Commission; (viii) all parties who are known to assert a security interest, lien, or claim in any of the Total Inventory, including the Pyramid Lessors; (ix) all the Debtors' landlords; (x) all applicable federal, state, and local taxing authorities (the "Taxing Authorities"); (xi) all applicable county and state consumer protection agencies; (xii) all applicable state attorneys general; and (xiii) any such other party entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(b) ((i) through (xiii) collectively, the "Notice Parties").   Objections, if any, to the interim relief requested in the Motion have been withdrawn or resolved and, to the extent not withdrawn or resolved, are hereby overruled.

F.    **Marketing Process:**  As demonstrated by: (i) the First Day Declaration and the Diercks Declaration, (ii) the testimony and other evidence proffered or adduced at the Interim Hearing, and (iii) the representations of counsel made on the record at the Interim Hearing, the Debtors have thoroughly marketed the Transferred Assets and have conducted the bidding solicitation fairly, with adequate opportunity for parties that either expressed an interest in acquiring or liquidating the Transferred Assets, or who the Debtors believed may have had an interest in acquiring or liquidating the Transferred Assets and submitting a competing bid.  The Debtors and the Agent have respectively negotiated and undertaken their roles leading to the Sale and entry into the Agency Agreement in a diligent, noncollusive, fair and good faith manner.

G.    **Business Judgment:**   The Debtors' decision to (i) enter into the Agency Agreement, and (ii) perform under and make payments required by the Agency Agreement, in each case through the entry of the Final Sale Order, is a reasonable exercise of the Debtors'

sound business judgment consistent with their fiduciary duties and is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

H.     **Personally Identifiable Information:**   Upon the entry of this Interim Order, the transactions contemplated by the Agency Agreement shall not include the sale or lease of personally identifiable information, as defined in section 101(41A) of the Bankruptcy Code ("Personally Identifiable Information") (or assets containing personally identifiable information).

I.     **Time of the Essence:**   Time is of the essence in approving the continuation of the Sale through the date of the Final Hearing without interruption.   The Debtors' estates, creditors and interested parties will suffer immediate and irreparable harm if the relief requested in the Motion is not granted on an interim basis.   Based on the record of the Interim Hearing, and for the reasons stated on the record at the Interim Hearing, the Sale under the Agency Agreement must be approved on an interim basis on or before December 12, 2014 to maximize the value that the Agent may realize from the Sale and the value that the Debtors may realize from entering into the Agency Agreement.   Accordingly, (i) the requirements of Bankruptcy Rule 6003 are satisfied and granting the relief requested in the Motion on an interim basis is necessary to avoid immediate and irreparable harm; and (ii) cause exists to lift the stay under Bankruptcy Rules 4001(a) and 6004(h) and to permit the immediate effectiveness of this Order.

J.     **Sale Free and Clear:**   A sale of the Transferred Assets other than one free and clear of liens, claims, encumbrances, defenses (including, without limitation, rights of setoff and recoupment) and interests, including, without limitation, security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, liens, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or

domestic governmental entity, taxes (including foreign, state and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances") and without the protections of this Order would hinder the Debtors' ability to obtain the consideration provided for in the Agency Agreement and, thus, would impact materially and adversely the value that the Debtors' estates would be able to obtain for the sale of such Transferred Assets.  In addition, each entity with an Encumbrance upon the Transferred Assets, (i) has consented to the Sale or is deemed to have consented to the Sale, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Encumbrances who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Therefore, interim approval of the Agency Agreement and the continuation of the Sale free and clear of Encumbrances are appropriate pursuant to section 363(f) of the

Bankruptcy Code and are in the best interests of the Debtors' estates, their creditors and other parties in interest.

K.    **Arm's-length Sale:**  The consideration to be paid by the Agent under the Agency Agreement was negotiated at arm's-length.

L.    **Good Faith:**  The Debtors, their management and their board of directors, and the Agent, its members and its officers, directors, employees, agents and representatives, actively participated in the bidding process and acted in good faith.  The Agency Agreement between the Agent and the Debtors was negotiated and entered into based upon arm's length bargaining, without collusion or fraud, and in good faith as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code.  With respect to all Sales made and Expenses paid through the date of the Final Hearing, the Agent shall be protected by sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal.  The Debtors were free to deal with any other party interested in buying or selling on behalf of the Debtors' estate some or all of the Transferred Assets.  Neither the Debtors nor the Agent has engaged in any conduct that would cause or permit the Sale, the Agency Agreement, or any related action or the transactions contemplated thereby to be avoided under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) or 364(e) of the Bankruptcy Code.  The Agent has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  Specifically, the Agent has not acted in a collusive manner with any person and was not controlled by any agreement among bidders.  The Agent's prospective performance and payment of any amounts owing under the Agency Agreement are in good faith and for valid business purposes and uses.

7

M.      **Insider Status:**  The Agent is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.  No common identity of directors or controlling stockholders exists between the Agent and the Debtors.

N.      **Corporate Authority:**  The Debtors (i) have full corporate or other power to execute, deliver and perform their obligations under the Agency Agreement through the entry of a Final Sale Order and all other transactions contemplated thereby (including without limitation, reaching an agreement and resolution regarding the final reconciliation contemplated by the Agency Agreement), and entry into the Agency Agreement has been duly and validly authorized by all necessary corporate or similar action, (ii) have all of the corporate or other power and authority necessary to consummate the transactions contemplated by the Agency Agreement, and (iii) have taken all actions necessary to authorize and approve the Agency Agreement and the transactions contemplated thereby.  Subject to the Final Hearing and the entry of the Final Sale Order, no consents or approvals, other than those expressly provided for herein or in the Agency Agreement, are required for the Debtors to consummate such transactions.

O.      **No Successor Liability:**  No sale, transfer or other disposition of the Transferred Assets pursuant to the Agency Agreement prior to the entry of the Final Sale Order will subject the Agent to any liability for claims, obligations or Encumbrances asserted against the Debtors or the Debtors' interests in such Transferred Assets by reason of such transfer under any laws, including, without limitation, any bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories.  The Agent is not a successor to the Debtors or their respective estates.

EAST\87304261.6

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED**

**THAT:**

**A.      Motion Granted, Objections Overruled**

1.      The relief requested in the Motion is approved on an interim basis through the date of the Final Hearing and subject to the rights of any parties in interest to be heard at the Final Hearing with respect to the continuation of the Sale for the period subsequent to the Final Hearing.

**B.      Interim Approval of Agency Agreement**

2.      Pending the entry of the Final Sale Order or other further Order of the Court, the Debtors are hereby authorized to continue performance under and to make all payments required by the Agency Agreement as and when due thereunder, and perform each of the transactions contemplated therein.

3.      All amounts payable to the Agent under the Agency Agreement on account of the Sale and Expenses incurred through and including the date of the Final Hearing shall be payable to the Agent without the need for any application of the Agent therefor or any further order of the Court.

4.      Upon entry of the Interim Sale Order, the Debtors and the Agent are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to continue to conduct the Sale in accordance with the Agency Agreement and the sale guidelines (the "Sale Guidelines") attached hereto as Exhibit 2, and to promote the Sale as a "store closing sale", "sale on everything", "everything must go", "going out of business" or a similar themed sale.  The Debtors are hereby authorized to conduct such Sales and store closures.  Pursuant to the Agency Agreement, the Agent is hereby authorized to conduct such Sales at the closing stores.

9

5. Upon entry of the Interim Sale Order, pursuant to section 363(b) of the Bankruptcy Code, the Debtors, the Agent and each of their respective officers, employees and agents are hereby authorized and directed to execute such documents and to do such acts as are necessary or desirable to carry out the Sale and effectuate the Agency Agreement and each of the transactions and related actions contemplated or set forth therein. Ryan Schreiber, the Debtors' President, Secretary and General Counsel, is specifically authorized to act on behalf of the Debtors in connection with the Sale and no other consents or approvals are necessary or required for the Debtors to carry out the Sale, effectuate the Agency Agreement and each of the transactions and related actions contemplated or set forth therein.

### C.  Order Binding

6. This Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Transferred Assets.

7. This Order and the terms and provisions of the Agency Agreement shall be binding on all of the Debtors' creditors (whether known or unknown), the Debtors, the Agent, and their respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting an interest in the Transferred Assets, notwithstanding any subsequent appointment of any trustee, party, entity or other fiduciary under any section of the Bankruptcy Code with respect to the forgoing parties, and as to such trustee, party, entity or

10

other fiduciary, such terms and provisions likewise shall be binding.   The provisions of this Order and the terms and provisions of the Agency Agreement, and any actions taken pursuant hereto or thereto shall survive the entry of any order which may be entered confirming or consummating any plan(s) of the Debtors or converting the Debtors' cases from chapter 11 to chapter 7, and the terms and provisions of the Agency Agreement, as well as the rights and interests granted pursuant to this Order and the Agency Agreement, shall continue in these or any superseding cases and shall be binding upon the Debtors, the Agent and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

**D.    Good Faith.**

8.    Entry into the Agency Agreement was undertaken by the parties thereto in good faith, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and Agent shall be protected by sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Order is amended, vacated, reversed or modified on appeal or in the Final Sale Order.   Any such amendment, vacatur, reversal or modification of the authorization provided herein to continue the Sale pursuant to the Agency Agreement through the entry of the Final Sale Order shall not affect the validity or enforceability of the Sale, any transactions contemplated pursuant to the Agency Agreement, or any security interests or priorities in favor of Agent authorized or created under the Agency Agreement or this Order.   The Agent is entitled to all of the benefits and protections afforded by sections 363(m) and 364(e) of the Bankruptcy Code.   The transactions contemplated by the Agency Agreement occurring prior to the date of the Final Hearing are not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

EAST\87304261.6

### E.      Conduct of the Sale

9.      Except as otherwise provided in the Agency Agreement, pursuant to section 363(f) of the Bankruptcy Code, until the entry of the Final Sale Order or any contrary Order of this Court, the Agent shall be authorized to sell all Merchandise, the FF&E and other Transferred Assets to be sold pursuant to the Agency Agreement free and clear of any and all Encumbrances, including, without limitation, the liens and security interests, as the same may have been amended from time to time, of the Lender whether arising by agreement, any statute or otherwise and whether arising before, on or after the date on which these chapter 11 cases were commenced, with any presently existing liens encumbering all or any portion of the Transferred Assets or the Proceeds thereof (including, but not limited to, the first-priority security interest of the Lender) attaching to the amounts payable to the Debtors under the Agency Agreement, with the same validity, force and effect as the same had with respect to the assets at issue, subject to any and all defenses, claims and/or counterclaims or setoffs that may exist.

10.      All entities that are presently in possession of some or all of the Transferred Assets or other property in which the Debtors hold an interest that are or may be subject to the Agency Agreement hereby are directed to surrender possession of such Transferred Assets or other property to the Agent.

11.      Unless otherwise ordered by the Court, all newspapers and other advertising media in which the Sale may be advertised and all landlords are directed to accept this Order as binding authority so as to authorize the Debtors and the Agent to consummate the Agency Agreement and to consummate the transactions contemplated therein, including, without limitation, to conduct and advertise the Sale in the manner contemplated by the Agency

EAST\87304261.6

Agreement, including, without limitation, conducting and advertising of the Sale in accordance

with the Agency Agreement, the Sale Guidelines, and this Order.

12.    Nothing in this Order or the Agency Agreement releases, nullifies, or enjoins the

enforcement of any liability to a governmental unit under environmental laws or regulations (or

any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any

entity would be subject to as the owner, lessor, lessee, or operator of the property after the date

of entry of this Order.  Nothing contained in this Order or in the Agency Agreement shall in any

way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish

the obligations of the Debtors to comply with environmental laws consistent with their rights and

obligations as debtors in possession under the Bankruptcy Code.  Nothing herein shall be

construed to be a determination that the Agent is an operator with respect to any environmental

law or regulation.  Moreover, the Sale shall not be exempt from, and the Agent shall be required

to comply with, laws of general applicability, including, without limitation, public health and

safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and

consumer protection laws, including consumer laws regulating deceptive practices and false

advertising (collectively, "General Laws").  Nothing in this Order shall alter or affect the

Debtors' and Agent's obligations to comply with all applicable federal safety laws and

regulations.  Nothing in this Order shall be deemed to bar any Governmental Unit (as defined in

Bankruptcy Code section 101(27)) from enforcing General Laws in the applicable non-

bankruptcy forum, subject to the Debtors' or the Agent's right to assert in that forum or before

this Court that any such laws are not in fact General Laws or that such enforcement is

impermissible under the Bankruptcy Code, this Order, or otherwise, pursuant to Paragraph 13

hereunder.  Notwithstanding any other provision in this Order, no party waives any rights to

argue any position with respect to whether the conduct was in compliance with this Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Order shall be deemed to have made any rulings on any such issues.

13. <u>Disputes Between Government Units and the Debtors or the Agent</u>. To the extent that the Sale is subject to any federal, state or local statute, ordinance, or rule, or licensing requirement solely directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws (each a "<u>GOB Law</u>," and together, the "<u>GOB Laws</u>"), including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the Sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the Sale (collectively, the "<u>Liquidation Laws</u>"), the following provisions shall apply:

a. Provided that the Sale is conducted in accordance with the terms of this Order, the Agency Agreement and the Sale Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors shall be presumed to be in compliance with any GOB Laws and Liquidation Laws and, subject to Paragraphs 13, 14 and 15 herein, are authorized to conduct the Sale in accordance with the terms of this Order and the Sale Guidelines without the necessity of further showing compliance with any such GOB Laws and Liquidation Laws.

b. Within three (3) business days of entry of this Order, the Debtors shall serve copies of this Order, the Agency Agreement and the Sale Guidelines via e-mail, facsimile or regular mail, on: (i) the Attorney General's office for each state where the Sale is being held, (ii) the county consumer protection agency or similar agency for each county where the Sale will be

14

held, (iii) the division of consumer protection for each state where the Sale will be held; (iv) the chief legal counsel for the local jurisdiction; and (v) the Debtors' landlords..

c.      To the extent there is a dispute arising from or relating to the Sale, this Order, the Agency Agreement, or the Sale Guidelines, which dispute relates to any GOB Laws or Liquidation Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute.  Any time within fifteen (15) days following service of this Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute to counsel for the Debtors and counsel for the Agent at the addresses set forth in the Agency Agreement so as to ensure delivery thereof within one (1) business day thereafter. If the Debtors, the Agent and the Governmental Unit are unable to resolve the Reserved Dispute within fifteen (15) days of service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

d.      In the event a Dispute Resolution Motion is filed, nothing in this Order shall preclude the Debtors, a landlord, the Agent or other interested party from asserting (i) that the provisions of any GOB Laws and/or Liquidation Laws are preempted by the Bankruptcy Code or (ii) that neither the terms of this Order, nor the Debtors or the Agent's conduct pursuant to this Order, violates such GOB Laws and/or Liquidation Laws.  Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of this Order or to limit or interfere with the Debtors' or the Agent's ability to conduct or to continue to conduct the Sale pursuant to this Order and the Agency Agreement, absent further order of this Court.  The Court grants authority for the Debtors and the Agent to conduct the Sale pursuant to the terms of this Order, the Agency Agreement, and/or the Sale Guidelines attached hereto and to take all actions reasonably related thereto or arising in connection therewith.  The Governmental Unit shall be entitled to assert any

15

jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Laws or the lack of any preemption of such GOB Laws and/or Liquidation Laws by the Bankruptcy Code. Nothing in this Order shall constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.      If, at any time, a dispute arises between the Debtors and/or the Agent and a Governmental Unit as to whether a particular law is a GOB Law and/or Liquidation Law, and subject to any provisions contained in this Order related to GOB Laws and/or Liquidation Laws, then any party to that dispute may utilize the provisions of Subparagraphs (b) and (c) hereunder by serving a notice to the other party and proceeding thereunder in accordance with those Paragraphs. Any determination with respect to whether a particular law is a GOB Law and/or Liquidation Law shall be made de novo.

14.     Except to the extent of the reserved rights of Governmental Units expressly granted elsewhere in this Order, the Debtors and Agent are hereby authorized to take such actions as may be necessary and appropriate to implement the Agency Agreement and to conduct the Sale without necessity of further order of this Court as provided in the Agency Agreement or the Sale Guidelines, including, but not limited to, advertising the Sale as a "store closing sale", "sale on everything", "everything must go", "going out of business", or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall Stores, and at enclosed mall Stores to the extent the applicable Store entrance does not require entry into the enclosed mall common area), use of signwalkers and street signage.

15.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the Sale, to the extent that disputes arise during the course of the Sale regarding laws regulating the use of sign-walkers, banners or

16

other advertising and the Debtors and the Agent are unable to resolve the matter consensually with a Governmental Unit, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled initially within two (2) business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

16. Except as expressly provided in the Agency Agreement, until the entry of the Final Sale Order or other contrary Order of the Court, the Sale shall be conducted by the Debtors and the Agent notwithstanding any restrictive provision of any lease, sublease or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sale, the rejection of leases, abandonment of assets or "going dark" provisions. The Agent and landlords of the Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Agent and any such landlords, provided that nothing in such Side Letters affects the provisions of Paragraphs 13, 14 and 15 of this Order. In the event of any conflict between the Sale Guidelines and any Side Letter, the terms of such Side Letter shall control.

17. Except as expressly provided for herein or in the Sale Guidelines, and except with respect to any Governmental Unit (as to which Paragraphs 13, 14 and 15 of this Order shall apply), no person or entity, including but not limited to any landlord, licensor, or creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sale, or the advertising and promotion (including the posting of signs and exterior banners or the use of signwalkers) of such Sale, and all such parties and persons of every nature and description, including landlords, licensors, creditors, website and other Direct Business Platform services providers, and utility companies, and all those acting for or on behalf

17

of such parties, are prohibited and enjoined from (i) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Sale and/or (ii) instituting any action or proceeding in any court (other than in the Bankruptcy Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Agent, or the landlords at the Closing Locations that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sale or other liquidation sales at the Closing Locations and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease or license based upon any relief authorized herein.

18.     The Agent shall have the right to use the Stores, the Distribution Centers and all related Store services and/or Distribution Center Services, furniture, fixtures, equipment and other assets of the Debtors for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines and this Order and subject to Paragraphs 13, 14, and 15 of this Order.

19.     Until the entry of the Final Sale Order or any contrary Order of this Court, the Agent shall accept the Debtors' validly-issued gift certificates and gift cards that were issued by the Debtors prior to the Sale Commencement Date, and the Debtors shall reimburse Agent for such amounts during the weekly sale reconciliation provided for and subject to the limitations set forth in Section 8.7(a) of the Agency Agreement.  Until the entry of the Final Sale Order or any contrary Order of this Court, the Agent shall accept returns of merchandise sold by the Debtors prior to the Sale Commencement Date, provided that such return is otherwise in compliance with the Debtors' return policies in effect as of the date such item was purchased and the customer is not repurchasing the same item so as to take advantage of the sale price being offered by the Agent, and the Debtors shall reimburse Agent for such amounts during the weekly sale

EAST\87304261.6

reconciliation provided for and subject to the limitations set forth in Section 8.7(a) of the Agency Agreement.

20.     All state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."  The Debtors and/or the Agent shall accept return of any goods purchased during the Sale that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within twenty-one (21) days of their purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect.  The Debtors shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any goods purchased during the Sale that contain such a latent defect.

21.     Until the entry of the Final Sale Order or any contrary Order of this Court, the Agent shall be granted a limited, royalty-free, license and right to use the trademarks, trade names, logos and customer, mailing and e-mail lists, websites, URL and social media relating to and used in connection with the operation of the Stores and the Direct Business Platform, as identified in the Agency Agreement, solely for the purpose of advertising the Sale, selling or otherwise disposing of the Transferred Assets, and otherwise conducting the Sale in accordance with the terms of the Agency Agreement; provided, however, that the Agent shall not receive Personally Identifiable Information from the Debtors.  Upon entry of the this Order, the Office of the United States Trustee is hereby authorized to appoint a consumer privacy ombudsman pursuant to sections 332 and 363(b)(1) of the Bankruptcy Code.

22.     Except as expressly provided for in the Agency Agreement, nothing in this Order or the Agency Agreement, and none of the Agent's actions taken in respect of the Sale shall be

deemed to constitute an assumption by Agent of any of the Debtors' obligations relating to any of the Debtors' employees. Moreover, the Agent shall not become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.

23.     The Agent shall not be liable for sales taxes except as expressly provided in the Agency Agreement and the payment of any and all sales taxes is the responsibility of the Debtors. The Debtors are directed to remit all taxes arising from the Sale to the applicable Taxing Authorities as and when due, provided that in the case of a bona fide dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the Taxing Authority. For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the Taxing Authority for which the sales taxes are collected. The Agent shall collect, remit to the Debtors and account for sales taxes as and to the extent provided in the Agency Agreement. This Order does not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under State law.

24.     Subject to the terms set forth in the Agency Agreement, the Debtors and/or the Agent (as the case may be) are authorized and empowered to transfer Transferred Assets among the Closing Locations. The Agent is authorized to sell the Debtors' furniture, fixtures and equipment and abandon the same, in each case, as provided for and in accordance with the terms of the Agency Agreement.

**F.**     **Other Rights of Agent**

25.     Prior to the entry of the Final Sale Order, Agent shall be under no obligation to make any payments from its own funds (including but not limited to the Initial Guaranty Payment) in the performance of its obligations under the Agency Agreement.  Following the entry of the Final Sale Order, the Debtors, the Lender, and the Agent shall make any payments required by the Final Sale Order and the Agency Agreement at the times, from the sources, and upon the terms and conditions set forth therein.

26.     Agent and the other Agent Indemnified Parties shall be indemnified and held harmless in accordance with the terms of Section 8.3(a) of the Agency Agreement.  Any claims against the Debtors arising under Section 8.3(a) of the Agency Agreement shall be, and hereby are, granted the status of superpriority claims in this case pursuant to Section 364(c) of Bankruptcy Code..

27.     The Agent is hereby authorized to include Additional Agent Merchandise in the Sale.  Additional Agent Merchandise shall be consigned to the Debtors as a true consignment under Article 9 of the UCC.  The Agent is hereby granted a first-priority security interest in (a) the Additional Agent Merchandise and (b) the Additional Agent Merchandise proceeds, which security interest shall be deemed perfected pursuant to this Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties; provided that the Agent is authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying the Agent's interest in the Additional Agent Merchandise as consigned goods thereunder and the Debtors as the consignee therefor, and the Agent's security interest in such Additional Agent Merchandise and Additional Agent Merchandise proceeds.

### G.     Other Provisions

28.     The Agent shall have the sole and exclusive right to sell the Owned FF&E for Agent's sole and exclusive benefit and at the Agent's sole cost and expense (other than rent and other occupancy expenses associated with the corporate office, which amounts shall be paid by the Debtors); provided, further, that, in that regard, Agent shall be entitled to retain all proceeds (which for the avoidance of doubt shall not constitute Proceeds or Asset Proceeds) from the sale or other disposition of the Owned FF&E, and the Agent shall be responsible for the payment of all costs and expenses associated with the sale or other disposition of the Owned FF&E (other than rent and other occupancy expenses associated with the corporate office, which amounts shall be paid by Debtors).

29.     The Agent shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Agent, in each case, other than as expressly provided for in the Agency Agreement.  The Agent shall have no successor liability whatsoever with respect to any Encumbrances or claims of any nature that may exist against the Debtors, and provided further that the Agent shall not be, or to be deemed to be: (i) a successor in interest or within the meaning of any law, including any revenue, successor liability, pension, labor, COBRA, ERISA, bulk-transfer, products liability, tax or environmental law, rule or regulation, or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories; or (ii) a joint employer, co-employer or successor employer with the Debtors, and the Agent shall have no obligation to pay the Debtors' wages, bonuses, severance pay, vacation pay, WARN act claims (if any), COBRA claims, benefits or any other payments to employees of the Debtors, including pursuant to any collective

22

bargaining agreement, employee pension plan, or otherwise, except as expressly set forth in the Agency Agreement.

30.     The Agent is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Order, the various procedures contemplated herein, any issues related to or otherwise connected to the Sale and the Agency Agreement.

31.     Except with respect to any Governmental Unit (as to which the provisions of Paragraphs 13, 14 and 15 of this Order shall apply), this Court shall retain exclusive jurisdiction with regard to all issues or disputes relating to this Order or the Agency Agreement, including, but not limited to, (i) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and signwalker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (ii) any claim of the Debtors, the landlords and/or the Agent for protection from interference with the Sale, (iii) any other disputes related to the Sale, and (iv) to protect the Debtors and/or the Agent against any assertions of Encumbrances.  No such parties or person shall take any action against the Debtors, the Agent, the landlords or the Sale until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

32.     The Debtors shall not be required to comply with any state or local Wage Requirements and regulations when terminating employees.

33.     Notwithstanding Bankruptcy Rules 4001 and 6004, or any other law that would serve to stay or limit the immediate effect of this Order, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Agent are free to

perform under the Agency Agreement at any time, subject to the terms of the Agency Agreement and this Order.

34.    The Final Hearing will be held before this Court on December__, 2014 at _____ ____.m. (ET).

35.    Any objections to the continuation of the Sale following the Final Hearing or to the approval of the Motion and the relief requested therein on a final basis shall be filed with this Court  (with a copy to Chambers) no later than three (3) business days prior to the Final Hearing and served so as to be received on or before such date by:  (i) the Debtors, 50 West 23rd Street, 10th Floor, New York, New York 10010, Attn: Ryan A. Schreiber, Esq.; (ii) counsel to the Debtors, DLA Piper LLP (US), 1251 Avenue of the Americas, 25th Floor, New York, New York 10020-1104, Attn: Gregg M. Galardi, Esq.; (iii) Office of the United States Trustee, 201 Varick Street, Suite 1006, New York, New York 10014, Attn:  Serene Nakano, Esq. and Richard C. Morrissey, Esq.; (iv) Choate Hall & Stewart, LLP, Two International Place, Boston, MA 02110, Attn:  John F. Ventola, Esq.; (v) DiConza Traurig Kadish LLP, 630 Third Avenue, 7th Floor, New York, New York 10017, Attn:  Maura I. Russell, Esq.; and (vi) counsel to the Agent, Goulston & Storrs PC, 400 Atlantic Avenue, Boston, MA  02110-3333, Attn: James F. Wallack, Esq. and Gregory O. Kaden, Esq.; and (vii) counsel to any statutory committee appointed in these Chapter 11 Cases.

36.    To the extent that anything contained in this Order explicitly conflicts with a provision in the Agency Agreement or the Sale Guidelines, this Order shall govern and control.

Dated:  December ___, 2014
            _____, _____

_____
UNITED STATES BANKRUPTCY JUDGE

## <u>EXHIBIT 1</u>

**Agency Agreement**

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is entered into as of this 4th day of December, 2014, by and between **DELIA\*S, INC.**, a Delaware corporation ("Merchant"), and a joint venture composed of **GORDON BROTHERS RETAIL PARTNERS, LLC**, a Delaware limited liability company, and **HILCO MERCHANT RESOURCES, LLC**, a Delaware limited liability company (collectively, the "Agent"; and collectively with Merchant, the "Parties").

## RECITALS

WHEREAS, Merchant operates certain retail stores in the United States and desires that Agent act as Merchant's exclusive agent for the limited purpose of (a) selling all of the Merchandise (as hereinafter defined) located in Merchant's retail store location(s) identified on Exhibit A-1 attached hereto (each individually a "Store", and collectively the "Stores") and in Merchant's distribution centers identified on Exhibit A-2 attached hereto (each individually a "Distribution Center", and collectively the "Distribution Centers" and collectively with the Stores, the "Closing Locations"), through the Stores and through the Merchant's Direct Business Platform (as defined below), and (b) selling all of the Owned FF&E (as hereinafter defined) located in the Stores, Merchant's corporate office and the Distribution Center (in each case subject to Section 15 below), in each case by means of a "sale on everything", "everything must go", or similarly themed sale, and, subject to entry of an Approval Order, as a "store closing" or "going-out-of-business" sale (in each case as further described below, the "Sale").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.     Definitions and Exhibits

1.1     Defined Terms.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
| --- | --- |
| Additional Agent Merchandise | Section 8.9(a) |
| Additional Taxes and Penalties | Section 8.3(a) |
| Adjustment Amount | Section 3.3(a) |
| Agency Accounts | Section 3.3(b)(ii) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent Claim | Section 12.5 |
| Agent Collateral | Section 16.11(a) |
| Agent Indemnified Parties | Section 8.3(a) |
| Agreement | Preamble |
| All Inclusive Guaranty Percentage | Section 3.1(a) |
| Applicable General Laws | Section 2(c) |

| | |
|---|---|
| Approval Order | Section 2(b) |
| Bankruptcy Code | Section 2(b) |
| Bankruptcy Court | Section 2(b) |
| Benefits Cap | Section 4.1(c) |
| Bid Protections | Section 16.12(b) |
| Break-Up Fee | Section 16.12(b) |
| Central Services | Section 4.1 |
| Closing Locations | Preamble |
| Committee | Section 3.1 |
| Competing Bid | Section 16.12(a) |
| Cost Factor | Section 3.1(d) |
| Cost Factor Threshold | Section 3.1(d) |
| Cost File | Section 5.3(a) |
| Cost Value | Section 5.3(a) |
| DC FF&E Commission | Section 15(a) |
| DC FF&E Commission Option | Section 15(a) |
| DC FF&E Disposition Budget | Section 15(a) |
| DC FF&E Disposition Expenses | Section 15(a) |
| DC FF&E Guaranty Amount | Section 15(a) |
| DC FF&E Guaranty Option | Section 15(a) |
| DC FF&E Sale Election Deadline | Section 15(a) |
| DC FF&E Sale Option | Section 15(a) |
| Defective Merchandise | Section 5.2(b) |
| Designated Deposit Accounts | Section 3.3(b)(i) |
| Direct Business Expense Reimbursement | Section 8.10 |
| Direct Business Platform | Section 8.10 |
| Distribution Center | Recitals |
| Distribution Center Merchandise | Section 5.2(b) |
| Distribution Center Services | Section 4.1 |
| Estimated Guaranteed Amount | Section 3.3(a) |
| Events of Default | Section 14 |
| Excluded Benefits | Section 4.1 |
| Excluded Defective Merchandise | Section 5.2(b) |
| Excluded Pricing Adjustments | Section 3.1(c)(ii) |
| Existing Vendors | Section 8.9(a) |
| Expenses | Section 4.1 |
| Expense Reimbursement | Section 16.12(b) |
| Final Inventory Report | Section 3.3(a) |
| Final Reconciliation | Section 8.7(b)(i) |
| Final Reconciliation Settlement Date | Section 8.7(b)(i) |
| Force Majeure Event | Section 8.8 |
| Gross Rings | Section 5.3(b)(iii) |
| Gross Rings Period | Section 5.3(b)(iii) |
| Guaranteed Amount | Section 3.1 |
| Guaranty Percentage | Section 3.1 |
| Hazardous Materials | Section 15(d) |

| | |
|---|---|
| In-Transit Merchandise | Section 5.2(b) |
| In-Transit Receipt Deadline | Section 5.2(b) |
| Interim Guaranty Installments | Section 3.3(a) |
| Initial Guaranty Payment | Section 3.3(a) |
| Interim Sale Period | Section 2(c) |
| Interim Sale Period Expenses | Section 3.3(a) |
| Interim Sale Proceeds | Section 3.3(a) |
| Inventory Date | Section 5.1 |
| Inventory Taking | Section 5.1 |
| Inventory Taking Instructions | Section 5.1 |
| Inventory Taking Service | Section 5.1 |
| Lender | Section 3.3(f) |
| Letter of Credit | Section 3.3(g) |
| Liquidation Sale Laws | Section 2(b)(v) |
| Lowest Location Price | Section 3.1(c)(i) |
| Membership Program Discount | Section 8.6(b) |
| Merchandise | Section 5.2(a) |
| Merchandise Ceiling | Section 3.1(b) |
| Merchandise Threshold | Section 3.1(b) |
| Merchant | Preamble |
| Merchant's Designated Account | Section 3.3(a) |
| Merchant Consignment Goods | Section 5.4 |
| Merchant Indemnified Parties | Section 8.3(a) |
| Net DC FF&E Proceeds | Section 15(a) |
| Non-CAM Trash Removal Charges | Section 4.1 |
| Occupancy Expenses | Section 4.1(a) |
| Owned FF&E | Section 15(a) |
| Parties | Preamble |
| Payment Date | Section 3.3(a) |
| POS | Section 3.1(c)(i) |
| Proceeds | Section 3.3(b) |
| Receipt Deadline | Section 5.2(a) |
| Remaining Initial Guaranty Payment | Section 3.3(a) |
| Remaining Merchandise | Section 3.2 |
| Retail Price | Section 3.1(c)(i) |
| Retained Employee | Section 9.1 |
| Retention Bonus | Section 9.4 |
| Returned Merchandise | Section 8.5 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 8.1(h) |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3(a) |
| Sales Tax Account | Section 8.3(a) |
| Signage Costs | Section 16.12(a) |

| Store(s) | Recitals |
| Store Sale Guaranty Percentage | Section 3.1(a) |
| Third Party | Section 4.1 |
| Third Party Vendors | Section 8.9(a) |
| UCC | Section 8.9(c) |
| Unapplied Interim Sale Proceeds | Section 3.3(a) |
| Vacate Date | Section 6.2 |
| WARN Act | Section 9.1 |

1.2    Exhibits. The Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Section Reference | Description |
| --- | --- | --- |
| Exhibit A-1 | Recitals | Stores |
| Exhibit A-2 | Recitals | Distribution Center |
| Exhibit 3.1(b) | Section 3.1(b) | Merchandise Ceiling/Threshold Adjustment |
| Exhibit 3.1(c) | Section 3.1(d) | Cost Factor Adjustment |
| Exhibit 3.3(a) | Section 3.3(a) | Merchant's Designated Account |
| Exhibit 3.3(h) | Section 3.3(h) | Form of Letter of Credit |
| Exhibit 4.1(a) | Section 4.1(a) | Store Occupancy Expense Schedule |
| Exhibit 5.1(a) | Section 5.1 | Inventory Taking Instructions |
| Exhibit 5.2(b)(1) | Section 5.2(b)(1) | Distribution Center Merchandise |
| Exhibit 5.2(b)(2) | Section 5.2(b)(1) | Direct Business Merchandise |
| Exhibit 8.1 | Section 8.1 | Sale Guidelines |
| Exhibit 10.1(c) | Section 10.1(c) | Form of Approval Order |
| Exhibit 11.1(d) | Section 11.1(c) | Pre-Existing Liens |
| Exhibit 11.1 (k) | Section 11.1(k) | Merchant's Promotions Since 11/1/14 |
| Exhibit 11.1(l) | Section 11.1(l) | Pending Matters |
| Exhibit 11.1 (o) | Section 11.1(o) | Extraordinary POS Activity |
| Exhibit 11.1(q) | Section 11.1(q) | Store Leases Expiring During Sale Term |
| Exhibit 11.1 (u) | Section 11.1(u) | Promotions/Discounts |

Section 2.    Appointment of Agent/Liquidation Sale Laws/Approval Order

(a)    Appointment of Agent. Effective on the date hereof and subject to the entry of the Approval Order, Merchant hereby irrevocably appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and disposing of Merchant's Owned FF&E at the Closing Locations and the corporate offices, in accordance with the terms and conditions of this Agreement.

(b)    Potential Bankruptcy/Approval Order.  Merchant intends to seek protection under Title 11 of the United States Code (the "Bankruptcy Code") by commencing a Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York (such court, or any other United States Bankruptcy Court overseeing such case, the "Bankruptcy Court"). In the event that during the Sale Term an involuntary petition under Chapter 7 the Bankruptcy Code is filed,

4

no later than two (2) business days after such filing, Merchant shall (x) exercise its right under the Bankruptcy Code and convert such filing to one under Chapter 11 of the Bankruptcy Code and otherwise consent to such petition; (y) simultaneously with such exercise, file a motion (the "Expedited Assumption Motion") with the Bankruptcy Court seeking entry of (1) an order on an expedited basis authorizing and approving the assumption of this Agreement pursuant to section 365 of the Bankruptcy Code on an expedited basis and authorizing Merchant and Agent to conduct the Sale in accordance with the terms hereof (the "Approval Order"); and (2) an interim order authorizing Merchant to continue to conduct the Sale pursuant to the terms of this Agreement and to promote the Sale as a "store closing sale" pending the hearing on the Expedited Assumption Motion (the "Interim Approval Order"). In the event of an involuntary petition under Chapter 11 the Bankruptcy Code is filed, no later than two (2) business days after such filing, Merchant shall (x) consent to entry of an order for relief in the case of an involuntary petition and (y) file the Expedited Assumption Motion. The Approval Order shall be in substantially the form annexed hereto as Exhibit 10.1(c), and otherwise be reasonably satisfactory to the Merchant and Agent, and provide, inter alia, that:

      (i)    Merchant is authorized and directed to assume this Agreement and that this Agreement (and each of the transactions contemplated hereby) is approved in its entirety;

      (ii)    Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby;

      (iii)    Agent shall be entitled to sell all Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and Owned FF&E hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, Owned FF&E, the Proceeds or any proceeds of the foregoing attaching only to the Guaranteed Amount and other amounts to be received by Merchant under this Agreement;

      (iv)    Agent shall have the right to use the Stores and all related Store and/or Distribution Center Services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person subject to compliance with the Sale Guidelines and Approval Order with respect to the Assets;

      (v)    Agent, as agent for Merchant, is authorized to conduct, advertise, post signs and otherwise promote the Sale as a "sale on everything", "everything must go," or similar themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court), and subject to entry of the Interim Approval Order, as a "store closing sales", and subject to entry of the Approval Order as a "going-out-of-business" sale and/or "store closing" sale, without compliance with all applicable laws, rules and regulations in respect of "going out of business," "store closing" or similar-themed sales (collectively, the "Liquidation Sale Laws"), subject to compliance with the Sale Guidelines, the Interim Approval Order, and Approval Order;

(vi)  Agent shall be granted a limited royalty-free sub-license and right to use until the Sale Termination Date the trademarks, trade names, logos, customer lists, website, URL, mailing lists and email lists relating to and used in connection with the operation of the Stores and the Direct Business Platform solely for the purposes of advertising the Sale, selling Merchandise, Additional Agent Merchandise, Merchant Consignment Goods and Owned FF&E, and otherwise conducting the Sale in accordance with the terms of this Agreement;

(vii)  all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement;

(viii) all utilities, landlords, creditors, website and other Direct Business Platform services providers, and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct or advertising of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or otherwise impedes the conduct or advertising of the Sale;

(ix)  the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement;

(x)  Agent shall not be liable for any claims against the Merchant other than as expressly provided for in this Agreement;

(xi)  Agent shall be authorized to include Additional Agent Merchandise in the Sale;

(xii)  subject to Agent having satisfied its obligations hereunder, any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in Merchant's Bankruptcy Case pursuant to Section 364(c) of Bankruptcy Code senior to all other superpriority claims, including, without limitation, to the superpriority claims of the Lender; provided that until the Merchant receives payment in full of the Guaranteed Amount and Expenses, and any such other amounts due to Merchant hereunder, any superpriority claim granted to Agent hereunder shall be junior and subordinate in all respects to the security interests and superpriority claims of Lender but solely to the extent of the amount of the unpaid portion of the Guaranteed Amount and Expenses , and such other amounts due to Merchant hereunder;

(xiii) Agent shall be granted a valid, binding, enforceable and perfected security interest as provided for in Section 16.11 hereof without the necessity of filing financing statements to perfect the security interests;

6

(xiv) the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Stores uninterrupted;

(xv) Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest;

(xvi) this Agreement was negotiated in good faith and at arms' length between the Merchant and Agent and that Agent is entitled to the protection of Section 363(m) of the Bankruptcy Code;

(xvii) Agent's performance under this Agreement will be, and payment of the Guaranteed Amount under this Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of Sections 363(m) and 364(e) of the Bankruptcy Code;

(xviii) this Agreement is approved pursuant to Section 363 of the Bankruptcy Code; and

(xix) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Sections 363(m) and 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order.

(c)     During the period between the Sale Commencement Date and the entry of the Approval Order (the "Interim Sale Period"), Agent shall be authorized to advertise and conduct the Sale as a "sale on everything", "everything must go", or similar-themed sale, and Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, permitting, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), including, the Liquidation Sale Laws, provided that such Sale is conducted in accordance with the terms of this Agreement and the Sale Guidelines. Upon entry of the Interim Approval Order, Agent shall be authorized to advertise and conduct the Sale as a "store closing" sale from and after the entry of the Interim Approval Order until the Approval Order is entered. Upon entry of the Approval Order, Agent shall be authorized to advertise and conduct the Sale as "going-out-of-business" sale and "store closing sale" from and after the entry of the Approval Order through the Sale Termination Date (the "Remaining Sale Period") shall continue to be required to comply with Applicable General Laws, other than Liquidation Sale Laws, and, provided the Sale is conducted in accordance with the this Agreement, the Sale Guidelines, the Interim Approval Order, and Approval Order, Agent shall be deemed to be in compliance with Applicable General Laws.

(d)     Authority.  Except as otherwise specifically provided in this Agreement, Agent shall have no authority, and shall not represent that it has any authority, to enter into any contract, agreement, or other arrangement or take any other action by or on behalf of Merchant, that would have the effect of creating any obligation or liability, present or contingent, on behalf of or for the account of Merchant without Merchant's prior written consent.

Section 3.     Guaranteed Amount and Other Payments

3.1     Payments to Merchant and Agent.

(a)     Provided the Approval Order is entered no later than December 24, 2014, as a guaranty of Agent's performance hereunder, in addition to the payment of Expenses (as provided for in Section 4.1 hereof), Agent guarantees that Merchant shall receive an amount (the "Guaranteed Amount") equal to the following: (a) ninety-one percent (91%) (the "Guaranty Percentage") of the aggregate Cost Value of Merchandise (including the Direct Business Merchandise) included in the Sale. In the event that Merchant is unable to obtain the Interim Approval Order on or prior to December 12, 2014, then such failure shall not be an event of default under this Agreement, but the Guaranty Percentage shall be adjusted in accordance with the per diem adjustment schedule set forth on Exhibit 3.1(a) annexed hereto. The Guaranteed Amount will be calculated based upon the product of (x) either the Store Guaranty Percentage or the All Inclusive Guaranty Percentage, as applicable *multiplied by* (y) the aggregate Cost Value of the Merchandise included in the Sale as determined by (A) the Final Inventory Report at the conclusion of the Inventory Taking by the Inventory Taking Service after written verification and reconciliation thereof by Agent and Merchant, in consultation with Lender and, upon its appointment, the Official Committee of Unsecured Creditors (the "Committee"), (B) the aggregate Cost Value of the Distribution Center Merchandise included in the Distribution Center Shipments, (C) the aggregate Cost Value of Merchandise sold during the Gross Rings Period (as adjusted for shrinkage per this Agreement), (D) the aggregate Cost Value of In-Transit Merchandise included in the Sale; and (E) the aggregate Cost Value of Returned Merchandise (not otherwise included in the Inventory Taking). Agent shall pay to Merchant (or its designee) the Guaranteed Amount in the manner and at the times specified in Section 3.3 below.

(b)     The Guaranteed Percentage has been fixed based upon the Merchant's representation that (i) the aggregate Cost Value of the Merchandise is not less than $15.5 million (the "Retail Merchandise Threshold") and not greater than $15.9 million (the "Retail Merchandise Ceiling") if the Direct Business Merchandise is excluded from the Sale and (ii) the aggregate Cost Value of the Direct Business Merchandise is not less than $4.782 million (the "Direct Merchandise Threshold") and not greater than $4.882 million (the "Direct Merchandise Ceiling"); provided, that, solely for purposes of determining whether the aggregate Cost Value of the Merchandise included in the Sale is less than the applicable Merchandise Threshold, no adjustment shall be made to the applicable Cost Value to account for the effect of any Prevailing Discount Adjustment (applied to Distribution Center Merchandise, In-Transfer Merchandise and/or Returned Merchandise) or Excluded Pricing Adjustment. To the extent that the aggregate Cost Value of the Merchandise (other than Direct Business Merchandise) included in the Sale is less than the Retail Merchandise Threshold or greater than the Retail Merchandise Ceiling, then such deviation shall not constitute a breach of any representation or warranty, or an Event of Default; provided,

8

however, that, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(b) attached hereto. In addition, to the extent that the aggregate Cost Value of the Direct Business Merchandise included in the Sale is less than the Direct Business Threshold or greater than the Direct Merchandise Ceiling, then such deviation shall not constitute a breach of any representation or warranty, or an Event of Default; provided, however, that, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(b) attached hereto. Any adjustment to the Guaranty Percentage provided for under this Section 3.1(b) shall be cumulative with, and in addition to, any other adjustment provided for under this Section 3.1(b) and otherwise in this Agreement, including, but not limited to, any adjustment provided for under Exhibit 3.1(d) hereof.

(c)     All Proceeds in excess of the sum of (x) the Guaranteed Amount, plus (y) Expenses of the Sale shall be retained by Agent for the Agent's sole and exclusive benefit.

(d)     The Guaranty Percentage has also been fixed based upon the assumption that the aggregate Cost Value of the Merchandise included in the Sale as a percentage of Retail Price of the Merchandise included in the Sale (without taking into account any Prevailing Discount Adjustment(applied to Distribution Center Merchandise, In-Transfer Merchandise and/or Returned Merchandise) and/or Excluded Price Adjustments) (the "Cost Factor") attributable to the Merchandise, excluding the Direct Business Merchandise, shall not be greater than twenty-seven and three-quarters of one percent (27.75%) (the "Store/DC Merchandise Cost Factor Threshold"), and the Cost Factor attributable to the Direct Business Merchandise included in the Sale shall not be greater than thirty-four and five-tenths of one percent (34.5%) (the "Direct Business Merchandise Cost Factor Threshold" and with the Store/DC Merchandise Cost Factor Threshold, as applicable the "Cost Factor Threshold"). In the event that the Cost Factor for the Merchandise (other than the Direct Business Merchandise) is greater than the Store/DC Merchandise Cost Factor Threshold, then such deviation shall not constitute a breach of any representation or warranty, or an Event of Default; provided, however, that, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(d) attached hereto. In addition, in the event that the Cost Factor for the Direct Business Merchandise is greater than the Direct Business Merchandise Cost Factor Threshold, then such deviation shall not constitute a breach of any representation or warranty, or an Event of Default; provided, however, that, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(d) attached hereto. Any adjustment to the Guaranty Percentage provided for under this Section 3.1(d) shall be cumulative with, and in addition to, any other adjustment provided for under this Section 3.1(d) and otherwise in this Agreement, including, but not limited to, any adjustment provided for under Exhibit 3.1(b) hereof. For purposes of this Agreement:

(i)     "Retail Price" means, with respect to each item of Merchandise, the lowest of the lowest ticketed price, determined as of the Sale Commencement Date, "Style Chain Current Retail" as reflected on the Cost File, other file price, marked price, shelf price, hang-tag price, stickered price, PLU price, or other hard-marked price, excluding Excluded Price Adjustments; provided, however, that, with respect to Aged Merchandise, the "Retail Price" shall be the lower of (x) the Retail Price as determined in accordance with the sentence to which this proviso is attached; or (y) the original retail price for such item of Aged Merchandise, multiplied by (y) fifty percent (50%). For purposes of calculating Retail Price, if an item of Merchandise has more than one ticketed price, "Style Chain Current Retail" as reflected on the Cost File, other file price,

marked price, shelf price, hang-tag price, stickered price, PLU price, or other hard-marked price, or if multiple items of the same SKU have different ticketed, "Style Chain Current Retail" as reflected on the Cost, other file, marked, shelf, hang-tag, stickered, PLU, or other hard-marked prices and such pricing does not otherwise qualify as an Excluded Price Adjustment, the lowest ticketed price, "Style Chain Current Retail" as reflected on the Cost File, other file price, marked price, shelf price, hang-tag price, stickered price, PLU price, or other hard-marked price on any such item shall prevail for such item or for all such items within the same SKU, as the case may be, that are located within the same location (as the case may be, the "Lowest Location Price"), unless it is reasonably determined by Merchant or Agent that the applicable Lowest Location Price was mismarked, normal course markdowns had not been reflected or taken, or such item was priced because it was damaged or marked as "as is," in which case the correct price shall control; provided, however, in determining the Lowest Location Price with respect to any item of Merchandise at a Store or Distribution Centers, the Lowest Location Price shall be determined based upon the lowest Retail Price for such item on a per location basis. No adjustment to Retail Price shall be made with respect to different Retail Prices for items located in different locations.

(ii)      "Excluded Price Adjustments" means the following discounts or price adjustments offered by the Merchant by any means: (i) point of sale discounts or similar adjustments regardless of duration; (ii) employee discounts; (iii) member or customer appreciation points or coupons; (iv) multi-unit purchase discounts; (v) adjustments for damaged, defective or "as-is"" items; (vi) coupons (Merchant's or competitors') or similar type coupons/promotions, "groupons", catalog, website, or circular prices, or "buy one get one" type discounts, or similar type discounts or promotions; (vii) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (viii) obvious ticketing or marking errors; (ix) instant (in-store) or mail in rebates; or (x) similar customer specific, temporary, or employee non-product specific discounts or pricing accommodations.

(e)      To ensure accurate sales audit functions, Agent shall use Merchant's existing point-of-sale system for recording all sales of Merchandise (including any sales of Additional Agent Merchandise) in the Stores and through the Direct Business Platform, all of Merchant's existing systems for recording all sales (including sales of any Additional Agent Merchandise).

3.2      Payments to Agent.  Subject to Agent's obligation to pay in full the Guaranteed Amount, and all Expenses, Agent shall be entitled to retain any remaining Proceeds. Provided that no Event of Default has occurred and continues to exist on the part of Agent, all Merchandise and Additional Agent Merchandise remaining at the conclusion of the Sale ("Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims, and encumbrances of any kind or nature. Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo.

3.3      Time of Payments; Proceeds; Control of Proceeds

(a)      During the Interim Sale Period, as part of each weekly reconciliation as provided for in Section 8.7(a), Merchant shall collect all of the Proceeds (the "Interim Sale

10

Proceeds") and (x) all Interim Sale Proceeds shall first be applied to the payment of Expenses that are incurred during the Interim Sale Period and become due and owing (collectively, the "Interim Sale Period Expenses") and (y) all remaining Interim Sale Proceeds after payment of Interim Sale Period Expenses (the "Unapplied Interim Sale Proceeds") shall be retained and applied by Merchant against the Guaranteed Amount (collectively, the "Interim Guaranty Installments") until the earlier of (i) receipt by Merchant of the balance of the Estimated Guaranteed Amount, or (ii) entry of the Approval Order. On the first business day after entry of the Approval Order (the "Payment Date"), Agent shall pay to Merchant an amount equal to the difference between (i) eighty percent (80%) of the Estimated Guaranteed Amount (as defined below) (the "Initial Guaranty Payment"); and (ii) the aggregate amount of the Interim Guaranty Installments retained by Merchant (with such differential being the "Remaining Initial Guaranty Payment"). The Estimated Guaranteed Amount shall be calculated by taking product of (x) the Guaranty Percentage *multiplied by* (y) the estimated aggregate Cost Value of the Merchandise to be included in the Sale (inclusive of Direct Business Merchandise), excluding any amounts attributable to In-Transit Merchandise, if applicable) as reflected on Merchant's books and records at the close of business on the last business day immediately preceding the Sale Commencement Date (the "Estimated Guaranteed Amount"). On the Payment Date, the Remaining Initial Guaranty Payment shall be made by wire transfer of immediately available funds to the account designated on Exhibit 3.3(a) attached hereto (the "Merchant's Designated Account"). The balance of the Guaranteed Amount (including any amounts attributable to In-Transit Merchandise not otherwise paid for or attributable to the inclusion of the Direct Business Merchandise in the Sale), shall be paid by Agent by wire transfer of immediately available funds to the Merchant's Designated Account on the earlier of: (x) the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise counted by the Inventory Taking Service following the completion of the Inventory Taking, after review, reconciliation and mutual written verification thereof by Agent and Merchant, in consultation with Lender (the "Final Inventory Report"); (y) the date that is thirty (30) days after the Sale Commencement Date (in the case of (y) above, Agent shall tender payment of the undisputed portion only on account of any remaining portion of the Guaranteed Amount). With respect to the Direct Business Merchandise, the balance of the Guaranteed Amount shall be paid as part of the Final Reconciliation. In the event of a dispute as to the calculation of the portion of the Guaranteed Amount, any such dispute shall be resolved in the manner and at the times set forth in 8.7(b)(ii) hereof, and Agent's failure to pay such balance or undisputed portion shall entitle the Merchant and the Lender (individually or collectively) to draw upon the Letter of Credit in accordance with Section 3.3(g) hereof to the extent of such balance or undisputed portion. Merchant and Agent shall exercise reasonable best efforts to reconcile the Inventory Taking within ten (10) days after its completion. In the event that the Initial Guaranty Payment is either less than or exceeds the Guaranteed Amount, as applicable, Agent or Merchant, as the case may be, shall pay to Merchant or Agent, as the case may be, the amount (the "Adjustment Amount") by which the actual Guaranteed Amount exceeds or is less than the sum of the Initial Guaranty Payment.

For purposes of this Agreement, "Proceeds" shall mean the aggregate of (i) the total amount (in dollars) of all sales of Merchandise in the Stores and/or through the Direct Business Platform provided for in Section 8.10 hereof; (ii) all service revenue received by Merchant from the Stores and/or through the Direct Business Platform (if applicable), in each case during the Sale Term and exclusive of Sales Taxes; (iii) the total amount (in dollars) of all sales of Additional Agent Merchandise (exclusive of Sales Taxes); (iv) all proceeds of Merchant's insurance for loss or

damage to Merchandise arising from events occurring during the Sale Term relating to the Merchandise and Additional Agent Merchandise; (v) all amounts received from customers or other third parties on account of postage, overnight delivery or other shipping charges related to the delivery of Merchandise and Additional Agent Merchandise to the consumers; and (vi) any and all proceeds received by Agent from the disposition of Remaining Merchandise. For the avoidance of doubt: (1) proceeds from the sales at Merchant's Stores or through the Direct Business Platform for periods prior to the Sale Commencement Date; (2) the proceeds from the sale of Merchant Consignment Goods pursuant to Section 5.4 hereof (subject to Agent's right to receive the commission under Section 5.4 below); (3) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring prior to the Sale Commencement Date; (4) proceeds from the sale or other disposition of Owned FF&E; and (5) payments made by Agent on account of the Guaranteed Amount, Expenses, and the Letter of Credit, shall, in each case, not constitute "Proceeds" hereunder.

(b)     Following the earlier of (i) payment of the Guaranteed Amount in full; or (ii) entry of the Approval Order, all Proceeds shall be controlled by Agent in the manner provided for below:

(i)     Prior to the date Agent establishes the Agency Accounts (see clause (ii) below), all Proceeds (including credit card Proceeds) shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, owned and in the name of, Merchant for the Stores, which accounts shall be designated for the deposit of Proceeds (including all cash, credit card payments, checks and similar items of payment, deposits and any other amounts contemplated by this Agreement (including proceeds from the sale of Additional Agent Merchandise)), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts"). Subject to the provisions of Section 16.11 hereof, the Approval Order shall provide (a) that Merchant grants to Agent a first priority security interest in and lien upon each Designated Deposit Account to the extent of any Proceeds and any other amounts payable to Agent deposited therein, and (b) for turnover to Agent of any such Proceeds (and any other amounts payable to Agent deposited therein) in accordance with the terms and provisions of this Agreement and the Approval Order, as applicable. If, notwithstanding the provisions of this Section, Merchant or Lender receives or otherwise has dominion over or control of any Proceeds, or other amounts due to Agent (including proceeds from the sale of Additional Agent Merchandise), Merchant and Lender shall hold the same and other amounts in trust for Agent, and shall not deposit such Proceeds or other amounts due Agent hereunder in any account except a Designated Deposit Account or as otherwise instructed by Agent. Until such time as Agent establishes the Agency Accounts (see clause (ii) below), Merchant, Agent and Lender shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement that are deposited into the Designated Deposit Accounts.

(ii)     After payment of the Initial Guaranty Payment and delivery of the Letter of Credit, Agent may establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds (including credit card Proceeds), and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"),

12

and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent may elect to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement, and the distribution of amounts payable hereunder; provided that, in the event (a) Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, and (b) such accounts have amounts deposited therein by Merchant that do not constitute Proceeds and/or other amounts payable to Agent under this Agreement, then Merchant, Agent, upon its appointment, the Committee and Lender shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds (including credit card Proceeds) and other such amounts. Upon request, Agent shall deliver to Merchant and Lender copies of all bank statements and other information relating to the Agency Accounts; provided that, in the event Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, Merchant shall deliver to Agent copies of all bank statements and other information relating to such accounts to enable Agent to track and trace deposited funds that constitute Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement. The Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

(iii)     Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, and Merchant identification number(s) and existing bank accounts for credit card Proceeds solely for purposes of the Sale, and for processing transactions relating to Additional Agent Merchandise. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds (and proceeds from Additional Agent Merchandise) for Agent's own account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to Merchandise and Additional Agent Merchandise sold during the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received, prior to, during or after the Sale Term.

(iv)     Commencing on the first business day following the Payment Date, and continuing on each business day thereafter, Merchant shall promptly pay to Agent by wire transfer of immediately available funds all funds constituting Proceeds (including, without limitation, Proceeds from credit card sales), and proceeds from Additional Agent Merchandise that

are deposited into the Designated Deposit Accounts for the prior day. Agent shall, within a reasonable period of time after the date of each such payment by Merchant, notify Merchant and Lender of any shortfall in such payment, in which case, Merchant shall promptly pay to Agent funds in the amount of any undisputed shortfall.

(c)     Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after two (2) business days' notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after two (2) business days' notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(d)     All amounts required to be paid by Agent or Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later than 2:00 p.m. (prevailing Eastern Time) on the date that such payment is due; provided, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (prevailing Eastern Time) on the date that such payment is due. In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

(e)     Upon Agent's failure to timely pay (i) the Adjustment Amount in the event the Guaranteed Amount exceeds the Initial Guaranty Payment, (ii) Expenses, or (iii) other undisputed amounts due by Agent under this Agreement, Lender or Merchant, as applicable, shall be entitled to immediately draw upon the Letter of Credit to the extent of such undisputed amount.

(f)     If, and to the extent, the Agent over-funds any amounts in respect of the Guaranteed Amount hereunder (as determined pursuant to the express terms of this Agreement) and such funding or payment cannot be recovered by the Agent from Merchant under Section 3.3(a) or Section 3.3(c), by means of an offset or otherwise, then Merchant agrees (or if Merchant shall be unable to or otherwise for any reason fails to, and Salus Capital Partners, LLC, in its capacity as administrative agent and collateral agent (the "Lender"), has received such funding or payment, the Lender agrees) to reimburse such undisputed amount of such overfunded amount to Agent within two (2) business days of written demand thereof by Agent.

(g)     Guaranty Security. To secure payment of the balance of any unpaid portion of the Guaranteed Amount, Expenses and other amounts due to Merchant hereunder, on the first business day following the entry of the Interim Approval Order, Agent shall deliver to Lender, as Merchant's designee, an irrevocable standby letter of credit, substantially in the form of Exhibit 3.3(h) attached hereto, in an original stated amount equal to the aggregate of (x) twenty percent (20%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course as of the date immediately preceding the Payment Date), and (y) three (3) weeks' estimated Expenses (the "Letter of Credit"). The Letter of Credit shall name Merchant as beneficiary. The Letter of Credit shall be delivered to Lender, no later than the second business day following the Sale Commencement Date, and shall be issued by a U.S. national bank selected

14

by Agent and reasonably acceptable to Merchant and Lender; for the avoidance of doubt, Bank of America, N.A. or its affiliate shall be deemed acceptable to Merchant and Lender. In the event that Agent fails to timely pay any undisputed amount hereunder in respect of the Guaranteed Amount, Expenses and/or other amounts due to Merchant, as required under this Agreement, Merchant shall be entitled to draw on the Letter of Credit to fund such undisputed amount or obligation after five (5) business days' written notice to Agent. Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount; provided, however, until the Final Reconciliation has been completed, under no circumstances shall the face amount of the Letter of Credit be reduced to an amount less than two (2) weeks' estimated Expenses (and Merchant and Lender shall cooperate with respect to each such request). The Letter of Credit shall expire no earlier than sixty (60) days after the Sale Termination Date; provided that, if, as of the tenth (10th) business day prior to the scheduled expiration date of the Letter of Credit, there remains any unresolved dispute as to the Guaranteed Amount, Expenses and/or other amounts due to Merchant under this Agreement, Agent shall cause the expiration date of the Letter of Credit to be extended for successive thirty (30) day intervals (or such other longer duration as Merchant and Agent may agree) until the subject dispute has been resolved and any additional amounts due hereunder on account of the Guaranteed Amount, Expenses and/or other amounts due to Merchant, have been paid to Merchant. If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) business days prior to the expiration date of the Letter of Credit (as may have been extended previously), Merchant shall have the right to make a drawing under the Letter of Credit in an amount equal to the amount(s) Merchant asserts are then owing to Merchant. After completion of the Final Reconciliation and payment in full of all amounts owing by Agent (including but not limited to the Guaranteed Amount, and Expenses), Merchant and Lender shall surrender the original Letter of Credit to the issuer thereof together with written notification that the Letter of Credit may be terminated. Upon Lender's receipt of payment in full of its claims against the Merchant, Lender shall promptly deliver the Letter of Credit to Merchant.

(h)     Upon execution of this Agreement, Merchant shall fund an Expense retainer to Agent in the amount of $600,000 (the "Retainer") to secure payment of Expenses, which Retainer shall be used to pay or reimburse Agent for certain Expenses paid or to be paid by Agent prior to entry of the Approval Order (inclusive of signage costs, supervision and Agent 50% share of the Inventory Taking). During the first Weekly Sale Reconciliation following entry of the Approval Order, Merchant shall be reimbursed or credited by Agent for the Retainer.

## Section 4.     Expenses of the Sale

4.1     Expenses. Subject to the entry of the Approval Order by December 24, 2014, Agent shall be unconditionally responsible for all Expenses, which expenses shall be paid by Agent in accordance with Section 4.2 below. Agent and/or Merchant and/or Lender may review or audit the Expenses at any time. Effective from and after the Payment Date, Agent shall be obligated to pre-fund (i) any payroll-related expenses consistent with Merchant's customary payroll funding practices and timing; and (ii) Occupancy Expenses for the Stores weekly in advance. As used herein, "Expenses" shall mean the Store-level (and where expressly applicable, Distribution Center-level) operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

(a)    (i) actual Occupancy Expenses for the Stores (that are in operation of each such date) on aggregate per diem basis in an amount up to the aggregate per diem amount set forth on Exhibit 4.1(a) hereto; plus (ii) the portion of any percentage rent obligations allocable to the sale of Merchandise during the Sale to the extent set forth on Exhibit 4.1(a), *plus* (iii) the portion of any percentage rent obligations attributable to the sale of Additional Agent Merchandise during the Sale to the extent set forth on Exhibit 4.1(a) (in each case as determined in the manner described in the definition of "Occupancy Expenses" below in this Section 4.1);

(b)    actual wages and commissions for all Store-level Retained Employees used in conducting the Sale; provided that, Agent shall only be obligated to pay 50% of the payroll wages for Store-level Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining 50% of the wages for Retained Employees used during the Inventory Taking;

(c)    actual amounts payable by Merchant for benefits for Retained Employees (including payroll taxes, FICA, unemployment taxes, workers' compensation and health care insurance benefits, but excluding Excluded Benefits) for Store-level Retained Employees used in the Sale, in an amount up to sixteen percent (16.0%) of base payroll (including commissions) for all Retained Employees in the Stores (the "Benefits Cap");

(d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)    all costs and expenses associated with Agent's on-site supervision of the Closing Locations, including but not limited to any and all fees, wages, bonuses, deferred compensation, taxes, and third party payroll costs and expenses of Agent's field personnel, travel to, from or between the Closing Locations, and all out-of-pocket and commercially reasonable expenses relating thereto;

(f)    all signage, banners, sign walkers, and in-Store signs that are produced for the Sale (inclusive of the Signage Costs provided for in Section 16.11);

(g)    promotional costs including, without limitation, email blasts, television, and any other advertising and/or direct mail attributable to the Sale and ordered or requested by Agent;

(h)    the costs and expenses of obtaining additional supplies used at the Stores as may be required by Agent in the conduct of the Sale;

(i)    Intentionally omitted;

(j)    postage/overnight delivery/courier charges to and from or among the Stores to the extent relating to the Sale;

(k)    credit card and bank card fees, chargebacks, and discounts attributable to the Sale at the Stores;

(l)     any and all costs of moving, transferring, or consolidating Merchandise and/or Additional Agent Merchandise and/or Direct Business Merchandise (to the extent such goods are included in the Sale and Agent elects to transfer Direct Business Merchandise to the Stores) between and among the Stores;

(m)     a pro rata portion for the Sale Term of Merchant's premiums in respect of general liability, casualty, property, inventory, and other insurance policies attributable to the Merchandise and Additional Agent Merchandise;

(n)     third-party payroll processing fees for the Stores and the Direct Business Platform;

(o)     armored car service and security personnel;

(p)     actual cost of Agent's capital, reasonable and documented legal expenses, letter of credit fees and insurance (as provided in Section 12.4 hereof);

(q)     Cost of transferring the Distribution Center Merchandise to the Stores up to an aggregate amount of $100,000;

(r)     Agent's 50% of the third party fees and costs of the Inventory Taking;

(s)     Actual Central Service Expenses in an amount equal to $10,000 per week (pro-rated for partial weeks) for the Sale Term (payable to Merchant) in respect of the cost of Merchant providing Central Services in accordance with Section 8.1 hereof;

(t)     Store cash thefts and other Store cash shortfalls in registers;

(u)     actual costs and expenses associated with operating the Direct Business Platform in an amount up to $45,000 per week (prorated for partial weeks);

(v)     actual Distribution Center Expenses (prorated for partial weeks);

(w)     actual costs and expenses of postage, overnight delivery or other shipping charges related to the delivery of Merchandise and Additional Agent Merchandise to the consumers;

(x)     any costs and expenses incurred in connection with the acquisition (including costs of goods), shipping, delivery, processing and transfer of any Additional Agent Merchandise;

(y)     costs and expenses associated with temporary labor requested or obtained by Agent for purposes of the Sale;

(z)     All costs and expenses incurred by Agent in order to comply with Applicable General Laws and/or Liquidation Sale Laws unless and until entry of the Approval Order; and

17

(aa)    the actual costs and expenses of Agent providing such additional services as the Agent reasonably deems appropriate for the Sale.

"Expenses" shall not include: (i) Central Service Expenses in excess of the amount set forth in Section 4.1(s); (ii) Excluded Benefits; (iii) any rent or other occupancy expenses other than Occupancy Expenses in accordance with Section 4.1(a) hereof; (iv) Distribution Center Expenses in excess of amounts provided for in Section 4.1(v); (v) costs of maintaining and operating Merchant's websites and Direct Business Platform in excess of the amounts provided for in Section 4.1(u); (vi) costs or expenses of postage, overnight delivery or other shipping charges related to the delivery of Merchandise and Additional Agent Merchandise to the consumers (except to the extent sold through the Direct Business Platform in which case Agent shall be responsible for payment in accordance with section 4.1(w) only) or (vii) any costs, expenses or liabilities arising during the Sale Term, other than the Expenses listed above. All costs or expenses related to the Sale not included as Expenses shall be paid by Merchant promptly when due during the Sale Term. Notwithstanding anything to the contrary herein, (x) to the extent that any Expense listed in Section 4.1 is also included on Exhibit 4.1(a), then Exhibit 4.1(a) shall control and such Expense shall not be double counted. Except as provided in this Section 4.1, no Expenses shall be paid with respect to any distribution center/warehouses other than the Distribution Centers Expenses.

As used herein, the following terms have the following meanings:

"Central Service Expenses" means costs and expenses for Merchant's Central Services.

"Central Services" means those Merchant central administrative services necessary for the conduct and support of the Sale, including, but not limited to, use or and access to Merchant's: (i) inventory control system, (ii) payroll system, (iii ) accounting system, (iv) office facilities, (v) central MIS and POS services, (vi) cash reconciliation, (vii) central administrative services and personnel to process and perform sales audit, banking, and other normal course administrative services customarily provided to or for the benefit of operating the Distribution Centers and/or the Stores, (viii) such other central office services reasonably necessary for the Sale, and (ix) use by Agent reasonably sized offices located at Merchant's central office facility to effect the Sale.

"Distribution Center Expenses" means an amount up to (i) $25,000 per week (prorated for partial weeks) in respect of Merchant's provision of Distribution Center Services during the period of the Sale (during which the Agent is utilizing the Distribution Centers , in each case for the period commencing on the Sale Commencement Date and concluding on the earliest to occur of (x) the Sale Termination Date or (y) the Vacate Date for the applicable Distribution Center; plus (ii) incremental costs and expenses associated with Additional Agent Merchandise, including, without limitation, the receipt, tagging, processing and/or transfer of the Additional Agent Merchandise from the Distribution Centers to the Stores. Agent shall pay Merchant any such Distribution Center Expense amount that may be due on a weekly basis as part of the weekly Sale reconciliation provided for under Section 8.7(a) hereof.

18

"Distribution Center Services" means those services customarily performed by Merchant in operating and maintaining the Distribution Centers in the ordinary course of business and in the course of receiving and distributing goods and supplies to the Stores, including, but not limited to, with respect to (i) payroll and related employee benefits of all Distribution Centers employees; (ii) rent and other occupancy costs and expenses associated with the Distribution Centers; (iii) the handling, receiving, in-take, storage, ticketing and processing of any Merchandise, Distribution Center Merchandise, In-Transit Merchandise, or Additional Agent Merchandise at the Distribution Centers; (iv) any required supplies in connection with the foregoing; (v) any Central Services required to operate and maintain the Distribution Centers during the Sale Term applicable thereto; and (vi) costs and expenses of moving, transferring, or consolidating Merchandise or Additional Agent Merchandise between the Distribution Centers and the Stores. Merchant hereby covenants and agrees to provide the Distribution Center Services throughout the Sale Term and, except as provided and solely to the extent set forth in section 4.1(v), Merchant shall be responsible for the payment of all costs and expenses associated with the Distribution Centers and the Distribution Center Services.

"Excluded Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Benefits Cap, including, without limitation, any payments due under the WARN Act.

"Occupancy Expenses" means rent, percentage rent, common-area maintenance, landlord promotional fees, real estate and use taxes, HVAC, utilities, telecom/telephone charges, point-of-sale systems maintenance, store security systems, routine repairs and maintenance, taxes and licenses, costs of all local, long-distance, and international telephone, satellite broadband connections, T-1 lines, broadband internet, and other telecommunications services, trash removal (to the extent excluded as a fixed charge component of lease obligation), snow removal, and ordinary course third-party cleanings, pest control services, plus any percentage rent obligations incurred by Merchant under applicable leases or occupancy agreements that are allocable to the sales as part of the Sale during the Sale Term of: (x) Merchandise and (y) Additional Agent Merchandise included in the Sale. Merchant and Agent agree that Exhibit 4.1(a) shall specify the actual applicable percentage and any applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s). Merchant and Agent further agree that in the event Exhibit 4.1(a) does not specify the actual applicable percentage and/or the applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s), Agent shall have no obligation to pay percentage rent other than as set forth on Exhibit 4.1(a). Notwithstanding anything to the contrary set forth in this Agreement, Merchant and Agent further agree that to the extent that, in connection with the conduct of the Sale and/or Agent's vacating of the Stores (but not in connection with the disposition of any unsold Owned FF&E or other non-Merchandise assets being abandoned or otherwise disposed of by Merchant), Merchant incurs additional trash removal charges at a Store, other than the fixed charge component of Merchant's lease obligation for a particular Store provided for on Exhibit 4.1(a) (the "Non-CAM Trash Removal Charges"), such Non-CAM Trash Removal Charges shall be paid

19

by Agent as an Expense of the Sale, in addition to any trash removal charges as may be set forth in Exhibit 4.1(a) hereof.

"Third-party" means, with reference to any Expenses, a party that is not affiliated with or related to Merchant.

4.2     Payment of Expenses. From and after the Payment Date, Agent shall be responsible for the payment of all Expenses, whether or not there are sufficient Proceeds collected to pay such Expenses after the payment of the Guaranteed Amount. All Expenses incurred during each week of the Sale (i.e., Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.7(a) below, based upon invoices and other documentation reasonably satisfactory to Merchant and Agent.

Section 5.     Inventory Valuation; Merchandise.

5.1     Inventory Taking. Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU-level and Retail Price physical inventory of the Merchandise located in the Stores and shall count the Distribution Centers in accordance with the below (collectively, the "Inventory Taking"). Subject to the availability of the Inventory Taking Service, Merchant and Agent shall use commercially reasonable efforts to complete the Inventory Taking as follows: (x) as to Merchandise located in the Stores, in each Store no later than twenty one (21) days after the Sale Commencement Date (the date of the Inventory Taking at each Store being the "Inventory Date" for such Store); (y) with regard to Distribution Center Merchandise and In-Transit Merchandise, when such Merchandise is shipped from the applicable Distribution Center to the Stores, and (z) with regard to Direct Business Platform Merchandise, (1) as such Merchandise is shipped to the customers or (2) in the case of Direct Business Platform Merchandise that is not sold to customers, as such Merchandise is shipped from the applicable Distribution Center to the Stores. Merchant and Agent shall jointly employ RGIS or another mutually acceptable independent inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking in the Stores, and Merchant and Agent shall agree upon procedures for Merchandise that is counted at the Distribution Centers before it is shipped to the Stores. The Inventory Taking shall be conducted in accordance with the procedures and instructions to be mutually agreed upon by Merchant (in consultation with the Lender) and Agent and made a part of this Agreement as Exhibit 5.1(a) (the "Inventory Taking Instructions"). As an Expense, Agent shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service. The balance of such fees and expenses shall be paid by Merchant. Except as provided in the immediately preceding sentence, Merchant and Agent shall each bear their respective costs and expenses related to the Inventory Taking; provided that, Agent shall be obligated to pay fifty percent (50%) of the payroll and related benefit costs (subject to the Benefits Cap) for Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining fifty percent (50%) of the payroll and related benefit costs for Retained Employees used during the Inventory Taking. Merchant, Agent, upon its appointment, the Committee, and Lender shall each have the right to have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service. Merchant agrees that during the Inventory Taking in each of the Stores, the applicable

20

Store shall be closed to the public and no sales or other transactions shall be conducted until the Inventory Taking has been completed, as agreed by Merchant and Agent. Merchant and Agent further agree that until the Inventory Taking in each particular Store is complete, Agent shall not (i) transfer any Merchandise to or from that Store, (ii) deliver any Additional Agent Merchandise to such Store, (iii) move Merchandise within or about the Stores, or (iv) remove any Merchant hang tags, price tickets, inventory control tags, or other indicia of pricing affixed to or related to any Merchandise. Agent and Merchant (in consultation with the Lender) shall use their reasonable best efforts to reconcile the Inventory Taking (including, but not limited to, the determination of the aggregate Cost Value of the Merchandise), within ten (10) days after its completion. In the event there is any dispute with respect to the reconciliation of the aggregate Cost Value of the Merchandise following completion of the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof).

     5.2   <u>Merchandise Subject to this Agreement</u>.

     (a)   For purposes of this Agreement, including but not limited to the calculation of the Guaranteed Amount, "<u>Merchandise</u>" means all new, first quality (other than as expressly set forth below), finished goods inventory that is owned by Merchant and customarily sold to customers in the ordinary course of Merchant's business, including, but not limited to, (i) Merchandise subject to Gross Rings; (ii) Merchandise located in the Stores on the Sale Commencement Date (other than Direct Business Merchandise); (iii) Direct Business Merchandise; (iv) Distribution Center Merchandise received in the Stores on or before the date that is twenty-one (21) days after Agent's delivery of the Merchandise Allocation to Merchant (the "<u>Receipt Deadline</u>"); (v) In-Transit Merchandise received at the Stores on or before the Receipt Deadline, (vi) Aged Merchandise; (vii) Defective Merchandise (to the extent Merchant and Agent can mutually agree on the Cost Value applicable thereto). Notwithstanding the foregoing, "Merchandise" shall not include (i) goods that belong to sublessees, licensees, or concessionaires of Merchant; (ii) goods held by Merchant on memo, on consignment, or as bailee; (iii) Excluded Defective Merchandise; (iv) Additional Agent Merchandise; and (v) furnishings, trade fixtures furniture, and equipment and improvements to real property that are located in the Closing Locations or the corporate offices; (vi) if applicable, Distribution Center Merchandise that is not received at the Stores on or before the Receipt Deadline; and/or (vii) In-Transit Merchandise that is not received at the Stores on or before to the Receipt Deadline.

     (b)   As used in this Agreement, the following terms have the respective meanings set forth below:

     "<u>Aged Merchandise</u>" means items of Merchandise located in the Stores and the Distribution Center Merchandise (but not Direct Business Merchandise) for which the "Style Last Receipt Date" was on or before May 31, 2014 as reflected on the applicable Cost File.

     "<u>Defective Merchandise</u>" means any item of Merchandise identified and agreed upon by Merchant and Agent (with each party acting reasonably) as defective in that it is damaged, defective, scratched, soiled, ripped, torn, stained, faded, discolored, dented, out of box (if normally sold as new in-the-box), missing pieces, mismatched, mis-mated or near-sized, parts,

items typically sold as a set which are incomplete, or gift with purchase items, or otherwise affected by other similar defenses rendering it not first quality. Sample merchandise and merchandise on display in the Stores shall not per se be deemed to be Defective Merchandise.

"Direct Business Merchandise" means those items of inventory identified on Exhibit 5.2(b)(2) that are located in Merchant's Distribution Centers on the Sale Commencement Date, which have been ear-marked and/or ticketed in the ordinary course of business for sale through the Direct Business Platform.

"Distribution Center Merchandise" means those items of inventory identified on Exhibit 5.2(b)(1) that are located in Merchant's Distribution Centers on the Sale Commencement Date that do not constitute Direct Business Merchandise. Merchant shall be responsible for providing the Distribution Center Services with respect to the Distribution Center Merchandise. Agent and Merchant shall cooperate with one another and mutually agree upon an allocation schedule or allocation schedules of Distribution Center Merchandise in light of the circumstances of the Sale, including (without limitation) Store capacity, Receipt Deadline (if applicable), and balance of the Sale Term remaining, with each party acting reasonably.

"Excluded Defective Merchandise" means (a) any item of Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used or sold for its intended purpose, (b) any item of Defective Merchandise for which the parties cannot mutually agree upon a Cost Value, and/or (c) packaway merchandise. Excluded Defective Merchandise located in the Stores shall be identified and counted during the Inventory Taking and thereafter removed from the sales floor and segregated. To the extent that goods in the Distribution Centers or in transit to the Stores constitute Excluded Defective Merchandise and such goods arrive at the Stores despite Merchant's covenant not to ship such goods to the Stores, such goods shall be identified during the Inventory Taking or, to the extent such goods arrive in a Store after the Inventory Date for such Store, such goods shall be reasonably identified by Agent within five (5) business days of receipt of at such Store and thereafter removed from the sales floor and/or segregated.

"In-Transit Merchandise" means items of inventory purchased by Merchant prior to the date of this Agreement, which goods are either subject to a Letter of Credit issued by Merchant and cannot be cancelled as of the date of this Agreement, and/or are already in transit to Merchant from the vendor as of the Sale Commencement Date. Agent and Merchant shall cooperate with one another and mutually agree upon an allocation schedule or allocation schedules of In-Transit Merchandise in light of the circumstances of the Sale, including (without limitation) Store capacity, the Receipt Deadline or In-Transit Receipt Deadline (as and if applicable), and balance of the Sale Term remaining, with each party acting reasonably.

5.3   Valuation.

(a)   For purposes of this Agreement, "Cost Value" shall mean, with respect to each item of Merchandise, other than the Additional Agent Merchandise, the lower of (i)(x) the lower of the Merchant's actual cost of such item and (y) the cost of such item as reflected in the SKU for such item of Merchandise as reflected on (1) Merchant's inventory cost file attributable

22

to the Merchandise (other than the Direct Business Merchandise) identified on Exhibit 5.3(a)(1); and (2) Merchant's inventory cost file attributable to the Direct Business Merchandise identified on Exhibit 5.3(a)(2); and (ii) the Retail Price.

(b)    Anything in Section 5.3(a) to the contrary notwithstanding, Merchant and Agent further agree as follows:

(i)    The Cost Value and Retail Price of any item of Distribution Center Merchandise and In-Transit Merchandise that is not received at a Store as of the fourteenth (14th) day following Agent's delivery of the Merchandise Allocation to Merchant shall be the otherwise applicable Cost Value and Retail Price of such item (determined in accordance with Sections 5.3(a) above and 3.1(e)), *multiplied by* the inverse of the prevailing Sale discount in effect on the date such item arrives in the Store (the "Prevailing Discount Adjustment"). No later than two (2) business days after the Sale Commencement Date, Agent shall deliver an allocation and schedule of Distribution Center Merchandise and In-Transit Merchandise using commercially reasonable and good faith efforts to allocate and schedule shipments of Distribution Center Merchandise and In-Transit Merchandise from the Distribution Centers to the Stores so as to minimize, where practicable (i.e., giving due consideration to the needs and capacity of the Stores) the effect of the Prevailing Discount Adjustment;

(ii)    Defective Merchandise shall be valued by mutual agreement of the parties; if the parties are unable to so agree, or if an item is determined to be Excluded Defective Merchandise, such goods shall be excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder, including, without limitation, calculation of the Guaranteed Amount and Proceeds;

(iii)    Excluded Pricing Adjustments shall not be taken into account in determining the Cost Value of any item of Merchandise;

(iii)    If the Sale commences prior to the completion of the Inventory Taking at any Store or the Distribution Centers, then for the period from the Sale Commencement Date until the Inventory Date for such Store (the "Gross Rings Period"), Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings") and (ii) cash reports of sales within such Store and or Direct Business Platform (if applicable) utilized by the subject Distribution Center. Agent and Merchant shall keep a strict count of register receipts and reports to determine the actual Cost Value and Retail Price of the Merchandise sold by SKU. All such records and reports shall be made available to Merchant and Agent during regular business hours upon reasonable notice. Any Merchandise included in the Sale using the Gross Rings method shall be included in Merchandise using the actual Cost Value of the Merchandise sold plus one percent (1.0%) shrink provision; and

5.4    Excluded Goods. Merchant shall retain all rights and responsibility for any goods not included as "Merchandise" hereunder and shall remove, at Merchant's expense, such goods

23

from the Stores and the Distribution Centers prior to the Sale Commencement Date, or as soon thereafter as reasonably practicable. If Merchant so elects at the beginning of the Sale Term, Agent shall accept those goods not included as "Merchandise" hereunder and as identified by Merchant for sale as "Merchant Consignment Goods". Merchant Consignment Goods shall be sold at prices mutually agreed upon by Merchant and Agent. Agent shall retain twenty percent (20%) of the sale price (less applicable Sales Taxes) for all sales of Merchant Consignment Goods, and Merchant shall receive eighty percent (80%) of the sale price (less applicable Sales Taxes) in respect of sales of Merchant Consignment Goods. Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the weekly reconciliation by Merchant and Agent pursuant to Section 8.7(a) below. Except as expressly provided in this Section 5.4, Agent shall have no cost, expense, or responsibility in connection with any goods not included in Merchandise, including but not limited to sales commissions and percentage rent.

     5.5     Distribution Center Services.

     (a)     On and after the Sale Commencement Date, Agent shall be responsible for allocating and designating the shipment of the Distribution Center Merchandise and In-Transit Merchandise to the Stores. Notwithstanding anything to the contrary herein, except as provided in Section 4.1(v), Agent shall not be responsible to pay any cost or expenses associated with the operation of the Distribution Centers.

     (b)     Agent's obligation to pay Distribution Center Expenses in accordance with Section 4.1(v) shall be limited to the period commencing on the Sale Commencement Date and concluding on the earliest to occur of (i) the Sale Termination Date or (ii) the Vacate Date for the applicable Distribution Center. Merchant agrees and covenants that it shall be responsible for performing and providing all Distribution Center Services.

Section 6.     Sale Term.

     6.1     Term. The Sale shall commence at each of the Stores on the first business day after execution of this Agreement, but in no event later than December 4, 2014 (the "Sale Commencement Date"). Agent shall complete the Sale and vacate the premises of each Store and the Direct Business Platform in favor of Merchant or its representative or assignee on or before the date that is the earlier of (i) April 15, 2015; and (ii) the date that is 120 twenty days after entry of an order for relief in Merchant's bankruptcy case (the earlier of (i) and (ii), the "Sale Termination Date"). The period beginning on the Sale Commencement Date through and including the Sale Termination Date shall be referred to herein as the "Sale Term". The Sale Termination Date as to any Store or Distribution Center may be (a) extended by mutual written agreement of Agent and Merchant, in consultation with the Lender or (b) accelerated by Agent, in which case Agent shall provide Merchant and the Lender with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date (each such notice being a "Vacate Notice"). If Agent fails to provide Merchant and the Lender with timely notice of an acceleration of the Sale Termination Date for a Store, Agent shall be liable for and shall pay any Occupancy Expenses resulting from such untimely notice.

     6.2     Vacating the Closing Stores and Distribution Centers. Subject to the terms

of Section 6.1 hereof, Agent shall provide Merchant and the Lender with not less than seven (7) days' advance written notice of its intention to vacate any Store or Distribution Center) (as to each such Store and/or Distribution Center, as applicable, the "Vacate Date"). On the Vacate Date, Agent shall vacate such Store and/or Distribution Center in favor of Merchant or its representatives or assignee, (subject to Agent's right to abandonment) remove all Remaining Merchandise (including any unsold Additional Agent Merchandise) from the Store and/or the Distribution Center in "broom clean" condition (ordinary wear and tear excepted) subject to the right to abandon, neatly in place, any unsold Owned FF&E. Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store and/or Distribution Center) (as and to the extent applicable) subject to Vacate Notice shall continue until the earlier of (a) the applicable Vacate Date for such Store and/or Distribution Center; and (b) the Sale Termination Date. All assets of Merchant used by Agent in the conduct of the Sale (e.g., FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Stores and/or the Distribution Centers), to the extent same have not been used in the conduct of the Sale or have not been otherwise disposed of through no fault of Agent. Any reference in this Section 6 to vacating the Stores and/or the Distribution Centers means vacating the Stores and/or Distribution Centers, as applicable, in favor of Merchant, its representatives, or assignee and shall not mean vacating possession or disclaimer of lease in favor of landlord or owner of the Store and/or Distribution Center premises. Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent, or licensee thereof) to any Store and/or Distribution Center during the Sale Term, ordinary wear and tear excepted. Agent shall have the right to abandon in place any asset of Merchant.

Section 7.    Designation Rights.

7.1    Certain Defined Terms. The following terms have the following meanings:

(a)    "Assets" means the Merchant's rights title and interests in and to the Intellectual Property.

(b)    "Asset Proceeds" means all cash and non-cash consideration received by Merchant or Agent from the sale or other disposition of the Assets, which for the avoidance of doubt shall exclude Proceeds and FF&E Proceeds.

(c)    "Asset Sharing Amount" means an amount equal to twenty-five percent (25%) of the Asset Proceeds in excess of $2,000,000, which amount (if any) shall be paid by Agent to Merchant promptly after receipt by Agent of Asset Proceeds in excess thereof.

(d)    "Cure Amount" means, with respect to each executory contract included within the meaning of Intellectual Property, the amount required to cure pre-Petition Date monetary defaults or compensate a counterparty for actual pre-Petition Date pecuniary loss, as required by Bankruptcy Code sections 365(b)(1)(A) and (B).

(e)    "Customer Lists" means any and all lists of current and past customers of Merchant and/or any business of Merchant, including any and all information relating in any way to the use of such lists for or by Merchant and/or any business of Merchant, including (x) personal information, such as name, address, telephone number, email address,

25

website and any other database information and (y) customer purchase history at a transaction level (including with respect to dollar amounts, dates, and items purchased) but excluding from the foregoing any credit card numbers or related customer payment source or financial information prohibited by law.

(f)     "Intellectual Property" means any and all worldwide rights in and to all tangible and intangible intellectual property assets of Merchant (whether arising under statutory or common law, contract, or otherwise), which include without limitation all of the following items owned by Merchant, for which Merchant is a licensee, sub-licensee, licensor, sub-licensor, assignee, assignor, or in which Merchant has an interest or right (and Schedule 1 hereto lists all issued or registered Intellectual Property and applications therefor owned by Merchant): (a) inventions, discoveries, processes, designs, techniques, developments and related improvements whether or not patentable; (b) patents, patent applications, industrial design registrations and applications therefor, divisions, divisionals, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, or any such patents or patent applications, and any foreign or international equivalent of any of the foregoing; (c) trademarks (whether registered, unregistered or pending), trade dress, service marks, service names, trade names, brand names, product names, logos, domain names, internet rights (including, without limitation IP Addresses and AS numbers), corporate names, fictitious names, other names, symbols (including business symbols), slogans, translations of any of any of the foregoing and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith and (to the extent transferable by law) any applications and/or registrations in connection with the foregoing and all advertising and marketing collateral including any of the foregoing; (d) work specifications, databases and artwork; (e) technical, scientific and other know-how and information (including promotional material), trade secrets, confidential information, methods, processes, practices, formulas, designs, patterns, assembly procedures, specifications owned or used by Merchant; (f) rights associated with works of authorship including copyrights, moral rights, design rights, rights in databases, copyright applications, copyright registrations, rights existing under any copyright laws and rights to prepare derivative works; (g) work for hire; (h) any and all rights of Merchant to the name "dELiA*s" or any derivation thereof, (i) Merchant's entire customer list and database (including all Customer Lists), and all assets used or useful by Merchant in the conduct of its catalog business and its business over the internet and/or in any other electronic medium, including (without limitation) any websites, social media sites and accounts (including the content contained therein, user names and passwords), diagrams, drawings, domain names, and all advertising and marketing materials and collateral (including all physical, digital, or electronic imagery and design files), samples, product catalogs, product designs and specifications (including tech specifications) vendor and merchandise supplier data and information, (j) software used in the operation of the Direct Business Platform, (k) all goodwill, rights and contracts (including all licenses and sublicenses granted or obtained with respect thereto) related to the foregoing, (k) the right to sue for infringement and other remedies against infringement of any of the foregoing, and (l) rights to protection of interests in the foregoing under the laws of all jurisdictions.

7.2     Designation Rights.  In partial consideration, and as a material component of the payment of the Guaranteed Amount and the Asset Sharing Amount (if any), during the Sale Term (the "Designation Rights Period") Agent shall have the exclusive right to direct

26

Merchant to designate the ultimate purchaser, acquirer, assignee, transferee, licensee, or designee, which, for the avoidance of doubt, may be the Agent or one or more affiliates of the Agent, as determined by Agent in Agent's sole and absolute discretion, of each of the Assets (collectively the "Designation Rights") and shall retain all Asset Proceeds (other than the Asset Sharing Amount) for Agent's sole and exclusive benefit. Merchant shall, upon such election by Agent, take such actions as may be reasonably required to effectuate all Designation Rights. Merchant agrees to cooperate with Agent to arrange for the sale or other disposition of the Assets, with such sales and dispositions to be on such terms as Agent shall determine in its sole and absolute discretion, subject to Section 7.10 of this agreement with respect to sale or transfer of the Customer List. Without limiting the generality of the foregoing, Merchant agrees to cooperate with Agent, its agents and any potential purchasers, acquirers, assignees, transferees, licensees, or designees of any of the Assets and provide unlimited access to the locations thereof.

7.3    Agent Dropout Rights. At any time prior to the expiration of the Designation Rights Period, Agent shall have the right, upon seven (7) days' written notice (the "Dropout Notice Period"), which right may be exercised at any time and from time to time in Agent's sole and absolute discretion, to provide notice to Merchant (each such notice, a "Dropout Notice") of Agent's election not to designate the ultimate purchaser, acquirer, assignee, transferee, licensee, or designee any Asset (each, a "Dropout Asset" and, collectively, the "Dropout Assets"). Upon the effective date of any Dropout Notice, (i) Agent shall have no further obligation or liability with respect to the subject Dropout Asset, and (ii) Merchant shall thereafter be solely responsible for all such Dropout Asset(s) from and after the effective date of the Dropout Notice. Upon Agent's delivery of a Dropout Notice, all rights to the Dropout Assets shall revert to Merchant, and Merchant may dispose of such Dropout Asset in such manner as Merchant may elect, and one hundred percent (100%) of all proceeds realized upon a disposition of such Dropout Asset shall be the exclusive property of Merchant (and shall not constitute Asset Proceeds, FF&E Proceeds, or Proceeds). The delivery of a Dropout Notice shall not result in a reduction of the Guaranteed Amount (as defined below) payable hereunder unless such Asset(s) was excluded due to a Merchant breach of this Agreement. Prior to the expiration of the Dropout Notice Period, the Agent, in its sole and absolute discretion, may withdraw any Dropout Notice upon written notice to Merchant.

7.4    Sale Notices. At any time prior to the expiration of the Designation Rights Period, Agent shall have the right, which right may be exercised at any time and from time to time, in Agent's sole and absolute discretion, to provide notice to Merchant (each such notice, a "Sale Notice") of Agent's election to require Merchant to seek Bankruptcy Court authority to designate the ultimate purchaser, acquirer, assignee, transferee, licensee, or designee any the Assets identified in the subject Sale Notice(s) (each, a "Designated Third Party Asset" and, collectively, the "Designated Third Party Assets") and sell, transfer, license, transfer, assign, or otherwise dispose of same to the purchaser, acquirer, assignee, transferee, licensee, or designee identified by Agent. Within three (3) business days following the date Agent delivers a Sale Notice and related information (including the applicable transaction documents) to Merchant, Merchant shall take all requisite actions (including, without limitation, actions required under Sections 363 and Section 365 of the Bankruptcy Code) to promptly sell, assume and assign the applicable Designated Third Party Asset(s) to the applicable designee identified in such Sale Notice(s). Other than in respect of the initial sale notice contemplated by Section 7.5 (excluding

"the subsequent Sale Notice" referenced in the proviso therein), Agent shall reimburse Merchant for all reasonable and documented costs incurred by Merchant with respect to effectuating a Sale Notice and obtaining approval of the associated sale or other disposition of the Assets in such Sale Notice (including, but not limited to, reasonable attorneys' fees and costs and noticing and copying fees and costs) (the "Transfer Costs"). Without limiting the generality of the foregoing, upon receipt of a Sale Notice, Merchant shall use commercially reasonable efforts to obtain the expedited entry of an order of the Court approving the sale or other disposition of the Designated Third Party Asset(s) and the sale or other disposition of such asset(s) to the specified designee, each in a form and substance reasonably acceptable to Agent, its designee, and Merchant.

       7.5    Initial Sale Notices. This Agreement shall be deemed to constitute a Sale Notice to Merchant of Agent's election to require Merchant to obtain Bankruptcy Court authority to sell or otherwise dispose of the Assets to one or more purchasers, acquirers, assignees, transferees, licensees, or designees as part of the relief granted in the Approval Order; provided, however, that, Agent shall have the right, in its sole discretion, delay such sale or other disposition to a future date identified in a subsequent Sale Notice.

       7.6    Adequate Assurances. If applicable, Agent shall cause the designee for the Assets to provide adequate assurance of future performance with respect to such Designated Third Party Asset in accordance with the Bankruptcy Code. Additionally, Agent or such designee, as applicable, shall pay all Cure Amounts.

       7.7    Carrying Costs and Expenses. Except with respect to the payment (or reimbursement to Merchant) of Expenses, Cure Amounts (if any and if applicable), the Transfer Costs, and costs or expenses associated with Agent's advertising or marketing with respect to the Assets, Merchant shall be responsible for paying costs and expenses customarily or historically incurred or paid by Merchant and associated with each Asset from and after the Petition Date through and including the earlier of (i) the closing of a transaction, subject to a Sale Notice or otherwise, with respect to each such Asset and (ii) the end of the Designation Rights Period.

       7.8    Rejection. Regardless of whatever elections Agent shall make under the this Agreement, the legal cost and expenses of the rejection at any time of any one or more Assets, including, without limitation, the filing and prosecution of any motions or other papers with respect to the same and/or the amount and priority of any claim arising from such rejection (collectively, the "Rejection Costs"), shall be borne solely by the Merchant. For the avoidance of doubt, if and to the extent that the Agent's actions (other than actions related to operation of the Direct Business Platform as contemplated by this Agreement) in respect of an executory contract result in Merchant incurring an allowed administrative expense not subject to defenses Merchant otherwise would not have incurred but for such actions, Agent shall be liable to reimburse Merchant for the allowed amount of such administrative expense.

       7.9    Procedures for Closings. Agent and Merchant shall cooperate and use best efforts to consummate the closing of any sale or other disposition of any Asset as promptly as possible. All Asset Proceeds (other than the Asset Sharing Amount) shall be retained by Agent for Agent's sole and exclusive benefit. All payments to Agent and all rights to Asset Proceeds (other than the Asset Sharing Amount) shall be free and clear of liens, claims, encumbrances and interests and shall not require any further Bankruptcy Court order. At each closing, Merchant

28

will deliver to the Agent's designee such documents and agreements as are provided for in the applicable transaction agreements to consummate the sale of the applicable Assets. Agent will prepare (and deliver to Merchant for its execution) the assignments, bills of sale, deeds, transfer tax declarations, and other closing documents to be delivered in connection with the closing in the forms contemplated in the applicable transaction agreements or otherwise in form reasonably acceptable to Merchant; provided, however, that Merchant will reasonably cooperate with Agent in such preparation.

7.10    Privacy. In connection with the transfer of the Customer List, any designee shall remain bound by and shall comply with the Merchant's privacy policy ("Privacy Policy") as currently set forth on Merchant's licensed website, "delias.com". Any designee, as successor-in-interest as to the personally identifiable information in the customer file, shall be liable for post-sale violations of the Privacy Policy. Should a designee propose to make any change to the Privacy Policy, such designee shall provide those listed on the Customer List with notice of the change and the opportunity to "opt-out". Any designee shall be bound by (a) the provisions of this Section 7.10; and (b) the Approval Order. The Approval Order shall provide, among other things, that any designee is the successor in interest to the Customer List; such designee shall be bound by the provisions of the Privacy Policy; such designee shall be responsible for any violation of the Privacy Policy after the date of the transfer; such designee shall provide notice to all customers on the Customer List that their email addresses are being transferred; such designee shall not disclose, sell or transfer customers' personally identifiable information to any third party in a manner inconsistent with the Privacy Policy; within 30 days of the entry of the Approval Order, the designee shall file a certification with the Bankruptcy Court that the notice described herein has been provided to Merchant's customers; and nothing in the Approval Order shall prevent or prohibit any designee or subsequent transferee of the Customer Lists from modifying the Privacy Policy in accordance with such Privacy Policy's terms and conditions.

Section 8.    Conduct of the Sale.

8.1    Rights of Agent and Merchant. Subject to the Interim Approval Order, the Approval Order and the Sale Guidelines, Agent shall be permitted to conduct a "going out of business", "store closing" or similarly themed sale at the Stores and the Distribution Centers throughout the Sale Term. Agent shall conduct the Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and, except as modified by the Approval Order, all governing laws and applicable agreements to which Merchant is a party. Agent shall conduct the Sale in accordance with the Sale Guidelines annexed hereto as Exhibit 8.1 and approved by the Approval Order (as and when applicable), whether by in-store promotion, media advertising, or other promotional materials. Merchant and Lender shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business, so long as Merchant's and/or Lender's presence does not unreasonably disrupt the conduct of the Sale. Merchant and Lender shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency. In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the following rights, limited by the Sale Guidelines:

(a)      except as otherwise provided in the Approval Order (as and when applicable), to establish Stores' hours, which are consistent with the terms of applicable leases, mortgages, or other occupancy agreements and local laws or regulations, including, without limitation, Sunday closing laws; provided, however, to the extent that Agent extends the hours of operation at one or more of the Stores beyond the hours historically operated by Merchant, which results in additional utilities charges and increased Occupancy Expenses in excess of the average utilities charges and Occupancy Expenses for such Stores over the twelve (12) months preceding the Sale Commencement Date, Agent shall reimburse Merchant the amounts, if any, of such additional costs and such additional costs shall constitute Expenses;

(b)      to use without charge during the Sale Term (except where otherwise designated as an Expense pursuant to Section 4.1 hereof), (i) all furniture, fixtures and equipment, (ii) bank accounts, (iii) Store-level and/or Distribution Center-level (and to the extent available, corporate) computer hardware and software, (iv) customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data), (v) existing supplies located at the Stores and/or Distribution Centers, (vi) intangible assets (including Merchant's names, logos, and tax identification numbers), (vii) Stores' and/or Distribution Center keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores and the Distribution Centers, and (viii) any other assets of Merchant located at the Stores and/or Distribution Centers (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses. Agent shall exercise due care and return to Merchant immediately at the end of the Sale all materials and supplies except materials or supplies expended;

(c)      subject to Agent's payment (if applicable) in accordance with Sections 4.1(s) and (v) above in respect of Central Services and Distribution Center Services, Merchant agrees and covenants that it shall be responsible for performing and providing to Agent such Central Services necessary or incident to the conduct of the Sale, including, but not limited to, use of Merchant's central office facilities, central administrative services, and personnel to process payroll, perform MIS, and provide other central office services necessary for the Sale to the extent that such services are normally provided by Merchant in house; provided, however, that, in the event Agent expressly requests Merchant to provide services other than those normally provided to the Stores and/or Distribution Centers and relating to the sale of Merchandise by Merchant in the ordinary course of business and as expressly contemplated by this Agreement, Agent shall be responsible to reimburse Merchant for the actual incremental cost of such services incurred by Merchant as an Expense of the Sale hereunder;

(d)      to establish Sale prices and implement advertising, signage (including exterior banners and signs and sign walkers), and promotional programs consistent with the sale theme described herein, and as otherwise provided in the Approval Order (as and when applicable and the Sale Guidelines (including, without limitation, by means of media advertising, A-frame, interior and exterior banners, use of sign walkers and similar signage).

(e)      once the Inventory Taking is complete at both the transferring Store and the

30

receiving Store, to transfer Merchandise between and among the Stores;

(f)      to transfer Merchandise between and among the Distribution Centers and the Stores; provided, however Merchant and Agent shall mutually agree upon a methodology for tracking the shipments and receipts of Distribution Center Merchandise and In-Transit Merchandise in the Stores

(g)      to supplement the Merchandise at the Stores with Additional Agent Merchandise in accordance with Section 8.9 hereof;

(h)      to sell the Direct Business Merchandise through the Direct Business Platform and/or sell the Direct Business Merchandise from the Stores; and

(i)      to conduct the Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1 (the "Sale Guidelines").

8.2      Terms of Sales to Customers.  Subject to Agent's compliance with applicable law (as determined with reference to the Approval Order, as and when applicable), all sales of Merchandise will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same. Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers. All sales will be made only for cash or nationally recognized credit and debit cards. Agent shall accept and honor coupons during the Sale Term, if any, as well as groupons and Merchant's employee discount terms as are in effect immediately prior to the commencement of the Sale Term. Merchant shall reimburse Agent in cash for all amounts related to coupons, as well as groupons and Merchant's employee discount terms, during each weekly sale reconciliation provided for in Section 8.7; provided that, Merchant shall only be obligated to reimburse Agent for Merchant's coupons, as well as groupons and Merchant's employee discount terms, honored by Agent during the first thirty (30) days of the Sale. Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term, so as to distinguish such Merchandise from the merchandise sold prior to the Sale Commencement Date. Agent may elect, in Agent's sole discretion, to accept returns of Merchandise or Additional Agent Merchandise sold using the Direct Business Platform during the Sale Term according to return policies established by Agent (in which case Agent shall be responsible for the costs and expenses associated with such returns of Merchandise and Additional Agent Merchandise sold using Merchant's e-commerce business platform during the Sale Term as an Expense).

8.3      Sales Taxes.  (a) During the Sale Term, all sales, excise, gross receipts, and other taxes attributable to sales of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and/or Owned FF&E as indicated on Merchant's point of sale equipment (other than taxes on income, but specifically including, without limitation, gross receipts taxes) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and/or Owned FF&E and collected by Agent in trust for Merchant at time of sale and paid over to Merchant. All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account"). If Agent does not timely remit Sales Taxes to Merchant, Merchant shall be permitted to immediately draw on the Letter of Credit

31

in the full amount of Sales Taxes collected by Agent in the preceding week. Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities. Notwithstanding anything to the contrary herein, Agent shall reimburse Merchant for any additional Sales Taxes, interest, fines, penalties, and similar amounts payable to any taxing authority as the result of a Sales Tax audit conducted by or on behalf of such authority which discloses that the Sales Taxes collected by Agent and paid over to Merchant for any period during the Sale Term were less than those mandated by applicable law for the sale of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and/or Owned FF&E, if any, that is sold by Agent under this Agreement (any such additional Sales Taxes and other amounts are collectively referred to herein as "Additional Taxes and Penalties"). Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections. Agent shall add Sales Tax to the sales price of all Additional Agent Merchandise sold and Agent shall collect Sales Taxes attributable to the sales of Additional Agent Merchandise and deposit such amounts into existing accounts, trust accounts, or other accounts designated by Agent, for remittance by Merchant, on behalf of Agent, to the appropriate taxing authority. If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant and its officers, directors, employees, agents and independent contractors (collectively, "Merchant Indemnified Parties") from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties (including but not limited to all Additional Taxes and Penalties) that Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and remit them to Merchant and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities. Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, the Lender, any taxing authority, or any other party, and Merchant (and Lender to the extent it has received any funds on account of Sales Taxes) shall indemnify and hold harmless Agent and its officers, directors, employees, agents and Supervisors (collectively, "Agent Indemnified Parties") from and against all claims, demands, assessments, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.

(b)     Without limiting the generality of Section 8.3(a) hereof, the Parties agree that because Agent will conduct the Sale solely as agent for Merchant, the various payments that this Agreement contemplates (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4     Supplies.  Agent shall have the right to use all existing supplies necessary to conduct the Sale (e.g., boxes, bags, and twine, but not gift certificates, rain checks, merchandise credits, or the like) located at the Stores and/or the Distribution Centers and in connection with the Direct Business Platform at no charge to Agent. In the event that additional supplies are required

in any of the Stores or the Direct Business Platform, during the Sale Term, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense; provided, however, that if reasonably requested by Agent, Merchant shall assist Agent in obtaining supplies, at Agent's expense, from Merchant's vendors at Merchant's usual and customary costs for such supplies. Merchant does not warrant that Merchant's existing supplies as of the Sale Commencement Date are adequate for purposes of the Sale.

8.5    Returns of Merchandise.  During the first thirty (30) days of the Sale, Agent shall accept returns of Merchandise sold by Merchant prior to the Sale Commencement Date in accordance with Merchant's return policies in effect at the time of purchase (to the extent presented in accordance with the foregoing terms, each such item being defined herein as "Returned Merchandise"). Merchant shall reimburse Agent in cash or credit against the following week's payment for the amount of any store credit or refund given to any customer in respect of Returned Merchandise. To the extent Returned Merchandise is salable as first quality merchandise, it shall be included in Merchandise and for purposes of the calculation of the Guaranteed Amount and shall be as follows: (i) to the extent that such item of Returned Merchandise is received during the first fourteen (14) days following the Sale Commencement Date, at the Cost Value and Retail Price provided for above applicable to such item; and (ii) to the extent that such item of Returned Merchandise is received during the period between the 15th day following the Sale Commencement Date and the 30th day following the Sale Commencement Date, at a value equal to the product of (x) the applicable Cost Value and Retail Price attributable to such item as provided for above, multiplied by (y) the Prevailing Discount Adjustment applicable to such item.  Subject to Merchant's reimbursement to Agent of the amount of any store credit or refund granted for any such Returned Merchandise, the aggregate Cost Value of the Merchandise and the Guaranteed Amount shall be adjusted accordingly. If the Returned Merchandise is not first quality goods, Merchant and Agent shall negotiate in good faith to determine an appropriate Cost Value applicable to such merchandise for purposes of determining the Cost Value attributable thereto; provided that, in the event Merchant and Agent cannot agree on the Cost Value to be attributed to any particular item(s) of Returned Merchandise, then such item(s) shall be segregated form Merchandise and excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder. Any reimbursements due to Agent as a result of Returned Merchandise shall be accounted for and paid by Merchant immediately following the weekly Sale reconciliation pursuant to Section 8.7(a) hereof. Any increases in payment on account of the Guaranteed Amount as a result of Returned Merchandise shall be paid by Agent as part of the final Sale reconciliation provided for under Section 8.7(b) hereof.

8.6.    Gift Cards; Merchandise Credits; Membership Program.

(a)    During the period between the Sale Commencement Date and the date that is thirty (30) days after entry of the Approval Order, Agent shall accept Merchant's gift cards, gift certificates, merchandise credits and other similar Merchant-issued credits, if any.  Merchant shall reimburse Agent in cash for gift card, gift certificate, merchandise credit, and other similar Merchant issued credit amounts redeemed during the Sale Term as part of the weekly sale reconciliation provided for in Section 8.7(a).

(b)    To the extent Merchant maintains any customer membership or customer

loyalty discount programs, said customers may take advantage of discounts afforded customers in connection with Merchant's customer membership or customer loyalty discount programs ("Membership Program Discounts") in addition to the then-prevailing Sale discounts being offered by Agent (for example, a "take an additional 10% off Membership Program Discount" may be combined with Agent's 30% prevailing sale discount, such that the affected customer would receive an effective discount of 37%); provided that, Merchant shall reimburse Agent in cash for the incremental increased discount received as a consequence of the recognition of such Membership Program Discounts (on a weekly basis as part of each weekly reconciliation).

      8.7.    Sale Reconciliation.

          (a)    Weekly Reconciliation.  On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and Merchant (in consultation with Lender) shall cooperate to reconcile Expenses, Gross Rings, and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), pursuant to procedures agreed upon by Merchant (in consultation with Lender) and Agent. On a weekly basis, Agent shall also provide Merchant (and a copy to Lender) with a report (in electronic format acceptable to Merchant) of all sales of Additional Agent Merchandise, which report shall detail by Store, at a minimum, gross and net sales and type of items sold. To ensure accurate sales audit functions, Agent shall use Merchant's existing point-of-sale system for recording all sales (including any sales of Additional Agent Merchandise) in the Stores.

          (b)    Final Reconciliation.

          (i)    Within thirty (30) days after the Sale Termination Date applicable to the last Store in which the Sale is concluded, Agent and Merchant (in consultation with the Lender) shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Proceeds, Sales Taxes, Expenses, and any other accountings required hereunder (the "Final Reconciliation"). Within five (5) days after completion of the Final Reconciliation, any undisputed and unpaid Expenses shall be paid by Agent (the "Final Reconciliation Settlement Date"). In the absence of an order of the Bankruptcy Court to the contrary, no disputed amounts owing hereunder shall be paid until the dispute has been resolved by agreement of the parties or as determined in the manner prescribed in Section 8.7(b)(ii) hereof. During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant (in consultation with the Lender) and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds, Sales Taxes, Expenses, and other Sale-related items to review and audit such records.

          (ii)    In the event that there is any dispute with respect to either (x) the determination of the aggregate Cost Value of the Merchandise as reflected in the Final Inventory Report and/or (y) the Final Reconciliation, such dispute shall be promptly (and in no event later than the fifth (5th) business day following a request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution. In the event of a dispute as to (x) or (y) above, Agent shall extend the Letter of Credit in accordance with the provisions of Sections 3.4 or 4.2(b) hereof, as applicable. If Agent has for any reason not so extended the expiration date of the Letter of Credit

by the date that is ten (10) business days prior to the applicable expiration date (as may have been extended previously), Merchant and/or Lender shall have the right to make a drawing under the Letter of Credit in an amount or amounts equal to the undisputed amounts Merchant asserts are then owing to Merchant.

8.8     Force Majeure. If any casualty, act of war or terrorism, or act of God prevents the conduct of business in the ordinary course at any Store and/or Distribution Center for a period in excess of ten (10) consecutive days (a "Force Majeure Event"), such Store and/or Distribution Center and the Merchandise located at such Store and/or Distribution Center shall be eliminated from the Sale and considered to be deleted from this Agreement as of the first date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale that is not the subject of insurance proceeds or consolidated by Agent into another Store(s) and/or Distribution Center(s) and, to the extent Agent has paid the Guaranteed Amount, Merchant (or Lender, to the extent Lender has received such amount(s)), to the extent such insurance proceeds are actually received, shall reimburse Agent for the amount by which the Guaranteed Amount is so reduced prior to the end of the Sale Term. If a Store and/or Distribution Center is eliminated from the Sale due to a Force Majeure Event, Agent will use its commercially reasonable efforts to transfer therefrom all Merchandise that is not the subject of insurance proceeds and include such Merchandise in the Sale at other Stores and/or Distribution Centers.

8.9     Additional Agent Merchandise

(a)     Agent shall be entitled to include in the Sale additional merchandise procured by Agent which is of like kind, and no lesser quality to the Merchandise located in the Stores ("Additional Agent Merchandise"). Agent agrees that Additional Agent Merchandise, if any, shall be procured from either Merchant's existing vendors ("Existing Vendors") or third party vendors who are not Existing Vendors ("Third Party Vendors") that sell merchandise of like kind, and no lesser quality to the Merchandise; provided however that, in the event Agent desires to include Additional Agent Merchandise that is not of like kind and of equal quality to the Merchandise, the inclusion of any such merchandise shall be subject to the mutual agreement of Agent and Merchant. Agent shall be responsible for payment of the costs associated with procuring any Additional Agent Merchandise as an Expense. Agent shall pay for all costs and expenses related to, or incurred in connection with, the marketing and sale of the Additional Agent Merchandise as an Expense of the Sale. Agent further agrees that if it elects to include Additional Agent Merchandise in the Sale, Agent shall be authorized to utilize the Distribution Centers for the receipt, processing, handling and distribution of such Additional Agent Merchandise as part of the Sale.

(b)     The Additional Agent Merchandise shall be at all times subject to the control of Agent, and Merchant and Lender shall cooperate with Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the Additional Agent Merchandise. If requested by Agent, Merchant shall, at Agent's expense as an Expense, insure the Additional Agent

Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.

(c)     Any transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Merchant. Merchant acknowledges, and the Approval Order (as and when applicable) shall provide, that the Additional Agent Merchandise shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code in effect in the State of Utah (the "UCC"). Agent is hereby granted a first priority security interest in (i) the Additional Agent Merchandise and (ii) the Additional Agent Merchandise proceeds, which security interest Agent shall be authorized to perfect prior to entry of the Approval Order, but which security interest shall, if not sooner perfected, be deemed perfected pursuant to the Approval Order (as and when applicable) without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Merchandise (and any proceeds from the sale thereof) as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in such Additional Agent Merchandise and Additional Agent Merchandise proceeds).

(d)     Lender hereby consents to the inclusion of the proceeds from the Sale of Additional Agent Merchandise as "Proceeds" hereunder.

(e)     In order to distinguish the Additional Agent Merchandise from the Merchandise located in the Stores, Agent shall affix distinctive tags and/or other identifying markings on all items of Additional Agent Merchandise, which shall enable Merchant and Agent to distinguish sales of the Additional Agent Merchandise from sales of the Merchandise. Additionally, Agent shall provide signage in the Stores and the Direct Business Platform notifying customers that the Additional Agent Merchandise has been included in the Sale.

8.10     Direct Business Platform.     Agent shall have the right to conduct the Sale using Merchant's e-commerce based direct business platform (the "Direct Business Platform") In addition to, and without limiting, any other provision of this Agreement, Merchant hereby grants Agent a royalty-free sub-license (exclusive during the Sale Term) to use Merchant's Direct Business Platform and related platform ("Direct Business Platform") to fulfill customer orders for purchases/sales of Merchandise and Additional Agent Merchandise (in Agent's capacity as Agent hereunder). All proceeds of such sales shall constitute Proceeds under this Agreement. Merchant shall provide Agent with all customary operations, systems, and services associated with the performance, operation and functionality of the Direct Business Platform and the fulfillment of sales therefrom; provided, however, that Agent shall reimburse Merchant, as an Expense, the amounts contemplated by Sections 4.1(u), (v), and (w). Merchant and Agent shall mutually agree on the date and procedures required to complete the Inventory Taking at the affected Distribution Center(s).

Section 9.     Employee Matters.

36

9.1     Merchant's Employees. Subject to the applicable provisions of the Approval Order (as and when applicable) and any other provisions in this Agreement relating to employees, Agent may use Merchant's Store and Distribution Center employees in the conduct of the Sale to the extent Agent deems expedient, and Agent may select and, with Merchant, schedule the number and type of Merchant's employees required for the Sale. Agent shall identify any such Store employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date. Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent. Merchant and Agent agree that except to the extent that wages, payroll taxes, benefits, and other costs relating to the employment of Retained Employees constitute Expenses hereunder and except as otherwise expressly provided in this Agreement, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims, and other termination-type claims and obligations, or any other amounts required to be paid by statute or law (except to the extent such items are amounts for which Merchant is entitled to indemnification pursuant hereto), nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees. Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of the Retained Employees, except as otherwise provided in this Agreement.

9.2     Termination of Employees by Merchant. Agent may in its discretion stop using any Retained Employee at any time during the Sale. In the event Agent determines to discontinue its use of any Retained Employee in connection with the conduct of the Sale, Agent will provide written notice to Merchant at least seven (7) days prior thereto, except for termination "for cause" (such as dishonesty, fraud, or breach of employee duties), in which case the seven (7) day notice period shall not apply; provided, however, that Agent shall immediately notify Merchant of the basis for such "cause". During the Sale Term, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent (which consent shall not be unreasonably withheld). Notwithstanding any other provision hereof, Agent will indemnify Merchant with respect to any claims by Retained Employees arising from Agent's treatment of such Retained Employees.

9.3     Payroll Matters. Subject to Section 4.1 hereof, during the Sale Term Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale. Each Wednesday prior to the date on which such payroll is payable (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, in the amount equal to the Benefits Cap.

9.4     Employee Retention Bonuses. Agent shall pay, as an Expense hereunder, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable) up to a maximum of approximately ten percent (10%) of base payroll,

to certain Retained Employees who do not voluntarily leave employment and are not terminated "for cause", as Agent shall determine in its sole discretion. The amount of such Retention Bonuses, which will be payable within thirty (30) days after the Sale Termination Date, shall be in an amount to be determined by Agent, in its discretion, and shall be processed through Merchant's payroll system. Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within two (2) business days after the Sale Commencement Date. Agent shall not utilize the Retention Bonus as a mechanism to encourage Retained Employees to act contrary to Merchant's best interests.

Section 10.    Conditions Precedent.

    10.1    Conditions to Agent's Obligations. The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

    (a)    All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date;

    (b)    No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement (including, without limitation, the Sale);

    (c)    The Lender shall have executed this Agreement in the space provided therefor; and

    (d)    Notwithstanding anything in this Agreement or any Agency Document to the contrary, the enforceability of this Agreement is subject in all respects to Agent's express written approval and acceptance of any Exhibit or Agency Document not fully executed by the parties and attached hereto.

    10.2    Conditions to Merchant's Obligations. The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

    (a)    All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date; and

    (b)    Notwithstanding anything in this Agreement or any Agency Document to the contrary, the enforceability of this Agreement is subject in all respects to Merchant's express written approval and acceptance of any Exhibit or Agency Document not fully executed by the parties and attached hereto.

Section 11.    Representations, Warranties and Covenants.

38

11.1    Merchant's Representations, Warranties, and Covenants.    Merchant hereby
represents, warrants, and covenants in favor of Agent as follows:

(a)    Merchant (i) is a corporation duly organized, validly existing, and in good
standing under the laws of the State of Delaware; (ii) has all requisite power and authority to own,
lease, and operate its assets and properties and to carry on its business as presently conducted; and
(iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business
and in good standing in each jurisdiction where the nature of its business or properties requires
such qualification, including all jurisdictions in which each Distribution Center and each Store
is/are located, except, in each case, to the extent that the failure to be in good standing or so
qualified could not reasonably be expected to have a material adverse effect on the ability of
Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Merchant has the right, power, and authority to execute and deliver this
Agreement and each other document and agreement contemplated hereby (collectively, together
with this Agreement, the "Agency Documents") and to perform fully its obligations hereunder.
Merchant has taken and, in the event of a bankruptcy filing shall take, all necessary actions required
to authorize the execution, delivery, and performance of the Agency Documents, and no further
consent or approval on the part of Merchant is required for Merchant to enter into and deliver the
Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of
the Agency Documents has been duly executed and delivered by Merchant and constitutes the
legal, valid, and binding obligation of Merchant, enforceable in accordance with its terms.  Except
as provided in this Agreement, no court order or decree of any federal, state, local, or provincial
governmental authority or regulatory body is in effect that would prevent or materially impair, or
is required for Merchant's consummation of, the transactions contemplated by this Agreement,
and no consent of any third party that has not been obtained is required therefor, other than as shall
be obtained prior to the Sale Commencement Date, except for any such consent the failure of
which to be obtained could not reasonably be expected to have a material adverse effect on the
ability of Merchant to execute and deliver this Agreement and perform fully its obligations
hereunder.  Other than for any consent as shall be obtained prior to the Sale Commencement Date,
and any contracts or agreements identified by Merchant to Agent on or prior to the Sale
Commencement Date, no contract or other agreement to which Merchant is a party or by which
Merchant is otherwise bound will prevent or materially impair the consummation of the Sale and
the other transactions contemplated by this Agreement.

(c)    As of the date of this Agreement, Merchant has continued normal
replenishment of Merchandise and supplies in and to the Stores.

(d)    Merchant (i) except as set forth on Exhibit 11.1(d), owns and will own at all
times during the Sale Term, good and marketable title to all of the Merchandise free and clear of
all liens, claims, and encumbrances of any nature; provided that, the liens identified in Exhibit
11.1(d) shall attach to the Guaranteed Amount, and such other amounts due Merchant hereunder
in the same extent and priority that such liens had in the Merchandise and Owned FF&E; and (ii)
Merchant shall not create, incur, assume, or suffer to exist any security interest, lien, or other
charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds, in each

case, except for such pre-existing liens and security interests as shall have been disclosed by Merchant to Agent and identified in Exhibit 11.1(d) hereof, which liens and security interests shall attach only to the Guaranteed Amount  Expenses and any other amounts payable to Merchant hereunder.

(e)     Merchant has maintained its pricing files, including without limitation, the Cost File, at and in respect of all Stores and in respect of the Direct Business Platform in the ordinary course of business, and prices charged to the public for goods (whether in-store, by advertisement, online, or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdowns, advertised sales, and other customary in-store, online, promotional or clearance activities). Each pricing file, including (without limitation) the Cost File, does not include or reflect Excluded Pricing Adjustments. With regard to pricing files attributable to the Direct Business Merchandise, all such files were updated on or about November 29, 2014 to reflect the current selling price for such items of Merchandise.

(f)     Merchant shall ticket or mark all items of inventory received at the Stores prior to the Sale Commencement Date in a manner consistent with similar Merchandise located at the Stores and in accordance with Merchant's past practices and policies relative to pricing and marking inventory.

(g)     To the best of Merchant's knowledge, all Merchandise is in material compliance with all applicable federal, state, and local product safety laws, rules, and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)     Agent shall have the right during the Sale Term to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores and the Distribution Centers, the assets currently located at the Closing Locations, and the utilities and other services provided at the Closing Locations. Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Stores. Except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, throughout the Sale Term Merchant shall remain current on all expenses and payables necessary for the conduct of the Sale.

(i)     Merchant has paid and shall continue to pay until entry of an order for relief under the Bankruptcy Code, and, subject to the Approval Order, Merchant shall continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Stores' employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)     Supplies have not been, since November 1, 2014, and shall not be, prior to the Sale Commencement Date, transferred by Merchant to or from the Stores so as to alter the mix or quantity of supplies at the Stores from that existing on such date, other than in the ordinary course of business.

(k)      Since November 1, 2014, Merchant (i) has not (and shall not, up to the Sale Commencement Date) marked up or raised the price of any items of Merchandise, (ii) has not reduced has the price of any items of Merchandise, (iii) has sold inventory during such period at customary prices consistent with the ordinary course of business, and has not promoted or advertised any sales or in-store promotions (including POS promotions) to the public other than as described on Exhibit 11.1(k) (in all cases whether or not consistent with Merchant's ordinary course of business consistent with historic periods), and (iv) has not removed or altered any tickets or any indicia of clearance merchandise or POS promotion, except in the ordinary course of business.

(l)      Except for (i) the Bankruptcy Case and (ii) the matters set forth on Exhibit 11.1(l), no action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

(m)      Merchant is not a party to any collective bargaining agreements with its employees. No labor unions represent Merchant's employees at the Distribution Centers or at any Store. There are currently no strikes, work stoppages, or other labor disturbances affecting the any Distribution Center or any Store, or Merchant's central office facilities.

(n)      Since November 1, 2014, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(o)      Since November 1, 2014, Merchant has operated, and, except as otherwise restricted by the Bankruptcy Code or as provided herein (including as described in Section 11.1(c)), through the Sale Commencement Date, Merchant covenants to continue to operate, the Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business and not promoting or advertising any sales or in-store promotions (including POS promotions) to the public other than as described on Exhibit 11.1(o) (in all cases whether or not consistent with Merchant's ordinary course of business consistent with historic periods); (ii) not returning inventory to vendors and not transferring inventory or supplies out of or to the Stores; or (iii) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores; and (iv) not making any management personnel moves or changes that would have a material adverse effect on the operation of the Direct Business Platform.

(p)      To Merchant's knowledge, formed after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

41

(q)     Except as identified on Exhibit 11.1(q), no Store lease or similar occupancy agreement has expired, nor shall expire at any time until the conclusion of the Sale Term in such Store (by its terms or otherwise).

(r)     [Intentionally Omitted]

(s)     Merchant has not since November 1, 2014 knowingly shipped any Excluded Defective Merchandise from the Distribution Centers to the Stores. Merchant will not ship any Excluded Defective Merchandise from the date of this Agreement from the Distribution Centers to the Stores.

(t)     Merchant (i) at the Sale Commencement Date will have, sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) to consummate the transactions contemplated by this Agreement and the other Agency Documents, (ii) at the Sale Commencement Date will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the other Agency Documents, and (iii) at the Sale Commencement Date, will not have incurred any obligation, commitment, restriction or liability of any kind which would impair or adversely affect such funds, resources and capabilities.

(u)     Merchant shall not, prior to the Sale Termination Date, offer any promotions or discounts at the Stores or through the Direct Business Platform except as detailed on Exhibit 11.1(u).

11.2   Agent's Representations, Warranties and Covenants.   Agent hereby represents, warrants, and covenants in favor of Merchant as follows:

(a)     Each entity composing Agent (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)     Agent has the right, power, and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale. Each of the Agency Documents has been duly executed and delivered by Agent and constitutes the legal, valid, and binding obligation of Agent enforceable in accordance with its terms. No court order or decree of any federal, provincial, state, or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein. No

contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

Section 12.    Insurance.

12.1    Merchant's Liability Insurance. Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability, and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Stores, and shall use best efforts to cause Agent to be named an additional insured with respect to all such policies. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal, or material change. In the event of a claim under any such policies, (a) Merchant shall be responsible for the payment of all deductibles, retentions, or self-insured amounts to the extent such claim arises from or relates to the alleged acts or omissions of Merchant or its employees (other than Retained Employees), agents (other than Agent's employees), or independent contractors (other than Agent and Supervisors hired by Agent in conjunction with the Sale) and (b) Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts (which amounts shall constitute Expenses) to the extent such claim arises from or relates to the alleged acts or omissions of Agent or its employees, agents, or independent contractors, including Retained Employees.

12.2    Merchant's Casualty Insurance. Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, fire, flood, theft, and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the Cost Value thereof, which coverage shall be reduced from time to time to take into account the sale of Merchandise. In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise and/or Additional Agent Merchandise (net of any deductible) shall constitute Proceeds. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal, or material change. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date (as may be extended from time to time as set forth herein) without Agent's prior written consent.

12.3    Worker's Compensation Insurance.    Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, worker's compensation insurance

(including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements. Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.4    Agent's Insurance. As an Expense of the Sale, Agent shall maintain throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies. Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant. In the event of a claim under such policies, Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts thereunder, to the extent such claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or Supervisors.

12.5    Risk of Loss. Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores or the assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing. Agent shall not be deemed to be a successor employer. Merchant and Agent agree that, subject to the terms of this Agreement, Agent shall bear all responsibility for liability claims of customers, employees, and other persons arising from events occurring at the Stores during and after the Sale Term (an "Agent Claim"). In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement. To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant. In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the address designated for delivery of notices hereunder.

Section 13.    Indemnification.

13.1    Merchant Indemnification. Merchant shall indemnify and hold Agent and each Agent Indemnified Party harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from or related to:

(a)    Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

44

(b)       any failure of Merchant to pay to its employees any wages, salaries, or benefits due to such employees during the Sale Term or other claims asserted against Agent by Merchant's employees resulting from Merchant's (and not Agent's) treatment of its employees;

(c)       subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

(d)       any consumer warranty or products liability claims relating to Merchandise and/or Additional Agent Merchandise;

(e)       any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act);

(f)       any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its representatives; and

(g)       the gross negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents (other than Agent), or representatives.

The indemnification obligations set forth in this Section 13.1 shall be in addition to (and shall not limit) any other indemnification obligations of Merchant set forth in this Agreement, including without limitation those set forth in Section 8.3(a).

13.2    Agent Indemnification.    Agent shall jointly and severally indemnify and hold harmless Merchant and the Merchant Indemnified Parties from and against all claims, demands, penalties, losses, liability, or damage including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Merchant resulting from or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of Agent):

(a)       Agent's material breach of or failure to comply with any Safety Laws or any of its agreements, covenants, representations, or warranties contained in any Agency Document;

(b)       any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its employees, agents, independent contractors, Supervisors, or other officers, directors, or representatives of Agent;

(c)       any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

45

(d)     any Agent Claims;

(e)     any Additional Taxes and Penalties arising out of Agent's failure to collect and/or remit to Merchant correct amounts of Sales Taxes (including any such failure resulting from Agent's use of any system other than Merchant's point of sale system to compute Sales Taxes relating to the Sale);

(h)     the gross negligence, willful misconduct, or fraud of Agent or any of its officers, directors, employees, agents, or representatives; and

(i)     any consumer warranty or products liability claims arising out of or related to the sale of Additional Agent Merchandise.

The indemnification obligations set forth in this Section 13.2 shall be in addition to (and shall not limit) any other indemnification obligations of Agent set forth in this Agreement, including without limitation those set forth in Section 8.3(a).

Section 14.    Defaults.

The following shall constitute "Events of Default" hereunder:

(a)     Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party; or

(b)     Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made or at any time and throughout the Sale Term;

(c)     The Approval Order is not entered by the Bankruptcy Court by December 24, 2014;

(d)     The filing of a motion by any party to covert or the conversion of the Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the filing of a motion by any party to appoint or the appointment of a chapter 11 trustee; or

(e)     Subject to Section 8.8 hereof, the Sale is terminated or materially interrupted or impaired at any Store or the Direct Business Platform or the Distribution Centers for any reason other than (i) an Event of Default by Agent or (ii) any other material breach or action by Agent not authorized hereunder; or

(f)     Once executed by Merchant, Agent, and Lender, Merchant or Lender consider competing bids or Merchant or Lender hereby continue, begin, or initiate communications with any third party who expressed or who may express an interest in selling (including in capacity as an agent), acquiring, or disposing of Merchant's assets that are the subject of this Agreement.

46

In the event of an Event of Default, the non-defaulting party (in the case of (a) or (b) above, or the Agent in the case of (c), (d), (e) or (f) above) may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder in the event such cure is not effected by the defaulting party.

Section 15.   Fixtures.

(a)   In partial consideration, and as a material component of the payment of the Guaranteed Amount, with respect to any furniture, fixtures and equipment (including, but not limited to (i) machinery, rolling stock, office equipment, computers, servers, and hardware used or utilized in connection with or associated with the Direct Business Platform, and personal property owned by Merchant and located at the Stores or Merchant's corporate offices and, solely with respect to computers, servers, and hardware used or utilized in connection with or associated with the Direct Business Platform, at the Distribution Centers; and (ii) such other items in the file entitled "FF&E Assets" provided by Merchant to Agent (exclusive in all instances of Owned DC FF&E referenced in such file (collectively, the "Owned FF&E"), Agent shall have the sole and exclusive right to sell the Owned FF&E for Agent's sole and exclusive benefit and at Agent's sole cost and expense (other than rent and other occupancy expenses associated with the corporate office, which amounts shall be paid by Merchant); provided, further, that, in that regard, Agent shall be entitled to retain all proceeds (which for the avoidance of doubt shall not constitute Proceeds or Asset Proceeds) from the sale or other disposition of the Owned FF&E, and Agent shall be responsible for the payment of all costs and expenses associated with the sale or other disposition of the Owned FF&E (other than rent and other occupancy expenses associated with the corporate office, which amounts shall be paid by Merchant). In addition, with respect to furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment, conveyors, racking, and personal property (other than computers, servers, and hardware used or utilized in connection with or associated with the Direct Business Platform) owned by Merchant and located at the Distribution Centers (collectively without the other than computers, servers, and hardware used or utilized in connection with or associated with the Direct Business Platform, the "Owned DC FF&E")), if Merchant requests and at Merchant's election (the "DC FF&E Sale Option"), Agent shall either (i) sell the Owned DC FF&E strictly on a commission basis (the "DC FF&E Commission Option"), or (ii) sell the Owned DC FF&E on a guaranteed fee basis (the "DC FF&E Guaranty Option"); provided that, the DC FF&E Guaranty Option shall be subject to the Merchant and Agent agreeing on a mutually acceptable Owned DC FF&E/asset listing and DC FF&E Guaranty Amount (as defined below). Merchant shall exercise the aforementioned Owned FF&E Sale Option by written notice to Agent. In the event Merchant elects the DC FF&E Commission Option, Agent shall be entitled to receive a commission equal to twenty percent (20%) of the gross proceeds from the sale of such Owned DC FF&E ("Agent's DC FF&E Commission"); provided, however, in such case Merchant shall be responsible for payment of expenses incurred in connection with the disposition of the Owned DC FF&E ("DC FF&E Disposition Expenses") in accordance with a budget to be mutually agreed upon between Merchant and Agent, in consultation with Lender ("DC FF&E Disposition Budget"), and all proceeds realized from the disposition of the Owned DC FF&E, after deduction of applicable sales taxes, Agent's DC FF&E Commission, and the DC FF&E Disposition Expenses (collectively, the "Net

DC FF&E Proceeds"), shall be paid to Lender, as Merchant's designee. In the event Merchant elects the DC FF&E Guaranty Option, Agent shall pay Merchant a lump sum payment in an amount to be agreed upon between Agent and Merchant, in consultation with Lender (hereinafter, the "DC FF&E Guaranty Amount"), in which case all costs and expenses associated with the disposition of Owned DC FF&E (other than rent and other occupancy expenses associated with the Distribution Centers, which amounts shall be paid by Merchant) shall be borne by Agent, and all proceeds realized from the sale or other disposition of the Owned DC FF&E (after payment of the applicable DC FF&E Guaranty Amount and net of any applicable sales taxes) shall be retained by Agent for its sole and exclusive benefit and shall not constitute Proceeds or Asset Sale Proceeds.

(b)     Anything in this Agreement to the contrary notwithstanding, Agent shall be authorized to abandon any and all unsold Owned FF&E or Owned DC FF&E (and all other furniture, fixtures, and equipment at the Stores, Distribution Centers and corporate offices) in place without any cost or liability to Agent. Agent shall have no responsibility whatsoever with respect to furniture, fixtures, and equipment located at the Stores, Distribution Centers and/or corporate offices which are not owned by Merchant.

(c)     Merchant hereby represents to Agent that: (i) all Owned FF&E and Owned DC FF&E may be sold by Agent on Merchant's behalf, free and clear of all claims, liens and encumbrances of any kind; and (ii) all such Owned FF&E and Owned DC FF&E is devoid of Hazardous Materials.

(d)     Anything in this Agreement to the contrary notwithstanding, Agent will not have any obligation whatsoever to purchase, sell, make, store, handle, treat, dispose, generate, transport or remove any Hazardous Materials that may be located at the Stores, Distribution Centers and/or Merchant's corporate offices or otherwise. Agent shall have no liability to any party for any environmental action brought: (i) that is related to the storage, handling, treatment, disposition, generation, or transportation of Hazardous Materials, or (ii) in connection with any remedial actions associated therewith or the Stores, Distribution Centers and/or Merchant's corporate offices. Merchant (and not Agent) shall be solely responsible to remove from the Stores, Distribution Centers and Merchant's corporate offices all Hazardous Materials. For purposes of this Agreement, the term "Hazardous Materials" means, collectively, any chemical, solid, liquid, gas, or other substance having the characteristics identified in, listed under, or designated pursuant to (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C.A. 9601(14), as a "hazardous substance", (ii) the Resource Conservation and Recovery Act, 42 U.S.C.A. 6903(5) and 6921, as a "hazardous waste", or (iii) any other laws, statutes or regulations of a government or political subdivision or agency thereof, as presenting an imminent and substantial danger to the public health or welfare or to the environment or as otherwise requiring special handling, collection, storage, treatment, disposal, or transportation.

(e)     In respect of the sale of Owned FF&E at or from the corporate offices, the effective date of any such sale of Owned FF&E shall not become effective until Merchant has discontinued use of such Owned FF&E. From time to time, Merchant shall cooperate with Agent to identify Owned FF&E at the corporate offices for which Merchant has discontinued use or will discontinue use in the then near future. Once Merchant has discontinued the use of all or substantially all Owned FF&E, Merchant and Agent shall mutually agree upon a reasonably period of time during

which the Agent may complete remaining sales of Owned FF&E and the corporate offices and provide purchasers thereof with reasonable access to remove such purchased Owned FF&E.
Section 16.    Miscellaneous.

16.1    Notices. All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by e-mail, and/or a recognized overnight delivery service, as follows:

If to Agent:

Gordon Brothers Retail Partners, LLC
Prudential Tower
800 Boylston Street
Boston, MA 02119
Attn:   Michael Chartock
Tel:    617.210.7116
Email: mchartock@gordonbrothers.com

-and-

Hilco Merchant Resources, LLC
5 Revere Drive, Suite 206
Northbrook, IL 60062
Attn:   Ian S. Fredericks
Tel:    847.418.2075
Email: ifredericks@hilcotrading.com

If to Merchant:

Delia*s, Inc.
50 W 23rd Street – 10th Floor
New York, NY 10010
Attn:   Ryan Schreiber, Esq.
        SVP, General Counsel & Secretary
Tel:    212.590-6204
Email: rschreiber@deliasinc.com

With a copy to (which shall not constitute notice):

DLA Piper
1251 Avenue of the Americas
New York, New York  10020-1104
Attn:   Gregg M. Galardi, Esq.
Tel:    212.335.4640
Email: Gregg.Galardi@dlapiper.com

If to Lender:

Salus Capital Partners, LLC
197 First Avenue, suite 250
Needham Heights, MA 02494
Attn:   Kyle C. Shonak
Tel:    617.420.2663
Email: kshonak@saluscapital.com

With a copy to (which shall not constitute notice):

Choate Hall & Stewart, LLP
Two International Place
Boston, MA  02110
Attn:   John F. Ventola, Esq.
Tel: 617.248.5085
Email: jventola@choate.com

-and-

DiConza Traurig Kadish, LLP
630 Third Avenue – 7th Floor
New York, NY 10017
Attn:   Maura I. Russell, Esq.
Tel:    212.682.4940
Email: mailto:mrussell@dtklawgroup.com

16.2    Governing Law; Consent to Jurisdiction.  This Agreement shall be governed and construed in accordance with the laws of the State of New York, without regard to conflicts of laws principles thereof.  The parties hereto agree that the Bankruptcy Court (and the District Court and Circuit Court of Appeal with appellate jurisdiction over the Bankruptcy Court) shall retain exclusive jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

16.3    Entire Agreement.   This Agreement, the Exhibits hereto, and the Agency Documents (subject, in each instance, to the Approval Order as and where applicable) contain the entire agreement between the Parties with respect to the transactions contemplated hereby and supersede and cancel all prior agreements, including but not limited to all proposals, letters of intent, or representations, written or oral, with respect thereto.

16.4    Amendments.  This Agreement, the Exhibits hereto, and the Agency Documents may not be modified except in a written instrument executed by each of the Merchant and Agent;

provided, however, that no modification may be made to this Agreement without the express consent of the Lender.

16.5   No Waiver.  No party's consent to or waiver of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party. Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

16.6   Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of Agent and Merchant, including but not limited to any chapter 11 or chapter 7 trustee.  No party to this Agreement shall be permitted to assign its obligations under this Agreement.

16.7   Execution in Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement. This Agreement may be executed by facsimile or other electronic means, and such facsimile or electronic signature shall be treated as an original signature hereunder.

16.8   Section Headings.  The headings of Sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.9   Survival.  All representations, warranties, covenants and agreements made herein shall be continuing, shall be considered to have been relied upon by the Parties and shall survive the execution, delivery, and performance of this Agreement.

16.10.   Termination.   This Agreement shall remain in full force and effect until the first to occur of (i) receipt by Merchant of written notice from Agent that any of the conditions specified in Section 10 hereof have not been satisfied or (ii) termination upon the occurrence of an Event of Default in accordance with Section 14 of this Agreement, or (iii) the expiration of the Sale Term and completion and certification by Merchant and Agent of the Final Reconciliation pursuant to Section 8.7(b) above. Notwithstanding the foregoing, (a) the representations, warranties, and indemnities of Merchant and Agent contained herein and the provisions of Section 11 above, and (b) any claim arising from a breach of this Agreement prior to its termination, shall survive the termination of this Agreement pursuant to this Section 16.10.

16.11   Agent's Security Interest.

(a)   In consideration of and subject to and effective upon payment by Agent of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit to the Lender, as Merchant's designee, Merchant hereby grants to Agent first priority, senior security interests in and liens (subject to the subordination provisions set forth herein below) upon: (i) the Merchandise; (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) the Agent's commission regarding the sale or other

51

disposition of Merchant Consignment Goods under Section 5.4 hereof; (v) in the event Merchant elects the FF&E Guaranty Option, the Owned FF&E and the proceeds realized from the sale or other disposition of Owned FF&E after payment of the FF&E Guaranty Amount; or, alternatively, the FF&E Commission; (vi) Agent's percentage share in excess of the Sharing Threshold, and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder. Upon entry of the Approval Order, payment of the Initial Guaranty Payment on the Payment Date, and delivery of the Letter of Credit to the Lender, the security interest granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(b)     Without any further act by or on behalf of the Agent or any other party (including (without limitation) the Lender and Merchant), the Agent's security interests and liens in the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other liens and security interests, provided, however, that (x) until the Merchant receives payment in full of the Guaranteed Amount, Expenses, and such other amounts due to Merchant hereunder, the security interest granted to Agent hereunder shall be junior and subordinate in all respects to the security interests of Lender in the Agent Collateral but solely to the extent and amount of the unpaid portion of the any of the Guaranteed Amount, Expenses, and such other amounts due to Merchant hereunder, and (y) upon payment in full of the Guaranteed Amount, Expenses, and such other amounts due to Merchant hereunder, any security interest or lien of the Lender in the Agent Collateral shall be junior and subordinate in all respects to the security interest and liens of Agent in the Agent Collateral. Merchant and Lender shall cooperate with Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

(c)     Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any encumbrance on, any of the Agent Collateral other than in favor of the Agent and Lender.

(d)     In the event of a Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the UCC.

16.12   Not Subject to Competing Offers.

From and after 12:01 a.m. on December 4, 2014, this Agreement shall not be subject to the consideration by Merchant or Lender of competing bids, and Merchant and Lender hereby covenant agree to discontinue all communications with third parties who have expressed or who may express an interest in selling (including in capacity as an agent), acquiring, or disposing of Merchant's assets that are the subject of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____
Name: Richard Edwards
Title: Co-President - Retail Division

**HILCO MERCHANT RESOURCES, LLC**

By: _____
Name: _____
Title: _____

**MERCHANT:**

**DELIA*S, INC.**

By: _____
Name: _____
Title: _____

**THE PROVISIONS OF THIS AGREEMENT
ARE HEREBY CONSENTED AND AGREED TO,
INCLUDING SECTIONS 3.3(c), 3.3(d), 3.3(g), 3.3(h),
4.1, 8.3, 8.8, 8.9, 15, 16.11 and 16.12:**

**SALUS CAPITAL PARTNERS, LLC,**
As Lender

By: _____
Name: Kyle Shonak
Title:  Executive Vice President-Special Opportunities

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____

      Name: _____

      Title: _____

**HILCO MERCHANT RESOURCES, LLC**

By: _____

      Name:   Ian Fredericks

      Title:   VP & Assistant General Counsel, Managing Member

**MERCHANT:**

**DELIA\*S, INC.**

By: _____

      Name: _____

      Title: _____

**THE PROVISIONS OF THIS AGREEMENT
ARE HEREBY CONSENTED AND AGREED TO,
INCLUDING SECTIONS 3.3(c), 3.3(d), 3.3(g), 3.3(h),
4.1, 8.3, 8.8, 8.9, 15, 16.11 and 16.12:**

**SALUS CAPITAL PARTNERS, LLC,**
As Lender

By: _____

      Name: Kyle Shonak

      Title:   Executive Vice President-Special Opportunities

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____

       Name:_____

       Title: _____

**HILCO MERCHANT RESOURCES, LLC**

By: _____

       Name:_____

       Title: _____

**MERCHANT:**

**DELIA*S, INC.**

By: _____

       Name:   Ryan A. Schreiber, Esq.

       Title:   Senior Vice President,
               General Counsel & Secretary

**THE PROVISIONS OF THIS AGREEMENT
ARE HEREBY CONSENTED AND AGREED TO,
INCLUDING SECTIONS 3.3(c), 3.3(d), 3.3(g), 3.3(h),
4.1, 8.3, 8.8, 8.9, 15, 16.11 and 16.12:**

**SALUS CAPITAL PARTNERS, LLC,**
As Lender

By: _____

       Name:  Kyle Shonak

       Title:   Executive Vice President-Special Opportunities

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____
        Name:_____
        Title: _____

**HILCO MERCHANT RESOURCES, LLC**

By: _____
        Name:_____
        Title: _____

**MERCHANT:**

**DELIA*S, INC.**

By: _____
        Name: _____
        Title: _____

**THE PROVISIONS OF THIS AGREEMENT
ARE HEREBY CONSENTED AND AGREED TO,
INCLUDING SECTIONS 3.3(c), 3.3(d), 3.3(g), 3.3(h),
4.1, 8.3, 8.8, 8.9, 15, 16.11 and 16.12:**

**SALUS CAPITAL PARTNERS, LLC,**
As Lender

By: _____
      Name: Kyle Shonak
      Title:   Executive Vice President-Special Opportunities

# EXHIBITS TO

# DELIA*S, INC.

# AGENCY AGREEMENT

## DATED: DECEMBER 4, 2014

**Delia's**
**Store List**
**Exhibit A-1**

| Store No. | Store | Address | Address 2 | City | State | Zip Code | Telephone No. | Square Ft |
|---|---|---|---|---|---|---|---|---|
| 202 | Willowbrook Mall | 2165 Willowbrook Mall | Suite 1540B | Wayne | NJ | 07470 | | 3,818 |
| 207 | Menlo Park Mall | 100 Menlo Park Road | | Edison | NJ | 08837 | | 4,057 |
| 210 | Natick Mall | 1245 Worcester Street | Space 2146 | Natick | MA | 01760 | | 3,729 |
| 215 | Towson Town Center | 825 Dulaney Valley Rd | Space 1045 | Towson | MD | 21204 | | 4,326 |
| 216 | The Plaza at King of Prussia | 160 N. Gulph Road | Suite 1307 | King of Prussia | PA | 19406 | | 3,936 |
| 219 | Woodfield Shopping Center | 5 Woodfield Shopping Center | Space 1301 | Schaumburg | IL | 60173 | | 3,055 |
| 229 | Roosevelt Field Mall | 630 Old Country Rd | Space 1034 | Garden City | NY | 11530 | | 3,953 |
| 233 | Bridgewater Commons | 400 Commons Way | Space 3395 | Bridgewater | NJ | 08807 | | 2,610 |
| 241 | Lehigh Valley Mall | 250 Lehigh Valley Mall | Space 2036B | Whitehall | PA | 18052 | | 3,316 |
| 242 | The Mall at Robinson | 100 Robinson Center Drive | Space 2410 | Pittsburgh | PA | 15205 | | 3,552 |
| 250 | Crossgates Mall | 1 Crossgates Mall Road | Space B-105 | Albany | NY | 12203 | | 3,500 |
| 251 | The Parks at Arlington | 3811 S. Cooper Street | Space 1410 | Arlington | TX | 76015 | | 3,593 |
| 256 | Easton Town Center | 136 Easton Town Center | Space C-102 | Columbus | OH | 43219 | | 3,500 |
| 257 | Wolfchase Galleria | 2760 N. Germantown Parkway | Space 2210 | Memphis | TN | 38133 | | 3,372 |
| 260 | Riverchase Galleria | 2000 Riverchase Galleria | Space 276A | Hoover | AL | 35244 | | 3,460 |
| 265 | Mall of Georgia | 3333 Buford Drive | Space 1026 | Buford | GA | 30519 | | 4,200 |
| 267 | Short Pump Town Center | 11800 West Broad St. | Suite 2032 | Richmond | VA | 23233 | | 3,706 |
| 268 | Coastal Grand | 2000 Coastal Grand Circle | Suite 400 | Myrtle Beach | SC | 29577 | | 3,434 |
| 269 | Montgomery Mall | 130 Montgomery Mall | | North Wales | PA | 19454 | | 3,950 |
| 270 | Deptford Mall | 1750 Deptford Center Rd. | Suite 2066 | Deptford | NJ | 08096 | | 3,661 |
| 271 | Twelve Oaks | 27666 Novi Road | Space C175 | Novi | MI | 48377 | | 3,289 |
| 273 | Northlake Mall | 6801 Northlake Mall Drive | Suite 159/157 | Charlotte | NC | 28216 | | 3,500 |
| 274 | Mall of America | 270 North Garden | | Bloomington | MN | 55425 | | 4,292 |
| 275 | The Mall at Wellington Green | 10300 West Forest Hill Blvd | Suite 172 | Wellington | FL | 33414 | | 3,626 |
| 276 | Hamilton Mall | 4403 Black Horse Pike | Suite 2042A | Mays Landing | NJ | 08330 | | 3,318 |
| 277 | The Town Center at Cobb | 400 Ernest Barrett Parkway | Space 166 | Kennesaw | GA | 30144 | | 3,369 |
| 278 | NorthPark Center | 8687 North Central Expressway | Suite 2104 | Dallas | TX | 75225 | | 4,550 |
| 279 | Southlake Town Square | 331 Grand Avenue East | | Southlake | TX | 76092 | | 3,542 |
| 280 | Firewheel Town Center | 490 Cedar Sage Drive | Space L01 | Garland | TX | 75040 | | 3,950 |
| 281 | Pheasant Lane Mall | 310 Daniel Webster Highway | Space E211B | Nashua | NH | 03060 | | 4,018 |
| 282 | Connecticut Post | 1201 Boston Post Rd | Space 2424 | Milford | CT | 06460 | | 3,757 |
| 283 | Clay Terrace | 14511 Clay Terrace Blvd | Space 100 | Carmel | IN | 46032 | | 4,055 |
| 284 | The Shops at Willowbend | 6121 W. Park Blvd | Space A-113 | Plano | TX | 75093 | | 3,647 |
| 285 | Galleria @ Ft. Lauderdale | 2368 East Sunrise Blvd | Space A-08 | Ft. Lauderdale | FL | 33304 | | 4,517 |
| 286 | The Greene | 81 Chestnut St. | Space B-118 | Beavercreek | OH | 45440 | | 3,723 |
| 287 | Staten Island Mall | 2655 Richmond Ave | Space 2165 | Staten Island | NY | 10314 | | 3,918 |
| 288 | Annapolis Mall | 1516 Annapolis Mall | | Annapolis | MD | 21401 | | 4,134 |
| 289 | Bayshore Mall | 5770 North Bayshore Drive | Space Q-112 | Glendale | WI | 53217 | | 3,500 |
| 290 | Marketplace Mall | 261 Miracle Mile Drive | Space A-10 | Rochester | NY | 14623 | | 4,000 |
| 291 | The Avenue Carriage Crossing | 4670 Merchants Park Circle | Suite 626 | Collierville | TN | 38017 | | 4,000 |
| 292 | Palisades Center | 2740 Palisades Center Drive | Space C201 | West Nyack | NY | 10994 | | 4,251 |
| 294 | Circle Center | 49 West Maryland St. | Space G15A | Indianapolis | IN | 46204 | | 3,925 |
| 295 | Holyoke Mall | 50 Holyoke St. | Space H208 | Holyoke | MA | 01041 | | 3,800 |
| 296 | Hanes Mall | 3320 Silas Creek Parkway | Space 416 | Winston-Salem | NC | 27103 | | 4,205 |

| # | Name | Address | Space | City | State | Zip | Value |
|---|---|---|---|---|---|---|---|
| 297 | Sarasota Square | 8201 South Tamiami Trail North | Space A-19 | Sarasota | FL | 34238 | 3,602 |
| 298 | Jordan Creek Town Center | 101 Jordan Creek Parkway | Space 12565 | West Des Moines | IA | 50266 | 3,987 |
| 299 | The Avenues | 10300 Southside Boulevard | Space 2125 | Jacksonville | FL | 32256 | 3,454 |
| 301 | Independence Center | 2092 Independence Center | Space K04A | Independence | MO | 64057 | 3,595 |
| 303 | Promenade @ Bolingbrook | 627 East Boughton Road | Suite 105 | Bolingbrook | IL | 60440 | 4,214 |
| 304 | Shops @ Sunset Place | 5701 Sunset Drive | Suite 126 | South Miami | FL | 33143 | 4,426 |
| 305 | Charleston Town Center | 2015 Charleston Town Center | Space 2015 | Charleston | WV | 25312 | 4,121 |
| 306 | Chesterfield Mall | 43 Chesterfield Mall | Space 156 | Chesterfield | MO | 63017 | 3,756 |
| 307 | Polaris Fashion Place | 1500 Polaris Parkway | Space 2178 | Columbus | OH | 43240 | 4,220 |
| 309 | Walden Galleria | 1 Walden Galleria | Space TH102 | Cheektowaga | NY | 14225 | 3,913 |
| 311 | Coconut Point | 23106 Fashion Drive | Space W13 | Estero | FL | 33928 | 3,603 |
| 313 | Zona Rosa | 7101 NW 86th Terrace | Space A-107 | Kansas City | MO | 64153 | 3,787 |
| 315 | The Shops at Highland Village | 1700 Cottonwood Creek | Suite 150 | Highland Village | TX | 75077 | 3,600 |
| 316 | Southlake 2 | 1975 Southlake Mall | Unit # DO-408 | Merrillville | IN | 46410 | 3,955 |
| 318 | The Shoppes at Buckland Hills | 194 Buckland Hills Drive | Space 1150 | Manchester | CT | 06040 | 3,604 |
| 319 | The Avenue Murfreesboro | 2615 Medical Center Parkway | Suite 1360 | Murfreesboro | TN | 37129 | 3,800 |
| 320 | Mall at Partridge Creek | 17420 Hall Road | Space 147 | Clinton Township | MI | 48038 | 3,593 |
| 321 | Lakeline Mall | 11200 Lakeline Mall Drive | Space C01 | Cedar Park | TX | 78613 | 4,100 |
| 322 | Emerald Square | 999 S. Washington Street | Space 144 | North Attleboro | MA | 02760 | 3,817 |
| 323 | North Point | 2112 North Point Circle | | Alpharetta | GA | 30022 | 3,736 |
| 324 | South Park Center | 428 South Park Center | | Strongsville | OH | 44136 | 4,039 |
| 325 | The Mall in Columbia | 10300 Little Patuxent Parkway | Space 2610 | Columbia | MD | 21044 | 3,421 |
| 332 | Beachwood Place | 26300 Cedar Road | Space 2095 | Beachwood | OH | 44122 | 3,631 |
| 335 | Yorktown Center | 205A Yorktown Mall | | Lombard | IL | 60148 | 3,961 |
| 336 | Burlington Mall | 75 Middlesex Turnpike | Space 1025B | Burlington | MA | 01803 | 4,066 |
| 339 | Galleria @ Roseville | 1151 Galleria Blvd | Suite 2170 | Roseville | CA | 95678 | 4,069 |
| 340 | La Plaza Mall | 2200 South 10th Street | Space F15A | McAllen | TX | 78503 | 4,921 |
| 341 | Mall of Louisiana | 6401 Bluebonnet Blvd | Space 1104 | Baton Rouge | LA | 70836 | 3,456 |
| 342 | Fox Valley Mall | 2428 Fox Valley Center | Space B9A | Aurora | IL | 60504 | 3,775 |
| 343 | The Mall at Rockingham | 99 Rockingham Park Blvd | Space W245 | Salem | NH | 03079 | 3,397 |
| 344 | Northshore Mall | 210 Andover Street | Space W108A | Peabody | MA | 01960 | 3,901 |
| 345 | The Maine Mall | 364 Maine Mall Road | Space S171 | South Portland | ME | 04106 | 3,733 |
| 350 | Smith Haven Mall | 450 Smith Haven Mall | Space D03B | Lake Grove | NY | 11755 | 4,086 |
| 351 | Livingston Mall | 112 Eisenhower Parkway | Space 1021A | Livingston | NJ | 07039 | 3,600 |
| 352 | Fox River Mall | 4301 W. Wisconsin Ave | Space 511 | Appleton | WI | 54913 | 3,749 |
| 353 | West Town Mall | 7600 Kingston Pike | Space 1098A | Knoxville | TN | 37919 | 3,672 |
| 354 | South Shore Plaza | 250 Granite Street | Space 2047A | Braintree | MA | 02184 | 4,082 |
| 356 | Christiana Mall | 150 Christiana Mall | | Newark | DE | 19702 | 3,978 |
| 359 | Garden State Plaza | 1 Garden State | Space 1037 | Paramus | NJ | 07652 | 4,761 |
| 362 | Plaza Bonita | 3030 Plaza Bonita Rd | Space 2082 | National City | CA | 91950 | 3,600 |
| 363 | RiverTown Crossing | 3700 Rivertown Pkwy S.W. | Space 1144 | Grandville | MI | 49418 | 4,273 |
| 364 | Bangor Mall | 663 Stillwater Avenue | Space 1097A | Bangor | ME | 04401 | 3,844 |
| 368 | Peninsula Town Center | 2561 McMenamin St | | Hampton | VA | 23666 | 3,500 |
| 373 | Rockaway Town Square | 301 Mt. Hope Ave | Space 2093A | Rockaway | NJ | 07866 | 3,422 |
| 374 | The Westchester | 125 Westchester Ave | Suite 3060 | White Plains | NY | 10601 | 4,352 |
| 375 | Providence Place | 127 Providence Place | Space 5080 | Providence | RI | 02903 | 3,730 |
| 376 | Hawthorn Center | 122 Hawthorn Center | Space 304 | Vernon Hills | IL | 60061 | 5,047 |
| 377 | Fashion Outlets of Niagara | 1734 Military Road | Space 28 | Niagara Falls | NY | 14304 | 2,862 |

92

**Delia's**
Store List
Exhibit A-2

| Store No. | Store | Address | Address 2 | City | State | Zip Code | Telephone No. | Square Fe |
|---|---|---|---|---|---|---|---|---|
| DC | Distribution Center | 348 Poplar St | | Hanover | PA | 17331 | | |

**dElia*s, Inc.**

**Exhibit 3.1(a)**

| Interim Order Entry Date | Reduction to Guaranty Amount | Cumulative Reduction |
|---|---|---|
| Saturday, December 13, 2014 | -1.5% | -1.5% |
| Sunday, December 14, 2014 | -1.5% | -3.0% |
| Monday, December 15, 2014 | -1.0% | -4.0% |
| Tuesday, December 16, 2014 | -1.0% | -5.0% |
| Wednesday, December 17, 2014 | -1.0% | -6.0% |
| Thursday, December 18, 2014 | -1.0% | -7.0% |
| Friday, December 19, 2014 | -1.5% | -8.5% |
| Saturday, December 20, 2014 | -1.5% | -10.0% |
| Sunday, December 21, 2014 | -1.5% | -11.5% |
| Monday, December 22, 2014 | -1.5% | -13.0% |
| Tuesday, December 23, 2014 | -1.5% | -14.5% |
| Wednesday, December 24, 2014 | -1.5% | -16.0% |

**dELiA*s, Inc.**
**Exhibit 3.1(b)**
**Retail**

| Merchandise Threshold Schedule | |
|---|---|
| **Cost Value** | **Adjustment Points** |
| 16,900,000 | 0.45% |
| 16,800,000 | 0.45% |
| 16,700,000 | 0.42% |
| 16,600,000 | 0.42% |
| 16,500,000 | 0.40% |
| 16,400,000 | 0.40% |
| 16,300,000 | 0.38% |
| 16,200,000 | 0.38% |
| 16,100,000 | 0.38% |
| 16,000,000 | 0.38% |
| 15,900,000 | |
| 15,500,000 | |
| 15,400,000 | 0.28% |
| 15,300,000 | 0.28% |
| 15,200,000 | 0.28% |
| 15,100,000 | 0.30% |
| 15,000,000 | 0.30% |
| 14,900,000 | 0.30% |
| 14,800,000 | 0.32% |
| 14,700,000 | 0.32% |
| 14,600,000 | 0.35% |
| 14,500,000 | 0.35% |

*Note(s):*
*1. Adjustments between the increments shall be on a prorata basis.*
*2. In the event that the Cost value of the Merchandise is greater than $16,900,000, each $100,000 (or pro rata portion thereof) increment shall decrease the Guaranty by 0.50%.*
*3. In the event that the Cost value of the Merchandise is less than $14,500,000, each $100,000 (or pro rata portion thereof) increment shall decrease the Guaranty by 0.40%.*

**dELiA*s, Inc.**
**Exhibit 3.1(b)**
**Direct**

| Merchandise Threshold Schedule | |
|---|---|
| **Cost Value** | **Adjustment Points** |
| 5,132,000 | 0.03% |
| 5,107,000 | 0.03% |
| 5,082,000 | 0.03% |
| 5,057,000 | 0.03% |
| 5,032,000 | 0.03% |
| 5,007,000 | 0.03% |
| 4,982,000 | 0.03% |
| 4,957,000 | 0.03% |
| 4,932,000 | 0.03% |
| 4,907,000 | 0.03% |
| 4,882,000 | |
| 4,782,000 | |
| 4,757,000 | 0.05% |
| 4,732,000 | 0.05% |
| 4,707,000 | 0.05% |
| 4,682,000 | 0.05% |
| 4,657,000 | 0.05% |
| 4,632,000 | 0.05% |
| 4,607,000 | 0.05% |
| 4,582,000 | 0.05% |
| 4,557,000 | 0.05% |
| 4,532,000 | 0.05% |

*Note(s):*
*1. Adjustments between the increments shall be on a prorata basis.*
*2. In the event that the Cost value of the Merchandise is greater than $5,132,000, each $25,000 (or pro rata portion thereof) increment shall decrease the Guaranty by 0.03%.*
*3. In the event that the Cost value of the Merchandise is less than $4,532,000, each $25,000 (or pro rata portion thereof) increment shall decrease the Guaranty by 0.05%.*

## dELiA*s, Inc.
## Exhibit 3.1(c)
## Retail

| Cost Factor | |
|---|---|
| **Cost Factor** | **Adjustment Points** |
| **27.75%** | |
| 27.80% | 0.32% |
| 27.85% | 0.32% |
| 27.90% | 0.32% |
| 27.95% | 0.32% |
| 28.00% | 0.32% |
| 28.05% | 0.32% |
| 28.10% | 0.32% |
| 28.15% | 0.32% |
| 28.20% | 0.32% |
| 28.25% | 0.32% |

*Notes:*

*1. Adjustments between the increments shall be on a prorata basis.*

*2. In the event that the Cost Factor of Merchandise is greater than 28.25%, each 0.05% (or pro rata portion thereof) increment shall decrease the Guaranty by 0.35%.*

**dELiA*s, Inc.**
**Exhibit 3.1(c)**
**Direct**

| Cost Factor | |
| --- | --- |
| Cost Factor | Adjustment Points |
| **34.50%** | |
| 34.55% | 0.10% |
| 34.60% | 0.10% |
| 34.65% | 0.10% |
| 34.70% | 0.10% |
| 34.75% | 0.10% |
| 34.80% | 0.10% |
| 34.85% | 0.10% |
| 34.90% | 0.10% |
| 34.95% | 0.10% |
| 35.00% | 0.10% |

*Notes:*
*1. Adjustments between the increments shall be on a prorata basis.*
*2. In the event that the Cost Factor of Merchandise is greater than 35.00%, each 0.05% (or pro rata portion thereof) increment shall decrease the Guaranty by 0.13%.*

**Exhibit 3.3(a)**

**Merchant's Designated Account**

JPMorgan Chase Bank

Funds Transfer Services

1 Chase Manhattan Plaza, 8th Floor

New York, NY 10005

| | |
|---|---|
| ABA# | 021000021 |
| Account # | 958172090 |
| Re: | Delia's Inc. |

**EXHIBIT 3.3(h)**

**Proposed Form of Letter of Credit**

## FORM OF AGENT LETTER OF CREDIT

[NAME OF ISSUING BANK]

[ADDRESS]

Date: _____, 2014

Irrevocable Standby Letter of Credit Number: _____

Co-Beneficiaries:        dELiA*s, Inc.
                         50 W 23rd Street – 10th Floor
                         New York, NY 10010
                         Attn:   Ryan Schreiber, Esq.
                         SVP, General Counsel & Secretary

                         SALUS CAPITAL PARTNERS, LLC
                         197 First Avenue, Suite 250
                         Needham Heights, MA 02494
                         Attn:   Kyle C. Shonak

                         Credit No.: _____
                         Opener's Reference No.: _____

Gentlemen:

BY ORDER OF:        [Gordon Brothers Retail Partners, LLC][Hilco Merchant Resources, LLC]

We hereby open in your favor our Irrevocable Standby Letter of Credit (the "Letter of Credit")
for the account of:[Gordon Brothers Retail Partners, LLC][Hilco Merchant Resources, LLC]  for
a sum or sums not exceeding a total of _____ U.S. Dollars
(_____) available by your draft(s) at SIGHT on OURSELVES
effective immediately and expiring at OUR COUNTERS on _____, 2014, or such
earlier date on which the beneficiaries shall notify us in writing that this Letter of Credit shall be
terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original Letter of Credit and a signed statement by either
(a) an officer of Salus Capital Partners, LLC, individually, in the form attached hereto as Exhibit
A-1 or (b) an officer of both of the Co-Beneficiaries in the form attached hereto as Exhibit A-2.

Partial and/or multiple drawings are permitted.

The Co-Beneficiaries may collectively, or Salus Capital Partners, LLC, individually, draw on the Letter of Credit if Agent fails to pay any amounts due by Agent to the Co-Beneficiaries pursuant to, and as such terms are defined in, that certain Agency Agreement dated as of _____ among the Co-Beneficiaries and Agent.

This Letter of Credit may be increased or reduced from time to time when accompanied by a signed statement from the Co-Beneficiaries in the form attached as Exhibit B.

If a drawing is received by [_____] at or prior to 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the account designated by Salus Capital Partners, LLC, individually, as directly below, in immediately available funds on the same Business Day.  If however, a drawing is received by [_____] after 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the account designated by Salus Capital Partners, LLC, individually, in immediately available funds on the next Business Day.

As used in the Letter of Credit "Business Day" shall mean any day other than a Saturday, Sunday, or a day on which Banking Institutions in Massachusetts are required or authorized to close.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No._____, dated _____ of [_____], _____

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 600."

We hereby agree that drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the above-mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this Letter of Credit to the attention of our Letter of Credit Operations, [_____], _____, mentioning our reference number as it appears above.  Telephone inquiries can be made to _____ at (___) ___-____.

Very truly yours,


Authorized official

TO IRREVOCABLE LETTER OF CREDIT NO._____
**Re: Drawing for Amounts Due to Salus Capital Partners, LLC:**

**Ladies and Gentlemen:**

I refer to your Letter of Credit No. _____(the "Letter of Credit").   The undersigned duly authorized officer of Salus Capital Partners, LLC, in its capacity as a Co-Beneficiary of the Letter of Credit hereby certify to you that:

      (i)     Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (collectively, the "Agent") have not made a payment when due of or for the Guaranteed Amount, Sharing Amount, Expenses, or other amounts due by Agent to the Co-Beneficiaries pursuant to, and as such terms are defined in, that certain Agency Agreement dated as of December 4, 2014, bewtenn among the Co-Beneficiaries on the one hand, and Agent, on the other.

      (ii)    The amount to be drawn is $_____ (the "Amount Owing").

      (iii)   Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the Letter of Credit, less any prior drawings, as of the date hereof.

      (iv)   The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

      (v)    In accordance with the terms of the Letter of Credit, the payment hereby demanded is requested to be made by wire transfer to the following account:

[Account]

IN WITNESS WHEREOF, this instrument has been executed and delivered as of this _____ day of _____, 2014.

Very truly yours,

Salus Capital Partners, LLC,
A Co-Beneficiary

By:_____
                Duly Authorized Officer
           Print Name:

## EXHIBIT A-2

TO IRREVOCABLE LETTER OF CREDIT NO._____
**Re: Drawing for Amounts Due to Salus Capital Partners, LLC and dELiA\*s, Inc.:**

**Ladies and Gentlemen:**

The undersigned refer to your Letter of Credit No. _____(the "Letter of Credit"). The undersigned duly authorized officers of Salus Capital Partners, LLC and dELiA\*s, Inc., respectively, in their capacity as Co-Beneficiaries of the Letter of Credit, hereby certify to you that:

      (i)      Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (collectively, the "Agent") have not made a payment when due of or for the Guaranteed Amount, Sharing Amount, Expenses, or other amounts due by Agent to the Co-Beneficiaries pursuant to, and as such terms are defined in, that certain Agency Agreement dated as of December 4, 2014, 2014 among the Co-Beneficiaries on the one hand, and Agent, on the other.

      (ii)     The amount to be drawn is $_____ (the "Amount Owing").

      (iii)    Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the Letter of Credit, less any prior drawings, as of the date hereof.

      (iv)    The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

      (v)     In accordance with the terms of the Letter of Credit, the payment hereby demanded is requested to be made by wire transfer to the following account:

      [Account]

IN WITNESS WHEREOF, this instrument has been executed and delivered as of this _____ day of _____, 2014.

      Very truly yours,

      Salus Capital Partners, LLC,
      A Co-Beneficiary

      By:_____
                  Duly Authorized Officer
              Print Name:

dELiA*s, Inc.,
A co-Beneficiary


By:_____
                    Duly Authorized Officer
            Print Name:

## EXHIBIT B

## TO IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re: Reduction of Face Amount:

Ladies and Gentlemen:

The undersigned refer to your Letter of Credit No. (the "Letter of Credit"). The undersigned, as Co-Beneficiaries of the Letter of Credit, hereby confirm to you that the face amount of the Letter of Credit hereby shall be reduced from its present face amount to a new face amount of $_____.

IN WITNESS WHEREOF, this instrument has been executed and delivered as of this _____ day of _____, 2014.

Very truly yours,

dELiA*s, Inc.,
A co-Beneficiary

By:_____
            Duly Authorized Officer
        Print Name:

Salus Capital Partners, LLC,
A co-Beneficiary

By:_____
            Duly Authorized Officer
        Print Name:

Exhibit 4.1(a)
Occupancy Expense Schedule



NOTE: The following spaces have Nk rates, would be added in afterwards
205, 208, 209, 216, 219, 224 & 375

**Cleaning Services** - Monthly charge for window and floor mat cleaning for interior areas.
No janitorial services for any floor

**dELiA*s AGENCY AGREEMENT**

**EXHIBIT 5.1(a)**

**INVENTORY TAKING INSTRUCTIONS**

[TO BE AGREED UPON BY MERCHANT, AGENT AND LENDER]

**<u>Exhibit 5.2(b)(1)</u>**

**<u>File of Distribution Center Merchandise in Data Room</u>**


5.2(b)(1) Distribution Center Merchandise

**<u>Exhibit 5.2(b)(2)</u>**

**<u>File of Direct Business Merchandise in Data Room</u>**

5.2(b)(2) Direct Business Merchandise

## Exhibit 5.3(a)(1) – Cost File for Store Merchandise and Distribution Center Merchandise

11.29 319-320-321-322-323.xlsx

11.29 353-354-356-359-362.xlsx

11.29 375-376-377.xlsx

11.29 339-340-341-342-343.xlsx

11.29 291-292-294-296-297.xlsx

11.29 281-282-283-284-285-286-287-288-289-290.xlsx

11.29 304-305-306-307-309-311-313-316-318.xlsx

11.29 270-271-273-274-275-276-277-278-279-280.xlsx

11.29 002-202-207-210-215-216-219-229-233-241.xlsx

11.29 295-315.xlsx

11.29 242-250-251-256-257-260-265-267-268-269.xlsx

## **EXHIBIT 5.3(a)(2) Cost File for Direct Business Merchandise**

Direct Aged Inv 11.29.14.xlsx

**EXHIBIT 8.1**

**SALE GUIDELINES**

## dELiA*s, INC. SALE GUIDELINES

A.    The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.    The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.    On "shopping center" property, the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Store's premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.    At the conclusion of the Sale, the Agent shall vacate the Stores in broom clean condition, and shall leave the Locations in the same condition as on Sale Commencement Date, ordinary wear and tear excepted, in accordance with Section 6 of the Agency Agreement, provided, however, that the Merchant and the Agent hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store. The Agent and Merchant may abandon any FF&E not sold in the Sale at the Stores at the conclusion of the Sale. Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E located at a Store.

E.    During the Interim Sale Period, Agent may advertise the sale as a "sale on everything", "everything must go", or similar themed sale. Following, and subject to, the entry of the Interim Approval Order and the Approval Order, the Agent may advertise the sale as a "store closing" and/or "going-out-of-business" sale, as dictated by the respective Interim Approval Order and Approval Order.

F.    Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and the Agent shall not use neon or day-glo on its display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet. In addition, the Merchant and the Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Approval Order.   Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement.

1

F.    Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

G.    Except with respect to the hanging of exterior banners, the Agent shall not make any alterations to the storefront or exterior walls of any Stores.

H.    The Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

I.    The Agent shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.    Subject to the provisions of the Agency Agreement the Agent shall have the right to sell all furniture, fixtures, and equipment located at the Stores and Distribution Center(s) (the "FF&E"). The Agent may advertise the sale of the FF&E in a manner consistent with these guidelines at the Stores and Distribution Center(s).  The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Store business hours. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E.

K.    The Agent shall be entitled to include Additional Agent Goods in the Sale in accordance with the terms of the Approval Order and the Agency Agreement.

L.    At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Store's premises as set forth in the applicable leases. The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

M.    Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.  Other than Agent's obligations under Section 4.1 of the Agency Agreement with respect to payment of Expenses, Agent shall have no responsibility therefor.

N.    The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

O.    If and to the extent that the landlord of any Store affected hereby contends that the Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows:

If to Agent:

Goulston & Storrs PC
400 Atlantic Avenue
Boston, MA  02110-3333
Attn:   James F. Wallack, Esq.

2

Gregory O. Kaden, Esq.
Tel:    617.482.1776
Email:  jwallack@goulstonstorrs.com
        gkaden@goulstonstorrs.com


If to Merchant:

Delia*s, Inc.
50 W 23rd Street – 10th Floor
New York, NY 10010
Attn:   Ryan Schreiber, Esq.
        SVP, General Counsel & Secretary
Tel:    212.590-6204
Email:  rschreiber@deliasinc.com


With a copy to (which shall not constitute notice):

DLA Piper
1251 Avenue of the Americas
New York, New York 10020-1104
Attn:   Gregg M. Galardi, Esq.
Tel:    212.335.4640
Email:  Gregg.Galardi@dlapiper.com

**dELiA\*s AGENCY AGREEMENT**

**EXHIBIT 10.1(c)**

**FORM OF APPROVAL ORDER**

[TO BE AGREED UPON BY MERCHANT, AGENT AND LENDER]

## Exhibit 11.1(d)

## Purported Existing Liens[1]

| NAME | DESCRIPTION[2] |
|---|---|
| Eklecco Newco LLC | Pursuant to the Standard Shopping Center Lease, dated February 13, 2006, a first lien on all Merchandise and Owned FF&E in Store 292. |
| Holyoke Mall Company, L.P. | Pursuant to the Standard Shopping Center Lease, dated February 14, 2006, a first lien on all Merchandise and Owned FF&E in Store 295. |
| Pyramid Walden Company, L.P., successor in interest to Pyramid Company of Buffalo | Pursuant to the Standard Shopping Center Lease, dated February 6, 2002, a first lien on all Merchandise and Owned FF&E in Store 309. |
| Salus Capital Partners LLC | Pursuant to the prepetition Credit Agreement, dated June 14, 2013, a first lien on substantially all of the assets with the exception of the Merchandise and Owned FF&E in Stores 292, 295 and 309, which Salus Capital Partners LLC holds a second lien. |

---

[1] The following list of purported existing lienholders are subject to continuing review by the Merchant based on UCC filings and its books and records.

[2] The Merchant makes no admission as to the validity, perfection or priority of any lien purported to be granted or perfected with respect to the assets described herein.

**Exhibit 11.1(k)**

**Promotional Calendar – November, 2014**

| Q4 | | DEPT | 2014 |
|---|---|---|---|
| NOVEMBER | WK 1 | TOPS | BOGO Free Graphics, $25 Sweaters, 2 Fors |
| | | RTW | BOGO 50% Denim/Pants, 30% off O/W & denim Jkts, |
| | | N/A | BOGO Free Jewelry/Hair |
| | | TOTAL | $8/$15 Rounders - Markdowns 50% off |
| | Wk 2 | TOPS | BOGO 50% Graphics, $25 Sweaters, 2 Fors |
| | | RTW | BOGO Free Denim/Pants, 30% O/W,40% Select Dresses |
| | | N/A | BOGO Free Jewlery, BOGO 50% Scarves, $5 Baggus |
| | | TOTAL | $8/$15 Rounders - Markdowns 50% off |
| | Wk 3 | TOPS | BOGO 50 Graphics, $16.9 Brushed, Select sweaters at $25, 30% outerwear, 2 fors |
| | | RTW | BOGO Free denim, BOGO Free Dresses |
| | | N/A | Non Apparel Jewelry and Scarves BOGO 50 |
| | | TOTAL | $8/$15 Rounders, 50% MDs |
| | Wk 4 | TOPS | Graphic Tee Black Friday deals $15 plus entire store discount |
| | | RTW | Woven Top Black Friday deal $20 plus entire store discount |
| | | N/A | Pricepointed Black Friday deals excluded from entire store discount |
| | | TOTAL | Wed - 40% off entire store, Thurs/Fri - 50% off entire store, Sat - 40% off entire store |

**dELiA\*s AGENCY AGREEMENT**

**EXHIBIT 11.1(l)**

**LIST OF PENDING MATTERS**

[BELIEVED TO BE NONE, BUT TO BE CONFIRMED BY MERCHANT]

**dELiA\*s AGENCY AGREEMENT**

**EXHIBIT 11.1(o)**

**EXTRORDINARY POS ACTIVITY**

[BELIEVED TO BE NONE, BUT TO BE CONFIRMED BY MERCHANT]

**dELiA*s AGENCY AGREEMENT**

**EXHIBIT 11.1(q)**

**LIST OF STORES WITH LEASE EXPIRATION/TERMINAITON DATES DURING THE SALE TERM**

[TO BE FINALIZED BY MERCHANT, AGENT AND LENDER]

# Exhibit 11.1(u)

# Promotions/Discounts Calendar

| Delia's 2014 | | | Email Offer Direct - 2014 |
|---|---|---|---|
| Fri | | 12/5/2014 | 40% Off Full Price Styles (exclude Branded Styles) + 50% Off Clearance Styles + FS $75 |
| Sat | | 12/6/2014 | 40% Off Everything (exclude Branded Styles) + FS $75 |
| December Week 1 | | | |
| Sun | | 12/7/2014 | Email #1: 40% Off Everything (exclude Branded Styles) + FS No Min<br>VIP Email #1: Spend $100 After 40% Off Discount, Get Free Muk Luks (Style #316274) |
| Mon | | 12/8/2014 | Email #1: 40% Off Everything (exclude Branded Styles) + FS No Min<br>VIP Email #1: Spend $100 After 40% Off Discount, Get Free Muk Luks (Style #316274) |
| Tue | | 12/9/2014 | 40% Off Everything (exclude Branded Styles) + FS No Min |
| Wed | | 12/10/2014 | 50% Off Everything (exclude Branded Styles) + FS $75 |
| Thu | | 12/11/2014 | 50% Off Everything (exclude Branded Styles) + FS $75 |
| Fri | | 12/12/2014 | 50% Off Everything (exclude Branded Styles) + FS $75 |
| Sat | | 12/13/2014 | 50% Off Everything (exclude Branded Styles) + FS $75 |
| December Week 2 | | | |
| Sun | | 12/14/2014 | Email #1: 50% Off Everything (exclude Branded Styles) + FS $75<br>VIP Email #1: TBD |
| Mon | | 12/15/2014 | Email #1: 50% Off Everything (exclude Branded Styles) + FS $75<br>VIP Email #1: TBD |
| Tue | | 12/16/2014 | 50% Off Everything (exclude Branded Styles) + FS $75 |
| Wed | | 12/17/2014 | 50% Off Everything (exclude Branded Styles) + FS $75 |
| Thu | | 12/18/2014 | 50% Off Everything (exclude Branded Styles) + FS $75 |
| Fri | | 12/19/2014 | 50% Off Everything (exclude Branded Styles) + FS $75 |
| Sat | | 12/20/2014 | 50% Off Everything (exclude Branded Styles) + FS $75 + Shipping Cutoff? |
| December Week 3 | | | |
| Sun | | 12/21/2014 | Email #1: 50% Off Everything (exclude Branded Styles) + FS $75<br>VIP Email #1: TBD |
| Mon | | 12/22/2014 | Email #1: 50% Off Everything (exclude Branded Styles) + FS $75<br>VIP Email #1: TBD |
| Tue | | 12/23/2014 | 50% Off Everything (exclude Branded Styles) + FS $75 + Order by 1PM (via upgraded shipping) |
| Wed | | 12/24/2014 | 50% Off Everything |
| Thu | | 12/25/2014 | BOGO Free Jeans and Graphic Tees + BOGO 50% Off Tops + Extra 40% Off Clearance |
| Fri | | 12/26/2014 | BOGO Free Jeans and Graphic Tees + BOGO 50% Off Tops + Extra 40% Off Clearance |
| Sat | | 12/27/2014 | BOGO Free Jeans and Graphic Tees + BOGO 50% Off Tops + Extra 40% Off Clearance |
| December Week 4 | | | |
| Sun | | 12/28/2014 | BOGO Free Jeans and Graphic Tees + BOGO 50% Off Tops + Extra 40% Off Clearance |
| Mon | | 12/29/2014 | BOGO Free Jeans and Graphic Tees + BOGO 50% Off Tops + Extra 40% Off Clearance |
| Tue | | 12/30/2014 | BOGO Free Jeans and Graphic Tees + BOGO 50% Off Tops + Extra 40% Off Clearance |
| Wed | | 12/31/2014 | BOGO Free Jeans and Graphic Tees + BOGO 50% Off Tops + Extra 40% Off Clearance |
| Thu | | 1/1/2015 | BOGO Free Jeans and Graphic Tees + BOGO 50% Off Tops + Extra 40% Off Clearance |
| Fri | | 1/2/2015 | BOGO Free Jeans and Graphic Tees + BOGO 50% Off Tops + Extra 40% Off Clearance |
| Sat | | 1/3/2015 | BOGO Free Jeans and Graphic Tees + BOGO 50% Off Tops + Extra 40% Off Clearance |
| December Week 5 | | | |

**11.1(u) Continued**

**Store Promotion Calendar**

| | | DEPT | 2014 |
|---|---|---|---|
| DECEMBER | WK 1 | TOPS | Sunday - 40% off entire store, Cyber Monday - 50% off entire store |
| | | | Excluding Sun/Monday - BOGO 50% TOPS, BOGO free Graphics |
| | | RTW | Sunday - 40% off entire store, Cyber Monday - 50% off entire store |
| | | | Excluding Sun/Monday - BOGO 50% TOPS, BOGO free Graphics |
| | | N/A | Sunday - 40% off entire store, Cyber Monday - 50% off entire store |
| | | | Excluding Sun/Monday - BOGO 50% TOPS, BOGO free Graphics |
| | | TOTAL | Sunday - 40% off entire store, Cyber Monday - 50% off entire store |
| | Wk 2 | TOPS | |
| | | RTW | |
| | | N/A | |
| | | TOTAL | 50% off Entire Store |
| | Wk 3 | TOPS | |
| | | RTW | |
| | | N/A | |
| | | TOTAL | 50% off Entire Store |
| | Wk 4 | TOPS | BOGO 50% FP graphics |
| | | RTW | BOGO free Denim, |
| | | N/A | BOGO Free jewlery, hair & socks, BOGO free MDS |
| | | TOTAL | All Graphic MDS $5 |
| | Wk 5 | TOPS | BOGO 50% FP graphics, 2 Fors |
| | | RTW | BOGO free Denim, |
| | | N/A | BOGO Free jewlery, hair & socks, BOGO free MDS |
| | | TOTAL | $5 Graphic Mds, $10 L/S, $15 Sweaters |

| | | DEPT | 2015 |
|---|---|---|---|
| JANUARY | WK 1 | TOPS | BOGO 50% FP graphics, 2 Fors, Pricepoints |
| | | RTW | BOGO 50% Denim |
| | | N/A | BOGO Free jewlery, hair & socks, $1 MD Jewelry, Cold weather 50% |
| | | TOTAL | 30% off MDS |
| | Wk 2 | TOPS | BOGO 50% FP graphics, 2 Fors, Pricepoints |
| | | RTW | BOGO 50% Denim |

# EXHIBIT 2

**Sale Guidelines**

EAST\87304261.6

## dELiA*s, INC. SALE GUIDELINES

A.    The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.    The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.    On "shopping center" property, the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Store's premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.    At the conclusion of the Sale, the Agent shall vacate the Stores in broom clean condition, and shall leave the Locations in the same condition as on Sale Commencement Date, ordinary wear and tear excepted, in accordance with Section 6 of the Agency Agreement, provided, however, that the Merchant and the Agent hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store. The Agent and Merchant may abandon any FF&E not sold in the Sale at the Stores at the conclusion of the Sale. Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E located at a Store.

E.    During the Interim Sale Period, Agent may advertise the sale as a "sale on everything", "everything must go", or similar themed sale. Following, and subject to, the entry of the Interim Approval Order and the Approval Order, the Agent may advertise the sale as a "store closing" and/or "going-out-of-business" sale, as dictated by the respective Interim Approval Order and Approval Order.

F.    Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and the Agent shall not use neon or day-glo on its display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet. In addition, the Merchant and the Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Approval Order.  Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement.

1

F.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

G.      Except with respect to the hanging of exterior banners, the Agent shall not make any alterations to the storefront or exterior walls of any Stores.

H.      The Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

I.      The Agent shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.      Subject to the provisions of the Agency Agreement the Agent shall have the right to sell all furniture, fixtures, and equipment located at the Stores and Distribution Center(s) (the "FF&E"). The Agent may advertise the sale of the FF&E in a manner consistent with these guidelines at the Stores and Distribution Center(s).  The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Store business hours. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E.

K.      The Agent shall be entitled to include Additional Agent Goods in the Sale in accordance with the terms of the Approval Order and the Agency Agreement.

L.      At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Store's premises as set forth in the applicable leases.  The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

M.      Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.  Other than Agent's obligations under Section 4.1 of the Agency Agreement with respect to payment of Expenses, Agent shall have no responsibility therefor.

N.      The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

O.      If and to the extent that the landlord of any Store affected hereby contends that the Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows:

    If to Agent:

    Goulston & Storrs PC
    400 Atlantic Avenue
    Boston, MA  02110-3333
    Attn:   James F. Wallack, Esq.

2

Gregory O. Kaden, Esq.

Tel:    617.482.1776

Email:  jwallack@goulstonstorrs.com
        gkaden@goulstonstorrs.com

If to Merchant:

Delia*s, Inc.
50 W 23rd Street – 10th Floor
New York, NY 10010

Attn:   Ryan Schreiber, Esq.
        SVP, General Counsel & Secretary

Tel:    212.590-6204

Email:  rschreiber@deliasinc.com

With a copy to (which shall not constitute notice):

DLA Piper
1251 Avenue of the Americas
New York, New York 10020-1104

Attn:   Gregg M. Galardi, Esq.

Tel:    212.335.4640

Email:  Gregg.Galardi@dlapiper.com

**EXHIBIT B**

**Diercks Declaration**

Gregg M. Galardi
Dienna Corrado
Arkady A. Goldinstein
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

*Proposed Counsel for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| dELiA*s, INC., *et al.*, | Case No. 14- ___ (____) |
| Debtors.[1] | Joint Administration Requested |

**DECLARATION OF LEE A. DIERCKS IN SUPPORT OF THE DEBTORS'
EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) (I) APPROVING THE DEBTORS' ASSUMPTION OF AGENCY AGREEMENT,
(II) AUTHORIZING THE DEBTORS TO SELL CERTAIN ASSETS THROUGH STORE
CLOSING SALES, (III) AUTHORIZING THE DEBTORS TO ABANDON UNSOLD
PROPERTY, (IV) WAIVING COMPLIANCE WITH CONTRACTUAL STORE
CLOSING SALE RESTRICTIONS AND EXEMPTING THE DEBTORS FROM STATE
AND LOCAL WAGE REQUIREMENTS AND LAWS RESTRICTING STORE
CLOSING SALES, (V) GRANTING RELATED RELIEF,
AND (VI) SCHEDULING A FINAL HEARING**

I, Lee A. Diercks, hereby declare that the following is true and correct to the best of my

knowledge, information and belief:

1.       I am a Partner of Clearing Thinking Group LLC ("Clear Thinking"), a consulting

firm that specializes in corporate restructuring, operations improvements, litigation analytics,

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  dELiA*s, Inc. (7172); dELiA*s Distribution Company (9076); A Merchandise, LLC (7639); dELiA*s Operating Company (3765); dELiA*s Retail Company (0036); dELiA*s Group Inc. (4035); AMG Direct, LLC (9236); dELiA*s Assets Corp. (3754); DACCS, Inc. (0225).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  50 West 23rd Street, New York, NY 10010.

valuations, liquidations and asset sales, and case management services.  Clear Thinking

maintains offices at 401 Towne Centre Drive, Hillsborough, New Jersey 08844.

2.       My duties as Partner with respect to Clear Thinking's engagement to represent

dELiA*s, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-

captioned Chapter 11 cases (collectively, the "Debtors"), include, among other things, strategic

advice with respect to a liquidation of the Debtors' assets, assistance with the negotiation of a

DIP facility, development of a DIP loan budget, operational improvements, participation in

negotiations among the Debtor and its creditors, suppliers, and other parties in interest, assistance

to the Debtor in reviewing the terms, conditions and impact of any proposed full or partial

liquidation of the Debtor's assets, advice and assistance to the Debtor's retail operations and

participation in presentations to the Debtor's pre-petition and post-petition secured lender(s).  I

understand that the Debtors intend to file an application to retain Clear Thinking shortly after the

Petition Date.

3.       I have read the *Debtors' Emergency Motion for Entry of Interim and Final Orders*

*(A) Approving the Debtors' Assumption of Agency Agreement, (II) Authorizing the Debtors to*

*Sell Certain Assets Through Store Closing Sales, (III) Authorizing the Debtors to Abandon*

*Unsold Property, (IV) Waiving Compliance With Contractual Store Closing Sale Restrictions*

*and Exempting the Debtors From State and Local Wage Requirements and Law Restricting Store*

*Closing Sales, (V) Granting Related Relief and (VI) Scheduling a Final Hearing* (the "Agency

Motion")[2] and submit this declaration in support thereof.

4.       The facts set forth in this Declaration are based upon my personal knowledge,

upon information and belief or upon client records kept in the ordinary course of business that

were reviewed by me or other senior employees of Clear Thinking who are working on this

---

[2] Capitalized terms not otherwise defined herein shall the meanings ascribed to such terms in the Agency Motion.

matter with me.  If called and sworn as a witness, I could and would testify to the matters set forth herein.

5.      Prior to the Petition Date, Clear Thinking was made aware that the Company engaged an investment banker, Janney Montgomery Scott LLC ("Janney") in early late August 2014 to seek a possible buyer and/or to raise needed capital.  I understand that the representatives from Janney reached out to over 75 strategic and private equity companies and provided those entities that may have interest access to a data room and other key financial information.  However, I understand that Janney received limited interest and no letters of intent or term sheets were ever submitted during the process to sell all or a portion of the business.

6.      Based on the results of efforts by their investment banker to obtain "going concern" transactions that included the Debtors' retail stores as well as obtaining additional financing, the Debtors and Clear Thinking determined that conducting Store Closing Sales by one or more experienced and reputable liquidators would achieve the maximum values for the Total Inventory and would minimize administrative expenses.  Given the breadth of the Store Closing Sales and the need to obtain maximum value for the inventory, and to do so during the holiday season, the Debtors determined that the use of an outside liquidator would provide the highest and best value for the Total Inventory for the Debtors' creditors.  Initially, the Debtors initially negotiated with potential bidders with respect to the liquidation of Store Inventory and Direct Inventory separately.

7.      Clear Thinking also advised the Debtors that it was critical to commence the Store Closing Sales as soon as possible to take advantage of the upcoming holiday shopping season in order to maximize the guaranteed recovery that the Debtors would receive from the Liquidating Agent for the Store Inventory.  In addition, the sooner the Debtors commenced liquidating the

Store Inventory, the sooner they would be able to reject the corresponding leases at the Closing

Stores, eliminating significant expenses, and in turn maximizing value and possibly providing

some recovery to their unsecured creditors.

### A.     THE SOLICITATION PROCESS AND ENTRY INTO THE AGENCY AGREEMENT.

8.     In order to maximize the value of the Total Inventory and to efficiently and

effectively liquidate such merchandise, we advised the Debtors that it was in their best interests

to retain a professional liquidating agent.  Accordingly, prior to the Petition Date, Clear Thinking

and the Debtors engaged in a strategic process to solicit bids to select a liquidation agent and

conduct the Store Closing Sales.

9.     To do so, the Debtors through their advisors began contacting the nation's largest

liquidation firms to gauge interest in a process to solicit bids to conduct Store Closing Sales.  In

mid-November, the Debtors concluded that the possibility of a going concern sale was no longer

likely to occur.  On November 25, 2014, the Debtors through their advisors transmitted bid

solicitation packages containing a draft of the Agency Agreement and a bid solicitation letter

informing parties of the Debtors' intentions to conduct Store Closing Sales and setting forth clear

procedures for parties to request more information and to submit bids.  Out of the parties

contacted, the Debtors received three bids.  The Debtors scheduled the auction (the "Auction") to

commence on December 2, 2014 at 1:00 p.m. (Eastern).

10.     Based on the differences in the bids, the Debtors commenced negotiations with

the parties regarding their bids on December 2, 2014 and conducted those negotiations until near

midnight.  Initially, negotiations with bidders involved primarily the conduct of the sale of the

Store Inventory through the Closing Stores, with the option to elect to also sell the Direct

Inventory through the Direct Business Platform, which option was to be exercised on or before

December 12, 2014.  These negotiations resulted in the Agency Agreement that was circulated to the other bidders to commence the Auction.  Based on its review, one bidder dropped out of the process.  Notwithstanding the fact that the bidder had dropped out before the commencement of the Auction, the negotiated Agency Agreement was circulated to them and they were invited to participate in the Auction.  With respect to the other bidder, the Debtors and their advisors responded to their questions.  It was ultimately determined that the Auction would be adjourned until December 3, 2014 at 9:30 a.m. (Eastern), providing the potential other bidder with time to determine whether to bid.  On the morning of December 3, 2014, after further information was circulated and questions answered, the Debtors commenced the Auction.

11.     As evidenced by the Auction Transcript, the Debtors solicited bids for the Total Inventory.  Ultimately, the highest bid for the Store Inventory was $.80 of the cost value of the merchandise.  In that same bid the Debtors only received a bid of $.85 for all of the Total Inventory.  Believing they might obtain higher bids, the Debtors requested bidders to submit a bid on Total Inventory without a back-up bid on Store Inventory.  After meeting with both bidders, the Debtors received a bid of $.91 with such bid including, among other things, a sale of (i) certain of the Debtors' Owned FF&E, and (ii) designation rights with respect to the Debtors' intellectual property.  The Debtor announced that bid on the record of the Auction as the highest and best bid based on the value received.  The Auction concluded.  Subsequently, the Successful Bidder agreed to provide the Debtors with 25% of the net recovery from any sale of the intellectual property in excess of $2 million, and on December 4, 2014, the Debtors entered into the Agency Agreement.

**B.      THE NEED FOR EXPEDITED RELIEF.**

12.      Expediency is warranted in this case because the Debtors will realize greater

benefits under the Agency Agreement if the Interim Order is entered immediately and by no later

than December 12, 2014, authorizing the Store Closing Sales.  Pursuant to Schedule 3.1(a) of the

Agency Agreement, if the Interim Order is not entered by December 12, 2014, for every day that

the Interim Order is not entered, the Guaranteed Amount payable to the Debtors is reduced by

1%-1.5% on a daily basis.  If the Interim Order is not entered by December 24, 2014, the

cumulative reduction in the Guaranteed Amount is 16%.  This means that unsecured creditors,

who are currently projected to receive a recovery if the Interim Order is entered by December 12,

2014, would not receive anything.

13.      Moreover, any delay in the liquidation of the Total Inventory will decrease value

because the Guaranteed Amount payable to the Debtors assumes a minimum level of Total

Inventory.  If the level of Total Inventory drops below such minimum, the Guaranty Percentage

will be reduced as to all inventory.  Because the Debtors' inventory levels will decline with

every day that the Store Closing Sales are postponed, it is important that the Debtors be

authorized to conduct its Store Closing Sales as expeditiously as possible to ensure that the

Debtors receive the full value of their bargain and maximizes the estate assets available for

distribution to the Debtors' creditors.

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, information, and belief, and after reasonable inquiry, the foregoing is true and correct.

Dated:  December 7, 2014

/s/ Lee A. Diercks
Lee A. Diercks

**EXHIBIT C**

**Auction Transcript**

```
 1

 2

 3                                    :
                                      :
 4                                    :
                                      :
 5    d'ELiA*s AUCTION                :
                                      :
 6                                    :
                                      :
 7                                    :

 8
      - - - - - - - - - - - - -
 9

10

11            TRANSCRIPT of the stenographic notes

12     of the proceedings in the above-entitled

13     matter, as taken by and before

14     CAROLYN CHEVANCE, a Shorthand Reporter, and

15     Notary Public of the State of New Jersey, held

16     at the office of DLA PIPER, 1251 Avenue of the

17     Americas, New York, New York, on December 3,

18     2014.

19

20

21

22

23

24

25
```

```
 1

 2    A P P E A R A N C E S:

 3          GREGG M. GALARDI, ESQ., DLA Piper

 4          IAN S. FREDERICKS, ESQ., Hilco Global

 5
            BENJAMIN L. NORTMAN, Hilco Global
 6

 7          JOHN VENTOLA, ESQ., Choate Hall &
            Stewart LLP
 8

 9          JAMES LEW, Great American Group

10          MAURA I. RUSSELL, ESQ., DiConza
            Traurig Kadish LLP
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    d'ELiA*s Auction

 2              MR. GALARDI:   This is Gregg

 3         Galardi, and I am representing d'ELiA*s.

 4              Just to give some history on the

 5         record, and if anybody wants to comment

 6         on it please feel free.

 7              We have solicited offers based on

 8         a Form Agency Agreement that we sent out

 9         prior to and worked on with our lender

10         Salus Capital; that we sent out prior to

11         the Thanksgiving break.

12              We sent it out to a number of

13         potential interested parties.  It would

14         be interested in liquidating the

15         inventory, and with respect to the

16         inventory, we've put it into,

17         essentially, two buckets: inventories

18         for the store and inventories for what

19         we call the direct E-commerce business.

20              With that we provided notice to

21         the potential bidders that we would

22         expect bids to come in by 10:00 a.m. on

23         Monday of this week.

24              We did receive bids based upon

25         other bidders wanting additional time to
```

1               d'ELiA*s Auction

2       provide bids based upon schedules.  We

3       then revised schedules to give further

4       information and asked for bids to come

5       in by 11:00 a.m. the following morning,

6       Tuesday, and said -- December 2nd if I'm

7       getting my dates correct, and said we

8       would commence an auction on one o'clock

9       on Tuesday, December 2, asked people to

10      come to the offices of DLA.

11              Since people came to the offices

12      at noon, we never opened up the auction,

13      but from noon yesterday and even before,

14      through about 2:00 a.m. last night, all

15      of the parties, to which I express my

16      gratitude for being here and working

17      through issues, were working on issues

18      related to what I will call the Final

19      Form Agency Agreement.  And even worked

20      continued this morning with respect to

21      the Agency Agreement, with parties we

22      have been circulating information.

23              As to the parties that submitted

24      a bid, we had a joint bid from the

25      Gordon Hilco Merchant Resources, which

```
 1                      d'ELiA*s Auction

 2           is the actual document that we

 3           circulated and I think it was 2:18 a.m.

 4           last night as quote, the final version.

 5                  We have made some changes to that

 6           this morning, but that was the document

 7           that we circulated to the other two

 8           bidders that were here as of last night.

 9           One bidder had left earlier.

10                  The first bidder that we

11           circulated to is Great American.  They

12           are present today in the conducting of

13           this auction.  We also sent that

14           agreement and explained an earlier

15           version of it to another bidding group

16           Schottenstein Capital and Tiger, I

17           believe it was.

18                  They decided around midnight they

19           were not going to bid after asking us

20           certain questions on that.

21                  Notwithstanding their decision

22           not to bid, we did circulate another

23           document.  We circulated the revised

24           versions today and circulated a call-in

25           number in case they are interested in
```

1                    d'ELiA*s Auction

2          bidding, if they did submit a bid and if

3          they are interested in bidding today we

4          would accept bids.

5                    With respect to the Agency

6          Agreement, we have a bid from Hilco, we

7          are going to print out that document and

8          put it in here.

9                    But the changes that were made

10         this morning, really, I can walk through

11         on the record and confirm so that we can

12         start the bidding on this.

13                   The actual numbers on the

14         guaranteed amounts have not changed.

15         I'll get to that.  That said, there were

16         a number of issues.  One is because we

17         are contemplating filing -- obviously,

18         all of this is subject to Board

19         approval, and we are a public company,

20         so this is not public information.

21                   We are contemplating filing a

22         restructuring, if we get a sufficient

23         bid that the Board ultimately approves,

24         let's say over the weekend, but most

25         likely Monday or Tuesday of next week.

1               d'ELiA*s Auction

2               We would anticipate that filing

3       be in the Southern District of New York.

4       We would then ask for a first day

5       hearing at the end of that week.

6               With respect to the Agency

7       Agreement, we have advised parties that

8       we would be prepared to start sales of

9       inventory at store locations commencing

10      this weekend, under certain rubric that

11      can be used that would not say this is a

12      full store closing or a liquidation,

13      because of various other reasons.

14              The anticipation would be that

15      there would be no further auction, post

16      bankruptcy filing, with respect to this

17      agreement.  That we would seek to assume

18      that agreement in the bankruptcy court,

19      subject to the court's availability and

20      timing.

21              We would actually -- what we have

22      told the bidders, again, with no

23      guarantees, and they have taken this

24      into their bid, that we would seek to

25      have an interim approval order where we

1                    d'ELiA*s Auction

2          can change the signage and the debtor

3          would be prepared to try to change the

4          signage to the "going out of business"

5          or "store closing language", but we

6          would need court authority to do that

7          and, therefore, we would seek an interim

8          order authorizing us to use that

9          language as early as December 12th, that

10         would be the interim order and we said

11         we would seek to try to have that order.

12                    In addition, what we advised

13         bidders, and we understand the value of

14         the weekend, so that is why we decided

15         the December 12th date.

16                    We also decided that in the event

17         the bankruptcy court is uncomfortable

18         providing that order, we will make

19         arguments, but in the event there is not

20         we will seek an assumption of the Agency

21         Agreement and the outside date for that

22         would be December 24th.

23                    Again, the theory being that if

24         we can do it December 24th, that is a

25         Wednesday, Christmas the 25th is a

1                    d'ELiA*s Auction

2           Thursday, and it would allow the sale of

3           inventory which maximizes value to us

4           and the parties during the week of the

5           26th of December.  Again, no guarantees

6           on any of this.

7                    We will provide what we call a

8           step-down schedule that was also

9           provided to the bidders, with respect to

10          the change in the signage that could

11          happen and the consequences on price,

12          should they not be able to use that

13          store closing or GOB type language from

14          December 12th through December 24th.

15                   As to the December 24th date, the

16          current contemplation is that the

17          document would be in default if we do

18          not assume it.  We would prevail on any

19          bidder who is the successful bidder to

20          negotiate a step-down schedule if the

21          court can't see us on the 24th or --

22          whatever date it is, but that we

23          understand that that is a valuable

24          weekend and we will do everything

25          possible to secure an order by that

```
 1                    d'ELiA*s Auction

 2          weekend.

 3                    The other changes, other than the

 4          dates, there was a schedule distributed,

 5          as I mentioned; with respect to what we

 6          called the step-down schedule with

 7          respect to the order.

 8                    There have been exhibits that

 9          have been circulated.  One issue that

10          did come up was the definition of

11          occupancy expenses, telephone expenses

12          in it.  It was not on the schedule of

13          occupancy expenses, but we understand

14          and I believe a revised exhibit has been

15          circulated.  I think it is 4.1A, if I'm

16          not mistaken.  But $35,000 spread over

17          the stores, as I understand it, a month,

18          has been included with no adjustment to

19          the purchase price.

20                    (Off-the-record discussion.)

21                    MS. RUSSELL:  I want you to

22          confirm on the record, although we are

23          going to ask for GOB to start as part of

24          the interim sale order, if we only get

25          store closing but not the GOB language,
```

1                    d'ELiA*s Auction

2          the step-down in Exhibit 3.1 is not

3          triggered.

4                    MR. GALARDI:  With respect to the

5          step-down language, again, this is fine

6          tuning on the language; we will be

7          seeking and we had advised people we

8          will seek the broadest language possible

9          on GOB and store closing.

10                   That said, it is our

11         understanding and I'd ask Hilco to

12         confirm so when we start the bidding,

13         this is in the document, that in the

14         event that we are unable to get the GOB

15         language but simply the store closing

16         language, that the step-down schedule

17         will not apply.

18                   My understanding, having done

19         this before, is that Ian Fredericks will

20         be speaking on behalf of Hilco Gordon

21         Brothers joint bid.  Ian, can you

22         confirm that?

23                   MR. FREDERICKS:  Correct.  The

24         agreement currently contemplates exactly

25         that.  The interim order will allow for

1                    d'ELiA*s Auction

2          store closing and the approval order

3          will add on, in addition to store

4          closing, going out of business.  I can

5          confirm that.

6                    MR. GALARDI:  I don't know if any

7          other parties want to say anything about

8          the history.

9                    One, again, I appreciate

10         everybody's long hours in staying here

11         for that period of time.

12                   MR. VENTOLA:  Salus has been very

13         supportive of this process.  I note for

14         the record, Salus reserves the right to

15         review all of the bids and whatever

16         rights it may have are reserved to

17         accept, reject, one of those bids but

18         obviously, we have been supportive of

19         this process.

20                   MR. GALARDI:  While everyone is

21         doing it and I said it to everyone, we

22         have a Board meeting at 2:00 today, we

23         are trying to move that, for obvious

24         reasons, at the time.

25                   The Board has been aware of our

1                    d'ELiA*s Auction

2          soliciting the proposals, but obviously,

3          everything is subject to the Board's

4          approval to enter into those agreements

5          and proceed.

6                    I've explained that issue to all

7          of the parties.  So we, similarly, are

8          reserving all rights, but we understand

9          the situation.

10                   With respect to the bids, the two

11         numbers that I think we think are the

12         most important, but there are other ways

13         to add value here, and will let bidders

14         have flexibility; we have two guaranteed

15         amounts, one is the 78 percent

16         guaranteed amount in the event that

17         d'ELiA*s does not do what we called the

18         direct business platform election.

19                   Essentially, that is if the only

20         inventory being liquidate is the

21         inventory in the stores and the

22         inventory in the distribution center,

23         that is slotted for the stores.

24                   That is a 78 percent bid on the

25         cost value of merchandise, and then if

1                     d'ELiA*s Auction

2          the debtor does in fact exercise that

3          election; i.e., all of the inventory is

4          to be liquidated.  We have a bid of 82

5          percent from Hilco in that same

6          agreement.

7                     Where we would request the

8          bidding is to be at a half a point.  Is

9          that where we -- we set the bidding

10         increments to initially be at a half

11         point, reserving our rights to modify

12         that.

13                    We will take into consideration

14         however you would like to make that half

15         a point.  We may have to adjourn to

16         consider that half point and whether

17         that is higher or better.

18                    And obviously, on the full

19         inventory liquidation, as I've also

20         mentioned to bidders, to the extent that

21         they want that direct electrician to go

22         away, that bidding -- the higher that is

23         the more likely the election goes away,

24         because we are still soliciting going

25         concern bids for that direct E-Commerce

```
 1                    d'ELiA*s Auction

 2        business.

 3                    Any questions about how we

 4        conduct the auction?  Any questions

 5        about what I said?  Everyone on the same

 6        page?

 7                    And with that, the only bidder

 8        present -- and I don't think I heard

 9        anybody from Schottenstein Group, who

10        submitted a bid, get on the phone.

11                    Then I would turn to Great

12        American and ask if they open the

13        bidding and ask whether they would like

14        to overbid the Hilco Gordon Brothers

15        bid.

16                    MR. LEW:  We will not overbid the

17        -- we will not overbid the store sell

18        guarantee percent of 78 percent.  We

19        would not.

20                    MR. GALARDI:  Will you match that

21        78 percent?

22                    MR. LEW:  We will match it.

23                    MR. GALARDI:  What about anything

24        else that you would want to add value,

25        over and above the Hilco bid?
```

1                    d'ELiA*s Auction

2                    MR. LEW:  We would like to

3          overbid the all-inclusive guarantee

4          percentage with one change to the

5          contract, that refers to Section 8.5,

6          related to the returned merchandise.

7                    We would like to add the

8          prevailing discount adjustment language

9          that is stipulated in Section 5.3, and

10         apply that same language to Section 3.5

11         for return merchandise.

12                   MS. RUSSELL:  You would be

13         looking for prevailing discounts for

14         goods received after the 14th day -- how

15         we defined the receipt deadline in the

16         document?

17                   MR. LEW:  Actually, we would like

18         to get that into effect on day one.

19                   MR. GALARDI:  So let me

20         understand.  So you want to add

21         prevailing discount language, but any

22         return that comes in day one is going to

23         be discounted right at that point if it

24         is return merchandise?

25                   MR. LEW:  That is correct.

```
 1                   d'ELiA*s Auction
 2                   MR. GALARDI:  And by the
 3        percentages that are set forth in the
 4        current document?
 5                   MR. LEW:  That's correct.
 6                   MR. GALARDI:  With that, what are
 7        you bidding so that we can take the
 8        package?
 9                   MR. LEW:  45 percent.
10                   MR. GALARDI:  Again, I don't
11        think that that is an overbid, given
12        that we are having a discount and it is
13        a half point.
14                   With the prevailing language, if
15        you take the prevailing language out, it
16        is an overbid, but I don't think it is
17        an acceptable overbid.  So we are not
18        prepared to accept that as an overbid of
19        the current deal.
20                   MR. LEW:  We need a break.
21                   (A short break is taken.)
22                   MR. GALARDI:  Back on the record.
23        Back to Great American on the bid, and
24        we ask Great American to submit a bid.
25                   MR. LEW:  We would like to still
```

1                    d'ELiA*s Auction

2          put in the prevailing discount

3          adjustment language in Section 8.5, but

4          it would start after 14 days, and for

5          that we would bid 82.5 percent.

6                    MR. GALARDI:  Again, at this

7          point it's not a higher and better bid,

8          because no matter what you are doing and

9          running the numbers on this particular

10         thing, and then saying, okay, now I will

11         do 82.5 and make it 21 days.

12                   The fact of the matter is, we

13         don't know the returns.  The sales will

14         start on a certain date and there will

15         be less returns then historical.  There

16         is a risk.

17                   And to do the minimum overbid of

18         82.5 there is going to be a negative,

19         and it's not the minimum overbid.

20                   We can continue to do this and go

21         back and go back and go back, but I

22         think at this point, I appreciate

23         everybody sitting here for so long, but

24         for 12 hours to start playing and

25         getting the document the way that we

1                   d'ELiA*s Auction

2          want -- that we were happy with the

3          document, that Hilco is prepared to

4          proceed we prefer, again, and we would

5          insist, to some extent, to get bids on

6          the numbers, on the dollars; and if

7          later on in the bidding people want to

8          talk about the other provisions, we can

9          talk about those provisions.

10                 If you want to talk about the

11         schedules, we can talk about the

12         schedules.  We can make ballpark

13         estimates, but I will tell you if it is

14         the prevailing discount language in this

15         provision it is going to be significant

16         discount to the price.

17                 Because we think it could be a

18         significant risk or might not be a

19         significant risk, but it is a risk we

20         are not prepared to take at this point

21         for half a point.

22                 MR. VENTOLA:  Non-quantifiable

23         number we are told within a reasonable

24         range.

25                 MR. LEW:  We will strike that

1                    d'ELiA*s Auction

2          issue and bid 82.5 percent.

3                    MR. GALARDI:  That bid is clearly

4          within the bidding -- the reasonable

5          acceptable amount and we go back to the

6          Hilco Gordon Brothers.

7                    MR. NORTMAN:  82.5, but no change

8          to the language in the agreement.

9                    MR. FREDERICKS:  On behalf of

10         Gordon Brothers, we will bid 79 on the

11         stores.  We will match the 82.5 on all

12         merchandise direct and otherwise, and we

13         will also add a guarantee on the store

14         only fixtures of $400,000.

15                   MR. LEW:  To clarify, when you

16         say "guarantee", we would pay the estate

17         $400,000, you would pick up all the

18         expenses of selling the fixtures and we

19         keep all the proceeds?

20                   MR. NORTMAN:  The reason why we

21         did it at store only is because we

22         understand it is owned and you are going

23         to try to tell sell it, and to the

24         extent you don't have -- you may do

25         better selling it with the fixtures in

```
1                    d'ELiA*s Auction
2           then with the fixtures out.  That is why
3           he focused on store-only fixtures.  If
4           we read that wrong, we are also willing
5           to throw in an increase in price if we
6           got the DC fixtures as property.
7                    MR. LEW:  That is a flat $400,000
8           guarantee, you get all --
9                    Mr. NORTMAN:  All proceeds cover
10          all expenses and write a check at
11          approval order date for those fixtures.
12                   MR. GALARDI:  Let's take five
13          minutes.
14                   (A short break is taken.)
15                   MR. GALARDI:  We are going back
16          on the record.  Hilco bid 400 fixed
17          guarantee on the store fixtures.
18          Increased its bid on the store
19          inventory to 79 and left its bid -- the
20          guarantee amount on the full inventory
21          at 82.5.
22                   At this the time we are not going
23          to consider bids on the fixtures.  So we
24          are not going to consider the $400,000
25          there.
```

1                    d'ELiA*s Auction

2                    If Hilco will affirm that its bid

3          is 79 cents on the store and 82.5 on the

4          -- all of the inventory without that,

5          then we can assess that bid.

6                    MR. FREDERICKS:  We will bid --

7          in light of the fact that you are not

8          accepting bids on the guaranteed bids on

9          the FF&E at this time.  We will bid 78.5

10         on the stores and 82.5 on the stores,

11         plus direct.

12                   MR. GALARDI:  At this time, based

13         upon the small increment to the stores

14         and based upon what I said earlier; that

15         in order for the Board to get the most

16         comfortable, we are seeking one of the

17         predominant features, not the exclusive

18         feature, is a higher and better bid with

19         respect to all of the inventory, and

20         there is not a .5 increment on all of

21         the inventory.

22                   There is only .5 on the 78.5

23         inventory, and we see that really as a

24         risk discount to us.  For example, if

25         the Board does not find a going concern

1                    d'ELiA*s Auction

2          bid, then we have an option to go on a

3          higher number.  If we do find a bid it

4          is really a put on the store inventory.

5                    So we see it as a risk factor,

6          and so we would discount that .5 and we

7          would say that is not a higher or

8          otherwise better bid.

9                    I'm not going to say how much we

10         discount it by, and I'm not going to get

11         into that.

12                   I think what I am signaling to

13         everyone one is the real money value

14         that we are most interested in,

15         especially at this time in the bidding,

16         is higher and better .5 increments on

17         the overall inventory bid, to get the

18         Board comfortable that either they forgo

19         that sale and make the election, or that

20         that is the best return for our credit

21         or constituency.  So we would not accept

22         the bid of 78.5 and 82.5.

23                   MR. FREDERICKS:  We will bid 78

24         even on the --

25                   MR. NORTMAN:  Raise the bid on

1                    d'ELiA*s Auction

2          the stores only to 79 and leave

3          82-and-a-half on the stores plus direct.

4                    MR. GALARDI:  Based on that bid,

5          we will accept that as a higher or

6          otherwise and turn to Great American.

7                    (A short break is taken.)

8                    MR. GALARDI:  Back on the record.

9          So we are back on the record now.

10                   And the last bid by Hilco, which

11         we said was higher or otherwise better,

12         is a bid of 79 on the store inventory

13         and 82.5 on the full inventory.

14                   Great American has now returned

15         and we ask Great American if they want

16         to submit another bid and what that bid

17         would be.

18                   MR. LEW:  We will match the store

19         only guarantee of 79 and raise the

20         global bid to 83.0.

21                   MR. GALARDI:  We deem that a

22         higher and otherwise better bid, and now

23         turn to Hilco.

24                   MR. NORTMAN:  Hilco will bid 80

25         percent on the stores only, and 83

```
 1                    d'ELiA*s Auction

 2          percent on the stores in direct.

 3                    MR. GALARDI:  We will -- again,

 4          I'm not going to say we are discounting

 5          it the same time every time we go up on

 6          a point there, but we will accept that

 7          as a higher or otherwise better bid, and

 8          we will now turn to Great American.

 9                    MR. LEW:  Break please.

10                    (A short break is taken.)

11                    MR. GALARDI:  Back on the record.

12          The last bid by Hilco Gordon Brothers

13          was 80 on the store inventory and 83 on

14          the full inventory and we now turn to

15          Great American.

16                    MR. LEW:  Great American will

17          match the 80 percent on the store only.

18          And raise our bid on global to 83.5.

19                    MR. GALARDI:  We will accept that

20          as a higher or otherwise better bid.  We

21          turn now to Hilco Gordon Brothers.

22                    MR. NORTMAN:  Hilco will bid 81

23          on the store only.  And 83-and-a-half on

24          the global.

25                    MR. GALARDI:  Based on the last
```

1                        d'ELiA*s Auction

2          bid, d'ELiA*s is not going to consider

3          further bids on the store only

4          inventory, as I indicated it was a risk

5          factor for us.  We think at 80 we are

6          comfortable.

7                    We will, in fact, be prepared to

8          revisit that at some future point, but

9          we would ask that the bidding now go

10         solely to the inventory only, as we

11         think that is going to be the decisive

12         factor ultimately.

13                   So we will not accept that as a

14         higher or better bid, and we will ask

15         Hilco if they want to bid on the full

16         inventory deal in the increment of .5 or

17         better?

18                   MR. NORTMAN:  We would like a

19         break.

20                   (A short break is taken.)

21                   MR. GALARDI:  Back on the record.

22         The last bid by Great American I have is

23         80 and then 83.5.  And then we advised

24         that we would not, at this time, be

25         adding value for bids to the store

1                    d'ELiA*s Auction

2          inventory, and we asked Hilco if they

3          would be prepared to bid on all the

4          inventory?

5                    MR. NORTMAN:  Yes, Hilco Gordon

6          Brothers will bid 80 percent on the

7          store only inventory.  And 85 cents on

8          the store plus direct.

9                    MR. GALARDI:  That is a higher

10         and otherwise greater bid.  We will turn

11         to Great American.

12                   (A short break is taken.)

13                   MR. GALARDI:  Back on the record.

14         At this point we turn to -- the last bid

15         from Hilco Gordon Brothers was 80 on the

16         store, and 85 on the full inventory, and

17         we ask Great American if it is prepared

18         to increase its bid?

19                   MR. LEW:  On behalf of the Great

20         American Group, we would not place any

21         further bids.  I congratulate the joint

22         venture of Hilco and Gordon Brothers.

23                   Best of luck.

24                   MR. GALARDI:  Let's not go quite

25         so quickly.  Hilco has the highest and

1                    d'ELiA*s Auction

2          best bid there.

3                    What we would ask now is, if at

4          all interested in bidding to Great

5          American, and assuming that there was no

6          put option, that is the debtor waived

7          its election -- actually, it exercises

8          its election as of tonight, tomorrow, so

9          that we would go full inventory.

10                    We want to know if you would want

11          to change the bid and not have to keep

12          the 80 on the store, obviously that

13          would go away.  Whether you would like

14          to submit a higher bid than the 85 on

15          the full inventory?

16                    MR. LEW:  Pretty much

17          guaranteeing us the E-Commerce election?

18                    MR. GALARDI:  Correct.

19                    MR. LEW:  That would be as of

20          night?

21                    MR. GALARDI:  If the Board

22          approves the deal and we have the Board

23          and the number is right, we are going to

24          the Board tonight.

25                    We are trying to give the Board

1                    d'ELiA*s Auction

2            the two options.  One of the options

3            will be if you don't need that insurance

4            policy, that I referred to or you want

5            it at a lower number, here is the number

6            you can get on the full inventory to

7            flush out the highest value on the full

8            inventory sale.

9                    (A short break is taken.)

10                   MR. GALARDI:  Back on the record.

11           Again, when we were on the record there

12           was a bid for inventory of the stores,

13           and inventory altogether at 80 and 85,

14           at which point Great American said that

15           -- they actually congratulated Hilco on

16           the auction and said that they were not

17           going to bid any longer.

18                   We then asked for bids solely on

19           all of the inventory, if in the event

20           that -- we have a Board meeting about

21           six o'clock tonight, ask the Board to

22           exercise their election and let all the

23           inventory go into the sale.

24                   I think I have been fairly clear

25           the whole day and yesterday, that the

1                    d'ELiA*s Auction

2        Board is considering this tonight.  And

3        I think we also indicated that their

4        comfort level, in light of the going

5        concern potential for the direct sale

6        business, that the number even at 85,

7        which is why we opened up the auction to

8        other alternatives, at 85 was probably

9        not going to get the Board there.

10               We then had conversations, which

11       I'm not going to say, other than what

12       the terms are.

13               Conversations with both Great

14       American about how to get that bid

15       higher, and then we had conversations

16       with Hilco to get higher.

17               What we have now is the following

18       bid from Hilco, which we think, given

19       where we were, is not to be topped and

20       is the bid that we would -- when I say

21       "we", the general counsel Ryan Schreiber

22       sitting next to me, myself, and the

23       advisors will be strongly recommending

24       that the Board pursue.

25               It is the same Agency Agreement

1                        d'ELiA*s Auction

2            we have been working with, but it is a

3            91 cent bid for all of the inventory.

4                        It is that the Board would elect

5            to put in all the direct inventory to

6            the sale, and do so, so that as of the

7            sale date tomorrow, the commencement

8            date, all of the inventory will be in

9            there.

10                       We have agreed with Hilco that

11           the prevailing discount, net 14 days, on

12           the returns will go into that language.

13                       We have given up sharing on the

14           additional merchandise for the

15           augmentation.

16                       MR. FREDERICKS:  Sharing is off.

17           There is no sharing.

18                       MR. GALARDI:  We have given it

19           up.

20                       MR. FREDERICKS:  Sharing is just

21           off.

22                       MR. GALARDI:  I misspoke.

23           Sharing is out of the agreement.

24                       In addition, the inventory

25           schedules that were provided -- so there

1                   d'ELiA*s Auction

2          was a direct inventory as of the

3          December 12th date, instead of rolling

4          forward to the December 12th date we are

5          rolling back to the December 4th date --

6          I think tomorrow is the 4th, we are

7          rolling back and there is a number, I

8          don't know, Lee can tell us what that

9          number is.

10                 In addition, on the store

11         inventory, based upon assumptions about

12         shrink, the number is going to be

13         revised and the number that we are now

14         targeting is a maximum number inventory,

15         starting tomorrow, of 15/9.  I believe

16         the minimum is 15/5.

17                 Hilco has agreed to amend that

18         schedule, which we also thought was

19         almost a two-point or a significant risk

20         factor to the bid.

21                 So we actually do think we are in

22         a real solid 91 bid for the inventory

23         right now.

24                 I don't know if there were other

25         terms.  We intend to put those terms

1                    d'ELiA*s Auction

2         into the asset purchase -- the ADC

3         agreement tonight.

4                    That is the agreement we would

5         seek to assume on both an interim basis

6         and a final basis on the dates that I

7         provided earlier.  And this is,

8         obviously, again, subject to Board

9         approval, but we will have the people

10        who have sat here strong recommendation

11        to proceed that way tonight.

12                   MR. FREDERICKS:  A couple of

13        additional points that I'm sure Gregg

14        overlooked.

15                   The FF&E, as part of the

16        transaction we have the right to sell

17        the FF&E.  We keep all of the proceeds

18        and we bear all of the expenses, and we

19        have the right to designate, either

20        ourselves or another third-party, as the

21        acquirer of the intellectual

22        property/direct business.

23                   That is all part of the 91 cent

24        consideration.

25                   MR. GALARDI:  Correct.

```
 1                    d'ELiA*s Auction

 2                    At this point we would declare

 3          them the highest or otherwise best bid,

 4          and we will take that bid to the Board,

 5          and ultimately we will seek approval of

 6          the assumption of that Agency Agreement

 7          with Hilco Gordon Brothers on --

 8          whenever the court hearing is.

 9                    I will turn to Great American, if

10          you have anything to say for the record,

11          but I think given where we understood

12          you were, there is really nothing

13          further to say on the bidding.

14                    MR. LEW:  We left off GB was at

15          83.5 for the global, 81 for --

16                    MR. GALARDI:  You were at -- the

17          last bid I have from you is 80 on store

18          and 83.5, and what GB and Hilco did was

19          went to 80, matched on that because I

20          said no further, and went straight to

21          85.

22                    I was told that you would not be

23          bidding any more on that kind of

24          proposal, and then we did have

25          conversations but we were not prepared
```

1                    d'ELiA*s Auction

2          to proceed on the terms that you had

3          suggested.

4                    MR. LEW:  Can we have the option

5          to look at the economic impact of this

6          prevailing discount language?  It could

7          potentially be painful to us.

8                    MR. GALARDI:  Again, as we

9          explained a few times, we don't have

10         that absolutely clear.  We made our best

11         estimate.  Maybe it's $70,000.  I

12         thought -- on the returns, the

13         prevailing discount --

14                   MR. NORTMAN:  It is in that

15         $70,000 to $100,000 range.

16                   MR. GALARDI:  That is what we

17         understand.  That is our best guess.

18         Again, we don't have the return.  We

19         don't know.

20                   We understand that is what your

21         estimate of the economics of that is, I

22         think, but that is a guess.  So we don't

23         think that is significant in given where

24         we on are on the rest of the provisions.

25                   MR. LEW:  Can you give us a few

1                    d'ELiA*s Auction

2        minutes?

3                    MR. GALARDI:  We can give you a

4        few minutes.  We do think this is

5        essentially a preemptive, what we asked

6        for, bid.

7                    (A short break is taken.)

8                    MR. GALARDI:  Back on the record.

9        Great American had taken a break.

10                   MR. LEW:  We understand it is a

11       very healthy bid that GB -- joint

12       venture of Hilco and Gordon Brothers put

13       forth, but we believe this is an unfair

14       process.  We weren't given the same

15       opportunity to bid on the IP and the

16       fixtures, and we reserve the right to

17       object to this process.

18                   MR. GALARDI:  That is fine.  We

19       understand, and if you want to sit down

20       and talk about the IP and the fixtures

21       we will certainly talk to you.

22                   The Board understands and will go

23       forward with the deal on that.  We are

24       not intending to shop the Hilco deal.

25       We think it is appropriate.  The

```
 1                    d'ELiA*s Auction
 2          fixtures were mentioned today.
 3                    So we understand.  You reserve
 4          your rights, and we will proceed with
 5          whatever you decide to do.
 6                    At this point we will close the
 7          auction, and we appreciate everybody's
 8          lingering for the last few days, the
 9          bidding, the conversation and the
10          dialogue.
11                    I should say one other thing, as
12          to the process, I think Great American
13          may be -- not the first one, throw the
14          stone on their proposal for their bid.
15          I will leave it at that.
16                    Thank you to everyone.  We will
17          document the deal and we will circulate
18          the document and commence the sale if
19          the Board approves tomorrow.
20                    Thank you.
21                    (Auction concluded at 5:00 p.m.)
22
23
24
25
```

1

2                              CERTIFICATE

3

4                     I, CAROLYN CHEVANCE, a Notary

5        Public of the State of New Jersey, do hereby

6        certify that the foregoing is a true and

7        accurate transcript of the testimony as taken

8        stenographically by and before me at the time,

9        place and on the date hereinbefore set forth.

10

11                    I DO FURTHER CERTIFY that I am

12       neither a relative nor employee nor attorney

13       nor counsel of any of the parties to this

14       action, and that I am neither a relative nor

15       employee of such attorney or counsel, and that

16       I am not financially interested in the action.

17

18

         _____

19         Notary Public of the State of New Jersey

20

21

22

23

24

25

## A

**able** 9:12
**aboveentitled** 1:12
**absolutely** 35:10
**accept** 6:4 12:17
  17:18 23:21 24:5
  25:6,19 26:13
**acceptable** 17:17
  20:5
**accepting** 22:8
**accurate** 38:7
**acquirer** 33:21
**action** 38:14,16
**actual** 5:2 6:13
**adc** 33:2
**add** 12:3 13:13
  15:24 16:7,20
  20:13
**adding** 26:25
**addition** 8:12 12:3
  31:24 32:10
**additional** 3:25
  31:14 33:13
**adjourn** 14:15
**adjustment** 10:18
  16:8 18:3
**advised** 7:7 8:12
  11:7 26:23
**advisors** 30:23
**affirm** 22:2
**agency** 3:8 4:19,21
  6:5 7:6 8:20
  30:25 34:6
**agreed** 31:10 32:17
**agreement** 3:8 4:19
  4:21 5:14 6:6 7:7
  7:17,18 8:21
  11:24 14:6 20:8
  30:25 31:23 33:3
  33:4 34:6
**agreements** 13:4
**allinclusive** 16:3
**allow** 9:2 11:25
**alternatives** 30:8
**altogether** 29:13
**amend** 32:17
**american** 2:9 5:11

15:12 17:23,24
  24:6,14,15 25:8
  25:15,16 26:22
  27:11,17,20 28:5
  29:14 30:14 34:9
  36:9 37:12
**americas** 1:17
**amount** 13:16 20:5
  21:20
**amounts** 6:14
  13:15
**anticipate** 7:2
**anticipation** 7:14
**anybody** 3:5 15:9
**apply** 11:17 16:10
**appreciate** 12:9
  18:22 37:7
**appropriate** 36:25
**approval** 6:19 7:25
  12:2 13:4 21:11
  33:9 34:5
**approves** 6:23
  28:22 37:19
**arguments** 8:19
**asked** 4:4,9 27:2
  29:18 36:5
**asking** 5:19
**assess** 22:5
**asset** 33:2
**assume** 7:17 9:18
  33:5
**assuming** 28:5
**assumption** 8:20
  34:6
**assumptions** 32:11
**attorney** 38:12,15
**auction** 1:5 3:1 4:1
  4:8,12 5:1,13 6:1
  7:1,15 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1,4
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1,16 30:1
  30:7 31:1 32:1

33:1 34:1 35:1
  36:1 37:1,7,21
**augmentation**
  31:15
**authority** 8:6
**authorizing** 8:8
**availability** 7:19
**avenue** 1:16
**aware** 12:25

## B

**back** 17:22,23
  18:21,21,21 20:5
  21:15 24:8,9
  25:11 26:21 27:13
  29:10 32:5,7 36:8
**ballpark** 19:12
**bankruptcy** 7:16
  7:18 8:17
**based** 3:7,24 4:2
  22:12,14 24:4
  25:25 32:11
**basis** 33:5,6
**bear** 33:18
**behalf** 11:20 20:9
  27:19
**believe** 5:17 10:14
  32:15 36:13
**benjamin** 2:5
**best** 23:20 27:23
  28:2 34:3 35:10
  35:17
**better** 14:17 18:7
  20:25 22:18 23:8
  23:16 24:11,22
  25:7,20 26:14,17
**bid** 4:24,24 5:19,22
  6:2,6,23 7:24
  11:21 13:24 14:4
  15:10,15,25 17:23
  17:24 18:5,7 20:2
  20:3,10 21:16,18
  21:19 22:2,5,6,9
  22:18 23:2,3,8,17
  23:22,23,25 24:4
  24:10,12,16,16,20
  24:22,24 25:7,12

25:18,20,22 26:2
  26:14,15,22 27:3
  27:6,10,14,18
  28:2,11,14 29:12
  29:17 30:14,18,20
  31:3 32:20,22
  34:3,4,17 36:6,11
  36:15 37:14
**bidder** 5:9,10 9:19
  9:19 15:7
**bidders** 3:21,25 5:8
  7:22 8:13 9:9
  13:13 14:20
**bidding** 5:15 6:2,3
  6:12 11:12 14:8,9
  14:22 15:13 17:7
  19:7 20:4 23:15
  26:9 28:4 34:13
  34:23 37:9
**bids** 3:22,24 4:2,4
  6:4 12:15,17
  13:10 14:25 19:5
  21:23 22:8,8 26:3
  26:25 27:21 29:18
**board** 6:18,23
  12:22,25 22:15,25
  23:18 28:21,22,24
  28:25 29:20,21
  30:2,9,24 31:4
  33:8 34:4 36:22
  37:19
**boards** 13:3
**break** 3:11 17:20
  17:21 21:14 24:7
  25:9,10 26:19,20
  27:12 29:9 36:7,9
**broadest** 11:8
**brothers** 11:21
  15:14 20:6,10
  25:12,21 27:6,15
  27:22 34:7 36:12
**buckets** 3:17
**business** 3:19 8:4
  12:4 13:18 15:2
  30:6 33:22

## C

**c** 2:2
**call** 3:19 4:18 9:7
**called** 10:6 13:17
**callin** 5:24
**cant** 9:21
**capital** 3:10 5:16
**carolyn** 1:14 38:4
**case** 5:25
**cent** 31:3 33:23
**center** 13:22
**cents** 22:3 27:7
**certain** 5:20 7:10
  18:14
**certainly** 36:21
**certificate** 38:2
**certify** 38:6,11
**change** 8:2,3 9:10
  16:4 20:7 28:11
**changed** 6:14
**changes** 5:5 6:9
  10:3
**check** 21:10
**chevance** 1:14 38:4
**choate** 2:7
**christmas** 8:25
**circulate** 5:22
  37:17
**circulated** 5:3,7,11
  5:23,24 10:9,15
**circulating** 4:22
**clarify** 20:15
**clear** 29:24 35:10
**clearly** 20:3
**close** 37:6
**closing** 7:12 8:5
  9:13 10:25 11:9
  11:15 12:2,4
**come** 3:22 4:4,10
  10:10
**comes** 16:22
**comfort** 30:4
**comfortable** 22:16
  23:18 26:6
**commence** 4:8
  37:18
**commencement**
  31:7

**commencing** 7:9
**comment** 3:5
**company** 6:19
**concern** 14:25
   22:25 30:5
**concluded** 37:21
**conduct** 15:4
**conducting** 5:12
**confirm** 6:11 10:22
   11:12,22 12:5
**congratulate** 27:21
**congratulated**
   29:15
**consequences** 9:11
**consider** 14:16
   21:23,24 26:2
**consideration**
   14:13 33:24
**considering** 30:2
**constituency** 23:21
**contemplates** 11:24
**contemplating** 6:17
   6:21
**contemplation** 9:16
**continue** 18:20
**continued** 4:20
**contract** 16:5
**conversation** 37:9
**conversations**
   30:10,13,15 34:25
**correct** 4:7 11:23
   16:25 17:5 28:18
   33:25
**cost** 13:25
**counsel** 30:21
   38:13,15
**couple** 33:12
**court** 7:18 8:6,17
   9:21 34:8
**courts** 7:19
**cover** 21:9
**credit** 23:20
**current** 9:16 17:4
   17:19
**currently** 11:24

**D**

**date** 8:15,21 9:15
   9:22 18:14 21:11
   31:7,8 32:3,4,5
   38:9
**dates** 4:7 10:4 33:6
**day** 7:4 16:14,18,22
   29:25
**days** 18:4,11 31:11
   37:8
**dc** 21:6
**deadline** 16:15
**deal** 17:19 26:16
   28:22 36:23,24
   37:17
**debtor** 8:2 14:2
   28:6
**december** 1:17 4:6
   4:9 8:9,15,22,24
   9:5,14,14,15 32:3
   32:4,5
**decide** 37:5
**decided** 5:18 8:14
   8:16
**decision** 5:21
**decisive** 26:11
**declare** 34:2
**deem** 24:21
**default** 9:17
**defined** 16:15
**definition** 10:10
**delia** 1:5 3:1,3 4:1
   5:1 6:1 7:1 8:1
   9:1 10:1 11:1
   12:1 13:1,17 14:1
   15:1 16:1 17:1
   18:1 19:1 20:1
   21:1 22:1 23:1
   24:1 25:1 26:1,2
   27:1 28:1 29:1
   30:1 31:1 32:1
   33:1 34:1 35:1
   36:1 37:1
**designate** 33:19
**dialogue** 37:10
**diconza** 2:10
**direct** 3:19 13:18
   14:21,25 20:12

   22:11 24:3 25:2
   27:8 30:5 31:5
   32:2 33:22
**discount** 16:8,21
   17:12 18:2 19:14
   19:16 22:24 23:6
   23:10 31:11 35:6
   35:13
**discounted** 16:23
**discounting** 25:4
**discounts** 16:13
**discussion** 10:20
**distributed** 10:4
**distribution** 13:22
**district** 7:3
**dla** 1:16 2:3 4:10
**document** 5:2,6,23
   6:7 9:17 11:13
   16:16 17:4 18:25
   19:3 37:17,18
**doing** 12:21 18:8
**dollars** 19:6
**dont** 12:6 15:8
   17:10,16 18:13
   20:24 29:3 32:8
   32:24 35:9,18,19
   35:22

**E**

**e** 2:2,2 14:3 22:9
   33:15,17
**earlier** 5:9,14 22:14
   33:7
**early** 8:9
**ecommerce** 3:19
   14:25 28:17
**economic** 35:5
**economics** 35:21
**effect** 16:18
**either** 23:18 33:19
**elect** 31:4
**election** 13:18 14:3
   14:23 23:19 28:7
   28:8,17 29:22
**electrician** 14:21
**employee** 38:12,15
**enter** 13:4

**especially** 23:15
**esq** 2:3,4,7,10
**essentially** 3:17
   13:19 36:5
**estate** 20:16
**estimate** 35:11,21
**estimates** 19:13
**event** 8:16,19 11:14
   13:16 29:19
**everybody** 18:23
**everybodys** 12:10
   37:7
**exactly** 11:24
**example** 22:24
**exclusive** 22:17
**exercise** 14:2 29:22
**exercises** 28:7
**exhibit** 10:14 11:2
**exhibits** 10:8
**expect** 3:22
**expenses** 10:11,11
   10:13 20:18 21:10
   33:18
**explained** 5:14
   13:6 35:9
**express** 4:15
**extent** 14:20 19:5
   20:24

**F**

**fact** 14:2 18:12
   22:7 26:7
**factor** 23:5 26:5,12
   32:20
**fairly** 29:24
**feature** 22:18
**features** 22:17
**feel** 3:6
**ff** 22:9 33:15,17
**filing** 6:17,21 7:2
   7:16
**final** 4:18 5:4 33:6
**financially** 38:16
**find** 22:25 23:3
**fine** 11:5 36:18
**first** 5:10 7:4 37:13
**five** 21:12

**fixed** 21:16
**fixtures** 20:14,18
   20:25 21:2,3,6,11
   21:17,23 36:16,20
   37:2
**flat** 21:7
**flexibility** 13:14
**flush** 29:7
**focused** 21:3
**following** 4:5 30:17
**foregoing** 38:6
**forgo** 23:18
**form** 3:8 4:19
**forth** 17:3 36:13
   38:9
**forward** 32:4 36:23
**fredericks** 2:4
   11:19,23 20:9
   22:6 23:23 31:16
   31:20 33:12
**free** 3:6
**full** 7:12 14:18
   21:20 24:13 25:14
   26:15 27:16 28:9
   28:15 29:6,7
**further** 4:3 7:15
   26:3 27:21 34:13
   34:20 38:11
**future** 26:8

**G**

**galardi** 2:3 3:2,3
   11:4 12:6,20
   15:20,23 16:19
   17:2,6,10,22 18:6
   20:3 21:12,15
   22:12 24:4,8,21
   25:3,11,19,25
   26:21 27:9,13,24
   28:18,21 29:10
   31:18,22 33:25
   34:16 35:8,16
   36:3,8,18
**gb** 34:14,18 36:11
**general** 30:21
**getting** 4:7 18:25
**give** 3:4 4:3 28:25

35:25 36:3
**given** 17:11 30:18
 31:13,18 34:11
 35:23 36:14
**global** 2:4,5 24:20
 25:18,24 34:15
**go** 14:21 18:20,21
 18:21 20:5 23:2
 25:5 26:9 27:24
 28:9,13 29:23
 31:12 36:22
**gob** 9:13 10:23,25
 11:9,14
**goes** 14:23
**going** 5:19 6:7 8:4
 10:23 12:4 14:24
 16:22 18:18 19:15
 20:22 21:15,22,24
 22:25 23:9,10
 25:4 26:2,11
 28:23 29:17 30:4
 30:9,11 32:12
**goods** 16:14
**gordon** 4:25 11:20
 15:14 20:6,10
 25:12,21 27:5,15
 27:22 34:7 36:12
**gratitude** 4:16
**great** 2:9 5:11
 15:11 17:23,24
 24:6,14,15 25:8
 25:15,16 26:22
 27:11,17,19 28:4
 29:14 30:13 34:9
 36:9 37:12
**greater** 27:10
**gregg** 2:3 3:2 33:13
**group** 2:9 5:15 15:9
 27:20
**guarantee** 15:18
 16:3 20:13,16
 21:8,17,20 24:19
**guaranteed** 6:14
 13:14,16 22:8
**guaranteeing** 28:17
**guarantees** 7:23
 9:5

### H
**half** 14:8,10,14,16
 17:13 19:21
**hall** 2:7
**happen** 9:11
**happy** 19:2
**healthy** 36:11
**heard** 15:8
**hearing** 7:5 34:8
**held** 1:15
**hereinbefore** 38:9
**higher** 14:17,22
 18:7 22:18 23:3,7
 23:16 24:5,11,22
 25:7,20 26:14
 27:9 28:14 30:15
 30:16
**highest** 27:25 29:7
 34:3
**hilco** 2:4,5 4:25 6:6
 11:11,20 14:5
 15:14,25 19:3
 20:6 21:16 22:2
 24:10,23,24 25:12
 25:21,22 26:15
 27:2,5,15,22,25
 29:15 30:16,18
 31:10 32:17 34:7
 34:18 36:12,24
**historical** 18:15
**history** 3:4 12:8
**hours** 12:10 18:24

### I
**ian** 2:4 11:19,21
**id** 11:11
**ill** 6:15
**im** 4:6 10:15 23:9
 23:10 25:4 30:11
 33:13
**impact** 35:5
**important** 13:12
**included** 10:18
**increase** 21:5 27:18
**increased** 21:18
**increment** 22:13,20

26:16
**increments** 14:10
 23:16
**indicated** 26:4 30:3
**information** 4:4,22
 6:20
**initially** 14:10
**insist** 19:5
**insurance** 29:3
**intellectual** 33:21
**intend** 32:25
**intending** 36:24
**interested** 3:13,14
 5:25 6:3 23:14
 28:4 38:16
**interim** 7:25 8:7,10
 10:24 11:25 33:5
**inventories** 3:17,18
**inventory** 3:15,16
 7:9 9:3 13:20,21
 13:22 14:3,19
 21:19,20 22:4,19
 22:21,23 23:4,17
 24:12,13 25:13,14
 26:4,10,16 27:2,4
 27:7,16 28:9,15
 29:6,8,12,13,19
 29:23 31:3,5,8,24
 32:2,11,14,22
**ip** 36:15,20
**issue** 10:9 13:6 20:2
**issues** 4:17,17 6:16
**ive** 13:6 14:19

### J
**james** 2:9
**jersey** 1:15 38:5,19
**john** 2:7
**joint** 4:24 11:21
 27:21 36:11

### K
**kadish** 2:10
**keep** 20:19 28:11
 33:17
**kind** 34:23
**know** 12:6 18:13
 28:10 32:8,24

35:19

### L
**l** 2:5
**language** 8:5,9 9:13
 10:25 11:5,6,8,15
 11:16 16:8,10,21
 17:14,15 18:3
 19:14 20:8 31:12
 35:6
**leave** 24:2 37:15
**lee** 32:8
**left** 5:9 21:19 34:14
**lender** 3:9
**level** 30:4
**lew** 2:9 15:16,22
 16:2,17,25 17:5,9
 17:20,25 19:25
 20:15 21:7 24:18
 25:9,16 27:19
 28:16,19 34:14
 35:4,25 36:10
**light** 22:7 30:4
**lingering** 37:8
**liquidate** 13:20
**liquidated** 14:4
**liquidating** 3:14
**liquidation** 7:12
 14:19
**llp** 2:7,10
**locations** 7:9
**long** 12:10 18:23
**longer** 29:17
**look** 35:5
**looking** 16:13
**lower** 29:5
**luck** 27:23

### M
**m** 2:3 3:22 4:5,14
 5:3 37:21
**match** 15:20,22
 20:11 24:18 25:17
**matched** 34:19
**matter** 1:13 18:8
 18:12
**maura** 2:10
**maximizes** 9:3

**maximum** 32:14
**meeting** 12:22
 29:20
**mentioned** 10:5
 14:20 37:2
**merchandise** 13:25
 16:6,11,24 20:12
 31:14
**merchant** 4:25
**midnight** 5:18
**minimum** 18:17,19
 32:16
**minutes** 21:13 36:2
 36:4
**misspoke** 31:22
**mistaken** 10:16
**modify** 14:11
**monday** 3:23 6:25
**money** 23:13
**month** 10:17
**morning** 4:5,20 5:6
 6:10
**move** 12:23

### N
**n** 2:2
**need** 8:6 17:20 29:3
**negative** 18:18
**negotiate** 9:20
**neither** 38:12,14
**net** 31:11
**never** 4:12
**new** 1:15,17,17 7:3
 38:5,19
**night** 4:14 5:4,8
 28:20
**nonquantifiable**
 19:22
**noon** 4:12,13
**nortman** 2:5 20:7
 20:20 21:9 23:25
 24:24 25:22 26:18
 27:5 35:14
**notary** 1:15 38:4,19
**note** 12:13
**notes** 1:11
**notice** 3:20

notwithstanding
   5:21
number 3:12 5:25
   6:16 19:23 23:3
   28:23 29:5,5 30:6
   32:7,9,12,13,14
numbers 6:13
   13:11 18:9 19:6

**O**

object 36:17
obvious 12:23
obviously 6:17
   12:18 13:2 14:18
   28:12 33:8
occupancy 10:11
   10:13
oclock 4:8 29:21
offers 3:7
office 1:16
offices 4:10,11
offtherecord 10:20
okay 18:10
open 15:12
opened 4:12 30:7
opportunity 36:15
option 23:2 28:6
   35:4
options 29:2,2
order 7:25 8:8,10
   8:11,18 9:25 10:7
   10:24 11:25 12:2
   21:11 22:15
outside 8:21
overall 23:17
overbid 15:14,16
   15:17 16:3 17:11
   17:16,17,18 18:17
   18:19
overlooked 33:14
owned 20:22

**P**

p 2:2,2 37:21
package 17:8
page 15:6
painful 35:7
part 10:23 33:15,23

particular 18:9
parties 3:13 4:15
   4:21,23 7:7 9:4
   12:7 13:7 38:13
pay 20:16
people 4:9,11 11:7
   19:7 33:9
percent 13:15,24
   14:5 15:18,18,21
   17:9 18:5 20:2
   24:25 25:2,17
   27:6
percentage 16:4
percentages 17:3
period 12:11
phone 15:10
pick 20:17
piper 1:16 2:3
place 27:20 38:9
platform 13:18
playing 18:24
please 3:6 25:9
plus 22:11 24:3
   27:8
point 14:8,11,15,16
   16:23 17:13 18:7
   18:22 19:20,21
   25:6 26:8 27:14
   29:14 34:2 37:6
points 33:13
policy 29:4
possible 9:25 11:8
post 7:15
potential 3:13,21
   30:5
potentially 35:7
predominant 22:17
preemptive 36:5
prefer 19:4
prepared 7:8 8:3
   17:18 19:3,20
   26:7 27:3,17
   34:25
present 5:12 15:8
pretty 28:16
prevail 9:18
prevailing 16:8,13

16:21 17:14,15
   18:2 19:14 31:11
   35:6,13
price 9:11 10:19
   19:16 21:5
print 6:7
prior 3:9,10
probably 30:8
proceed 13:5 19:4
   33:11 35:2 37:4
proceedings 1:12
proceeds 20:19
   21:9 33:17
process 12:13,19
   36:14,17 37:12
property 21:6
   33:22
proposal 34:24
   37:14
proposals 13:2
provide 4:2 9:7
provided 3:20 9:9
   31:25 33:7
providing 8:18
provision 19:15
provisions 19:8,9
   35:24
public 1:15 6:19,20
   38:5,19
purchase 10:19
   33:2
pursue 30:24
put 3:16 6:8 18:2
   23:4 28:6 31:5
   32:25 36:12

**Q**

questions 5:20 15:3
   15:4
quickly 27:25
quite 27:24
quote 5:4

**R**

r 2:2
raise 23:25 24:19
   25:18
range 19:24 35:15

read 21:4
real 23:13 32:22
really 6:10 22:23
   23:4 34:12
reason 20:20
reasonable 19:23
   20:4
reasons 7:13 12:24
receipt 16:15
receive 3:24
received 16:14
recommendation
   33:10
recommending
   30:23
record 3:5 6:11
   10:22 12:14 17:22
   21:16 24:8,9
   25:11 26:21 27:13
   29:10,11 34:10
   36:8
referred 29:4
refers 16:5
reject 12:17
related 4:18 16:6
relative 38:12,14
reporter 1:14
representing 3:3
request 14:7
reserve 36:16 37:3
reserved 12:16
reserves 12:14
reserving 13:8
   14:11
resources 4:25
respect 3:15 4:20
   6:5 7:6,16 9:9
   10:5,7 11:4 13:10
   22:19
rest 35:24
restructuring 6:22
return 16:11,22,24
   23:20 35:18
returned 16:6
   24:14
returns 18:13,15
   31:12 35:12

review 12:15
revised 4:3 5:23
   10:14 32:13
revisit 26:8
right 12:14 16:23
   28:23 32:23 33:16
   33:19 36:16
rights 12:16 13:8
   14:11 37:4
risk 18:16 19:18,19
   19:19 22:24 23:5
   26:4 32:19
rolling 32:3,5,7
rubric 7:10
running 18:9
russell 2:10 10:21
   16:12
ryan 30:21

**S**

s 1:5 2:2,4 3:1,3 4:1
   5:1 6:1 7:1 8:1
   9:1 10:1 11:1
   12:1 13:1,17 14:1
   15:1 16:1 17:1
   18:1 19:1 20:1
   21:1 22:1 23:1
   24:1 25:1 26:1,2
   27:1 28:1 29:1
   30:1 31:1 32:1
   33:1 34:1 35:1
   36:1 37:1
sale 9:2 10:24
   23:19 29:8,23
   30:5 31:6,7 37:18
sales 7:8 18:13
salus 3:10 12:12,14
sat 33:10
saying 18:10
schedule 9:8,20
   10:4,6,12 11:16
   32:18
schedules 4:2,3
   19:11,12 31:25
schottenstein 5:16
   15:9
schreiber 30:21

**section** 16:5,9,10
   18:3
**secure** 9:25
**see** 9:21 22:23 23:5
**seek** 7:17,24 8:7,11
   8:20 11:8 33:5
   34:5
**seeking** 11:7 22:16
**sell** 15:17 20:23
   33:16
**selling** 20:18,25
**sent** 3:8,10,12 5:13
**set** 14:9 17:3 38:9
**sharing** 31:13,16
   31:17,20,23
**shop** 36:24
**short** 17:21 21:14
   24:7 25:10 26:20
   27:12 29:9 36:7
**shorthand** 1:14
**shrink** 32:12
**signage** 8:2,4 9:10
**signaling** 23:12
**significant** 19:15
   19:18,19 32:19
   35:23
**similarly** 13:7
**simply** 11:15
**sit** 36:19
**sitting** 18:23 30:22
**situation** 13:9
**six** 29:21
**slotted** 13:23
**small** 22:13
**solely** 26:10 29:18
**solicited** 3:7
**soliciting** 13:2
   14:24
**solid** 32:22
**southern** 7:3
**speaking** 11:20
**spread** 10:16
**start** 6:12 7:8 10:23
   11:12 18:4,14,24
**starting** 32:15
**state** 1:15 38:5,19
**staying** 12:10

**stenographic** 1:11
**stenographically**
   38:8
**stepdown** 9:8,20
   10:6 11:2,5,16
**stewart** 2:7
**stipulated** 16:9
**stone** 37:14
**store** 3:18 7:9,12
   8:5 9:13 10:25
   11:9,15 12:2,3
   15:17 20:13,21
   21:17,18 22:3
   23:4 24:12,18
   25:13,17,23 26:3
   26:25 27:7,8,16
   28:12 32:10 34:17
**storeonly** 21:3
**stores** 10:17 13:21
   13:23 20:11 22:10
   22:10,13 24:2,3
   24:25 25:2 29:12
**straight** 34:20
**strike** 19:25
**strong** 33:10
**strongly** 30:23
**subject** 6:18 7:19
   13:3 33:8
**submit** 6:2 17:24
   24:16 28:14
**submitted** 4:23
   15:10
**successful** 9:19
**sufficient** 6:22
**suggested** 35:3
**supportive** 12:13
   12:18
**sure** 33:13

───── **T** ─────
**take** 14:13 17:7,15
   19:20 21:12 34:4
**taken** 1:13 7:23
   17:21 21:14 24:7
   25:10 26:20 27:12
   29:9 36:7,9 38:7
**talk** 19:8,9,10,11

36:20,21
**targeting** 32:14
**telephone** 10:11
**tell** 19:13 20:23
   32:8
**terms** 30:12 32:25
   32:25 35:2
**testimony** 38:7
**thank** 37:16,20
**thanksgiving** 3:11
**thats** 17:5
**theory** 8:23
**thing** 18:10 37:11
**think** 5:3 10:15
   13:11,11 15:8
   17:11,16 18:22
   19:17 23:12 26:5
   26:11 29:24 30:3
   30:18 32:6,21
   34:11 35:22,23
   36:4,25 37:12
**thirdparty** 33:20
**thought** 32:18
   35:12
**throw** 21:5 37:13
**thursday** 9:2
**tiger** 5:16
**time** 3:25 12:11,24
   21:22 22:9,12
   23:15 25:5,5
   26:24 38:8
**times** 35:9
**timing** 7:20
**today** 5:12,24 6:3
   12:22 37:2
**told** 7:22 19:23
   34:22
**tomorrow** 28:8
   31:7 32:6,15
   37:19
**tonight** 28:8,24
   29:21 30:2 33:3
   33:11
**topped** 30:19
**transaction** 33:16
**transcript** 1:11
   38:7

**traurig** 2:10
**triggered** 11:3
**true** 38:6
**try** 8:3,11 20:23
**trying** 12:23 28:25
**tuesday** 4:6,9 6:25
**tuning** 11:6
**turn** 15:11 24:6,23
   25:8,14,21 27:10
   27:14 34:9
**two** 3:17 5:7 13:10
   13:14 29:2
**twopoint** 32:19
**type** 9:13

───── **U** ─────
**ultimately** 6:23
   26:12 34:5
**unable** 11:14
**uncomfortable**
   8:17
**understand** 8:13
   9:23 10:13,17
   13:8 16:20 20:22
   35:17,20 36:10,19
   37:3
**understanding**
   11:11,18
**understands** 36:22
**understood** 34:11
**unfair** 36:13
**use** 8:8 9:12

───── **V** ─────
**valuable** 9:23
**value** 8:13 9:3
   13:13,25 15:24
   23:13 26:25 29:7
**various** 7:13
**ventola** 2:7 12:12
   19:22
**venture** 27:22
   36:12
**version** 5:4,15
**versions** 5:24

───── **W** ─────
**waived** 28:6

**walk** 6:10
**want** 10:21 12:7
   14:21 15:24 16:20
   19:2,7,10 24:15
   26:15 28:10,10
   29:4 36:19
**wanting** 3:25
**wants** 3:5
**way** 18:25 33:11
**ways** 13:12
**wednesday** 8:25
**week** 3:23 6:25 7:5
   9:4
**weekend** 6:24 7:10
   8:14 9:24 10:2
**went** 34:19,20
**weve** 3:16
**willing** 21:4
**worked** 3:9 4:19
**working** 4:16,17
   31:2
**write** 21:10
**wrong** 21:4

───── **X** ─────

───── **Y** ─────
**yesterday** 4:13
   29:25
**york** 1:17,17 7:3

───── **Z** ─────

───── **0** ─────
**0** 24:20
**00** 3:22 4:5,14
   12:22 37:21
**000** 10:16 20:14,17
   21:7,24 35:11,15
   35:15

───── **1** ─────
**1** 11:2
**10** 3:22
**100** 35:15
**11** 4:5
**12** 18:24
**1251** 1:16

**12th** 8:9,15 9:14
32:3,4
**14** 18:4 31:11
**14th** 16:14
**15** 32:15,16
**18** 5:3
**1a** 10:15

### 2

**2** 4:9,14 5:3 12:22
**2014** 1:18
**21** 18:11
**24th** 8:22,24 9:14
9:15,21
**25th** 8:25
**26th** 9:5
**2nd** 4:6

### 3

**3** 1:17 11:2 16:9,10
**35** 10:16

### 4

**4** 10:15
**400** 20:14,17 21:7
21:16,24
**45** 17:9
**4th** 32:5,6

### 5

**5** 16:5,9,10 18:3,5
18:11,18 20:2,7
20:11 21:21 22:3
22:9,10,20,22,22
23:6,16,22,22
24:13 25:18 26:16
26:23 32:16 34:15
34:18 37:21

### 6

### 7

**70** 35:11,15
**78** 13:15,24 15:18
15:21 22:9,22
23:22,23
**79** 20:10 21:19 22:3
24:2,12,19

### 8

**8** 16:5 18:3
**80** 24:24 25:13,17
26:5,23 27:6,15
28:12 29:13 34:17
34:19
**81** 25:22 34:15
**82** 14:4 18:5,11,18
20:2,7,11 21:21
22:3,10 23:22
24:13
**82andahalf** 24:3
**83** 24:20,25 25:13
25:18 26:23 34:15
34:18
**83andahalf** 25:23
**85** 27:7,16 28:14
29:13 30:6,8
34:21

### 9

**9** 32:15
**91** 31:3 32:22 33:23