**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| dELiA*s, INC., *et al.*, | Case No. 14- ___ (___) |
| Debtors.[1] | Joint Administration Requested |

**DECLARATION OF EDWARD BRENNAN PURSUANT TO**
**LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Edward Brennan, being duly sworn, deposes and says:

1.        I am the Chief Financial Officer of dELiA*s, Inc. and certain of its subsidiaries

and affiliates (collectively, the "Company" or "Debtors") in the above captioned Chapter 11

cases (the "Chapter 11 Cases").  I have been employed by the Debtor since February 2004

holding various positions within Finance and am responsible for overseeing the general

accounting and financial planning of the Company.  As such, I have developed substantial

institutional knowledge regarding the Debtors' finances, day-to-day operations, business affairs,

and books and records.

2.        I am over the age of 18, competent to testify, and authorized to submit this

Declaration in support of the Debtors' Chapter 11 petitions and the first day pleadings described

herein (the "First Day Motions").

3.        On the date hereof (the "Petition Date"), the Debtors commenced these Chapter

11 Cases by filing voluntary petitions for relief under Chapter 11 of title 11 of the United States

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  dELiA*s, Inc. (7172); dELiA*s Distribution Company (9076); A Merchandise, LLC (7639); dELiA*s Operating Company (3765); dELiA*s Retail Company (0036); dELiA*s Group Inc. (4035); AMG Direct, LLC (9236); dELiA*s Assets Corp. (3754); DACCS, Inc. (0225).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  50 West 23rd Street, New York, NY 10010.

Code, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the

Southern District of New York (the "Court").

4.    The Debtors continue to manage and operate their businesses as debtors in

possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner or

official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

5.    The Debtors have filed or anticipate filing the following First Day Motions:

    i.    *Debtors' Motion for Order Directing Joint Administration of Cases Pursuant to Fed. R. Bankr. P. 1015(b)* ("Joint Administration Motion");

    ii.    *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of a Formatted Mailing Matrix, (B) File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors and (C) Mail Initial Notices and (II) Approving the Form and Manner of Notifying Creditors of Commencement of Debtors' Chapter 11 Cases* ("Consolidated List Creditor Motion");

    iii.    *Debtors' Motion for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs* ("Motion to Extend Time to File Schedules");

    iv.    *Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent* ("Claims Agent Application");

    v.    *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Continued Use of the Debtors' Cash Management System, (II) Authorizing Continued Maintenance of Existing Bank Accounts and Business Forms, and (III) Extending the Time to Comply with the Requirements of Section 345(b) of the Bankruptcy Code* ("Cash Management Motion");

    vi.    *Debtors' Motion for Entry of an Order Authorizing Debtors to Pay Prepetition Wages, Compensation, and Employee Benefits* ("Wage Motion");

    vii.    *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies and (III) Prohibiting Utility Companies From Altering, Refusing Or Discontinuing Service* ("Utilities Motion");

viii. *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing Debtors to (I) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, and (II) Renew, Revise, Extend Supplement, Change or Enter into New Insurance Policies* ("<u>Insurance Motion</u>");

ix. *Debtors' Motion for Interim and Final Orders  Pursuant to 11 U.S.C. §§ 105(a), 507(a)(8) and 541 and Fed. R. Bankr. P. 6003 Authorizing the Debtors to Pay Certain Prepetition Sales, Use and Other Such Trust Fund Taxes and Related Obligations* ("<u>Tax Motion</u>");

x. *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) 363(b), 503(b), 506, 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Certain Prepetition Shipping and Delivery Charges* ("<u>Shipping and Delivery Motion</u>");

xi. *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(A), 363, 507(A)(7), 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing Continuation of Certain Customer Practices* ("<u>Customer Practices Motion</u>");

xii. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Certain Related Relief* ("<u>DIP Financing Motion</u>"); and

xiii. *Debtors' Emergency Motion for Entry of Interim and Final Orders (A)(I) Approving the Debtors' Assumption of Agency Agreement, (II) Authorizing the Debtors to Sell Certain Assets through Store Closing Sales, (III) Authorizing the Debtors to Abandon Unsold Property, (IV) Waiving Compliance with Contractual Store Closing Sale Restrictions and Exempting the Debtors from State and Local Wage Requirements and Laws Restricting Store Closing Sales, (V) Granting Related Relief, and (VI) Scheduling a Final Hearing* ("<u>Agency Agreement Motion</u>").

6.    Additionally, the Debtors anticipate filing at the outset of these Chapter 11 Cases, among other things, applications seeking authorization for the Debtors to retain certain professionals in connection with these Chapter 11 Cases and a motion to establish interim compensation procedures for such professionals.

7.    I submit this declaration pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") and in support of the First Day Motions.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals, my review of the relevant documents, or my experience with, and knowledge of, the Debtors' operations and financial condition.  If called upon, I could and would testify to the facts set forth herein.  I am authorized to submit this Declaration.

8.    This Declaration is divided into three parts.  Part I of this Declaration provides background information about the Debtors, their business operations, and the circumstances surrounding the commencement of these Chapter 11 cases.  Part II sets forth the relevant facts in support of each of the Debtors' First Day Motions.  Annexed to this Declaration are schedules providing additional information about the Debtors, as required by Local Rule 1007-2.

**PART I**

**BACKGROUND**

**A.    THE DEBTORS' OPERATIONS AND BUSINESSES.**

9.    Launched in 1993, the Company is a multi-channel retailer which sells apparel, accessories, footwear, and cosmetics marketed primarily to teenage girls and young women.  The dELiA*s brand products are sold through the Company's mall-based retail stores, direct mail catalogs and e-commerce websites.

- Retail Stores.  As of the Petition Date, the Debtors own and operate ninety-two (92) stores in twenty-nine (29) states.  The inventory for the retail stores are located at the retail stores and at the Debtors' distribution center located in Hanover, Pennsylvania. (the "Distribution Center").

- Direct Business Platform.  Through the Direct Business Platform, the Debtors sell dELiA*s products and merchandise via direct mail catalogs and e-

commerce websites.  The inventory for the Direct Business Platform is also located at the Distribution Center.

10.     The retail apparel business is highly competitive, and the Debtors' businesses account for a fraction of the total market for teenage girls' and young women's apparel.  The Company's stores compete with discount stores, specialty apparel stores, department stores, manufacturer-owned factory outlet stores and other retail outlets.  At various times of the year, department store chains and specialty shops offer brand-name merchandise at substantial markdowns which further intensifies the competitive nature of the industry.

11.     As of the Petition Date, the Debtors owned assets of approximately $74 million based on book value; however, based on the recent Auction (as defined below), the best estimated value of the Debtors' assets is approximately $47 million on a consolidated basis.  As of the Petition Date, the Debtors had aggregate liabilities of approximately $50.5 million.  The Debtors' revenue for 2014 through the Petition Date is approximately $90 million.

**B.     THE DEBTORS' CORPORATE STRUCTURE**.

12.     A corporate organization chart depicting the ownership structure of the Debtors is attached hereto as **Exhibit A**.  dELiA*s, Inc., a publicly-held Delaware corporation, is the parent company of each of the other Debtors.  The Debtors' retail stores are operated by dELiA*s Retail Company.  The Debtors' Direct Business Platform is operated by dELiA*s Operating Company.

13.     Prior to the Petition Date, dELiA*s, Inc. common stock was listed on NASDAQ under the symbol "**DLIA**."  As of the Petition Date, approximately 77 million shares of dELiA*s, Inc. common stock were outstanding.

14.     On February 18, 2014, the Company sold and issued (i) 199,834 shares of series B preferred stock (the "Preferred Stock") for an aggregate purchase price of $19,983,400, and (ii) an aggregate of $24,116,600 in principal amount of notes.  The Preferred Stock has a stated

value of $100 per share and is convertible at the option of the holder into shares of common stock.

15.     Holders of Preferred Stock are entitled to receive, when, as and if declared by the Board of Directors of the Company, out of any funds legally available therefor, dividends per share of Preferred Stock in an amount equal to 6% per annum of the stated value per share. The first date on which dividends are payable is February 18, 2015, and, thereafter, dividends are payable semi-annually in arrears on February 18th and August 18th of each year. Dividends, whether or not declared, begin to accrue and are cumulative from February 18, 2014. If the Company does not pay any dividend in full on any scheduled dividend payment date, then dividends thereafter will accrue at an annual rate of 8.0% of the stated value of the Preferred Stock from such scheduled dividend payment date to the date that all accumulated dividends on the Preferred Stock have been paid in cash in full. In addition, if the Company does not meet minimum borrowing availability tests under the Prepetition Credit Agreement (as defined below) with Salus (as defined below), it may not pay dividends on the Preferred Stock.

## C.     THE DEBTORS' CAPITAL STRUCTURE.

16.     dELiA*s, Inc. and certain of its wholly-owned subsidiaries, as borrowers (as the "Borrowers"),[2] and certain of its wholly-owned subsidiaries, as guarantors (the "Guarantors"),[3] entered into that certain Credit Agreement, dated as of June 14, 2013 (the "Prepetition Credit Agreement") with Salus Capital Partners, LLC ("Salus"), as a lender and as agent for the lenders that are from time to time parties to the Prepetition Credit Agreement (together, with Salus in its capacity as a lender, the "Lenders"). The Prepetition Credit Agreement replaces the Company's

---

[2] The Borrowers under the Prepetition Credit Agreement are: dELiA*s, Inc., dELiA*s Distribution Company, A Merchandise, LLC (f/k/a Alloy Merchandise, LLC), dELiA*s Operating Company, dELiA*s Retail Company, dELiA*s Group Inc., and AMG Direct, LLC.
[3] The Guarantors under the Prepetition Credit Agreement are: dELiA*s Assets Corp., and DACCS, Inc.

prior revolving credit facility with General Electric Capital Corporation ("GE Capital").  The

Prepetition Credit Agreement provides for a total aggregate commitment of the Lenders of

$25,000,000, has a term of four years and matures on June 14, 2017.  The obligations of the

Borrowers under the Prepetition Credit Agreement are secured by substantially all property and

assets of the Company and certain of its subsidiaries.  The Guarantors guaranteed, on a joint and

several basis, all of the Obligations (as defined in the Prepetition Credit Agreement) of the

Borrowers under the Prepetition Credit Agreement.

17.    The Prepetition Credit Agreement requires the Company to have a blocked

account arrangement whereby all cash received is deposited into a blocked account and use to

pay down the loan under the Prepetition Credit Agreement.  As of the Petition Date,

approximately $18.5 million is outstanding under the Prepetition Credit Agreement.

18.    On June 14, 2013, the Company and certain of its wholly-owned subsidiaries (the

"Applicants") entered into a Letter of Credit Agreement with GE Capital to provide for the

issuance of letters of credit to finance the acquisition of inventory from suppliers, to provide

standby letters of credit to landlords, insurance providers and other parties for business purposes

and for other general corporate purposes.  The aggregate letters of credit issued and to be issued

under the Letter of Credit Agreement at any one time may not exceed $15,000,000.  The

obligations of the Applicants under the Letter of Credit Agreement are secured by cash collateral

deposited with GE Capital in the amount equal to 105% of the letters of credit outstanding from

time to time.  As of the Petition Date, the aggregate amount of outstanding letters of credit issued

under the Letter of Credit Agreement is approximately $7.7 million.

## D.    EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES.

19.    Starting in 2013, the Company's revenue and profitability declined due to several

factors, including the extremely competitive market for teenage girls' and young women's

apparel and still struggling national economy.  Therefore, the Company has faced increased

competition for declining consumer purchases for the types of apparel and products the

Company sells.  For the fiscal year ended 2013, the loss before income taxes was $57 million.

20.    In response, the Company undertook numerous initiatives to improve their

performance and maximize value, including initiating closings of underperforming stores.  The

Company has closed fourteen (14) stores in the past twenty (20) months and is scheduled to close

an additional three (3) stores in January 2015.  The majority of these stores were

underperforming.  Additionally, the Company has reduced its catalog circulation by 27% in 2014

as compared to 2013.

21.    On August 28, 2014, the Company retained Janney Montgomery Scott, LLC

("Janney") as its investment banking firm to commence exploration of all possible sources of

capital funding for the Company as well as a potential sale of the Company, each in accordance

with the terms of the existing engagement between the Company and Janney, dated February 19,

2013.  Janney provided services on matters relating to capital raising (whether institutional, retail

or lenders, or from the private placement of debt instruments or equity securities), potential

mergers, sales, joint ventures or similar transactions.

22.    From August 28, 2014 through mid-November 2014, I understand that Janney

assisted the Company's active efforts in securing either or both of a capital raise or a potential

sale of the Company.  In connection with the capital raise, Janney reached out to thirty (30)

potential investors.  The Company received two (2) draft term sheets in mid-to-late October 2014

for capital raise transactions that would act as a bridge to a potential sale of the Company in the

near term.  The Company considered both proposals and ultimately did not, in the exercise of its

business judgment, approve to proceed with either transaction.

23.     At the same time that the Company was meeting and actively negotiating with potential investors, I understand that Janney also contacted over seventy (70) potential purchasers. While there appeared to be interest, nothing came to fruition and the Company did not receive any bids by the November 25, 2014 deadline.

24.     Janney aggressively sought out potential buyers for the Company for the past 90 days. A fully functional data room was set up for the potential buyers to review the Company's financial information. Additionally, senior management of the Company met with potential buyers to review the opportunity and answer any and all questions. There have been five (5) potential buyers who have engaged in talks with the Company and who have utilized the data room. To date, no buyers have expressed a continued interest in buying the Company.

25.     In September 2014, the Company retained Clear Thinking Group LLC ("Clear Thinking") as financial advisor to the Company. Since its retention, Clear Thinking has been significantly involved with all aspects of the Company's businesses. Clear Thinking has been instrumental in advising the Company with regards to cash management, inventory purchases, and expense reductions, including a reduction in force, working through credit issues with the Lenders and advising the Company on the potential sale of the business and/or its assets.

26.     In November 2014, Clear Thinking solicited bids from national liquidation firms to serve as the Company's exclusive agent in connection with the liquidation of the merchandise and owned furniture, fixtures and equipment located at the Company's retail store locations and e-commerce platform by means of store closings or similar themed sales (the "Sales"). The Company received three (3) competing bids and determined that a joint venture composed of Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (the "Liquidating Agent") should serve as the Company's exclusive liquidating agent for the Sales.

27.     On December 4, 2014, the Debtors entered into an agency agreement (the "Agency Agreement") with the Liquidating Agent to, among other things, liquidate all merchandise owned by the Debtors and to dispose of certain furnishings, trade fixtures, equipment and improvements to real property with respect to the Debtors' stores.

28.     As described in further detail below, the Debtors have filed a motion to, among other related relief, assume the Agency Agreement, authorize the Debtors to conduct store closures and sell all of their inventory, and authorize the Liquidating Agent to conduct store closing sales and going out of business sales of the Debtors' assets located in their retail stores and the inventory in a distribution center for their direct platform business.

29.     The Debtors have filed these Chapter 11 Cases to best maximize value for the benefit of all interested parties - including creditors and stockholders - by conducting an orderly wind down and total liquidation of their assets.

## PART II

## FIRST DAY MOTIONS

30.     Concurrently with the commencement of these Chapter 11 Cases, the Debtors have filed a number of First Day Motions to minimize the adverse effects of the Chapter 11 Cases on their businesses during the pendency of the bankruptcy.  I have reviewed each of the First Day Motions and related orders (including the exhibits attached thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  I believe that the relief sought in each of the First Day Motions and Orders (a) is vital to enable the Debtors to make the transition to, and operate in, Chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving an orderly wind-down of the Debtors' businesses.

**A.    JOINT ADMINISTRATION MOTION.**

31.    The Debtors seek entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only.  I believe that joint administration will also save time and money and avoid duplicative and potentially confusing filings by permitting counsel for all parties in interest to (a) use a single caption on the numerous documents that will be served and filed herein and (b) file the papers in one case rather than in multiple cases.  I understand that joint administration will also protect parties in interest by ensuring that parties in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in these cases.

32.    I have also been advised that rights of the respective creditors and stakeholders of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights.

**B.    CONSOLIDATED LIST CREDITOR MOTION.**

33.    The Debtors request that the Court authorize them: (a) to prepare a consolidated list of creditors in the format or formats currently maintained in the ordinary course of business in lieu of submitting any required mailing matrix; (b) file a consolidated list of the Debtors' 50 largest unsecured creditors; and (c) mail the Notice of Commencement (as defined in the Consolidated List Creditor Motion) through Prime Clerk LLC ("<u>Prime Clerk</u>").

34.    There are nine (9) Debtor entities involved in these Chapter 11 Cases and the Debtors estimate that they have over 500 creditors on a consolidated basis.  Contemporaneously with the filing of the motion, the Debtors have filed an application to retain Prime Clerk as their notice and claims agent in these Chapter 11 Cases.  The Debtors believe that using Prime Clerk

for this purpose will maximize administrative efficiency in these Chapter 11 Cases and reduce

the administrative burdens that would otherwise fall upon this Court and the U.S. Trustee.

35.     The Debtors believe that preparing the consolidated list in the format or formats

currently maintained by the Debtors in the ordinary course of business will be sufficient to

permit Prime Clerk to promptly provide notices to all applicable parties.  Accordingly, the

Debtors believe that maintaining their lists of creditors and equity holders in electronic format

rather than preparing and filing separate matrices will maximize efficiency, increase accuracy

and reduce costs to the benefit of these estates.

**C.      MOTION TO EXTEND TIME TO FILE SCHEDULES.**

36.     The scope and complexity of the Debtors' businesses, coupled with the limited

time and resources available to the Debtors to marshal the required information, necessitate an

extension of the deadline to file the Schedules and SOFAs.  As stated above, the Debtors have

over 500 potential creditors and operate a nationwide retail business with products sourced

around the globe.  Further, the nature and scope of the Debtors' operations require them to

maintain voluminous records and intricate accounting systems.

37.     I believe that an extension is necessary due to the complexity and diversity of the

Debtors' business, the limited staff available to perform the required internal review of their

financial records and affairs, the numerous critical operational matters that their limited

accounting staff and legal personnel must address in the early days of these Chapter 11 Cases,

the pressure incident to the commencement of these Chapter 11 Cases, and the fact that certain

prepetition invoices may have not yet been received or entered into their accounting systems.

**D.      CLAIMS AGENT APPLICATION.**

38.     The Debtors request that Prime Clerk be appointed as the claims and noticing

agent for the Debtors and these Chapter 11 Cases, including assuming full responsibility for the

distribution of notices and the maintenance, processing and docketing of proofs of claim filed in these Chapter 11 Cases.

39.     The Debtors have obtained and reviewed engagement proposals from four (4) other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

**E.    CASH MANAGEMENT MOTION.**

40.     Prior to the Petition Date, the Debtors employed a cash management system to efficiently collect, transfer, and disburse the funds generated by its business operations (the "Cash Management System").  The Debtors have depository accounts (the "Depository Accounts") for dELiA*s Retail Company, dELiA*s Operating Company, dELiA*s Distribution Company and dELiA*s, Inc. and for each of the Debtors' retail store locations at the banks (the "Banks") listed in the Cash Management Motion.  Cash sales from stores, credit card deposits, and checks from both stores and mail orders are deposited into the depository accounts daily. Credit card deposit account balances are automatically transferred on a daily basis at noon EST into a blocked account under dELiA*s, Inc. (the "Blocked Concentration Account").  The Depository Accounts have minimal or a zero balance at the end of each day.

41.     Store bank accounts and catalog depository accounts are also swept daily into the Blocked Concentration Account.  At the end of each business day, the entire balance in the Blocked Concentration Account is transferred to an account controlled by Salus (the "Salus Account") under the Prepetition Credit Agreement.  The funds from the Blocked Concentration Account are used to pay down any outstanding balance under the Prepetition Credit Agreement.

42.     In the event funds are needed to fund the daily activities of the Debtors'
businesses, such as payroll and refunds, as well as any authorized wires or ACH debits, funds are
borrowed under the Prepetition Credit Agreement are deposited directly into a "funding account"
held by dELiA*s, Inc. (the "<u>Funding Account</u>") into the relevant Debtor entity's payroll, refunds
or disbursements accounts for payment to third parties.

43.     The Cash Management System facilitates the Debtors' cash forecasting and
reporting and enables the Debtors to monitor and record the collection and disbursement of funds
and maintain control over the administration of their bank accounts  (the "<u>Bank Accounts</u>").[4]

44.     Although the Debtors maintain the Bank Accounts as part of an established cash
management system, it is my understanding that the U.S. Trustee Guidelines require that the
Debtors, as debtors in possession, take certain actions with respect to their prepetition Bank
Accounts in order for the U.S. Trustee to supervise the administration of the Debtors' Chapter 11
Cases.  I have been informed that, according to the U.S. Trustee Guidelines, the requirements are
designed to (i) draw a clear line of demarcation between prepetition and postpetition transactions
and operations, and (ii) prevent inadvertent postpetition payment of prepetition claims.  The
Debtors submit, however, that a waiver of certain requirements is warranted in these Chapter 11
Cases.

45.     Specifically, both the Blocked Concentration Account (where most of the
Debtors' cash is held) and the Funding Account (from which funds are disbursed to the various
accounts of the Debtors on an as needed basis) are with JPMorgan Chase, Bank, N.A.
("<u>JPMorgan</u>"), a financially stable banking institution with FDIC insurance (up to an applicable
limit, if any, per Debtor).  To protect against the unauthorized payment of prepetition

---

[4] The Debtors believe that the list of Bank Accounts attached as <u>Exhibit C</u> is complete but reserve the right to
    supplement such list in the event the Debtors have inadvertently omitted a Bank Account.

obligations, the Debtors represent that if they are authorized to continue to use the Bank

Accounts, they will not pay, and JPMorgan will be directed not to pay, any debts incurred before

the Petition Date, other than as authorized by this Court.  In the event there are funds currently in

an account at a Bank other than JPMorgan, the Debtors will direct such Bank not to pay any

debts incurred before the Petition Date, other than as authorized by this Court.

46.    If the U.S. Trustee's requirements are enforced in these Chapter 11 Cases, such

requirements would cause enormous disruption in the Debtors' business and would impair the

Debtors' business operations during these Chapter 11 Cases to the detriment of their estates and

creditors.  Indeed, as explained in detail above, the Bank Accounts comprise an established cash

management system that the Debtors need to maintain in order to ensure that collections and

disbursements continue to occur without issue or disruption during the pending of these Chapter

11 Cases.

47.    The Debtors' Cash Management System is highly automated and computerized.

This allows the Debtors to manage centrally all of their cash flow needs and includes the

necessary accounting controls to enable the Debtors, as well as creditors and the Court, to trace

funds through the system and ensure that all transactions are adequately documented and readily

ascertainable.  While the Debtors' Chapter 11 Cases are pending, the Debtors will continue to

maintain detailed records reflecting all transfers of funds.

48.    Accordingly, in order to avoid delays in payments to administrative creditors, to

ensure as smooth a transition into Chapter 11 as possible with minimal disruption, and to aid in

the Debtors' efforts to maximize the value of their estates.

**F.    WAGE MOTION.**

49.    The Debtors request that the Court enter an order, under sections 105(a), 363(b),

507(a), 1107(a) and 1108 authorizing, but not directing, the Debtors:  (a)  to pay and/or perform,

as applicable, prepetition obligations to current employees, retirees and independent contractors, including accrued prepetition wages, salaries and other cash and non-cash compensation claims, except as otherwise set forth herein (collectively, the "Employee Claims"); (b) to honor and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' vacation, sick time and holiday time policies, workers' compensation, employee and retiree benefit plans and programs (collectively, the "Employee Benefit Obligations"), as described below, and to pay all fees and costs in connection therewith, except as otherwise set forth herein; (c) to reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business (the "Employee Expense Obligations"); (d) to pay all related prepetition withholdings, and payroll-related taxes associated with the Employee Claims and the Employee Benefit Obligations (the "Employee Taxes"); and (e) to pay all administrative fees and employer contributions to Employee pension funds (the "Pension Obligations" and, together with the Employee Claims, the Employee Benefit Obligations, the Employee Expense Obligations and the Employee Taxes collectively, the "Prepetition Employee Obligations"), all as described in detail in the Wage Motion.

50.     The Debtors believe, in the exercise of their business judgment, that relief is necessary to avoid immediate and irreparable harm to the Debtors' estates.  Paying prepetition wages, employee benefits and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors to conduct the postpetition liquidation and wind-down process effectively.  Indeed, the Debtors believe that without the relief requested herein being granted, their Employees may seek alternative opportunities sooner than the liquidation is complete. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to conduct an orderly wind down.

## G.     UTILITIES MOTION.

51.     In connection with the operation of their businesses and the management of their

properties, the Debtors obtain water, gas, electricity, telephone, and similar utility products and

services (collectively, the "Utility Services") from the Utility Companies covering a number of

utility accounts.  The relief requested herein is for all Utility Companies providing Utility

Services to the Debtors and is not limited to those listed on the Utility Company List attached to

the Interim Order as Schedule 1.

52.     On average, prior to the Petition Date, the Debtors spent approximately $203,000

each month on account of Utility Services.  Included in the calculation of this amount are certain

utilities that are included in the Debtors' rent payments to landlords at certain store locations

who are then responsible for paying the relevant utility companies.  Currently, certain of the

Utility Companies already hold deposits of approximately $8,500 in the aggregate.

53.     Uninterrupted Utility Services are essential to the Debtors' business operations

during the pendency of these Chapter 11 Cases, particularly during the crucial upcoming holiday

sales season.  Should any Utility Company alter, refuse or discontinue service, even for a brief

period, the Debtors' business operations could be severely disrupted, and such disruption would

jeopardize the Debtors' efforts.  It is essential that the Utility Services continue uninterrupted.

## H.     INSURANCE MOTION.

54.     The Debtors maintain various insurance programs providing coverage for, among

other things, workers' compensation liability, automobile liability, employment practices

liability, commercial property liability, international liability, crime liability, directors and

officers liability, fiduciary liability, and commercial umbrella (collectively, the "Insurance

Programs").  The Insurance Programs include coverage primarily from the insurance policies

(collectively, the "Insurance Policies"), which the Debtors have obtained through third-party

insurance carriers (collectively, the "Insurance Carriers").  As of the Petition Date, the Debtors

believe they are current on all of their premium obligations arising under the Insurance Policies.

The Debtors maintain the Insurance Policies in amounts and types of coverage in accordance

with laws governing the multiple jurisdictions in which the Debtors do business as well as in

accordance with their contractual obligations.

55.     For the policy period 2014-2015, the total annual premiums under the Insurance

Policies equaled approximately $836,000.  The coverage types, levels and premiums for these

Insurance Policies are neither unusual in amount nor in number in relation to the extent of the

business operations conducted by the Debtors, and are similar to businesses of a comparable size

and type to those of the Debtors.

56.     As of the Petition Date, the Debtors believe that they are current on their payment

obligations under the Insurance Policies, including the D&O Policy which expires on March 2,

2015.  Although the Debtors believe they are current, to the extent the Debtors discover that

there are any outstanding prepetition obligations due, the Debtors request, out of an abundance of

caution, authorization to make payments of Insurance Obligations and Premium Financing

Obligations (plus any unforeseen deductible payment amounts for prepetition claims).

57.     The Insurance Policies maintained by the Debtors will eventually expire under

their annual terms.  I have been advised that maintenance of insurance coverage is required under

the United States Trustee for Region 2 Operating Guidelines and Reporting Requirements for

Debtors in Possession and Trustees (Revised November 27, 2013) (the "Guidelines"), the laws of

many of the various jurisdictions in which the Debtors operate, the Debtors' various contractual

agreements, and/or prudent business practices.  Furthermore, coverage under the Insurance

Policies is needed to protect the Debtors as they wind down their businesses in an orderly

fashion.  To the extent that any Insurance Policy premiums may be attributed to prepetition

insurance coverage, the Debtors believe that payment of such Insurance Policy premiums is

necessary to ensure continued coverage.  Similarly, the Debtors' believe that continued payment

of Insurance Policy premiums as such premiums come due is necessary to ensure continued

coverage.

58.     The Debtors have been represented in their negotiations with the various

Insurance Carriers by UIC, Inc., Marsh USA Inc., and Arthur J. Gallagher & Co. (the "Insurance

Consultants").  The employment of the Insurance Consultants has allowed the Debtors to obtain

the insurance coverage necessary to operate their businesses in a reasonable and prudent manner,

and to realize considerable savings in the procurement of such policies.  Employment of the

Insurance Consultants is necessary for the maintenance of the Insurance Policies in the most

efficient, cost-effective manner, and based on the fact that failure to maintain the Insurance

Policies and Insurance Programs would violate the Guidelines, the Debtors believe that they

should be authorized to continue to pay the applicable Insurance Obligations to the Insurance

Consultants as these obligations become due.  This is especially necessary during the next few

weeks as many of the Debtors' Insurance Policies expire at the end of January 2015 and the

Debtors require the Insurance Consultants to maintain and renew any Insurance Policies that the

Debtors believe are necessary.

59.     In the event that the Debtors were unable to pay the Insurance Consultants' fees,

it is likely that the Debtors would lose the services of a knowledgeable agent and be forced to

find other entities willing to serve as their insurance consultant.  The Insurance Consultants have

a unique knowledge of the Debtors' business and insurance needs that would be difficult to

replace in the event that the Insurance Consultants refuse to continue as the Debtors' agent.

60.     Non-payment of the Insurance Obligations could result in cancellation of the

Insurance Policies and disengagement of the Insurance Consultants, in which case the Debtors

would not only be in violation of the Guidelines, the laws of various states in which the Debtors

operate, and various contractual agreements, but also the Debtors may be unable to find

alternative insurance coverage and consulting services, or find such alternatives only at a much

higher cost than the Debtors currently incur.

## I.     TAX MOTION.

61.     Prior to the Petition Date, the Debtors in their ordinary course of business,

incurred various Taxes, including state and local sales and use tax liabilities.  Sales and use taxes

accrue as the Debtors sell merchandise or consume goods and are calculated on the basis of

statutorily mandated percentages of the price at which the Debtors' merchandise is sold and/or

cost of merchandise consumed.  As of the Petition Date, the Debtors were substantially current in

the payment of assessed and undisputed Taxes; however, certain Taxes attributable to the

prepetition period were not yet due.  The Debtors estimate they may be liable for approximately

$535,000 in Taxes, of which approximately $506,000 are sales taxes from the sale of

merchandise that must be remitted to the Taxing Authorities.

62.     The continued payment of the Taxes on their normal due dates will ultimately

preserve the resources of the Debtors' estates, thereby creating a greater recovery for creditors

and stakeholders.  If such obligations are not timely paid, the Debtors will be required to expend

time and incur attorneys' fees and other costs to resolve a multitude of issues related to such

obligations, each turning on the particular terms of each Taxing Authority's applicable laws,

including whether the obligations are proratable or fully prepetition or postpetition, and whether

penalties, interest, and attorneys' fees and costs can continue to accrue on a postpetition basis,

and, if so, whether such penalties, interest, and attorneys' fees and costs are priority, secured or

unsecured in nature.

63.    Further, the Debtors believe that certain Taxes constitute "trust fund" taxes that

are not included in property of the Debtors' estates, and/or obligations as to which the Debtors'

officers and directors may have personal liability in the event of nonpayment.  Efforts by Taxing

Authorities to collect such taxes would provide obvious distractions to the Debtors and their

officers and directors in their efforts to maximize the value of the estates.

64.    Finally, certain Taxing Authorities either have not been paid or have been sent

checks and/or wires for Taxes that may or may not have been presented or cleared as of the

Petition Date.  Similarly, in other cases, obligations have accrued or are accruing, or are subject

to audit or review, but have not yet become due and payable.  Accordingly, the Debtors seek

authorization for their banks to honor prepetition checks and wires issued by the Debtors to the

Taxing Authorities in payment of prepetition Taxes that, as of the Petition Date, have not cleared

or been transferred.  In addition, to the extent the Debtors have not yet sought to remit payment

to the Taxing Authorities with respect to certain Taxes, the Debtors seek authorization to issue

checks or provide for other means of payment to the Taxing Authorities as necessary to pay the

Taxes.

**J.    SHIPPING AND DELIVERY MOTION.**

65.    In the ordinary course of their businesses, the Debtors incur certain fees and

charges to several common carriers ("Shippers") to ship, transport, store and deliver goods

through the Debtors' established distribution networks.  The Debtors have contracts with these

Shippers for the transportation services provided.  The contracts typically set forth agreed upon

rates for the transportation services.  The Shippers are generally not paid in advance but rather

invoice the Debtors for shipping services previously rendered.  At any given time, there are

common carriers shipping goods to the Debtors' Distribution Center as well as carriers shipping

goods from the Distribution Center to the Debtors' stores.  In addition, the Debtors may be

required to pay customs duties for goods delivered to them from overseas.

66.    The Debtors estimate that the prepetition shipping charges to be paid are

approximately $350,000, which amount includes the high volume of shipping and delivery in

connection with the recent "Black Friday" and "Cyber Monday" sales.

67.    The Debtors rely extensively on their Shippers to distribute and transport

merchandise to and from their distribution center in Hanover, PA (the "Distribution Center").

The Debtors also may rely on their Shippers to return goods, merchandise and products to the

Debtors' vendors.  The services provided by these Shippers are critical to the day-to-day

operations of the Debtors' retail business.  At any given time, shipments are en route to the

Debtors' Distribution Center and stores.

68.    The Debtors seek to pay the prepetition Shipping Charges for several reasons.

First, because of the filing of these Chapter 11 Cases, I believe that certain Shippers who hold

goods for delivery to or from the Debtors may refuse to release such goods pending payment for

their services.

69.    Second, if the prepetition Shipping Charges are not paid, many of the Shippers

may refuse to perform future services for the Debtors.  In such event, the Debtors will incur

additional expenses (such as premium shipping costs) to replace the Shippers, which amounts

may exceed the amount of unpaid prepetition Shipping Charges that the Debtors request

permission to pay hereunder.

70.    Third, because of the method of distribution employed by the Debtors, as well as

space limitations, the Debtors' Distribution Center and the stores themselves hold only limited

quantities of merchandise at a given time.  If shipments from the Distribution Center to the stores are not made promptly and regularly, the Debtors may risk having inadequate in-store inventory, which would disrupt the Debtors' wind-down process and liquidation sales.  Such a disruption would be especially damaging because any delay would frustrate the Debtors' ability to capitalize on the upcoming holiday shopping season.  I believe that the failure to pay the Shipping Charges could have a material adverse impact on the operations of their businesses and, thus, their efforts to maximize the value of their estates.

## K.   CUSTOMER PRACTICES MOTION.

71.    The Debtors seek authority to maintain certain Customer Programs (as defined and described in detail in the Motion) and Credit Card Processing (as defined and described in detail in the Motion), in order to carry out the terms of the Agency Agreement.

72.    The ability of the Debtors to maximize the value of their inventory for the benefit of their creditors and stakeholders is dependent upon the patronage of their customers.  In this regard, the Debtors' Customer Programs and Credit Card Processing are critical, and any delay in honoring the Debtors' obligations thereunder could severely disrupt the Store Closing Sales.

73.    I believe that any failure to honor prepetition customer obligations or inability to process credit card transactions, for even a brief time, may well drive away valuable customers, thereby harming the Debtors' efforts to maximize the value of their inventory.  Accordingly, the Debtors seek Court authority to continue the Customer Programs and Credit Card Processing.

## L.   DIP FINANCING MOTION

74.    The Debtors seek authority to enter into the DIP Facility (as defined in the DIP Financing Motion) which will provide the Debtors with access to as much as $20,000,000 immediately after entry of the Interim DIP Order, which the Debtors have determined should be sufficient to support the Debtors' operations and liquidation sales through the pendency of these

Chapter 11 Cases. Additionally, the DIP Facility will provide the Debtors with access to the

Cash Collateral, which relieves the Debtors of the cost of borrowing additional amounts to

replace that cash. The Debtors negotiated the DIP Documents as part of their larger discussions

with the Prepetition Secured Lenders and DIP Lender with respect to a court-approved sale

process. The DIP Documents are a reflection of the cooperation among these parties, which is

critical to the Debtors' ability to expeditiously and successfully conclude these Chapter 11 Cases.

     75.     I believe that the Debtors have an immediate and critical need to obtain

postpetition financing under the DIP Facility and to use Cash Collateral to pay, in accordance

with the Budget various parties in the ordinary course of business and as authorized by the Court.

These include employees, landlords, third party vendors, utilities, insurance companies, taxing

authorities, who in the judgment of the Debtors' management, provide the essential services

needed to operate, maintain and insure the Debtors' assets. In addition, the Debtors require

funds to retain and pay costs of professionals, consultants and advisors who will enable the

Debtors to conduct sales of their assets and inventory in a manner that maximizes value for the

Debtors' estates and their creditors. Taken together, the services provided by all of the foregoing

parties and other entities are absolutely critical to the preservation of the Debtors' business and

asset value.

     76.     The Debtors reasonably believe that the Budget will be adequate, considering all

available assets, to pay all administrative expenses due or accruing during the period covered by

the Budget. Without access to the DIP Facility and use of Cash Collateral, the Debtors would

suffer immediate and irreparable harm and the entire bankruptcy proceedings will be jeopardized

to the significant detriment of the Debtors' estates and their creditors.

77.     Furthermore, I believe that the use of Cash Collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs.  The Debtors have been unable to obtain unsecured credit allowable as an administrative expense.  The Debtors have also been unable to obtain credit:  (a) having priority over that of administrative expenses; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral in order to satisfy their postpetition liquidity needs.  Financing on a postpetition basis is not otherwise available without granting the DIP Lender the protections it required pursuant to the DIP Loan Documents.

78.     The DIP Lender has indicated a willingness to provide the Debtors with certain financing commitments, but solely on the terms and conditions set forth in the DIP Loan Documents and the Interim Order.  After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Loan Documents and the Interim Order represents the best financing presently available to the Debtors.  These funds will be used to maintain the Debtors' assets during an orderly sale process.

79.     The Debtors have negotiated the DIP Facility and the DIP Loan Documents in good faith and at arm's length with the DIP Lender and Prepetition Secured Lenders.  The Debtors believe that the terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

80.     The Debtors' decision to enter into the DIP Facility is an exercise of their sound business judgment that warrants approval by the Court.  Before the Petition Date, the Debtors and their advisors undertook a detailed investigation as to the Debtors' projected financing needs during the pendency of a bankruptcy case and determined that the Debtors would require postpetition financing to support their sale process.  Accordingly, the Debtors negotiated the DIP Loan Documents with the DIP Lender in good faith, at arm's length and with the assistance of outside counsel, to obtain the required postpetition financing on terms favorable to the Debtors.  Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Documents provide a greater amount of financing on more favorable terms than any other reasonably available alternative.

**M.     AGENCY MOTION.**

81.     Prior to the Petition Date, the Debtors and their advisors considered various strategic options with respect to the sale of the retail stores and the Direct Business Platform.  It was ultimately concluded that the Debtors' stores could not sustain continued operations and were not saleable as going concerns and therefore, it was in the best interests of the Debtors and their stakeholders to close their retail stores and liquidate all Store Inventory.  Separately, the Debtors also explored a potential sale with respect to the Direct Business Platform, but, with the exception of inquiries the Debtors received with respect to the designation of rights to intellectual property, the Direct Business Platform did not generate much interest from the market.

82.     Thus, the Debtors, with input from their financial advisor and, based on the results of efforts by their investment banker to obtain "going concern" transactions that included the Debtors' retail stores as well as obtaining additional financing, determined that conducting Store

Closing Sales by one or more experienced and reputable liquidators would achieve the maximum values for the Total Inventory and would minimize administrative expenses.  Given the breadth of the Store Closing Sales and the need to obtain maximum value for the inventory, and to do so during the holiday season, the Debtors determined that the use of an outside liquidator would provide the highest and best value for the Total Inventory for the Debtors' creditors.  As described in further detail below, the Debtors initially negotiated with potential bidders with respect to the liquidation of Store Inventory and Direct Inventory separately.

83.     The Debtors also determined that it was critical to commence the Store Closing Sales as soon as possible to take advantage of the upcoming holiday shopping season in order to maximize the guaranteed recovery that the Debtors would receive from the Liquidation Agent for the Store Inventory.  In addition, the sooner the Debtors commenced liquidating the Store Inventory, the sooner they would be able to reject the corresponding leases at the Closing Stores, eliminating significant expenses, and in turn maximizing value and possibly providing some recovery to their unsecured creditors.

84.     It became apparent that at a certain guaranteed price to be paid for the Store Inventory by the Liquidating Agent, the sooner the Debtors can commence liquidating the Store Inventory and reject the corresponding leases at the Closing Stores, the sooner the Debtors can maximize value and possibly provide some recovery to their unsecured creditors.

85.     In order to maximize the value of the Total Inventory and to efficiently and effectively liquidate such merchandise, the Debtors determined it was in their best interests to retain a professional liquidating agent.  Accordingly, prior to the Petition Date, the Debtors and their advisors engaged in a strategic process to solicit bids to select a liquidation agent to sell the Store Inventory and/or the Direct Inventory.

86.     The Debtors believe, in the exercise of their business judgment, that assumption of the Agency Agreement is in the best interests of their estates because it will allow the Debtors to continue to conduct the Store Closing Sales as presently being conducted in the Closing Stores, and upon entry of the Interim Order and Final Order by the targeted deadlines set forth in the Agency Agreement, the larger Guaranteed Amount will be payable to the Debtors by the Liquidating Agent.  The Debtors, in consultation with their advisors and key constituents, having determined that there was no viable going concern buyer, further determined that in order to maximize what it would be receiving for Store Inventory (and Direct Inventory), the Store Closing Sales had to commence immediately in order to take advantage of the critically short holiday season.

87.     Not taking advantage of the holiday season and waiting until January to begin the Store Closing Sales would have resulted in a significantly reduced recovery to the Debtors for the Total Inventory.  Furthermore, the Liquidating Agent has agreed to a Guaranteed Amount of 91% of the cost value of the Total Inventory to be sold which is based on the amount of inventory.  The sooner the Debtors are able to assume the Agency Agreement, the larger the Guaranteed Amount will be payable to the Debtors by the Liquidating Agent.

88.     Moreover, the Auction, through its competitive bidding process, ensured that the Liquidating Agent was chosen in good faith and that the terms and conditions of the Agency Agreement are fair and reasonable and represent the highest and best offer for the Total Inventory.  In light of the foregoing, the Debtors submit that the assumption of the Agency Agreement represents a reasonable exercise of the Debtors' business judgment and is in the best interest of their estates and creditors.

## PART III

## SCHEDULES PURSUANT TO LOCAL RULE 1007-2

89.     Attached hereto and incorporated herein by reference are various schedules setting forth information required pursuant to Local Bankruptcy Rule 1007-2.  Capitalized terms used in the attached schedules that are not otherwise defined therein shall have the meanings ascribed to them in this Declaration.

*        *        *

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  December 7, 2014
           New York, New York

                                                    dELiA*S INC. (for itself and on behalf of each of
                                                    its affiliated debtors and debtors in possession)


                                        By:      */s/ Edward J. Brennan*
                                                    Name:  Edward J. Brennan
                                                    Title:    Chief Financial Officer

## **<u>EXHIBIT A</u>**

**Corporate Organizational Chart**

**dELiA*s, Inc. AND AFFILIATES**



**SCHEDULE 1**[1]

**List of Committees Formed Prior to the Petition Date**

Pursuant to Local rule 1007-2(a)(3), and to the best of the Debtors' knowledge, no committees were organized prior to the Petition Date.

---

[1] Capitalized terms used in the these schedules that are not otherwise defined therein shall have the meanings ascribed to them in the Declaration of Edward Brennan Pursuant to Local Bankruptcy Rule 1007-2 and In Support of Chapter 11 Petitions and First Day Motions.

## SCHEDULE 2

### Consolidated List of the Holders of the 50 Largest Unsecured Claims

Pursuant to Local Rule 1007-2(a)(4), the following provides information with respect to the holders of the 50 largest unsecured claims against the Debtors on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein in a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule includes estimates outstanding claim amounts as of the Petition Date. The Debtors have excluded from this schedule any claims that will be addressed by the First Day Motions filed in connection with these Chapter 11 Cases. Any employees and former employees owed amounts under non-qualified pension plans or deferred compensation plans are also not included in this schedule.

| | Creditor | Contact, Mailing Address & Telephone Number/Fax Number | Nature of Claim | Amount of Claim |
|---|---|---|---|---|
| 1. | Quad Graphics, Inc | P.O. BOX 842858 Boston MA 02284-2858 414-566-6000 | Catalog Printing Expense & Paper | $830,164.41 |
| 2. | Epicor Retail Solutions Corp | C/O T60167U P.O. BOX 66512 CHICAGO IL 60666-0512 514-426-0822 | Capital Project (POS System) | $627,899.53 |
| 3. | NYC Alliance Co LLC | 525 7TH AVE STE 701 NEW YORK NY 10018 | Trade Debt | $626,323.89 |
| 4. | Poison Ivy | 2430 PORTER ST LOS ANGELES CA 90021 | Trade Debt | $535,290.78 |
| 5. | Guru Knits | 225 W 38TH ST LOS ANGELES, CA 90037 323-235-9424 | Trade Debt | $480,223.61 |
| 6. | KBL Group International LTD | 9142-9150 NORWALK BLVD SANTA FE SPRINGS CA 90670 562-699-8995 | Trade Debt | $374,010.60 |
| 7. | Spicy Clothing Co LLC | 530 SEVENTH AVE STE 302 NEW YORK NY 10018 201-243-2500 | Trade Debt | $343,110.10 |
| 8. | Celebrity Pink | 1708 GAGE ROAD MONTEBELLO, CA 90640 323-837-9800 | Trade Debt | $326,256.05 |
| 9. | G. Girl | 1800 E. 50TH ST LOS ANGELES CA 90058 323-233-3017 | Trade Debt | $324,451.82 |

|  | Creditor | Contact, Mailing Address & Telephone Number/Fax Number | Nature of Claim | Amount of Claim |
|---|---|---|---|---|
| 10. | Tailgate Clothing Co | 2805 S.W. SNYDER BLVD ANKENY IA 50023 | Trade Debt | $267,570.95 |
| 11. | Marketlive Inc | 75 REMITTANCE DR DEPT 1372 CHICAGO IL  60675-1372 877-341-5729 | Database Mgmt | $233.017.09 |
| 12. | Big Strike DBA Heart N Soul | 127 E 9TH ST #906 LOS ANGELES CA  90015 310-851-4772 | Trade Debt | $227,975.68 |
| 13. | January Digitial | 400 E. 12TH ST #7 NEW YORK NY 10009 | Web Marketing Programs | $181,474.61 |
| 14. | Fire Div of Topson Downs | 3539 MOTOR AVE LOS ANGELES CA  90034 | Trade Debt | $179,318.20 |
| 15. | Mighty Fine | 2010 E 15TH ST LOS ANGELES, CA 90021 213-627-2498 | Trade Debt | $172,320.84 |
| 16. | Revolve Apparel NYC INC | 9 THE MAPLES ROSLYN, NY 11576 718-821-2245 | Trade Debt | $162,408.30 |
| 17. | GMPC Total | 11390 W. OLYMPIC BLVD STE 400 LOS ANGELES CA  90064 310-392-0443 | Trade Debt | $159,030.05 |
| 18. | Brandon Thomas Co. LTD | 1407 BROADWAY, STE 803 NEW YORK, NY 10018 917-229-1400 | Trade Debt | $146,139.25 |
| 19. | Eco Textiles Group Inc | 1035 SOUTH GRAND AVE STE 400 LOS ANGELES CA  90015 213-744-7900 | Trade Debt | $139,500.00 |
| 20. | Urban Episode Inc | 794 E. 18TH ST LOS ANGELES CA  90021 213-765-0515 | Trade Debt | $117,038.95 |
| 21. | Jakes Dry Goods | 2749 TANAGER AVE COMMERCE CA  90040 323-583-1111 | Trade Debt | $114,098.95 |
| 22. | Sweden Unlimited | 199 LAFAYETTE ST STE 4A2 NEW YORK NY 10012 212-941-5904 | Web Advertising Programs | $110,750.00 |
| 23. | Mightyhive Inc | P.O. BOX 398017 SAN FRANCISCO CA  94139-8017 610-737-7001 | Web Advertising Programs | $108,609.24 |

| | Creditor | Contact, Mailing Address & Telephone Number/Fax Number | Nature of Claim | Amount of Claim |
|---|---|---|---|---|
| 24. | Park Mall LLC | SDS-12-1377<br>P.O. BOX 86<br>MINNEAPOLIS MN  55486-1377 | Store Rent | $99,074.50 |
| 25. | Reliable of Milwaukee | 100 CAMPBELLSPORT DR<br>CAMPBELLSPORT WI  53010 | Trade Debt | $99,074.50 |
| 26. | Defy Media LLC | DEPT CH 19589<br>PALATINE IL  60055-9589<br>212-244-4307 | Web URL Fees | $87,000.00 |
| 27. | Orly Shoe Co | 350 FIFTH AVE RM 6721<br>NEW YORK NY  10118<br>212-695-0998 | Trade Debt | $86,700.59 |
| 28. | The Ultimate Software Group Inc | P.O. BOX 930953<br>ATLANTA GA  31193-0953<br>954-331-7000 | HR Systems | $86,560.45 |
| 29. | Sunrise Apparel Group LLC | 801 S. FIGUEROA ST SUITE 2500<br>LOS ANGELES  CA  90017 | Trade Debt | $81,316.58 |
| 30. | Secret Charm LLC | 1437 E. 20TH ST<br>LOS ANGELES  CA  90011 | Trade Debt | $77,809.25 |
| 31. | Wanted Shoes Inc | 48 ETHEL ROAD<br>EDISON NJ  08817 | Trade Debt | $75,732.50 |
| 32. | Rakuten Marketing LLC | 215 Park Ave<br>New York NY 10003 | Web Advertising | $73,812.64 |
| 33. | The Glam Fashion Inc | 952 S Western Ave<br>#105-77<br>Los Angeles CA 90006<br>323-731-5570 | Trade Debt | $71,229.50 |
| 34. | Younique Clothing | 270 W 38th Street<br>New York NY 10018<br>212-764-2121 | Trade Debt | $70,160.95 |
| 35. | IT Closet | 170 W39th Street<br>Los Angeles CA 90037<br>323-234-1321 | Trade Debt | $68,618.30 |
| 36. | Midway Industries America Inc | 10 W 33rd Street<br>STE 1221<br>New York NY 10001<br>212-244-4777 | Trade Debt | $66,682.77 |
| 37. | J&F Design Inc | 5578 Bandini Blvd<br>Bell CA 90201<br>323-526-4444 | Trade Debt | $65,693.30 |

|  | Creditor | Contact, Mailing Address & Telephone Number/Fax Number | Nature of Claim | Amount of Claim |
|---|---|---|---|---|
| 38. | Bravado Int'l Group MS Inc | 1755 Broadway 2nd Floor New York NY 10019 212-445-3412 | Trade Debt | $64,085.50 |
| 39. | Converse Inc | One High Street No14 North Andover MA 01845 | Trade Debt | $63,942.78 |
| 40. | Kash Apparel LLC | 1929 Hooper Ave Los Angeles CA 90011 213-747-8885 | Trade Debt | $60,935.00 |
| 41. | Inspireme Apparel LLC | 10018 Lower Azusa Road #B El Monte CA 91731 626-582-8855 | Trade Debt | $60,686.00 |
| 42. | Crater Communications Inc | PO Box 588 West Brookfield MA 01585 508-637-1661 | Trade Debt | $56,749.36 |
| 43. | Donnelly Communications | 1349 W Peachtree Street STE 100 Atlanta GA 30309 800-535-2880 | Call Center | $55,920.77 |
| 44. | Hot Steps | 236 5th Ave 3rd Floor New York NY 10001 212-481-9090 | Trade Debt | $55,247.70 |
| 45. | EOS Products | 19 W 44th STE 811 New York NY 10036 | Trade Debt | $54,763.20 |
| 46. | 4836 The Retail Property Trust | PO Box 35467 Newark NJ 07193 | Store Rent | $53,088.38 |
| 47. | Signmasters Inc | 217 Brook Ave Passaic NJ 07055 973-614-8300 | Store Signage | $53,024.28 |
| 48. | Farylrobin | 200 Park Ave South #1610 New York NY 10003 | Trade Debt | $52,295.25 |
| 49. | Deloitte Tax LLP | 1633 Broadway New York NY 10019 | Tax Service | $51,997.00 |
| 50. | Westchester Mall LLC | PO Box 643095 Pittsburgh PA 15264 | Store Rent | $50,322.86 |

## SCHEDULE 3

## Consolidated List of the Holders of the 5 Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), the following lists the creditors holding, as of the Petition Date, the five largest secured, non-contingent claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

In addition to the parties listed below, the Debtors may have unliquidated and/or contingent claims as a result of parties asserting a security interest against the Debtors' assets through UCC filings.

|   | Creditor | Contact, Mailing Address & Telephone Number/Fax Number | Nature of Claim | Amount of Claim |
|---|---|---|---|---|
| 1. | Eklecco Newco LLC | Pyramid Management Group, Inc. (on behalf of EKLECCO NEWCO LLC)<br><br>The Clinton Exchange, 4 Clinton Square Syracuse, New York 13202-1078 | Pursuant to the Standard Shopping Center Lease, dated February 13, 2006, a first lien on all Merchandise and Owned FF&E in Store 292. | The Debtors are current on their rent obligations under the lease with this party. |
| 2. | Holyoke Mall Company, L.P. | Pyramid Management Group, Inc. (on behalf of Holyoke Mall Company LP) The Clinton Exchange, 4 Clinton Square Syracuse, New York 13202-1078 | Pursuant to the Standard Shopping Center Lease, dated February 14, 2006, a first lien on all Merchandise and Owned FF&E in Store 295. | The Debtors are current on their rent obligations under the lease with this party |
| 3. | Pyramid Walden Company, L.P., successor in interest to Pyramid | Pyramid Management Group, Inc. The Clinton Exchange, 4 Clinton Square Syracuse, New York 13202-1078 | Pursuant to the Standard Shopping Center Lease, dated February 6, 2002, a first lien on all Merchandise and Owned | The Debtors are current on their rent obligations under the lease with this party |

| | Creditor | Contact, Mailing Address & Telephone Number/Fax Number | Nature of Claim | Amount of Claim |
|---|---|---|---|---|
| | Company of Buffalo | | FF&E in Store 309. | |
| 4. | Salus Capital Partners, LLC | Salus Capital Partners, LLC 197 First Avenue, Suite 250 Needham, MA 02494 Attn: Kyle C. Shonack Telephone: (617) 420-2670 Facsimile: (781) 459-0058 | Pursuant to the prepetition Credit Agreement, dated June 14, 2013, a first lien on substantially all of the assets with the exception of the Merchandise and Owned FF&E in Stores 292, 295 and 309, which Salus Capital Partners LLC holds a second lien. | $18,520,584 |

## SCHEDULE 4

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the following financial data (unaudited and subject to change) is the latest available information and reflects the Debtors' financial conditions, as consolidated as of Petition Date.

The following financial data shall not constitute an admission of liability by the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a contingent, unliquidated or disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

Total Assets:                    $47 million

Total Liabilities:               $50.5 million

# SCHEDULE 5

## Schedule of Publicly Held Securities

Pursuant to Local Rule 1007-2(a)(7), the following is a schedule of the Company's shares of stock, debentures and other securities that are publicly held, and the approximate number of holders thereof.

| Issuance | Issue Amount/ Number of Shares | Maturity | Secured/ Unsecured | Number of Shares Outstanding | Approx. Number of Holders |
|---|---|---|---|---|---|
| Common Stock | 77,041,963 | | | 77,011,303 | 190 |
| Preferred Stock | 441,000 | | | 391,600 | 9 |

Pursuant to Local Rule 1007-2(a)(7), the following chart sets forth a list of the names of the Company's officers and directors who own shares of stock, debenture or other securities of the Company, and the amounts so held.

| Name | Shares Owned | Percent of Outstanding Stock |
|---|---|---|
| Paul Raffin | 349,448 | 0.45% |
| Scott Rosen | 308,227 | 0.40% |
| Mario Ciampi | 186,212 | 0.24% |
| David Diamond | 167,397 | 0.22% |
| Ryan Schreiber | 25,000 | 0.03% |
| Daphne Smith | 100,000 | 0.13% |
| Michael Zimmerman | 293,373 | 0.38% |

# SCHEDULE 6

### List of Debtors' Property In the Possession of Third Parties

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property that is in the possession or custody of any custodian, public officer, mortgage, pledge, assignee of rents, secured creditor, or agent for any such entity:

In the ordinary course of business, property of the Debtors is likely to be in possession of various other persons, including suppliers, maintenance providers, shippers, common carries, custodians, public officer, or agents.

As of the Petition Date, the Debtors estimate that the value of goods in the possession of carriers, shippers or other logistics providers is minimal as the Debtors have stopped purchasing inventory and most of their inventory is either in their distribution center or in their retail stores.

# SCHEDULE 7

## Summary of Property From Which the Debtors Operate Their Business

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their businesses.

| Debtor | Premises Description | Leased/ Owned | Premises Address |
|---|---|---|---|
| dELiA*s, Inc. | Corporate Headquarters | Leased | 50 West 23rd Street New York, NY 10010 |
| dELiA*s Distribution Company | Distribution Center | Owned | 348 Poplar Street Hanover, PA 17331 |
| dELiA*s Retail Company | Retail Store 202 | Leased | 2165 Willowbrook Mall Wayne, NJ 07470 |
| dELiA*s Retail Company | Retail Store 207 | Leased | 100 Menlo Park Road Edison, NJ 8837 |
| dELiA*s Retail Company | Retail Store 210 | Leased | 1245 Worcester Street Natick, MA 01760 |
| dELiA*s Retail Company | Retail Store 215 | Leased | 825 Dulaney Valley Rd Towson, MD 21204 |
| dELiA*s Retail Company | Retail Store 216 | Leased | 160 N. Gulph Road  King of Prussia, PA 19406 |
| dELiA*s Retail Company | Retail Store 219 | Leased | 5 Woodfield Shopping Center Schaumburg, IL 60173 |
| dELiA*s Retail Company | Retail Store 229 | Leased | 630 Old Country Rd Garden City, NY 11530 |
| dELiA*s Retail Company | Retail Store 233 | Leased | 400 Commons Way Bridgewater, NJ 08807 |
| dELiA*s Retail Company | Retail Store 241 | Leased | 250 Lehigh Valley Mall Whitehall, PA 18052 |
| dELiA*s Retail Company | Retail Store 242 | Leased | 100 Robinson Center Drive Pittsburgh, PA 15205 |
| dELiA*s Retail Company | Retail Store 250 | Leased | 1 Crossgates Mall Road Albany, NY 12203 |
| dELiA*s Retail Company | Retail Store 251 | Leased | 3811 S. Cooper Street Arlington, TX 76015 |
| dELiA*s Retail Company | Retail Store 256 | Leased | 136 Easton Town Center Columbus , OH 43219 |
| dELiA*s Retail Company | Retail Store 257 | Leased | 2760 N. Germantown Parkway Memphis , TN 38133 |

| Debtor | Premises Description | Leased/ Owned | Premises Address |
|---|---|---|---|
| dELiA*s Retail Company | Retail Store 260 | Leased | 2000 Riverchase Galleria Hoover , AL 35244 |
| dELiA*s Retail Company | Retail Store 265 | Leased | 3333 Buford Drive Buford, GA 30519 |
| dELiA*s Retail Company | Retail Store 267 | Leased | 11800 West Broad St. Richmond, VA 23233 |
| dELiA*s Retail Company | Retail Store 268 | Leased | 2000 Coastal Grand Circle Myrtle Beach, SC 29577 |
| dELiA*s Retail Company | Retail Store 269 | Leased | 130 Montgomery Mall North Wales, PA 19454 |
| dELiA*s Retail Company | Retail Store 270 | Leased | 1750 Deptford Center Rd. Deptford, NJ 8096 |
| dELiA*s Retail Company | Retail Store 271 | Leased | 27666 Novi Road Novi, MI 48377 |
| dELiA*s Retail Company | Retail Store 273 | Leased | 6801 Northlake Mall Drive Charlotte, NC 28216 |
| dELiA*s Retail Company | Retail Store 274 | Leased | 270 North Garden Bloomington, MN 55425 |
| dELiA*s Retail Company | Retail Store 275 | Leased | 10300 West Forest Hill Blvd Wellington , FL 33414 |
| dELiA*s Retail Company | Retail Store 276 | Leased | 4403 Black Horse Pike Mays Landing, NJ 8330 |
| dELiA*s Retail Company | Retail Store 277 | Leased | 400 Ernest Barrett Parkway Kennesaw, GA 30144 |
| dELiA*s Retail Company | Retail Store 278 | Leased | 8687 North Central Expressway Dallas, TX 75225 |
| dELiA*s Retail Company | Retail Store 279 | Leased | 331 Grand Avenue East Southlake, TX 76092 |
| dELiA*s Retail Company | Retail Store 280 | Leased | 490 Cedar Sage Drive Garland , TX 75040 |
| dELiA*s Retail Company | Retail Store 281 | Leased | 310 Daniel Webster Highway Nashua, NH 3060 |
| dELiA*s Retail Company | Retail Store 282 | Leased | 1201 Boston Post Rd Milford, CT 6460 |
| dELiA*s Retail Company | Retail Store 283 | Leased | 14511 Clay Terrace Blvd Carmel, IN 46032 |
| dELiA*s Retail Company | Retail Store 284 | Leased | 6121 W. Park Blvd Plano, TX 75093 |

| Debtor | Premises Description | Leased/ Owned | Premises Address |
|---|---|---|---|
| dELiA*s Retail Company | Retail Store 285 | Leased | 2368 East Sunrise Blvd Ft. Lauderdale, FL 33304 |
| dELiA*s Retail Company | Retail Store 286 | Leased | 81 Chestnut St. Beavercreek, OH 45440 |
| dELiA*s Retail Company | Retail Store 287 | Leased | 2655 Richmond Ave Staten Island, NY 10314 |
| dELiA*s Retail Company | Retail Store 288 | Leased | 1516 Annapolis Mall Annapolis, MD 21401 |
| dELiA*s Retail Company | Retail Store 289 | Leased | 5770 North Bayshore Drive Glendale, WI 11706 |
| dELiA*s Retail Company | Retail Store 290 | Leased | 261 Miracle Mile Drive Rochester , NY 14623 |
| dELiA*s Retail Company | Retail Store 291 | Leased | 4670 Merchants Park Circle Collierville, TN 38017 |
| dELiA*s Retail Company | Retail Store 292 | Leased | 2740 Palisades Center Drive West Nyack, NY 10994 |
| dELiA*s Retail Company | Retail Store 294 | Leased | 49 West Maryland St. Indianapolis, IN 46204 |
| dELiA*s Retail Company | Retail Store 295 | Leased | 50 Holyoke St. Holyoke, MA 01040 |
| dELiA*s Retail Company | Retail Store 296 | Leased | 3320 Silas Creek Parkway Winston-Salem, NC 27103 |
| dELiA*s Retail Company | Retail Store 297 | Leased | 8201 South Tamiami Trail North Sarasota , FL 34238 |
| dELiA*s Retail Company | Retail Store 298 | Leased | 101 Jordan Creek Parkway West Des Moines, IA 50266 |
| dELiA*s Retail Company | Retail Store 299 | Leased | 10300 Southside Boulevard Jacksonville, FL 32256 |
| dELiA*s Retail Company | Retail Store 301 | Leased | 2092 Independence Center Independence, MO 64057 |
| dELiA*s Retail Company | Retail Store 303 | Leased | 627 East Boughton Road Bolingbrook, IL 60440 |
| dELiA*s Retail Company | Retail Store 304 | Leased | 5701 Sunset Drive South Miami, FL 33143 |
| dELiA*s Retail Company | Retail Store 305 | Leased | 2015 Charleston Town Center Charleston, WV 25389 |
| dELiA*s Retail Company | Retail Store 306 | Leased | 43 Chesterfield Mall Chesterfield, MO 63017 |

| Debtor | Premises Description | Leased/ Owned | Premises Address |
|---|---|---|---|
| dELiA*s Retail Company | Retail Store 307 | Leased | 1500 Polaris Parkway Columbus, OH 43240 |
| dELiA*s Retail Company | Retail Store 309 | Leased | 1 Walden Galleria Cheektowaga, NY 14225 |
| dELiA*s Retail Company | Retail Store 311 | Leased | 23106 Fashion Drive Estero, FL 33928 |
| dELiA*s Retail Company | Retail Store 313 | Leased | 7101 NW 86th Terrace Kansas City, MO 64153 |
| dELiA*s Retail Company | Retail Store 315 | Leased | 1700 Cottonwood Creek Highland Village, TX 75077 |
| dELiA*s Retail Company | Retail Store 316 | Leased | 1975 Southlake Mall Merrillville, IN 46410 |
| dELiA*s Retail Company | Retail Store 318 | Leased | 194 Buckland Hills Drive Manchester , CT 06042 |
| dELiA*s Retail Company | Retail Store 319 | Leased | 2615 Medical Center Parkway Murfreesboro, TN 37129 |
| dELiA*s Retail Company | Retail Store 320 | Leased | 17420 Hall Road Clinton Township, MI 48038 |
| dELiA*s Retail Company | Retail Store 321 | Leased | 11200 Lakeline Mall Drive Cedar Park , TX 78613 |
| dELiA*s Retail Company | Retail Store 322 | Leased | 999 S. Washington Street North Attleboro, MA 02760 |
| dELiA*s Retail Company | Retail Store 323 | Leased | 2112 North Point Circle Alpharetta, GA 30022 |
| dELiA*s Retail Company | Retail Store 324 | Leased | 428 South Park Center Strongsville, OH 44136 |
| dELiA*s Retail Company | Retail Store 325 | Leased | 10300 Little Patuxent Parkway Columbia, MD 21044 |
| dELiA*s Retail Company | Retail Store 332 | Leased | 26300 Cedar Road Beachwood, OH 44122 |
| dELiA*s Retail Company | Retail Store 335 | Leased | 205A Yorktown Mall Lombard, IL 60148 |
| dELiA*s Retail Company | Retail Store 336 | Leased | 75 Middlesex Turnpike Burlington , MA 1803 |
| dELiA*s Retail Company | Retail Store 339 | Leased | 1151 Galleria Blvd Roseville, CA 95678 |

| Debtor | Premises Description | Leased/ Owned | Premises Address |
|---|---|---|---|
| dELiA*s Retail Company | Retail Store 340 | Leased | 2200 South 10th Street McAllen, TX 78503 |
| dELiA*s Retail Company | Retail Store 341 | Leased | 6401 Bluebonnet Blvd Baton Rouge, LA 70836 |
| dELiA*s Retail Company | Retail Store 342 | Leased | 2428 Fox Valley Center Aurora, IL 60504 |
| dELiA*s Retail Company | Retail Store 343 | Leased | 99 Rockingham Park Blvd Salem, NH 03079 |
| dELiA*s Retail Company | Retail Store 344 | Leased | 210 Andover Street Peabody, MA 01960 |
| dELiA*s Retail Company | Retail Store 345 | Leased | 364 Maine Mall Road South Portland, ME 4106 |
| dELiA*s Retail Company | Retail Store 350 | Leased | 450 Smith Haven Mall Lake Grove, NY 11755 |
| dELiA*s Retail Company | Retail Store 351 | Leased | 112 Eisenhower Parkway Livingston, NJ 07039 |
| dELiA*s Retail Company | Retail Store 352 | Leased | 4301 W. Wisconsin Ave Appleton, WI 54913 |
| dELiA*s Retail Company | Retail Store 353 | Leased | 7600 Kingston Pike Knoxville, TN 37919 |
| dELiA*s Retail Company | Retail Store 354 | Leased | 250 Granite Street Braintree, MA 02184 |
| dELiA*s Retail Company | Retail Store 356 | Leased | 150 Christiana Mall Newark, DE 19702 |
| dELiA*s Retail Company | Retail Store 359 | Leased | 1 Garden State Plaza Paramus, NJ 07652 |
| dELiA*s Retail Company | Retail Store 362 | Leased | 3030 Plaza Bonita Rd National City, CA 91950 |
| dELiA*s Retail Company | Retail Store 363 | Leased | 3700 Rivertown Pkwy S.W. Grandville , MI 49418 |
| dELiA*s Retail Company | Retail Store 364 | Leased | 663 Stillwater Avenue Bangor, ME 04401 |
| dELiA*s Retail Company | Retail Store 368 | Leased | 2561 McMenamin St Hampton, VA  23666 |
| dELiA*s Retail Company | Retail Store 373 | Leased | 301 Mt. Hope Ave Rockaway, NJ 07866 |
| dELiA*s Retail Company | Retail Store 374 | Leased | 125 Westchester Ave White Plains, NY 10601 |
| dELiA*s Retail Company | Retail Store 375 | Leased | 127 Providence Place Providence, RI 02903 |

| Debtor | Premises Description | Leased/ Owned | Premises Address |
|---|---|---|---|
| dELiA*s Retail Company | Retail Store 376 | Leased | 122 Hawthorn Center Vernon Hills, IL 60061 |
| dELiA*s Retail Company | Retail Store 377 | Leased | 1734 Military Road Niagara Falls, NY  14304 |

## SCHEDULE 8

### Location of the Debtors' Assets, Books and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

**Location of Debtors' Substantial Assets**

The Debtors have assets nationwide of approximately $47 million (unaudited and subject to change), with substantial assets in New York, NY and Hanover, PA.

**Books and Records**

The Debtors' books and records are located at 50 West 23rd Street, New York, NY 10010.

**Debtors' Assets Outside the United States (if applicable)**

The Debtors do not have assets outside of the United States.

# SCHEDULE 9

**Summary of Legal Actions Against the Debtors**

Pursuant to Local Rule 1007-2(a)(11), the following is a list of the nature and present status of each material action or proceeding, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

| Action or Proceeding | Date Filed | Nature of Action | Case Number and Court | Status of Action |
|---|---|---|---|---|
| Major Textile Imports, Inc. v. dELiA*s, Inc., *et al.* | September 2, 2014 | Trademark Infringement | US District Court for the District of Southern California, Case No. | Pending |
| Collins Asset Group, LLC v. dELiA*s, Inc. | July 3, 2014 | Breach of Contract | County of New York, CV-018070-14/NY | Pending |
| Collins Asset Group, LLC v. dELiA*s, Inc. | July 3, 2014 | Breach of Contract | County of New York, CV-018071-14/NY | Pending |
| Santos v. dELiA*s, Inc. | August 14, 2014 | Employee Discrimination | Tennessee Human Rights Commission, Charge No. 3-106-14/EEOC Charge No. 25A-2014-00548C | Pending |

# SCHEDULE 10

## Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name/Position | Experience and Responsibilities |
| --- | --- |
| Ryan Schreiber President, General Counsel, Secretary | On December 5, 2014, Ryan Schreiber, age 45 was appointed as Chief Executive Officer and will continue in his capacity as General Counsel and Secretary.  Mr. Schreiber served as the Company's Senior Vice President, General Counsel and Secretary beginning in September 2013. He previously served as Vice President and General Counsel to New York & Company from 2007 until 2013 and led the legal team upon joining the business in 2004.  Prior to that, Mr. Schreiber served as in-house counsel in various capacities for The Children's Place from 1999 to 2004. Mr. Schreiber also served as an attorney in the commercial real estate and litigation departments of Farer Siegal Fersko, P.A., and as counsel to Party City Corporation and Petrie Retail, Inc. |
| Edward Brennan Chief Financial Officer | On December 5, 2014, Edward Brennan, age 50, was appointed as Chief Financial Officer.  Mr. Brennan served as the Company's Vice President of Finance beginning in January 2009 and was Senior Director of Finance since February 2004.  He previously worked at J.Crew from 1992 through 2004 in various roles including Senior Director of Finance.  Prior to that, Mr. Brennan worked at Browning-Ferris Industries from 1989 to 1992 and Petrie Retail, Inc. from 1986 to 1989 in various roles in Accounting. |
| Daphne Smith Executive Vice President, Operations | Ms. Smith has served as the Debtors' EVP of Operations since August 2013.  Before joining the Debtors' management team, Ms. Smith was SVP of eCommerce for New York &Company for 2 years.  For the first 16 years of Ms. Smith's career she was with J.Crew Group, Inc. where she held various positions within planning and ultimately became the SVP of Direct until leaving in 2011. |
| David Diamond Senior Vice President, Human Resources | Mr. Diamond has served as the Debtors' Senior Vice President of Human Resources since January 2004.  Before joining the Debtors' management team, Mr. Diamond was an Executive Recruiter with Levy Kerson Associates, Russell Reynold Associates from 1996 to 2004. |

# SCHEDULE 11

## Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to be paid to the Debtors' employees (not including officers and directors) and the estimated amount to be paid to officers, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the filing of the Chapter 11 petitions.

| Payments to Employees, Officers and Directors | |
|---|---|
| Payments to Employees (Not Including Officers and Directors) | $1,954,000 |
| Payments to Officers and Directors | $198,000 |

| Payments to Financial and Business Consultants | |
|---|---|
| Janney Montgomery Scott LLC | $0 |
| Clear Thinking Group LLC | $150,000 |

## SCHEDULE 11

### Cash Receipts and Disbursements,
### Net Cash Gain or Loss, Unpaid Obligations and Receivables

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the estimated cash receipts and disbursements, net cash increase or decrease, and obligations and receivables expected to accrue that remain unpaid, other than professional fees, on a consolidated basis.

| | |
|---|---|
| Cash Receipts | $22,941,510 |
| Cash Disbursements | $6,643,760 |
| Net Cash Increase (Decrease) | $16,170,260 |
| Unpaid Obligations | $15,300,848 |
| Unpaid Receivables | $625,000 |