Gregg M. Galardi
Dienna Corrado
Arkady A. Goldinstein
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501

*Counsel for the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>dELiA*s, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 14-23678 (RDD)<br><br>Jointly Administered |

## DEBTORS' MOTION FOR ENTRY OF
## (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND BID
## PROTECTIONS IN CONNECTION WITH THE SALE OF CERTAIN ASSETS,
## (B) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF
## EXECUTORY CONTRACTS, (C) APPROVING THE FORM AND MANNER OF
## NOTICE, AND (D) SCHEDULING AN AUCTION AND A SALE HEARING, AND
## (II) ORDER AUTHORIZING AND APPROVING THE SALE OF CERTAIN ASSETS

dELiA*s, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors"), hereby file this motion (the "Motion") for entry of the Bidding Procedures Order and Sale Order (as each term is defined herein).  In support of the Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  dELiA*s, Inc. (7172); dELiA*s Distribution Company (9076); A Merchandise, LLC (7639); dELiA*s Operating Company (3765); dELiA*s Retail Company (0036); dELiA*s Group Inc. (4035); AMG Direct, LLC (9236); dELiA*s Assets Corp. (3754); DACCS, Inc. (0225).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  50 West 23rd Street, New York, NY 10010.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider the Application pursuant to 28

U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of

these cases and this Application in this District is proper pursuant to 28 U.S.C. §§ 1408 and

1409.  The statutory bases for the relief requested herein are pursuant to sections 105(a), 363,

365, 503 and 507 of title 11 of the United States Code, as amended (the "Bankruptcy Code"),

Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and rules 2002-1, 6004-1, and 6006-1 of the Local Bankruptcy Rules for the Southern

District of New York (the "Local Rules").

## BACKGROUND

2.     On December 7, 2014 (the "Petition Date"), the Debtors commenced these

bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under Chapter

11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as

debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.     On December 12, 2014, an official committee of unsecured creditors (the

"Committee") was appointed in these Chapter 11 cases.  As of the date hereof, no trustee or

examiner has been appointed in these Chapter 11 Cases.  These Chapter 11 Cases are jointly

administered for procedural purposes only.

4.     The factual background regarding the Debtors, including their business

operations, their capital and debt structures, and the events leading to the filing of these Chapter

11 Cases, is set forth in detail in the *Declaration of Edward Brennan Pursuant to Local*

*Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and First Day Motions* (the

"First Day Declaration") [Docket No. 16].

2

5.      On January 9, 2015, the Court entered the *Final Order (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Adequate Protection and (III) Granting Certain Related Relief* [Docket No. 140] (the "Final DIP Order").

6.      Prior to the Petition Date, on December 4, 2014, the Debtors entered into an agency agreement (and as later amended, the "Agency Agreement") with Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (collectively, the "Agents") to, among other things, liquidate all merchandise and inventory owned by the Debtors and dispose of certain furnishings, trade fixtures, and equipment located at the Debtors' stores and, at the Debtors' option, the Debtors' distribution center.

7.      On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) (I) Approving the Debtors' Performance of Agency Agreement, (II) Authorizing the Debtors' to Sell Certain Assets Through Store Closing Sales, (III) Authorizing the Debtors to Abandon Unsold Property, (IV) Waiving Compliance With Contractual Store Closing Sale Restrictions and Exempting the Debtors From State and Local Wage Requirements and Law Restricting Store Closing Sales, (V) Granting Related Relief, and (VI) Scheduling a Final Hearing* [Docket No. 15] (the "Agency Motion").  On December 9, 2014, the Court entered an order granting the Agency Motion on an interim basis.  On December 24, 2014, the Court entered an order granting the Agency Motion on a final basis.  Pursuant to the Agency Agreement, the Agents are conducting going out of business sales ("GOB Sales") at the Debtors' stores.  The GOB Sales have been proceeding much more rapidly than was originally anticipated.  The Agents and the Debtors currently project that the GOB Sales at the Debtors' stores may be concluded as early as February 22, 2015.

8.      Pursuant to Section 7.4 of the Agency Agreement, the Agent may designate a

third party as the purchaser, acquirer, assignee, transferee, licensee or designee of certain assets

which include the Acquired Assets (as defined below).

9.      The Debtors, the Agents, and Butterfly Retail Acquisition LLC (the "Stalking

Horse Bidder") entered into that certain Letter Agreement, dated as of January 28, 2015 (the

"Stalking Horse Agreement"), a copy of which is attached as **Exhibit B** hereto, with respect to

the Purchaser's acquisition of the Acquired Assets (the "Proposed Transaction").

**RELIEF REQUESTED**

10.      By this Motion, the Debtors seek entry of an order, substantially in the form

attached hereto as **Exhibit A** (the "Bidding Procedures Order") and, at the conclusion of the Sale

Hearing (as defined herein), an order, substantially in the form attached hereto as **Exhibit C** (the

"Sale Order").  The  Debtors will consult with the Committee and Salus Capital Partners, LLC,

as lender and administrative agent (the "DIP Agent") under the Debtors' postpetition financing

credit facility (the "DIP Facility") with respect to any changes to the form of such Sale Order.

11.      The Debtors seek entry of the Bidding Procedures Order:

    a.  authorizing and approving the bidding procedures for competitive bidding
        in connection with the Sale (as defined herein), substantially in the form
        attached hereto as **Exhibit 1** to the Bidding Procedures Order (the
        "Bidding Procedures"), and the Bid Protections (as defined herein);

    b.  approving the form and manner of notice of the Sale by auction, the Sale
        Hearing and related matters, substantially in the form attached as **Exhibit
        2** to Bidding Procedures Order (the "Auction and Sale Notice");

    c.  authorizing and approving procedures for the assumption and assignment
        of executory contracts and leases (collectively, the "Assumed Contracts"),
        including the notice of the proposed assumption and assignment of the
        Assumed Contracts in the form attached as **Exhibit 3** to the Bidding
        Procedures Order (the "Assumption and Assignment Notice"); and

    d.  establishing the following dates and deadlines, subject to modification:

     i.  Bid Deadline: February 19, 2015 at 12:00 p.m. (Eastern Time), as the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline").

     ii.  Auction: February 20, 2015 at 10:00 a.m. (Eastern Time), as the date and time the auction, if one is needed (the "Auction"), which will be held at the office of DLA Piper LLP (US), located at 1251 Avenue of the Americas, 27th Floor, New York, New York 10020.

     iii.  Sale Objection Deadline: February 22, 2015 at 4:00 p.m. (Eastern Time), as the deadline to object to the Sale and/or the assumption and assignment of Assumed Contracts or cure amounts related thereto.

     iv.  Sale Hearing: February 23, 2015 at 10:00a.m. (Eastern Time), as the date and time of the hearing to approve the Sale which will be held before Honorable Robert D. Drain, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, Courtroom 118, White Plains, New York 10601.

12.    The Debtors also seek entry of the Sale Order following the conclusion of the Sale Hearing:

    a.  approving the Stalking Horse Agreement (or such other agreement as agreed to with respect to the Proposed Transaction with the successful bidder at the Auction), and the sale of the Acquired Assets free and clear of all liens, claims, interests and encumbrances (the "Sale"), subject to the Permitted Encumbrances (as defined in the Stalking Horse Agreement) to the Stalking Horse Bidder or such other party that is the successful bidder at the Auction; and

    b.  authorizing the assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder or such other party that is the successful bidder at the Auction.

## OVERVIEW OF THE PROPOSED TRANSACTION

13.     The principal terms of the Stalking Horse Agreement are summarized in the

following chart:[2]

| SUMMARY DESCRIPTION | |
|---|---|
| **Parties** | Merchant:  dELiA*s, Inc. and its debtor affiliates.<br><br>Purchaser:  Butterfly Retail Acquisition LLC.<br><br>Agent:  A joint venture comprising of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC. |
| **Acquired Assets** | Upon the terms and subject to the conditions set forth in the Stalking Horse Agreement, the Agent agrees to direct the Merchant to transfer, sell, convey, assign and deliver to Purchaser, or its designee, and, at the Closing (as defined herein), the Merchant shall transfer, sell, convey, assign and deliver to Purchaser, or its designee, the Acquired Assets, free and clear of all liens, claims and encumbrances (collectively, the "Encumbrances"), subject to the Permitted Encumbrances (as defined herein).  "Acquired Assets" shall mean the following:<br><br>(a)     All of the Merchant's membership interests (the "Membership Interests") in dELiA*s Brand LLC ("D Brand");<br><br>(b)     All of the Merchant's rights, title, and interests in and to the Intellectual Property (but, with respect to any of the Merchant's Intellectual Property that is the subject of an executory contract, only to the extent such executory contract is an Assumed Contract, including without limitation, the Intellectual Property identified on the list attached to the Stalking Horse Agreement as Schedule 2.1(b) (the "Acquired IP"); and<br><br>(c)     All of the Merchant's rights, title and interests in other assets of Merchant set forth on the list attached to the Stalking Horse Agreement as Schedule 2.1(c) (the "Other Assets").<br><br>For purposes of the Stalking Horse Agreement, "Permitted Encumbrances" shall mean any claim, lien or encumbrance on the Acquired Assets (i) in favor of JLP Daisy, LLC to the extent set forth in that certain Master License Agreement, dated as of February 24, 2003 (the "Master License Agreement"), between D Brand and JLP Daisy LLC ("JLP"), (ii) to the extent set forth in that certain Limited Liability Company Agreement of D Brand, dated as of February 24, 2003; and (iii) created under any of the Assumed Contracts pursuant to the express terms of such Assumed Contracts or existing under any of the Assumed Contracts solely as a result |

---

[2] Capitalized terms used but not otherwise defined in the summary chart shall have the meaning ascribed to such terms in the Stalking Horse Agreement.  This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse Agreement, the latter governs in all respects.

| | |
|---|---|
| | of the failure of the Debtors to pay the amounts due and owing thereunder. |
| **Payment Amount** | The Payment Amount shall be (a) $2,500,000 in cash; and (b) to the extent Purchaser requests that the Merchant assume and assign to Purchaser one or more contracts, which request may be made in Purchaser's sole discretion on or prior to the Funding Date (each such contract, an "<u>Assumed Contract</u>" and, collectively, the "<u>Assumed Contracts</u>"), any and all Cure Amounts associated with such Assumed Contracts. |
| **Timing of Payment** | The Payment Amount shall be paid by the Purchaser to the Agent on the "Funding Date," which shall mean the later of:<br><br>(a)    three (3) business days after entry of an order entered by the Bankruptcy Court (the "<u>Approval Order</u>") approving the sale, acquisition, assignment, transfer, license, and/or designation of the Acquired Assets to the Purchaser free and clear of all Encumbrances (other than Permitted Encumbrances) and waiving any stay under Federal Rules of Bankruptcy Procedure 6004(h), 6006(d), or otherwise, or fifteen (15) days if such order does not contain a provision waiving any applicable stay;<br><br>(b)    satisfaction of the conditions precedent to the Purchaser's obligation to purchase the Acquired Assets as set forth in this Stalking Horse Agreement (the "<u>Conditions</u>"); and<br><br>(c)    such other date as the Agent and Purchaser may agree in writing.<br><br>Agent shall retain all rights to all Asset Proceeds, as well as (i) the Merchandise, the Proceeds, the Owned FF&E (to the extent not set forth on Schedule 2.1(c) to this Letter Agreement), and all proceeds of the foregoing, (ii) commissions in respect of the sale of Merchant Consignment Goods and Owned DC FF&E, and (iii) all other amounts to be paid to Agent pursuant to the Agency Agreement, and the Purchaser shall have no interest in or rights to any such assets, amounts, or proceeds thereof.<br><br>The Purchaser is not assuming, nor shall it in any manner become liable for, any debts, liabilities, obligations or expenses of any kind or nature whatsoever of the Debtors or the Agent, whether existing on the date hereof or on the date of entry of the Approval Order; <u>provided</u>, <u>however</u>, if the Closing occurs, the Purchaser shall be responsible for the payment of the Cure Amounts associated with the Assumed Contracts and all debts, liabilities, obligations or expenses arising under the Assumed Contracts. |
| **Conditions** | The Purchaser's obligation to purchase the Acquired Assets and pay the Payment Amount to the Agent on the Funding Date is subject to the following Conditions:<br><br>(a)    approval by the Bankruptcy Court of the bidding procedures for the Acquired Assets, in the form attached to the Stalking Horse Agreement as <u>Exhibit E</u> or in such other form as is reasonably acceptable to the Purchaser and Merchant, in consultation with the Committee and the DIP Lender (the "<u>Bidding Procedures</u>").  Notwithstanding the foregoing or anything contained herein to the contrary, if the Bidding Procedures (i) provide for the right to bid on assets (whether owned by the Merchant, D |

7

| | |
|---|---|
| | Brand or any other third party) in addition to, or otherwise modify the description or scope of, the Acquired Assets or (ii) provide for any sharing of the proceeds of the sale of any assets included within the Bidding Procedures with any third party (other than any sharing arrangement by or among the Agent, the Merchant and/or the official committee of unsecured creditors in the Chapter 11 Cases), then (y) the Purchaser shall have no obligation to consummate the Closing and (z) the sale of any assets included within the modified Bidding Procedures shall be deemed to constitute an Alternative Transaction (as defined in Section 12) if a bid (other than the Purchaser's bid) is received in connection with such modified Bidding Procedures and such bid is "qualified" and, as a result, the Purchaser shall be entitled to receive the Break Up Fee and Expense Reimbursement (as each such term is defined in Section 12) if the Closing does not occur; and <br><br> (b)    approval by the Bankruptcy Court of the Purchaser's acquisition of the Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), including any contract designated by the Purchaser as an Assumed Contract, which Assumed Contracts shall include: <br><br> (i)    that certain Trademark License Agreement, dated as of February 24, 2003, between D Brand and dELiA*s Corp. (the "<u>Trademark License Agreement</u>"); and <br><br> (ii)    that certain Amended and Restated Media Services Agreement (the "<u>Media Services Agreement</u>") by and between Merchant and Defy Media, LLC (f/k/a Alloy, Inc.). |
| **Transition Services Agreement** | The Agent shall use commercially reasonable good faith efforts to assist the Purchaser with negotiations with Merchant in respect of a transition services agreement (the "<u>Transition Services Agreement</u>"), on terms and conditions reasonably acceptable to the Purchaser, that provides for the Purchaser's use of the Distribution Centers in connection with the Direct Business Platform for a period of no less than 30 days after the date of the Closing.  The Purchaser hereby acknowledges that the Agent has provided the Merchant with notice that the Agent is vacating and will cease using the Distribution Centers on January 29, 2015. <br><br> The Purchaser shall have no obligation to enter into the Transition Services Agreement. |
| **Approval Order and Closing Date** | Agent and Merchant shall use commercially reasonable good faith efforts to <br><br> (a)    obtain entry of the Approval Order or other order of the Bankruptcy Court, acceptable to Agent, Merchant, and the Purchaser in each such party's reasonable discretion, approving the sale, acquisition, assignment, transfer, license, and/or designation of the Acquired Assets to the Purchaser, and waiving any stay under Federal Rules of Bankruptcy Procedure 6004(h), 6006(d), or otherwise, and <br><br> (b)    assist the Purchaser with closing the transactions contemplated |

8

| | |
|---|---|
| | by the Stalking Horse Agreement in respect of the Acquired Assets (the "Closing"). Agent and Merchant each hereby covenants that, from time to time after the Closing, at the Purchaser's reasonable request and without further consideration, Agent and Merchant will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts, conveyances, transfers, assignments, powers of attorney and assurances as reasonably may be required more effectively to convey, transfer to and vest in the Purchaser, and to put the Purchaser in possession of, any of the Acquired Assets; provided, however, that Purchaser shall be responsible for preparing all documents and other instruments at Purchaser's sole cost and expense. |
| | The Closing shall occur on the Funding Date (the "Closing Date"), which shall occur no later than March 15, 2015 (the "Outside Closing Date"). If the Funding Date does not occur by the Outside Closing Date due to the failure of the Agent to satisfy certain of the Conditions, then the Purchaser may elect, in its discretion, either to (i) terminate its obligations under this Letter Agreement or (ii) extend the Outside Closing Date until the satisfaction of the Conditions (or the waiver of such Conditions by the Purchaser). |
| | The Purchaser agrees to accept and comply with the recommendations from the Consumer Privacy Ombudsman appointed in the Chapter 11 Cases in respect of the personally identifiable information in the Customer List. |
| | Prior to the consummation of the sale of the Acquired Assets pursuant to the Bidding Procedures, Merchant, in its capacity as a member of the Board of Managers of D Brand and as the sole owner of the Membership Interests, shall not cause D Brand to transfer or assign any of its assets. |
| **Store Closing Sale** | If the Closing occurs, the Purchaser hereby agrees that Agent shall be authorized to conduct, until the Sale Termination Date, the Sale at the Stores, the Distribution Centers, and corporate offices and, until the Closing Date, through the Direct Business Platform as a "sale on everything", "everything must go", "store closing," or "going out of business". |
| | Effective on the Closing Date, the Agent shall discontinue the sale of goods through the Direct Business Platform; provided, however, until the Sale Termination Date, Purchaser hereby irrevocably grants Agent the right and otherwise authorizes Agent to reasonably promote the Sale at the Stores using one or more reasonably sized banners located at the top of the landing page(s) for the Direct Business Platform (including (without limitation) websites and social media sites such as Facebook and Twitter) and utilize the functionality of the Store locator feature, all of which shall be updated by the Purchaser at the Agent's expense, based on Agent's reasonable requests and otherwise operated and maintained by the Purchaser. |
| **Intellectual Property License** | The Purchaser hereby grants to Agent, effective as of the Closing Date and ending on the Sale Termination Date (or, in the case of Remaining Merchandise and MOOS Inventory, once sold), an irrevocable, non- |

|  | transferable, royalty free license and right to use all Acquired IP and Customer Lists that constitute Acquired Assets in connection with the Sale, subject to reasonable restrictions requested by the Purchaser in order for the Purchaser to comply with its privacy policy (as well as Merchant's privacy policy) and applicable laws governing the use and dissemination of confidential consumer personal data (including those applicable to the Purchaser pursuant to the Section 6.2 of the Stalking Horse Agreement. |
|---|---|
|  | Without limiting the generality of the foregoing, Agent shall be authorized to use the Intellectual Property and Customer Lists included as Acquired Assets to sell or otherwise dispose of the Merchandise (including (without limitation) the Remaining Merchandise), the MOOS Inventory, Owned FF&E (to the extent not set forth on Schedule 2.1(c) to the Stalking Horse Agreement), Excluded Goods, and Owned DC FF&E and otherwise advertise and promote the Sale, including (without limitation) the use of the trade names, logos, e-mail lists, customer lists, and e-commerce sites (including (without limitation) websites and social media sites such as Facebook and Twitter), all in accordance with the license to use such Acquired Assets granted to the Agent by the Merchant under the Agency Agreement subject to such reasonable quality control requirements mutually acceptable to the Purchaser and Agent. |
|  | With respect to Remaining Merchandise and MOOS Inventory, the Purchaser hereby grants the Agent the right to sell such Remaining Merchandise and MOOS Inventory on a wholesale basis with all logos, tags, and other intellectual property intact and grant purchasers thereof the right to sell such Remaining Merchandise and MOOS Inventory with such logos, tags, and other intellectual property intact and advertise the sale of such Remaining Merchandise and MOOS Inventory as "Authentic dELiA*s Branded Goods". |
|  | All goodwill associated with use of the Acquired Assets shall inure to the benefit of the Purchaser. |
|  | For the avoidance of doubt, "Intellectual Property" shall exclude software licenses relating solely to the operation of the Debtors' Stores. |
|  | To the extent the Transition Services Agreement, or any similar type of agreement, transfers to the Purchaser any software that the Debtors still require in order to conduct the wind down of their operations, the Purchaser agrees that it will license such software back to the Debtors at no charge until the closing of the Chapter 11 Cases or as otherwise agreed to in writing by the Purchaser and the Debtors. |
| **Acknowledgement as to Condition** | Except as expressly set forth below, the Purchaser acknowledges and agrees that neither Merchant nor Agent makes any representations or warranties whatsoever, express or implied, with respect to the Acquired Assets or any matter relating to the Acquired Assets. Without in any way limiting the foregoing, Agent, on behalf of itself and Merchant, disclaims any warranty (express or implied) of Merchantability or fitness for any particular purpose as to any Acquired Asset. Merchant and Agent, to the best of Agent's knowledge, represent and warrant that dELiA*s Assets Corp. owns all of the outstanding Membership Interests in D Brand and |

10

| | |
|---|---|
| | there are no other rights, options or warrants to purchase membership interests in D Brand.<br><br>The Purchaser further acknowledges that the Purchaser (a) has conducted independent due diligence in respect of the Acquired Assets as the Purchase deemed necessary or appropriate; (b) has conducted an independent inspection and investigation of the physical and other conditions of Acquired Assets and all such other matters relating to or affecting the Acquired Assets as the Purchaser deemed necessary or appropriate, and (c) that in proceeding with the Purchaser's acquisition of the Assets, Purchaser is doing so based solely upon such independent due diligence and independent inspections and investigations.<br><br>Accordingly, except for the limited representation set forth above, Purchaser is, and at Closing, shall be deemed to be, purchasing the Acquired Assets on an "as is" and "where is" basis. |
| **Exclusivity** | In consideration of the sharing of confidential information and the agreements contained herein, from the date hereof through the date on which the Bankruptcy Court enters an order approving Bidding Procedures for the Acquired Assets (the "<u>Bidding Procedures Order</u>"),<br><br>    (a)    absent the written consent of the Agent, Merchant, and Purchaser, on behalf of itself and its Representatives, Purchaser agrees that neither the Purchaser nor its Representatives will solicit, negotiate or enter into any agreement with any party (other than Agent, Merchant or their Representatives) with respect to the transactions contemplated by the Stalking Horse Agreement; and<br><br>    (b)    absent the written consent of the Agent, Merchant and Purchaser, on behalf of itself and its Representatives, Agent and Merchant agree that neither Agent, Merchant nor their Representatives will solicit, negotiate or enter into an agreement with any party (other than the Purchaser or its Representatives) with respect to the Acquired Assets.<br><br>From the date of the Stalking Horse Agreement through and including the date of entry of the Bidding Procedures Order, absent the written consent of the Purchaser, the Agent shall not, on behalf of itself or its Representatives,<br><br>    (a)    exercise its designation rights in respect of the Acquired IP or other Acquired Assets in favor of any party (other than the Purchaser);<br><br>    (b)    fail to exercise the designation rights in favor of the Purchaser;<br><br>    (c)    negotiate or enter into any agreement with any party (other than the Purchaser) regarding the assignment of all or any part of the Acquired Assets to such party.<br><br>Following the entry of the Bidding Procedures Order, the Merchant and Agent and their respective Representatives may solicit and negotiate with one or more third parties for the purchase of the Acquired Assets pursuant to procedures approved in the Bidding Procedures Order. |
| **Break Up Fee and Expense Reimbursement** | If an alternative transaction with respect to the Acquired Assets (an "<u>Alternative Transaction</u>") is consummated, the Purchaser shall be entitled |

11

| | |
|---|---|
| | to a break up fee (the "Break Up Fee") in the aggregate amount of 3% of the cash portion of the Payment Amount and expense reimbursement for up to $50,000 in reasonable and documented out of pocket expenses (the "Expense Reimbursement").  The Break Up Fee and Expense Reimbursement shall be paid at the closing of, and shall be a condition to the consummation of, the Alternative Transaction, and the amounts used to pay the Break Up Fee and Expense Reimbursement shall not constitute Asset Proceeds. |
| **Indemnification** | Agent shall indemnify and hold the Purchaser and its Representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against the Purchaser or its Representatives resulting from, or in any way related to (i) Agent's failure to perform under or material breach of the Stalking Horse Agreement or the Agency Agreement or (ii) Agent's conduct in connection with the Merchandise, the Owned FF&E and the Assets (other than the Acquired Assets) on or after the Sale Commencement Date.

The Purchaser shall indemnify and hold Agent and its Representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent or its Representatives resulting from, or in any way related to (i) the Purchaser's failure to perform under or material breach of the Stalking Horse Agreement, or (ii) the Purchaser's conduct in connection with the Acquired Assets on or after the Closing Date.

Agent and the Purchaser shall each, as promptly as practical, provide the other with notice of any claim, suit or demand that in any way relates to or arises out of the Stalking Horse Agreement.  Such notice shall set forth whether the notifying party seeks, as of that time, indemnification from the other party for such claim, suit or demand.  Neither the Purchaser nor Agent shall compromise or settle any claim, suit or demand for which indemnification is sought without the prior written consent of the other party hereto. |

## SUMMARY OF "EXTRAORDINARY PROVISIONS" PURSUANT TO GUIDELINES FOR THE CONDUCT OF ASSETS SALES UNDER THE LOCAL RULES

14.    **No Successor Liability –** The Stalking Horse Agreement provides, and the

proposed Sale Order include certain findings, that the purchaser of the Acquired Assets will not

be liable for, any debts, liabilities, obligations or expenses of any kind or nature whatsoever of

the Debtors or the Agents.  In light of the extensive marketing and open nature of this sale

transaction, and the form and manner of the Auction and Sale Notice, including that it contains

an express disclosure regarding successor liability findings in the Sale Order, the Debtors believe affected parties will have sufficient notice of the Sale and, therefore, inclusion of successor liability findings in the Sale Order is appropriate and reasonable, especially balanced against the benefits of the Sale.

15.     **Requested Findings as to Fraudulent Conveyance.**  The proposed Sale Order provides that the Stalking Horse Agreement (or any other agreement entered into with the successful bidder) and the Proposed Transaction are not subject to avoidance under any fraudulent conveyance statute.

16.     **Relief From Stay Under Bankruptcy Rules 6004(h) and 6006(d).**  The proposed Sale Order provides for a waiver of the 14-day stay of the Sale Order arising under Bankruptcy Rules 6004(h) and 6006(d), including the parties' ability to close the Sale and assign the Assumed Contracts.  A waiver of the stay is necessary to maximize as soon as possible the value that the Debtors may realize from the sale of the Acquired Assets, especially in light of the pace of the Debtors' liquidation and wind down of operations.  Moreover, the Sale was extensively marketed and notice of the Sale was and will be further adequately provided to all parties in interest.  Therefore, the Debtors submit there are adequate grounds to waive the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d) so that the Sale Order is effective immediately.

17.     **No Good Faith Deposit.**  The Stalking Horse Agreement does not require the Stalking Horse Bidder to provide a good faith deposit as a requirement of the Stalking Horse Bid.  This provision was a necessary inducement for the Stalking Horse Bidder's entry into the Stalking Horse Agreement, which maximizes the value of the Debtors' estates and increases creditor recoveries.

13

18.     **Use of Proceeds.**  Proceeds from the sale of the Acquired Assets shall be

distributed in accordance with the sharing provisions agreed to in the Agency Agreement.

Subject to the Challenge Period (as defined in the Final DIP Order), that portion of the net

proceeds of the sale of the Acquired Assets that is payable to the Debtors shall be paid in

accordance with the DIP Facility and the Final DIP Order.  Moreover, any other lien on the

Acquired Assets will attach to the proceeds of the sale to the same extent, validity and priority.

### SUMMARY OF PROPOSED BIDDING PROCEDURES
### PURSUANT TO LOCAL RULE 6004-1

19.     The Bidding Procedures are intended to permit a fair and efficient competitive

sale process to confirm that the bid of the Stalking Horse Bidder is indeed, the best offer or

promptly identify the alternative bid that is higher or otherwise better.  Because the proposed

Bidding Procedures are attached to the Bidding Procedures Order as <u>Exhibit 1</u>, they are not

restated herein.  Generally, however, the Bidding Procedures establish, among other things:

a.     the requirements Potential Bidders must satisfy to participate in the bidding process and become "Acceptable Bidders" (<u>see</u> Bid. Proc., at ¶ B);

b.     the availability of, access to and conduct during due diligence by Acceptable Bidders (<u>see</u> Bid. Proc., at ¶ C);

c.     the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger an Auction, including the minimum consideration that must be provided and the terms, conditions that must be satisfied, and deadline that must be met, by any Acceptable Bidder (other than the Stalking Horse Bidder) to be considered a "Qualified Bidder" (*see* Bid. Proc., at ¶¶ D, E, and F);

d.     the manner in which Qualified Bids will be evaluated by the Debtors to determine the Starting Bid for the Auction (*see* Bid. Proc., at ¶ G);

e.     the conditions for having an Auction and procedures for conducting the Auction, if any (<u>see</u> Bid. Proc., at ¶ H, I);

14

  f.  the criteria by which the "Successful Bidder" will be selected by the Debtors, in consultation with their advisors (see Bid. Proc., at ¶ J); and

  g.  various other matters relating to the Sale process generally, including regarding the Sale Hearing, designation of the Back-Up Bid, payment of the Break-up Fee, return of any good faith deposits and certain reservations of rights (see Bid. Proc., at ¶¶ K – N).

## FORM AND MANNER OF AUCTION AND SALE NOTICE

20.  Within (3) business days of entry of the Bidding Procedures Order, the Debtors will serve the Auction and Sale Notice by first class mail upon the following parties: (i) the Office of the United States Trustee for the Southern District of New York; (ii) counsel to Salus Capital Partners, LLC, as a lender and administrative agent under the Debtors' postpetition financing credit facility; (iii) counsel to General Electric Capital Corporation as the issuer of the prepetition letter of credit agreement; (iv) proposed counsel for the Committee; (v) the Internal Revenue Service; (vi) the United States Attorney for the Southern District of New York, (vii) the U.S. Securities and Exchange Commission; (viii) any party known or reasonably believed to have asserted any lien, claim or encumbrance or other interest in the Acquired Assets; (ix) any party known or reasonably believed to have expressed an interest in acquiring any of the Acquired Assets; and (x) the consumer privacy ombudsman appointed in these Chapter 11 Cases; (x) entities known or reasonably believed to have any such other party entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(b).  The Debtors submit that no other or further notice need be given.

21.  The Debtors submit that the Auction and Sale Notice is reasonably calculated to prove all interested parties with timely and proper notice of the proposed Sale, including (a) the date, time and place of the Auction (if one is held); (b) the Bidding Procedures and the dates and deadlines related thereto; (c) the Sale Objection Deadline and the date, time and place of the Sale

Hearing; (d) reasonably specific identification of the Acquired Assets; (e) instructions for promptly obtaining a copy of the Stalking Horse Agreement; (f) representations describing the Sale as being free and clear of liens, claims, interests, and other encumbrances (subject to the Permitted Encumbrances), with all such liens, claims, interests and other encumbrances attaching with the same validity and priority to the proceeds of the Sale; (g) the commitment by the Stalking Horse Bidder to assume certain liabilities of the Debtors; (h) notice of the proposed assumption and assignment of contracts and leases to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement (or to any other Successful Bidder arising from the Auction, if any), the proposed cure amounts relating thereto and the right, procedures and deadlines for objecting thereto.  The Debtors propose that no other or further notice of the Sale shall be required.  Accordingly, the Debtors request that the form and manner of the Auction and Sale Notice be approved.

## SUMMARY OF ASSUMPTION PROCEDURES

22.    The Debtors are also seeking approval of the procedures to facilitate the fair and orderly assumption and assignment of Assumed Contracts in connection with the Proposed Transaction, including the form of the Assumption and Assignment Notice attached to the Bidding Procedures Order as Exhibit 3, (the "Assumption Procedures"),  The Assumption Procedures are set forth in detail in the attached Bidding Procedures Order and therefore, are not restated herein.  Generally, however, the Assumption Procedures (i) outline the process by which the Debtors will give notice to all counterparties to the Assumed Contracts regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right and the procedures to object thereto, and (ii) establish objection and other relevant

16

deadlines and the manner for resolving disputes relating to the assumption and assignment of the Assumed Contracts to the extent necessary.

**BASIS FOR RELIEF**

**A.     THE PROPOSED BIDDING PROCEDURES ARE
         FAIR, APPROPRIATE AND SHOULD BE APPROVED.**

23.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction.  The Debtors believe a sale of the Acquired Assets pursuant to a public auction governed by the proposed Bidding Procedures and the subsequent Sale will maximize the sale proceeds received by the Debtors' estates, which is the paramount goal in any proposed sale of property of the estate.  See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) ("'It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.'") (quoting Cello Bag Co. Inc. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)); see also Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand") (internal citation omitted).  To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  See, e.g., Integrated Res., 147 B.R. at 659 (such procedures "encourage bidding and . . . maximize the value of the debtor's assets").

24.     The Debtors and their advisors, in consultation with their key constituents, have established the terms and conditions of the bidding process and the Auction, which are consistent with the standard procedures approved in this District and other bankruptcy courts.  The Bidding

17

Procedures allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Acquired Assets.

25.    Accordingly,  The Debtors submit that the forgoing procedures are fair, transparent and will derive the highest and best bids for the Acquired Assets.

## B.    THE STALKING HORSE BID PROTECTIONS HAVE A SOUND BUSINESS PURPOSE AND SHOULD BE APPROVED.

26.    The Debtors  are also requesting approval of a break-up fee equal to 3% of the cash portion of the Payment Amount (the "Break Up Fee") and reimbursement of expenses for up to $50,00 in documented, out of pocket expenses (the "Expense Reimbursement", and together with the Break Up Fee, the "Bid Protections") to be paid to the Stalking Horse Bidder in the event an alternative transaction with respect to the Acquired Assets is consummated.

27.    Bankruptcy courts in the Second Circuit analyze the appropriateness of bidding incentives such as these under the "business judgment rule" standard, and is it well established in this district that courts consider whether (a) the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation, (b) the fee hampers, rather than encourages, bidding and (c) the amount of the fee is unreasonable relative to the proposed purchase price. See Integrated Res., 147 B.R. at 656-57 (to evaluate bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing and in the exercise of honest judgment) (internal citations omitted).  The Debtors submit that the Bid Protections pass muster under each of the three foregoing factors.

28.    First, the Bid Protections are the product of good faith, arm's-length negotiations between the Purchaser, the Agents and the Debtors, who were acting not in their own self-

18

interest but, rather, in the interest of the bankruptcy estates consistent with their fiduciaries

duties.  Moreover, the Debtors have consulted with the DIP Agent and the Committee who have

not objected to the Bid Protections.  Furthermore, the provisions in the Stalking Horse

Agreement relating to the Bid Protections (as well as the other provisions therein) were

scrutinized by the Debtors' advisors and professionals.

29.     Second, the Debtors believe, based on their reasoned business judgment, that the

presence of the Bid Protections enhances their ability to maximize value without chilling bidding

for the Acquired Assets.  The Bid Protections were a material inducement for, and a condition of,

the Stalking Horse Bidder's agreement to enter into the Stalking Horse Agreement.  Indeed,

granting these Bid Protections convinced the Stalking Horse Bidder to enter into the Stalking

Horse Agreement, which assures the Debtors of a sale of the Acquired Assets to a contractually-

committed bidder at a price they believe is fair and reasonable and provides the upside

opportunity that the Debtors could potentially receive a higher or otherwise better offer at the

Auction which, absent such a bid floor, might otherwise never have been realized.  See In re 995

Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding bidding incentives

"legitimately necessary to convince a white knight to enter the bidding by providing some form

of compensation for the risks it is undertaking") (internal citations omitted).

30.     The Debtors further believe, and are advised, that the amount of the Bid

Protections is comparable to market and bid protections approved by courts in this district.  See,

e.g., In re BearingPoint, Inc., No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) [Docket No.

369] (approving a break-up fee of approximately 3% of the purchase price and expense

reimbursement up to $5,000,000); In re Musicland Holding Corp., No. 06-10064(SMB) (Bankr.

S.D.N.Y. Jan. 17, 2006) [Docket No. 64] (approving break up fee of 3% of the purchase price).

31.     Third, the Debtors believe, based on their reasoned business judgment, that the

Bid Protections are reasonable and appropriate relative to the size, nature and complexity of this

transaction and the commitments made and resources expended by the Stalking Horse Bidder in

connection therewith in view of:

- the meaningful floor established by the Payment Amount in the Stalking Horse Agreement for competitive bidding;

- the substantial benefits already received by the Debtors and their estates from having a stalking horse bid serve as a catalyst for other potential or actual bidders to confirm that the Debtors receive the highest and best offer by subjecting the sale of the Acquired Assets to an open auction and competitive bidding;

- the need of the Debtors to move forward with a transaction with a high likelihood of closure assured by a contractually committed party at a fair and reasonable price consistent with the timeline of these Chapter 11 Cases;

- the extensive due diligence, analysis and negotiations undertaken by the Stalking Horse Bidder in connection with the Proposed Transaction; and

- the risks borne by the Stalking Horse Bidder for being the stalking horse in this transaction and any opportunity costs incurred as a result thereof.

32.     Accordingly, the Debtors submit that the Bid Protections reflect a sound business

purpose, are fair and appropriate under the circumstances and, because the standard used by

courts in this district in approving similar protections has been satisfied here, the Debtors

respectfully submit that the Bid Protections should be approved.

## C.      THE FORM AND MANNER OF THE AUCTION AND SALE NOTICE SHOULD BE APPROVED.

33.     The Debtors also seek approval of the form of the Auction and Sale Notice.  The

Auction and Sale Notice will include, among other things, the date, time and place of the

Auction and the Sale Hearing, as well as the deadline for filing any objections to the relief

requested in this Motion once they are set by the Court.

34.     By this Motion, the Debtors propose that the Bankruptcy Court set (i) February 20, 2015 at 10:00 a.m. (prevailing Eastern Time) as the date for the Auction; (ii) February 22, 2015 at 4:00 p.m. (prevailing Eastern Time) as the Sale Objection Deadline; and (iii) February 23, 2015 at 10:00 a.m. (prevailing Eastern Time) as the date and time for the Sale Hearing.

35.     The Debtors propose that such a timeline is warranted and necessary given the exigent circumstances and the Debtors' need to sell the Acquired Assets in a timely fashion. Moreover, the Debtors propose that such a timeline is appropriate and will have little impact on the Debtors' ability to market the Acquired Assets.

**D.     THE ASSUMPTION AND ASSIGNMENT PROCEDURES ARE APPROPRIATE AND SHOULD BE APPROVED.**

36.     In connection with the assumption and assignment of the Assumed Contracts, the Debtors believe it is necessary to establish a process by which (a) the Debtors and counterparties to Assumed Contracts can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code, and (b) such counterparties can object to the assumption and assignment of Assumed Contracts and/or related cure amounts.

37.     As set forth in the proposed Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assumed Contract be deemed to consent to (a) the assumption and assignment of the applicable Assumed Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order and (b) assignment of any Assumed Contract notwithstanding any anti-alienation provision or other restriction on assignment.  See, e.g., Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

21

38.     The Debtors believe that the Assumption Procedures are fair and reasonable,

provide sufficient notice to parties to the Assumed Contracts and provide certainty to all parties

in interest regarding their respective obligations and rights in respect thereof.  Accordingly, the

Debtors request the Court approve the Assumption Procedures set forth in the Bidding

Procedures Order.

**E.      THE PROPOSED SALE OF THE ACQUIRED ASSETS SHOULD BE
         APPROVED AS AN EXERCISE OF SOUND BUSINESS JUDGMENT.**

39.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate . . ."  11 U.S.C. § 363(b)(1); see also In re Ames Dept. Stores,

Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that "going-out-of-business" sales are

governed by section 363(b)).  Moreover, section 105(a) of the Bankruptcy Code provides that

"[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry

out the provisions of this title."  11 U.S.C. § 105(a).

40.     The decision to sell assets outside the ordinary course of business is based upon

the sound business judgment of the debtor.  See, e.g., In re Chateaugay Corp., 973 F.2d 141, 145

(2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d

1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b)

application expressly find from the evidence presented before him at the hearing a good business

reason to grant such an application."); see also In re Integrated Res., Inc., 147 B.R. at 656

(S.D.N.Y. 1992) (stating "the business judgment rule is a presumption that in making a business

decision the directors of a corporation acted on an informed basis, in good faith and in the honest

belief that the action was in the best interests of the company" and has continued applicability in

22

bankruptcy ) (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)), <u>appeal</u> <u>dismissed</u>, 3 F.3d 49 (2d Cir. 1993).

41.     Ample business justification exists in this case to approve the Debtors' sale of the Acquired Assets.  The Debtors are conducting a liquidation and wind down of their business and believe, in the exercise of their business judgment, that the sale of the Acquired Assets will maximize value for the benefit of the Debtors' estates and their creditors.  The Proposed Transaction will provide the Debtors with cash, and the payment of the cure amounts with respect to the Assumed Contracts, which reduces the amount of claims that may have been asserted against the Debtors' estates had the Debtors rejected such contracts.  Accordingly, the Debtors submit that that the sale of the Acquired Assets is appropriate and should be approved.

**F.     THE SALE OF THE ACQUIRED ASSETS HAS BEEN
         PROPOSED IN GOOD FAITH AND WITHOUT COLLUSION
         AND THE SUCCESSFUL BIDDER IS A GOOD FAITH PURCHASER.**

42.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from the debtor notwithstanding that authorization of the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) provides, in relevant part, as follows:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] . . . does not affect the validity of a sale . . . to an
> entity that purchased . . . such property in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such
> authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

43.     Section 363(m) "reflects the . . . 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  <u>In re Abbotts Dairies of Penn., Inc.</u>, 788 F.2d 143, 147 (3d Cir. 1986) (quoting <u>Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)</u>, 724 F.2d 52, 55 (7th Cir. 1983));

23

see also United States v. Salerno, 932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m)

furthers the policy of finality in bankruptcy sales . . . [and] assists bankruptcy courts in

maximizing the price for assets sold in such proceedings"); In re Stein & Day, Inc., 113 B.R.

157, 162 (Bankr. S.D.N.Y. 1990) (noting that section 363(m) advances the policy of finality in

bankruptcy sales).

44.    While the Bankruptcy Code does not define "good faith," the Second Circuit has

held that the good faith of a purchaser is shown by the integrity of his conduct during the course

of the sale proceedings, finding that where there is a lack of such integrity, a good faith finding

may not be made.  See, e.g., Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390

(2d Cir. 1997) ("A purchaser's good faith is lost by fraud, collusion between the purchaser and

other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders")

(internal citations omitted); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

45.    The Debtors submit that the Stalking Horse Bidder, or other successful bidder

arising from the Auction, is or would be a "good faith purchaser" within the meaning of section

363(m) of the Bankruptcy Code and the Stalking Horse Agreement, or any marked version

thereof, is or would be a good faith agreement on arm's-length terms entitled to the protections

of section 363(m) of the Bankruptcy Code.

46.    First, the consideration to be received by the Debtors pursuant to the Stalking

Horse Agreement is substantial, fair and reasonable.  Second, the Stalking Horse Agreement was

entered into by the Debtors and the Stalking Horse Bidder in good faith and after extensive,

arm's-length negotiations, during which both parties were represented by competent counsel of

similar bargaining positions.  Third, there is no indication of any "fraud, collusion between the

purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other

24

bidders" or similar conduct that would cause or permit the Proposed Transaction or the Stalking

Horse Agreement to be avoided under section 363(n) of the Bankruptcy Code.[3]  Finally, the

Stalking Horse Bidder's offer was evaluated and  approved by the Debtors, in consultation with

their advisors, the Committee and the DIP Agent.

47.    Accordingly, the Debtors believe that the Stalking Horse Bidder (or other

successful bidder) should be entitled to the full protections of section 363(m) of the Bankruptcy

Code and that the Proposed Transaction may not be avoided under section 363(n) of the

Bankruptcy Code.

## G.    THE SALE SHOULD BE APPROVED FREE AND CLEAR UNDER SECTION 363(F) OF THE BANKRUPTCY CODE.

48.    The Debtors request approval to sell the Acquired Assets, free and clear of any

and all liens, claims and encumbrances (the "Encumbrances"), other than Permitted

Encumbrances (as defined in the Stalking Horse Agreement), in accordance with section 363(f)

of the Bankruptcy Code.

49.    A debtor in possession may sell property under sections 363(b) and 363(f) "free

and clear of any interest in such property of an entity other than the estate" if any one of the

following conditions is satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

---

[3] Section 363(n) of the Bankruptcy Code provides that "The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount."  11 U.S.C. § 363(n).

- such interest is in *bona fide* dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5); <u>Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)</u>, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since Section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).

50.    To facilitate the Proposed Transaction, the Debtors seek to sell the Acquired Assets free and clear of all Encumbrances (other than the Permitted Encumbrances, as defined in the Stalking Horse Agreement).  The DIP Agent  has already consented to the Proposed Transaction.  Moreover, the Debtors believe that any party holding liens in the Acquired Assets could be compelled to accept a monetary satisfaction of such interests.  Finally, the Sale Order provides that any Encumbrance in the Acquired Assets, if any, will attach to the net proceeds of the sale of the Acquired Assets, subject to the Permitted Encumbrances.  Accordingly, the Debtors believe that the Proposed Transaction will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and the sale of their Acquired Assets should be approved free and clear of all liens, claims and encumbrances.  Notwithstanding the foregoing, subject to the Challenge Period (as defined in the Final DIP Order), that portion of the net proceeds of the sale of the Acquired Assets that is payable to the Debtors shall be used in accordance with the terms of the DIP Facility and the Final DIP Order.

## H.    THE PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS SHOULD BE APPROVED.

51.    Section 365 of the Bankruptcy Code authorizes a debtor to reject, assume and assign an executory contract of unexpired lease subject to court approval.  Section 365(a) of the Bankruptcy Code provides that

26

Except as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).

52.     Section 365(b)(1) of the Bankruptcy Code provides that:

If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform non-monetary obligations under an expired lease of real property, if it is impossible for the trustee to cure such default by performing non-monetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease. . . .

11 U.S.C. § 365(b)(1).

53.     Section 365(f)(2) provides that

The trustee may assign an executory contract or unexpired lease of the debtor only if —

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

27

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

54.     Accordingly, section 365 of the Bankruptcy Code authorizes the proposed assumption and assignment of executory contracts, provided that the defaults under such contracts must be cured and adequate assurance of future performance is provided.  The Debtors submit that the statutory requirements of section 365(b)(1)(A) will be satisfied (and promptly) because the Stalking Horse Agreement and the Bidding Procedures require that the Stalking Horse Bidder (or the successful bidder) pay the cure amount associated with any and all Assumed Contracts.  Because the Bidding Procedures Order (once approved) provides a clear process by which to resolve disputes over cure or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

55.     It is well settled that the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but that a contract counterparty is not required to receive an absolute guarantee of future performance.  See, e.g., In re Glycogenesys, Inc., 352 B.R. 568, 578 (Bankr. D. Mass. 2006) ("[I]t is appropriate to evaluate the financial condition of the assignee and the likelihood that the non-Debtor party will receive the benefit of its bargain from the assignee"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (stating that the "required assurance will fall considerably short of an absolute guaranty of performance").

56.     As stated above, the Debtors expect that the Stalking Horse Bidder (or other successful bidder), to whom an Assumed Contract is assigned, will not only cure any defaults

under such Assumed Contract, but will provide information with respect to adequate assurance of future performance under such Assumed Contracts. The Debtors intend to send the Assumption and Assignment Notice to the counterparties to the Assumed Contracts (the "Assumed Contract Counterparties") regarding the proposed assumption and assignment of the Assumed Contracts to resolve any issues regarding adequate assurance or cure amounts as soon as reasonably practicable prior to the Sale Hearing.

57.     Accordingly, the Debtors submit that the Assumption Procedures should be approved.

## REQUEST FOR WAIVER OF STAY

58.     In addition, by this Motion, the Debtors seek a waiver of any stay of the effectiveness of any order approving the relief requested in this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, pursuant to Bankruptcy Rule 6006(d), "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." For the reasons, described above, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

59.     The Debtors submit that the requirements of the Local Rules 6004-1 and 6006-1 have been satisfied. Alternatively, to the extent the Court finds that the Debtors have not met any applicable provision of the Local Rules 6004-1 and 6006-1, the Debtors respectfully request that the Court waive such requirement with respect to this Motion.

## NOTICE

60.     No trustee or examiner has been appointed in these Chapter 11 Cases.  Notice of

this Motion has been given to:  (i) the Office of the United States Trustee for the Southern

District of New York; (ii) counsel to the DIP Agent; (iii) counsel to General Electric Capital

Corporation as the issuer of the prepetition letter of credit agreement; (iv) proposed counsel for

the Committee; (v) the Internal Revenue Service; (vi) the United States Attorney for the

Southern District of New York, (vii) the U.S. Securities and Exchange Commission; and

(viii) entities known or reasonably believed to have any such other party entitled to notice

pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(b).  The Debtors submit that no other

or further notice need be given.

## NO PRIOR REQUEST

61.     No previous request for the relief sought in this Motion has been made to this or

any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding

Procedures Order and the Sale Order granting the relief requested and such other or further relief

as is just and proper.

Dated:  New York, New York
       January 28, 2015

*/s/ Gregg M. Galardi*
Gregg M. Galardi
Dienna Corrado
Arkady A. Goldinstein
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501

*Counsel for the Debtors and Debtors in*
*Possession*

30

## EXHIBIT A

**Proposed Bidding Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| dELiA*s, INC., *et al.*, | Case No.  14-23678 (RDD) |
| Debtors.[1] | Jointly Administered |

**ORDER (A) APPROVING BIDDING PROCEDURES AND BID
PROTECTIONS IN CONNECTION WITH THE SALE OF CERTAIN ASSETS,
(B) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS, (C) APPROVING THE FORM AND MANNER OF
NOTICE, AND (D) SCHEDULING AN AUCTION AND A SALE HEARING**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in

possession (collectively, the "Debtors"), for entry of an order (a) authorizing and approving the

bidding procedures with stalking horse bid protections in connection with the sale of the

Acquired Assets, (b) approving the form and manner of notice of the Auction and Sale Hearing,

(c) approving procedures for the assumption and assignment of Assumed Contracts and noticing

of related cure amounts, and (d) scheduling an Auction and a Sale Hearing, as more fully set

forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief

requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion being a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to

28 U.S.C. §§ 1408 and 1409; and it appearing that notice of the Motion was adequate and proper

under the circumstances of these Chapter 11 Cases and that no further or other notice need be

given; and a hearing having been held to consider the relief requested in the Motion ("Bid

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  dELiA*s, Inc. (7172); dELiA*s Distribution Company (9076); A Merchandise, LLC (7639); dELiA*s Operating Company (3765); dELiA*s Retail Company (0036); dELiA*s Group Inc. (4035); AMG Direct, LLC (9236); dELiA*s Assets Corp. (3754); DACCS, Inc. (0225).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  50 West 23rd Street, New York, NY 10010.
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the

Procedures Hearing"); and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors and that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and any objections to the requested relief having been withdrawn or overruled on the merits; and after due deliberation thereon and good and sufficient cause appearing therefor,

## IT IS HEREBY FOUND AND DETERMINED THAT:

**A.**     **Bidding Procedures**.  The Debtors have articulated good and sufficient reasons for authorizing and approving the bidding procedures attached hereto as Exhibit 1 (the "Bidding Procedures"), which are fair and reasonable and appropriate under the circumstances and designed to maximize recovery on, and realizable value of, the Acquired Assets.

**B.**     **Stalking Horse Bid Protections**.  The Debtors have demonstrated a compelling and sound business justification for authorizing the payment of the Break Up Fee and Expense Reimbursement (together, the "Bid Protections") to the Stalking Horse Bidder, including:

     i.     the Bid Protections are the product of negotiations between the Debtors, the Agents, and the Stalking Horse Bidder conducted in good faith and at arm's length, and the Stalking Horse Agreement with respect to the Proposed Transaction is the culmination of a process undertaken by the Debtors, the Agents, and their respective professionals to negotiate a transaction with a bidder who was prepared to pay the highest or otherwise best purchase price to date for the Acquired Assets to maximize the value of the Debtors estates;

     ii.    the Bid Protections are an actual and necessary cost and expense of preserving the respective Debtors' estates;

     iii.   the Bid Protections are fair, reasonable and appropriate in light of, among other things, the size and nature of the Proposed Transaction, the substantial efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the Proposed Transaction is subject to higher or better offers, and the substantial benefits the Stalking Horse Bidder has provided to the Debtors, their estates and creditors and all parties in interest herein, including, among other things, by increasing the

likelihood that the best possible price for the Debtors' assets will be received;

iv.    the protections afforded to the Stalking Horse Bidder by way of the Bid Protections were material inducements for, and express conditions of, the Stalking Horse Bidder's willingness to enter into the Stalking Horse Agreement, and were necessary to ensure that the Stalking Horse Bidder would continue to pursue the proposed acquisition on terms acceptable to the Debtors in their sound business judgment, subject to competitive bidding; and

v.    the assurance of the payment of the Bid Protections has promoted more competitive bidding by inducing the Stalking Horse Bidder's bid, which otherwise would not have been made, without which competitive bidding would be limited, and which may be the highest and best available offer for the Acquired Assets, induced the Stalking Horse Bidder to conduct due diligence with respect to the Debtors' business, assets, operations and liabilities, and propose the sale of the Acquired Assets contemplated by the Stalking Horse Agreement, including, among other things, submission of a bid that will serve as a minimum or floor bid on which all other bidders can rely and increases the likelihood that the final purchase price reflects the true value of the Debtors' assets.

**C.    Auction and Sale Notice**.  The form of Auction and Sale Notice attached hereto as Exhibit 2 is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale of the Acquired Assets, including: (i) the date, time and place of the Auction (if one is held); (ii) the Bidding Procedures and certain dates and deadlines related thereto; (iii) the Sale Objection Deadline and the date, time and place of the Sale Hearing; (iv) reasonably specific identification of Acquired Assets; (v) instructions for promptly obtaining a copy of the Stalking Horse Agreement; (vi) representations describing the sale of the Acquired Assets as being free and clear of liens, claims, interests and other encumbrances, with all such liens, claims, interests and other encumbrances attaching with the same validity and priority to the sale proceeds; (vii) the commitment by the Stalking Horse Bidder to assume certain liabilities of the Debtors; and (viii) notice of the proposed assumption and assignment of Assumed Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement (or to another

Successful Bidder arising from the Auction, if any) and the right, procedures and deadlines for objecting thereto. No other or further notice of the Auction and Sale Hearing shall be required.

> **D.** **Assumption Procedures**. The Assumption and Assignment Notice are reasonably calculated to provide counterparties to the Assumed Contracts with proper notice of the intended assumption and assignment of their executory contracts, any cure amounts relating thereto and the Assumption and Assignment Procedures.

**NOW, THEREFORE, IT IS ORDERED THAT:**

> 1.    The Motion is granted to the extent set forth herein.

**I.    Important Dates and Deadlines**:

> 2.    **Sale Hearing**:  [February 23, 2015, at 10:00 a.m. (Eastern Time)], is the date and time the hearing to approve the Proposed Transaction (the "Sale Hearing") will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, Courtroom 118, White Plains, New York 10601.  **Please take notice** that the Sale Hearing may be adjourned without further notice other than announcement in open Court or on the Court's calendar.

> 3.    **Sale Objection Deadline**: [February 22, 2015, at 4:00 p.m. (Eastern Time)], is the deadline to object to entry of the proposed Sale Order (the "Sale Objection Deadline"). Objections, if any, must: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules and any orders of the Court; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) filed with the Court and served so the objection is actually received no later than the Sale Objection Deadline by the following parties (the "Notice Parties"):

| Debtors | Counsel to the Debtors |
|---|---|
| dELiA*s, Inc.<br>50 West 23rd Street<br>New York, New York 10010<br>Attn: Ryan A. Schreiber, Esq. | DLA Piper LLP (US)<br>1251 Avenue of the Americas, 25th Floor<br>New, York, New York 10020<br>Attn: Gregg Galardi, Esq.<br>        Dienna Corrado, Esq. |
| **United States Trustee** | **Proposed Counsel to the Committee** |
| Office of the United States Trustee for<br>the Southern District of New York<br>201 Varick Street, Suite 1006<br>New York, New York 10014<br>Attn: Richard C. Morrissey, Esq.<br>        Serene Nakano, Esq. | Kelley Drye & Warren LLP<br>101 Park Avenue<br>New York, NY 10178<br>Attn: Robert L. LeHane, Esq.<br>        Gilbert R. Saydah, Jr., Esq. |
| **Counsel to the DIP Agent** | **Counsel to the Stalking Horse Bidder** |
| Choate, Hall & Stewart LLP<br>Two International Place<br>Boston, MA 02110<br>Attn: John F. Ventola, Esq.<br>        Seth Mennillo, Esq. | Greenberg Traurig, P.A.<br>401 E. Las Olas Boulevard, Suite 2000<br>Fort Lauderdale, FL 33301<br>Attn:  Mathew Hoffman, Esq.<br>Telephone: (954) 768-8203<br>Facsimile: (954) 759-5532<br>Email: hoffmanma@gtlaw.com |
| **Agents Under the Agency Agreement** | |
| Gordon Brothers Retail Partners, LLC<br>Prudential Tower<br>800 Boylston Street<br>Boston, MA 02119<br>Attn: Michael Chartock | Hilco Merchant Resources, LLC<br>5 Revere Drive, Suite 206<br>Northbrook, IL 60062<br>Attn: Ian S. Fredericks |

**The failure to timely file an objection in accordance with this order shall forever bar the assertion of any objection to the Motion, entry of the Sale Order and/or consummation of the Proposed Transaction, including the assumption and assignment of the Assumed Contracts to the Successful Bidder pursuant to the Stalking Horse Agreement, and shall be deemed to constitute any such party's consent to entry of the Sale Order and consummation of the Proposed Transactions and all transactions related thereto.**

4.      **Bidding Dates and Deadlines:** The following dates and deadlines with respect to

bidding on the Acquired Assets are hereby established (subject to modification as needed):

a)      Bid Deadline: [February 19, 2015 at 12:00 p.m. prevailing Eastern Time], is the deadline by which all "Qualified Bids" (as defined in the Bidding Procedures) must be actually received by the parties specified in the Bidding Procedures (the "Bid Deadline"); and

b)      Auction: [February 20, 2015 at 10:00 a.m. prevailing Eastern Time], is the date and time the Auction, if one is needed, will be held at the offices of

counsel to the Debtors: DLA Piper LLP (US) 1251 Avenue of the Americas, 27th Floor, New, York, New York 10020.

**II.       Bidding Procedures and Related Relief**

5.      The Bidding Procedures, substantially in the form attached hereto as <u>Exhibit 1</u>

and incorporated by reference as though fully set forth herein, are hereby approved.  The Bidding

Procedures shall govern the submission, receipt and analysis of all bids relating to the Proposed

Transaction, and any party desiring to submit a higher or better offer for the Acquired Assets

shall do so strictly in accordance with the terms of the  Bidding Procedures and this Order.

6.      As described in the Bidding Procedures, if the Debtors do not receive any

Qualified Bids other than from the Stalking Horse Bidder or if no Qualified Bidder other than the

Stalking Horse Bidder indicates its intent to participate in the Auction, the Debtors  will not hold

the Auction, the Stalking Horse Bidder will be named the Successful Bidder and the Debtors will

seek approval of the Stalking Horse Agreement at the Sale Hearing.  If one or more Qualified

Bids is timely received from a Qualified Bidder (other than the Stalking Horse Bidder) in

accordance with the Bidding Procedures, the Debtors shall conduct the Auction as set forth

herein.

7.      If the Auction is conducted, each Qualified Bidder participating in the Auction

shall be required to confirm that it has not engaged in any collusion with respect to the bidding

process or the Proposed Transaction, the Auction will be conducted openly and shall be either

transcribed or videotaped.

8.      The Bid Protections described in the Motion and set forth in the Stalking Horse

Agreement are hereby approved to the extent set forth herein.  If the Stalking Horse Bidder

becomes entitled to receive the Bid Protections in accordance with the terms of Stalking Horse

Agreement , (a) the Debtors are authorized, upon the closing of the Successful Bid or the Back-

Up Bid (as applicable) and the payment of the purchase price for the Acquired Assets to pay

from the proceeds of such purchase price any and all amounts owing to the Stalking Horse

Bidder in accordance with the terms of the Stalking Horse Agreement, including the Break Up

Fee and Expense Reimbursement, without further action or order by the Bankruptcy Court, in

accordance with the terms and conditions of the Stalking Horse Agreement and this Order, and

(b) the Stalking Horse Bidder shall be, and hereby is, granted an allowed administrative claim in

the Debtors' Chapter 11 Cases in an amount equal to the Break-Up Fee and Expense

Reimbursement under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

9.      No person or entity, other than the Stalking Horse Bidder, shall be entitled to any

expense reimbursement, break-up fee, "topping," termination or other similar fee or payment.

**III.      Auction and Sale Notice and Related Relief**

10.     The Auction and Sale Notice, substantially in the form attached hereto as <u>Exhibit</u>

<u>2</u> is hereby approved.

11.     Within (3) business days of entry of the Bidding Procedures Order, the Debtors

shall serve the Auction and Sale Notice by first class mail upon the following parties: (i) the

Office of the United States Trustee for the Southern District of New York; (ii) counsel to Salus

Capital Partners, LLC, as lender and administrative agent (the "<u>DIP Agent</u>") under the Debtors'

postpetition financing credit facility; (iii) counsel to General Electric Capital Corporation as the

issuer of the prepetition letter of credit agreement; (iv) proposed counsel for the Committee; (v)

the Internal Revenue Service; (vi) the United States Attorney for the Southern District of New

York, (vii) the U.S. Securities and Exchange Commission; (viii) any party known or reasonably

believed to have asserted any lien, claim or encumbrance or other interest in the Acquired

Assets; (ix) any party known or reasonably believed to have expressed an interest in acquiring

any of the Acquired Assets; and (x) the consumer privacy ombudsman appointed in these

Chapter 11 Cases; (x)  entities known or reasonably believed to have any such other party

entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(b).  No other or

further notice need be given.

**IV.      Auction and Sale Notice and Related Relief**

12.    The procedures set forth below regarding the assumption of the Assumed

Contracts pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse

Bidder (or other successful bidder arising from the Auction, if any) pursuant to section 365(f) of

the Bankruptcy Code in connection with the Proposed Transaction are hereby approved to the

extent set forth herein (the "Assumption Procedures").

13.    These Assumption Procedures shall govern the assumption and assignment of all

Assumed Contracts assumed and assigned in connection with the Proposed Transaction:

    **a.**    Assumption and Assignment Notice.  As soon as is practicable, the
Debtors shall serve the Assumption and Assignment Notice, substantially
in the form attached hereto as Exhibit 3 by first class mail on all Assumed
Contract Counterparties and provide a copy of the same to the Stalking
Horse Bidder.  The Assumption and Assignment Notice shall inform each
recipient that its respective contract may be designated as Assumed
Contract in connection with the Proposed Transaction and should contain
(i) the title of the Assumed Contract, (ii) the name of the Assumed
Contract Counterparty, (iii) the Debtors' good faith estimates of the cure
amounts required in connection with such Assumed Contract, (iv) the
identity of Stalking Horse Bidder; and (v) the deadline by which the
Assumed Contract Counterparty must file an objection to the proposed
assumption and assignment and/or cure amount, and (vi) the Assumption
Procedures relating thereto; provided, however, that service of an
Assumption and Assignment Notice does not constitute an admission that
such Assumed Contract is an executory contract.

    **b.**    Objections.  Objections, if any, to the proposed assumption and
assignment of the Assumed Contract or the cure amount proposed with
respect thereto, must: (i) be in writing; (ii) comply with the applicable
provisions of the Bankruptcy Rules, Local Bankruptcy Rules and Case
Management Order entered in these Chapter 11 Cases; (iii) state with

specificity the nature of the objection and, if the objection pertains to the proposed cure amount, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served upon, so as to be <u>actually received</u> by, the Notice Parties before the Sale Objection Deadline.

    **c.**    <u>Dispute Resolution</u>.  Any objection to the assumption and assignment of a contract or cure amount proposed in connection with the Proposed Transaction that remains unresolved as of the Sale Hearing, shall be heard at the Sale Hearing (or at a later date as fixed by the Court).

14.    Any party failing to timely file an objection to the cure amount listed on the Assumption and Assignment Notice (a) shall be forever barred from objecting thereto, including making any demands for additional cure amounts or monetary compensation on account of any alleged defaults against the Debtors, their estates, the Stalking Horse Bidder, or other successful bidder arising from the Auction, if any, with respect to any such Assumed Contract, and (b) shall be deemed to consent to the Proposed Transaction.

15.    The Debtors are authorized to execute and deliver all instruments and documents, and take such other action as may be necessary or appropriate to implement and effectuate the transactions contemplated by this order.

16.    This Order shall be effective and enforceable immediately upon entry.

17.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: February [*], 2015
    White Plains, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1 TO BIDDING PROCEDURES ORDER**

**Bidding Procedures**

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| dELiA*s, INC., *et al.*, | Case No.  14-23678 (RDD) |
| Debtors.[1] | Jointly Administered |

## BIDDING PROCEDURES

These bidding procedures (the "Bidding Procedures") have been approved by an order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered on February [*], 2015 [Docket No. *] (the "Bidding Procedures Order") in the above-captioned jointly administered Chapter 11 cases of dELiA*s, Inc. and its debtor affiliates (collectively, the "Debtors" or "Merchant").

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct the auction (the "Auction") for the sale the ("Sale") of certain assets (the "Acquired Assets") on the terms substantially set forth in the Letter Agreement, dated as of January 28, 2015, by and among the Debtors, the Agents[2] and the Stalking Horse Bidder,[3] a copy of which is attached hereto as Exhibit A (the "Stalking Horse Agreement").  The Acquired Assets consist of:

(a)    All of the Merchant's membership interests in dELiA*s Brand LLC;

(b)    All of the Merchant's rights, title, and interests in and to the Acquired IP (as defined in the Stalking Horse Agreement)

(c)    All of the Merchant's rights, title and interests in Other Assets (as defined in the Stalking Horse Agreement) of Merchant as set forth on the list attached to the Stalking Horse Agreement as Schedule 2.1(c).

The Sale of the Acquired Assets will be implemented pursuant to the terms and conditions of the Stalking Horse Agreement, as the same may be amended pursuant to the terms hereof, subject to the receipt of higher and otherwise better bids in accordance with these Bidding Procedures.  Please take notice that all capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Stalking Horse Agreement.

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  dELiA*s, Inc. (7172); dELiA*s Distribution Company (9076); A Merchandise, LLC (7639); dELiA*s Operating Company (3765); dELiA*s Retail Company (0036); dELiA*s Group Inc. (4035); AMG Direct, LLC (9236); dELiA*s Assets Corp. (3754); DACCS, Inc. (0225).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  50 West 23rd Street, New York, NY 10010.

[2] On December 4, 2014, the Debtors entered into an agency agreement (and as later amended, the "Agency Agreement") with Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (collectively, the "Agents") to, among other things, liquidate all merchandise and inventory owned by the Debtors and dispose of certain furnishings, trade fixtures, and equipment located at the Debtors' stores and, at the Debtors' option, the Debtors' distribution center.

[3] Butterfly Retail Acquisition LLC.

> Copies of the Bidding Procedures Order, the Stalking Horse Agreement and other documents related thereto are available free of charge on the website of the Debtors' noticing and claims agent, Prime Clerk LLC, at http://cases.primeclerk.com/delias, or upon request by contacting Prime Clerk, by telephone at (855) 842-4126, or by e-mail at deliasinfo@primeclerk.com.

**A.      Approval of Stalking Horse Bid Protections.**

The Bidding Procedures Order approved, among other things, the approval of (i) a fee equal to 3% of the cash portion of the Payment Amount (the "Break Up Fee"); and (ii) reimbursement of expenses for up to $50,00 in documented, out of pocket expenses (the "Expense Reimbursement", and together with the Break Up Fee, the "Bid Protections") which is payable to the Stalking Horse Bidder in the event the Bankruptcy Court approves the Sale of the Acquired Assets to any other person or entity other than the Stalking Horse Bidder.

**B.      Participation Requirements.**

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person (other than the Stalking Horse Bidder) interested in submitting a Bid must, on or before February 19, 2015 at 12:00 p.m. (Eastern Time) (the "Bid Deadline") deliver (unless previously delivered) the following documents along with an offer for the Acquired Assets in accordance with Section D below (the "Bid Documents"):

a.    an executed confidentiality agreement on terms reasonably acceptable to the Debtors and containing terms in the aggregate no less favorable to the Debtors in any material respect (other than with respect to the effective periods and the non-disclosure and non-solicitation provisions contained therein, all of which terms shall be commercially reasonable) than those contained in the confidentiality agreement by and among the Stalking Horse Bidder (or its affiliate), the Debtors and certain of their respective affiliates (the "Confidentiality Agreement"); and

b.    preliminary proof by the Potential Bidder of its financial capacity to close a proposed transaction, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which the Debtors and its advisors will determine in consultation with (i) the official committee of unsecured creditors in the Chapter 11 Cases (the "Committee"); and (ii) Salus Capital Partners, LLC, lender and administrative agent under the Debtors' postpetition credit facility (the "DIP Agent", and together with the Committee, the "Consultation Parties").

The Bid Documents shall be delivered to the following parties (collectively, the "Notice Parties"):

| Debtors | Counsel to the Debtors |
|---|---|
| dELiA*s, Inc. | DLA Piper LLP (US) |
| 50 West 23rd Street | 1251 Avenue of the Americas, 25th Floor |
| New York, New York 10010 | New, York, New York 10020 |
| Attn: Ryan A. Schreiber, Esq. | Attn: Gregg Galardi, Esq. |
| | Dienna Corrado, Esq. |

| Counsel to the DIP Agent | Proposed Counsel to the Committee |
|---|---|
| Choate, Hall & Stewart LLP | Kelley Drye & Warren LLP |
| Two International Place | 101 Park Avenue |
| Boston, MA 02110 | New York, NY 10178 |
| Attn: John F. Ventola, Esq. | Attn: Robert L. LeHane, Esq. |
| Seth Mennillo, Esq. | Gilbert R. Saydah, Jr., Esq. |
| Agents Under the Agency Agreement | |
| Gordon Brothers Retail Partners, LLC | Hilco Merchant Resources, LLC |
| Prudential Tower | 5 Revere Drive, Suite 206 |
| 800 Boylston Street | Northbrook, IL 60062 |
| Boston, MA 02119 | Attn: Ian S. Fredericks |
| Attn: Michael Chartock | |

Within two (2) days after a Potential Bidder delivers the Bid Documents, the Debtors shall determine, in consultation with its advisors and the Consultation Parties, and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Bid Documents so that the Potential Bidder may conduct a due diligence review with respect to the Acquired Assets. Only those Potential Bidders that have submitted acceptable Preliminary Bid Documents (each, an "Acceptable Bidder") may submit bids. The Stalking Horse Bidder shall at all times be deemed an Acceptable Bidder.

**C.    Access to Due Diligence.**

Only Acceptable Bidders shall be eligible to receive due diligence and access to additional non-public information. The Debtors shall provide to each Acceptable Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request, which information shall be commensurate with that information given to the Stalking Horse Bidder. To the extent the Debtors provide any information to any Acceptable Bidder that they had not previously provided to the Stalking Horse Bidder, the Debtors shall promptly provide such information to the Stalking Horse Bidder. The due diligence period will end on the Bid Deadline (as defined herein) and the Debtors shall have no obligation to furnish any due diligence information after the Bid Deadline.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not, except with respect to the Acquired Assets, furnish any other confidential information relating to the Debtors, the Debtors' assets or liabilities, or the Sale to any person except an Acceptable Bidder or such Acceptable Bidder's duly-authorized representatives to the extent provided in the applicable Confidentiality Agreement.

The Debtors along with their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided, however,* the Debtors may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment and following consultation with the Consultation Parties, have not established that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate their Bid. No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

Each Acceptable Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Debtors' assets and liabilities that are the subject of the Auction prior to making any such bids; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise regarding the Debtors' assets or liabilities, or the completeness of any information provided in connection therewith, except as expressly

stated in these Bidding Procedures or the Stalking Horse Agreement. Neither the Debtors nor any of their employees, officers, directors, affiliates, subsidiaries, representatives, agents, advisors or professionals are responsible for, and shall bear no liability with respect to, any information obtained by Acceptable Bidders in connection with the Sale.

> The Debtors have designated [*] to coordinate all reasonable requests for additional information and due diligence access.

**D.      Bid Requirements.**

To be eligible to participate in the Auction, an Acceptable Bidder (other than the Stalking Horse Bidder) must deliver to (i) the Debtors, (ii) its advisors and (iii) counsel to the Agent, which shall be shared with the other Notice Parties within one (1) business day following receipt thereof, a written, irrevocable offer that must be determined by the Debtors, in consultation with the Consultation Parties, to satisfy each of the following conditions:

a.  **Bid Deposit.**  Each Bid (other than the Stalking Horse Bid) must be accompanied by a 10% cash deposit of the proposed purchase price (the "Good Faith Deposit"), which shall be sent to counsel to the Debtors by wire transfer, which amount shall be deposited in an interest-bearing account;

b.  **Minimum Bid Amount.**  The value of each Bid must exceed the aggregate sum of the following: (i) the Stalking Horse Bid; (ii) the Bid Protections; and (iii) the minimum bid increment in an amount to be determined by the Debtors, in consultation with the Consultation Parties (all of which must be in the form of cash, and/or the assumption of administrative expense liabilities except to the extent of any secured debt that is being credit bid);

c.  **Good Faith Offer.**  Each Bid must constitute a good faith, bona fide offer to purchase the Acquired Assets, subject to the Permitted Encumbrances;

d.  **Same or Better Terms/Identification of Assumed Contracts**.  Each Bid must be accompanied by clean and duly executed transaction documents (including schedules and exhibits thereto that identify with particularity which of the Debtors' contracts the Acceptable Bidder seeks to have assigned, along with a copy of the Stalking Horse Agreement that is marked to reflect the amendments and modifications from such agreement, which modifications may not be materially more burdensome to the Debtors than the Stalking Horse Agreement or inconsistent with these Bidding Procedures;

e.  **No Contingencies.**  A Bid must not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval, (iii) the outcome or completion of a due diligence review by the Acceptable Bidder; (iv) the Acquired Assets free and clear of the Permitted Encumbrances; and/or (v) any third party consents;

f.  **Irrevocable.**  Each Bid must remain irrevocable until 48 hours after the Sale Hearing (as defined below);

g.  **Joint Bids.**  The Debtors will be authorized to approve joint Bids in the Debtors' exercise of their reasonable good faith business judgment, following consultation with the Consultation Parties, on a case-by-case basis;

h.   **Adequate Assurance Information.**  Each Bid must be accompanied by sufficient and adequate financial and other information (the "<u>Adequate Assurance Information</u>") to demonstrate, to the satisfaction of the Debtors, following consultation with the Consultation Parties, that such Acceptable Bidder (i) has the financial wherewithal and ability to consummate in the Sale of the Acquired Assets and the assumption of the Debtors' liabilities as set forth the Stalking Horse Agreement, including payment of any cure amount with respect to any contract that may be assigned with respect to the Sale. The Bid shall also identify a contact person that counterparties to any lease or contract may contact to obtain additional Adequate Assurance Information;

i.   **No Fees.**  The Bids must not be subject to any break up fee, transaction fee, termination fee, expense reimbursement or any similar type of payment or reimbursement.

**E.    Qualified Bids.**

Bids, or a combination of one or more Bids, fulfilling all of the preceding requirements shall be deemed to be "<u>Qualified Bids</u>," and those parties submitting Qualified Bids shall be deemed to be "<u>Qualified Bidders</u>."

Within two (2) days after the Bid Deadline, the Debtors, in consultation with the Consultation Parties shall determine which Acceptable Bidders are Qualified Bidders after consultation with their advisors and will notify the Acceptable Bidders whether Bids submitted constitute, alone or together with other Bids, Qualified Bids so as to enable such Qualified Bidders to bid at the Auction (as defined below). Any Bid that is not deemed a "Qualified Bid" shall not be considered by the Debtors.

The Stalking Horse Bidder shall be deemed to be a Qualified Bidder.  The Stalking Horse APA submitted by the Stalking Horse Bidder shall be deemed a Qualified Bid, qualifying the Stalking Horse Bidder to participate in the Auction.

**F.    Bid Deadline.**

Qualified Bids must be received by each of the Debtors, the Stalking Horse Bidder, the Agent, their respective advisors and the advisors to the Committee and the DIP Agent,  in each case so as to be actually **received no later than the Bid Deadline of February 19, 2015 at 12:00 p.m. (prevailing Eastern Time).**

**G.    Evaluation of Qualified Bids.**

Prior to the Auction, the Debtors shall evaluate Qualified Bids and, in consultation with their advisors and the Consultation Parties, identify the Qualified Bid that is, in the Debtors' judgment, the highest or otherwise best bid (the "<u>Starting Bid</u>").  Within 24 hours of such determination, but in no event later than one (1) Business Day prior to the date of the Auction, the Debtors' shall notify the Stalking Horse Bidder and the other Qualified Bidders as to which Qualified Bid is the Starting Bid.  The Debtors shall distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

**H.    No Qualified Bids.**

If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur, the Stalking Horse Agreement will be deemed the Successful Bid (as defined herein) and the Debtors and the

Agent will pursue entry of an order by the Bankruptcy Court approving the Stalking Horse Agreement and authorizing the Sale of the Acquired Assets to the Stalking Horse Bidder at the Sale Hearing.

**I.    Auction.**

If one or more Qualified Bids is received by the Bid Deadline, then the Debtors shall conduct the Auction with respect to the Acquired Assets.  The Auction shall commence on February 20, 2015 at 10:00 a.m. (Eastern Time) at the offices of DLA Piper LLP (US), 1251 Avenue of the Americas, 25th Floor, New York, New York 10020, or such later time (after consultation with the Consultation Parties) or other place as the Debtors shall timely notify the Stalking Horse Bidder and all other Qualified Bidders.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures")

a.    the Auction will be conducted openly;

b.    only the Qualified Bidders, including the Stalking Horse Bidder, shall be entitled to bid at the Auction;

c.    the Qualified Bidders, including the Stalking Horse Bidder, shall appear in person or through duly-authorized representatives at the Auction;

d.    only such authorized representatives of each of the Qualified Bidders, the Stalking Horse Bidder, Agents, the Committee, the DIP Agent, the Debtors, and their respective advisors, shall be permitted to attend the Auction;

e.    bidding at the Auction shall begin at the Starting Bid; subsequent Bids at the Auction, including any Bids by Stalking Horse Bidder, shall be made in minimum increments in an amount to be determined by the Debtors, in consultation with the Consultation Parties, to be announced at the Auction;

f.    each Qualified Bidder will be informed of the terms of the previous Bids;

g.    the bidding will be transcribed or videotaped to ensure an accurate recording of the bidding at the Auction;

h.    each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale; and

i.    absent irregularities in the conduct of the Auction, the Bankruptcy Court will not consider Bids made after the Auction is closed; and the Auction shall be governed by such other Auction Procedures as may be announced by the Debtors after consultation with its advisors and the Consultation Parties from time to time on the record at the Auction; provided, that, any such other Auction Procedures shall not be inconsistent with any order of the Bankruptcy Court or with the provisions of the Stalking Horse Agreement with respect to these Bidding Procedures.

**J.    Acceptance of the Successful Bid.**

Upon the conclusion of the Auction (if such Auction is conducted), the Debtors, in the exercise of their reasonable, good-faith business judgment, and in consultation with the Consultation Parties, shall identify the highest or otherwise best Qualified Bid that in the exercise of their fiduciary duties the

Debtors in good faith believe is materially more beneficial to the Debtors than the Stalking Horse Bid (the "Successful Bid"), which will be determined by considering, among other things:

a.   the number, type and nature of any changes to the Stalking Horse Agreement as appropriate;

b.   the total expected consideration to be received by the Debtors;

c.   the likelihood of the bidder's ability to close a transaction and the timing thereof; and

d.   the expected net benefit to the estate.

The Qualified Bidder having submitted a Successful Bid will be deemed the "Successful Bidder". The Successful Bidder, the Debtors and the Agents shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

The Debtors will present the results of the Auction to the Bankruptcy Court at the Sale Hearing (as defined below), at which certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that (a) the Auction was conducted, and the Successful Bidder was selected, in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, (c) the Successful Bid was a Qualified Bid as defined in these Bidding Procedures and (d) consummation of the Successful Bid will provide the highest or otherwise best value for the Debtors' assets and is in the best interests of the Debtors' estates.

If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when (1) such Qualified Bid is declared the Successful Bid at the Auction and (2) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid and entry of the Sale Order approving such Successful Bid.

**K.**     **Sale Hearing.**

A hearing to consider approval of the Qualified Bid submitted by the Successful Bidder (or to approve the Stalking Horse Agreement if no Auction is held) (the "Sale Hearing") is presently scheduled to take place on [February 23, 2015 at 10:00 a.m.] (prevailing Eastern Time), or as soon thereafter as counsel may be heard, before the Honorable Robert D. Drain, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, Courtroom 118, White Plains, New York 10601.

**The Sale Hearing may be adjourned to a later date by the Debtors, in consultation with the Consultation Parties, by the filing a notice of adjournment or making an announcement at the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.**

**L.**     **Designation of Back-Up Bidder.**

If for any reason the Successful Bidder fails to consummate the Qualified Bid within the time permitted after the entry of the Sale Order approving the Sale to the Successful Bidder, then the Qualified Bidder with the second highest or otherwise best Bid (the "Back-Up Bidder"), as determined by the Debtors after consultation with their advisors, and in consultation with the Consultation Parties, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein, will automatically be deemed to have submitted the highest or otherwise best Bid (the "Back-Up Bid").

The Debtors will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid as soon as is commercially reasonable without further order of the Bankruptcy Court upon at least twenty-four (24) hours advance notice, which notice will be filed with the Bankruptcy Court; it being understood that nothing herein shall require the Stalking Horse Bidder to be a Back-Up Bidder or its Bid to be a Back-Up Bid.  Upon designation of the Back-Up Bidder at the Auction, the Back-Up Bid shall remain open until the closing of the Successful Bid.

**M.      Break-up Fee.**

In the event that neither the Successful Bid nor the Back-Up Bid is made by the Stalking Horse Bidder, the Debtors and the Agent shall be obligated to pay to the Stalking Horse Bidder from the proceeds of the purchase price for the Acquired Assets, upon the closing of the Successful Bid or the Back-Up Bid (as applicable) and the payment of such purchase price, by wire transfer in immediately available funds to an account designated by the Stalking Horse Bidder, the Break-up Fee and Expense Reimbursement and any other amounts returnable to the Stalking Horse Bidder, in each instance in accordance with the applicable provisions of the Stalking Horse Agreement.

**N.      Return of Good Faith Deposit.**

The Good Faith Deposit of the Successful Bidder shall, upon consummation of the Successful Bid, be credited to the purchase price paid for Debtors' assets and liabilities.  If the Successful Bidder fails to consummate the Successful Bid, then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, the Debtors.

The Good Faith Deposit of any unsuccessful Qualified Bidders will be returned within fifteen (15) days after consummation of the Sale of the Acquired Assets

**O.      Reservation of Rights.**

The Debtors reserve their rights to modify these Bidding Procedures, in consultation with the Consulting Parties, in any manner that will best promote the goals of the bidding process (subject to any restrictions set forth in the Stalking Horse Agreement) or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Acquired Assets.

Notwithstanding anything herein or in the Bidding Procedures Order to the contrary, nothing will in any way impair or enhance, alter or otherwise affect any and all rights that any secured lender may have to "credit bid" pursuant to section 363(k) of the Bankruptcy Code or other applicable law.

**EXHIBIT A TO BIDDING PROCEDURES**

**STALKING HORSE AGREEMENT**

EAST\89654015.6

## EXHIBIT 2 TO BIDDING PROCEDURES ORDER

**Form of Auction and Sale Notice**

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| dELiA*s, INC., *et al.*, | Case No.  14-23678 (RDD) |
| Debtors.[1] | Jointly Administered |

## NOTICE OF SALE BY AUCTION AND SALE HEARING

　　PLEASE TAKE NOTICE that, on January [*], 2015, dELiA*s, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned jointly administered cases (the "Chapter 11 Cases") filed a motion [Docket No. ____] (the "Sale Motion") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (a) authorizing and approving the bidding procedures with stalking horse bid protections in connection with the sale of the Acquired Assets, (b) approving the form and manner of notice of the Auction and Sale Hearing, (c) approving procedures for the assumption and assignment of Assumed Contracts and noticing of related cure amounts, and (d) scheduling an Auction and a Sale Hearing and setting other related dates and deadlines all as further described in the Sale Motion. On January [*], 2015, the Bankruptcy Court entered an order (the "Bidding Procedures Order")[2] approving certain bidding procedures attached thereto as Exhibit 1 (the "Bidding Procedures").

Copies of the Sale Motion, Bidding Procedures Order, and other documents related thereto are available free of charge on the website of the Debtors' noticing and claims agent, Prime Clerk LLC, at http://cases.primeclerk.com/delias, or upon request by contacting Prime Clerk, by telephone at (855) 842-4126, or by e-mail at deliasinfo@primeclerk.com.

　　PLEASE TAKE FURTHER NOTICE that the Debtors are soliciting offers for the purchase of the Acquired Assets (as defined in the Bidding Procedures). All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order. To the extent there are any inconsistencies between this notice and the Bidding Procedures, the latter shall govern in all respects.

　　PLEASE TAKE FURTHER NOTICE that, if the Debtors receive competing Qualified Bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction (the "Auction") of the Acquired Assets on [DATE] at the offices of counsel to the Debtors: DLA Piper LLP (US) 1251 Avenue of the Americas, 27th Floor, New, York, New York 10020.

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  dELiA*s, Inc. (7172); dELiA*s Distribution Company (9076); A Merchandise, LLC (7639); dELiA*s Operating Company (3765); dELiA*s Retail Company (0036); dELiA*s Group Inc. (4035); AMG Direct, LLC (9236); dELiA*s Assets Corp. (3754); DACCS, Inc. (0225).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  50 West 23rd Street, New York, NY 10010.
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the sale of the Acquired Assets at a hearing scheduled to commence on [February 23, 2015 at10:00 a.m. (prevailing Eastern Time)] (the "Sale Hearing") or as soon thereafter as counsel may be heard, before the Honorable Robert D. Drain, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, Courtroom 118, White Plains, New York 10601.

**PLEASE TAKE FURTHER NOTICE** that objections to the proposed sale of the Acquired Assets, if any, must: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules and the Order Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus Hearing Dates [Docket No. 107] entered in these Chapter 11 Cases; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) filed with the Court and served so the objection is actually received no later than the [DATE] (the "Sale Objection Deadline") by the following parties (the "Notice Parties"):

| Debtors | Counsel to the Debtors |
|---|---|
| dELiA*s, Inc.<br>50 West 23rd Street<br>New York, New York 10010<br>Attn: Ryan A. Schreiber, Esq. | DLA Piper LLP (US)<br>1251 Avenue of the Americas, 25th Floor<br>New, York, New York 10020<br>Attn: Gregg Galardi, Esq.<br>Dienna Corrado, Esq. |
| **United States Trustee** | **Proposed Counsel to the Committee** |
| Office of the United States Trustee for the<br>Southern District of New York<br>201 Varick Street, Suite 1006<br>New York, New York 10014<br>Attn: Richard C. Morrissey, Esq.<br>Serene Nakano, Esq. | Kelley Drye & Warren LLP<br>101 Park Avenue<br>New York, NY 10178<br>Attn: Robert L. LeHane, Esq.<br>Gilbert R. Saydah, Jr., Esq. |
| **Counsel to the DIP Agent** | **Counsel to the Stalking Horse Bidder** |
| Choate, Hall & Stewart LLP<br>Two International Place<br>Boston, MA 02110<br>Attn: John F. Ventola, Esq.<br>Seth Mennillo, Esq. | Greenberg Traurig, P.A.<br>401 E. Las Olas Boulevard, Suite 2000<br>Fort Lauderdale, FL 33301<br>Attn: Mathew Hoffman, Esq.<br>Telephone: (954) 768-8203<br>Facsimile: (954) 759-5532<br>Email: hoffmanma@gtlaw.com |
| **Agents Under the Agency Agreement** | |
| Gordon Brothers Retail Partners, LLC<br>Prudential Tower<br>800 Boylston Street<br>Boston, MA 02119<br>Attn: Michael Chartock | Hilco Merchant Resources, LLC<br>5 Revere Drive, Suite 206<br>Northbrook, IL 60062<br>Attn: Ian S. Fredericks |

**CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION**

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE OF THE ACQUIRED ASSETS ON OR BEFORE THE**

OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS TO THE SUCCESSFUL BIDDER AND ANY CURE AMOUNTS RELATED THERETO.

---

**NO SUCCESSOR OR TRANSFEREE LIABILITY**

The proposed Order approving the Sale of the Acquired Assets provides that the Successful Bidder will have no responsibility for, and the Acquired Assets will be sold free and clear of, any successor liability, including: (a) any debt, liability or other obligation of the Debtors of any kind or nature whatsoever of the Debtors or related to the Acquired Assets other than as expressly set forth in the Stalking Horse Agreement or (b) any claims against the Debtors or any of their predecessors or affiliates.

---

Dated:  New York, New York
       February [*], 2015

*/s/ DRAFT*
Gregg M. Galardi
Dienna Corrado
Arkady A. Goldinstein
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501

*Counsel for the Debtors and Debtors in Possession*

# EXHIBIT 3 TO BIDDING PROCEDURES ORDER

## Form of the Assumption and Assignment Notice

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>dELiA*s, INC., *et al.*,<br><br>                            Debtors.[1] | Chapter 11<br><br>Case No.  14-23678 (RDD)<br><br>Jointly Administered |

### NOTICE OF ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS

**PLEASE TAKE NOTICE** that, on January [*], 2015, dELiA*s, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned jointly administered cases (the "Chapter 11 Cases") filed a motion [Docket No. ___] (the "Sale Motion") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (a) authorizing and approving the bidding procedures with stalking horse bid protections in connection with the sale (the "Sale") of the Acquired Assets, (b) approving the form and manner of notice of the Auction and Sale Hearing, (c) approving procedures for the assumption and assignment of Assumed Contracts and noticing of related cure amounts, and (d) scheduling an Auction and a Sale Hearing and setting other related dates and deadlines all as further described in the Sale Motion.  On January [*], 2015, the Bankruptcy Court entered an order (the "Bidding Procedures Order")[2] approving certain bidding procedures attached thereto as Exhibit 1 (the "Bidding Procedures").

> **Copies of the Sale Motion, Bidding Procedures Order, and other documents related thereto are available free of charge on the website of the Debtors' noticing and claims agent, Prime Clerk LLC, at http://cases.primeclerk.com/delias, or upon request by contacting Prime Clerk, by telephone at (855) 842-4126, or by e-mail at deliasinfo@primeclerk.com.**

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of the Acquired Assets (as defined in the Bidding Procedures).  The Debtors have indicated on Schedule A attached hereto a list of the Debtors' executory contracts that the Debtors may be assumed and assigned to the Successful Bidder (each, a "Contract") along with the cure amounts that the Debtors believe must be paid to cure all prepetition defaults (in each instance, the "Cure Cost").

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the sale of the Acquired Assets at a hearing scheduled to commence on [February 23, 2015 at10:00 a.m. (prevailing Eastern Time)] (the "Sale Hearing") or as soon thereafter as counsel may be heard, before the Honorable Robert D. Drain, United States Bankruptcy Judge in the United States Bankruptcy Court

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  dELiA*s, Inc. (7172); dELiA*s Distribution Company (9076); A Merchandise, LLC (7639); dELiA*s Operating Company (3765); dELiA*s Retail Company (0036); dELiA*s Group Inc. (4035); AMG Direct, LLC (9236); dELiA*s Assets Corp. (3754); DACCS, Inc. (0225).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  50 West 23rd Street, New York, NY 10010.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

for the Southern District of New York, 300 Quarropas Street, Courtroom 118, White Plains, New York 10601.

**PLEASE TAKE FURTHER NOTICE** that if you agree with the Cure Costs listed on Schedule A, you need not take any further action.

**PLEASE TAKE FURTHER NOTICE** that any party seeking to object to the validity of the Cure Costs (a "Cure Objection") as determined by the Debtors or otherwise assert that any other amounts, defaults, conditions or pecuniary losses must be cured or satisfied under any of the Contracts in order to be assigned to the Successful Bidder must filed an objection, which must: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules and the Order Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus Hearing Dates [Docket No. 107] entered in these Chapter 11 Cases; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) filed with the Court and served so the objection is actually received no later than the [DATE] (the "Objection Deadline") by the following parties (the "Notice Parties"):

| Debtors | Counsel to the Debtors |
|---|---|
| dELiA*s, Inc.<br>50 West 23rd Street<br>New York, New York 10010<br>Attn: Ryan A. Schreiber, Esq. | DLA Piper LLP (US)<br>1251 Avenue of the Americas, 25th Floor<br>New, York, New York 10020<br>Attn: Gregg Galardi, Esq.<br>    Dienna Corrado, Esq. |
| **United States Trustee** | **Proposed Counsel to the Committee** |
| Office of the United States Trustee for the<br>Southern District of New York<br>201 Varick Street, Suite 1006<br>New York, New York 10014<br>Attn: Richard C. Morrissey, Esq.<br>    Serene Nakano, Esq. | Kelley Drye & Warren LLP<br>101 Park Avenue<br>New York, NY 10178<br>Attn: Robert L. LeHane, Esq.<br>    Gilbert R. Saydah, Jr., Esq. |
| **Counsel to the DIP Agent** | **Counsel to the Stalking Horse Bidder** |
| Choate, Hall & Stewart LLP<br>Two International Place<br>Boston, MA 02110<br>Attn: John F. Ventola, Esq.<br>    Seth Mennillo, Esq. | Greenberg Traurig, P.A.<br>401 E. Las Olas Boulevard, Suite 2000<br>Fort Lauderdale, FL 33301<br>Attn:  Mathew Hoffman, Esq.<br>Telephone: (954) 768-8203<br>Facsimile: (954) 759-5532<br>Email: hoffmanma@gtlaw.com |
| **Agents Under the Agency Agreement** | |
| Gordon Brothers Retail Partners, LLC<br>Prudential Tower<br>800 Boylston Street<br>Boston, MA 02119<br>Attn: Michael Chartock | Hilco Merchant Resources, LLC<br>5 Revere Drive, Suite 206<br>Northbrook, IL 60062<br>Attn: Ian S. Fredericks |

**CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION**

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE PROPOSED CURE COST SHALL BE (A) FOREVER BARRED FROM OBJECTING TO THE CURE COSTS AND FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT OT THE CONTRACTS, AND THE DEBTORS AND THE SUCCESSFUL BIDDER SHALL BE ENTITLED TO RELY SOLELY UPON THE CURE COSTS LISTED ON EXHIBIT A, AND (B) FOREVER BARRED AND ESTOPPED FROM ASSERTING OR CLAIMING AGAINST THE DEBTORS OR THE SUCCESSFUL BIDDER THAT ANY ADDITIONAL AMOUNTS ARE DUE OR OTHER DEFAULTS EXIST.**

**ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS TO THE SUCCESSFUL BIDDER AND ANY CURE AMOUNTS RELATED THERETO.**

**PLEASE TAKE FURTHER NOTICE** that the hearing with respect to the Cure Objections may be held (i) at the Sale Hearing, or (ii) on such other date as the Bankruptcy Court may designate. To the extent the Debtors and non-Debtor counterparty to a Contract are able to consensually resolve the Cure Objection prior to the Sale Hearing, the Debtors shall promptly provide notice to the Committee and the Successful Bidder of such resolution. To the extent the Debtors and non-Debtor counterparty to a Contract are unable to consensually resolve the Cure Objection prior to the Sale Hearing, then the amount to be paid with respect to the Cure Cost will be determined at the Sale Hearing or at such other date and time as may be fixed by the Bankruptcy Court.

Dated:  New York, New York
      February [*], 2015

*/s/ DRAFT* _____
Gregg M. Galardi
Dienna Corrado
Arkady A. Goldinstein
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501

*Counsel for the Debtors and Debtors in Possession*

## EXHIBIT A TO ASSUMPTION AND ASSIGNMENT NOTICE

### CONTRACTS

| Counterparty | Counterparty Address | Title/Description of Contract | \ Cure Cost |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

**EXHIBIT B**

**STALKING HORSE AGREEMENT**

January 28, 2015

<u>**VIA EMAIL ONLY**</u>
Brian Lattman, President
Butterfly Retail Acquisition LLC
50 West 23rd Street – 10th Floor
New York, NY 10010
Office: 212-590-6351
Cell:  917-797-0353
E-mail:  blattman@alloymerch.com

      **Re:**    **Letter Agreement For Acquired Assets**

Dear Brian:

      This letter (the "<u>Letter Agreement</u>") sets forth the binding agreement of Butterfly Retail Acquisition LLC, an affiliate of HRSH Acquisitions, LLC d/b/a Alloy Apparel & Accessories, LLC (the "<u>Purchaser</u>"), dELiA*s, Inc. and its debtor affiliates (collectively, the "<u>Debtors</u>" or "<u>Merchant</u>"), and a joint venture comprising of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "<u>Agent</u>") with respect to the Acquired Assets (as defined herein).

## SECTION 1 - AGENT'S DESIGNATION RIGHTS.

      1.1    All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in <u>Exhibit A</u> attached hereto.

      1.2    Reference is made to that certain Amended & Restated Agency Agreement, dated December 22, 2014 (the "<u>Agency Agreement</u>") between Merchant and the Agent, which was approved in <u>In re dELiA*s, Inc., et al.</u>, Case No. 14-23678(RDD) (Bankr. S.D.N.Y.) (the "<u>Chapter 11 Cases</u>") pursuant to the *Final Order (A)(I) Approving the Debtors' Assumption of Agency Agreement, (II) Authorizing the Debtors to Sell Certain Assets Through Store Closing Sales, (III) Authorizing the Debtors to Abandon Unsold Property, (IV) Waiving Compliance With Contractual Store Closing Sale Restrictions and Exempting the Debtors From Laws Restricting Store Closing Sales, and (V) Granting Related Relief* [Docket No. 98] entered on December 24, 2014 (the "<u>Agency Order</u>").

      1.3    In accordance with Section 7.4 of the Agency Agreement, the Agent hereby agrees to exercise its designation rights and designate Purchaser as the purchaser, acquirer, assignee, transferee, licensee, and/or designee, as applicable, of the Acquired Assets.  Subject to the sale process set forth in this Letter Agreement, including as set forth in sections 11 and 12 of this Letter Agreement, this Letter Agreement shall constitute a Sale Notice (as defined in the Agency Agreement) to Merchant in accordance with Section 7.4 of the Agency Agreement and, within two (2) days following the execution of this Letter Agreement, the Agent shall provide a Sale Notice to the Committee as required by Section 7.4 of the Letter Agreement.

**SECTION 2 – ACQUIRED ASSETS.**

2.1     <u>Acquired Assets</u>.  Upon the terms and subject to the conditions set forth in this Letter Agreement, the Agent agrees to direct the Merchant to transfer, sell, convey, assign and deliver to Purchaser, or its designee, and, at the Closing (as defined herein), the Merchant shall transfer, sell, convey, assign and deliver to Purchaser, or its designee, the Acquired Assets, free and clear of all liens, claims and encumbrances (collectively, the "<u>Encumbrances</u>"), subject to the Permitted Encumbrances (as defined herein).  "<u>Acquired Assets</u>" shall mean the following:

(a)     All of the Merchant's membership interests (the "<u>Membership Interests</u>") in dELiA*s Brand LLC ("<u>D Brand</u>") pursuant to an assignment agreement substantially in the form attached hereto as <u>Exhibit B</u>; and

(b)     All of the Merchant's rights, title, and interests in and to the Intellectual Property (but, with respect to any of the Merchant's Intellectual Property that is the subject of an executory contract, only to the extent such executory contract is an Assumed Contract, as defined in Section 3.1(b) of this Letter Agreement), including, without limitation, the Intellectual Property identified on the list attached hereto as Schedule 2.1(b) (the "<u>Acquired IP</u>") pursuant to:

(i)     with respect to any Assumed Contract, an assignment agreement substantially in the form attached hereto as <u>Exhibit C</u>;

(ii)    with respect to Acquired IP (other than the Assumed Contracts) and all of the Merchant's rights, title and interests in other assets of Merchant set forth on the list attached hereto as Schedule 2.1(c) hereto (the "<u>Other Assets</u>"), a bill of sale substantially in the form attached hereto as <u>Exhibit D</u>.

2.2     Without the prior written consent of the Purchaser, Agent shall not amend or otherwise modify the definition of "Intellectual Property" or "Customer Lists" contained in the Agency Agreement, or otherwise amend, modify or waive any other provision contained in the Agency Agreement in a manner materially adverse to the interests of the Purchaser hereunder or thereunder.

2.3     The form of the agreements attached hereto as <u>Exhibits B</u>, <u>C</u>, and <u>D</u> have been agreed to by the Merchant, Agent and Purchaser as the definitive documents (the "<u>Definitive Documents</u>") with respect to the transactions contemplated by this Letter Agreement in respect of the Acquired Assets and each shall be executed at the Closing in the form attached hereto.

For purposes of this Letter Agreement, "Permitted Encumbrances" shall mean any claim, lien or encumbrance on the Acquired Assets (i) in favor of JLP Daisy, LLC to the extent set forth in that certain Master License Agreement, dated as of February 24, 2003 (the "<u>Master License Agreement</u>"), between D Brand and JLP Daisy LLC ("<u>JLP</u>"), (ii) to the extent set forth in that certain Limited Liability Company Agreement of D Brand, dated as of February 24, 2003; and (iii) created under any of the Assumed Contracts pursuant to the express terms of such Assumed

Contracts or existing under any of the Assumed Contracts solely as a result of the failure of the Debtors to pay the amounts due and owing thereunder.

**SECTION 3 – CONSIDERATION.**

3.1     <u>Consideration; Payment Amount</u>.  On the Funding Date (as defined herein), the Purchaser shall pay Agent the "<u>Payment Amount</u>" which shall mean the sum of:

(a)     $2,500,000 in cash; and

(b)     to the extent Purchaser requests that the Merchant assume and assign to Purchaser one or more contracts, which request may be made in Purchaser's sole discretion on or prior to the Funding Date (each such contract, an "<u>Assumed Contract</u>" and, collectively, the "<u>Assumed Contracts</u>"), any and all Cure Amounts associated with such Assumed Contracts.

3.2     <u>Timing of Payment</u>.  The Payment Amount shall be paid by the Purchaser to the Agent on the "<u>Funding Date</u>" which shall mean the later of

(a)     three (3) business days after entry of an order entered by the Bankruptcy Court (the "<u>Approval Order</u>") approving the sale, acquisition, assignment, transfer, license, and/or designation of the Acquired Assets to the Purchaser free and clear of all Encumbrances (other than Permitted Encumbrances) and waiving any stay under Federal Rules of Bankruptcy Procedure 6004(h), 6006(d), or otherwise, or fifteen (15) days if such order does not contain a provision waiving any applicable stay;

(b)     satisfaction of the conditions precedent to the Purchaser's obligation to purchase the Acquired Assets as set forth in this Letter Agreement (the "<u>Conditions</u>"); and

(c)     such other date as the Agent and Purchaser may agree in writing.

3.3     Agent shall retain all rights to all Asset Proceeds, as well as (i) the Merchandise, the Proceeds, the Owned FF&E (to the extent not set forth on Schedule 2.1(c) to this Letter Agreement), and all proceeds of the foregoing, (ii) commissions in respect of the sale of Merchant Consignment Goods and Owned DC FF&E, and (iii) all other amounts to be paid to Agent pursuant to the Agency Agreement, and the Purchaser shall have no interest in or rights to any such assets, amounts, or proceeds thereof.

3.4     The Purchaser is not assuming, nor shall it in any manner become liable for, any debts, liabilities, obligations or expenses of any kind or nature whatsoever of the Debtors or the Agent, whether existing on the date hereof or on the date of entry of the Approval Order; <u>provided</u>, <u>however</u>, if the Closing occurs, the Purchaser shall be responsible for the payment of the Cure Amounts associated with the Assumed Contracts and all debts, liabilities, obligations or expenses arising under the Assumed Contracts.

**SECTION 4 – CONDITIONS.**

4.1    The Purchaser's obligation to purchase the Acquired Assets and pay the Payment Amount to the Agent on the Funding Date is subject to the following Conditions:

(a)    approval by the Bankruptcy Court of the bidding procedures for the Acquired Assets, in the form attached hereto as <u>Exhibit E</u> or in such other form as is reasonably acceptable to the Purchaser and Merchant, in consultation with the Committee and Lender (the "<u>Bidding Procedures</u>"). Notwithstanding the foregoing or anything contained herein to the contrary, if the Bidding Procedures (i) provide for the right to bid on assets (whether owned by the Merchant, D Brand or any other third party) in addition to, or otherwise modify the description or scope of, the Acquired Assets or (ii) provide for any sharing of the proceeds of the sale of any assets included within the Bidding Procedures with any third party (other than any sharing arrangement by or among the Agent, the Merchant and/or the official committee of unsecured creditors in the Chapter 11 Cases), then (y) the Purchaser shall have no obligation to consummate the Closing and (z) the sale of any assets included within the modified Bidding Procedures shall be deemed to constitute an Alternative Transaction (as defined in Section 12)  if a bid (other than the Purchaser's bid) is received in connection with such modified Bidding Procedures and such bid is "qualified" and, as a result, the Purchaser shall be entitled to receive the Break Up Fee and Expense Reimbursement (as each such term is defined in Section 12) if the Closing does not occur; and

(b)    approval by the Bankruptcy Court of the Purchaser's acquisition of the Acquired Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), including any contract designated by the Purchaser as an Assumed Contract, which Assumed Contracts shall include:

(i)    that certain Trademark License Agreement, dated as of February 24, 2003, between D Brand and dELiA*s Corp. (the "<u>Trademark License Agreement</u>"); and

(ii)    that certain Amended and Restated Media Services Agreement (the "<u>Media Services Agreement</u>") by and between Merchant and Defy Media, LLC (f/k/a Alloy, Inc.).

**SECTION 5– TRANSITION SERVICES AGREEMENT.**

5.1    The Agent shall use commercially reasonable good faith efforts to assist the Purchaser with negotiations with Merchant, in consultation with the Committee and Lender, in respect of a transition services agreement (the "<u>Transition Services Agreement</u>"), on terms and conditions reasonably acceptable to the Purchaser, that provides for the Purchaser's use of the Distribution Centers in connection with the Direct Business Platform for a period of no less than 30 days after the date of the Closing.  The Purchaser hereby acknowledges that the Agent has

provided the Merchant with notice that the Agent is vacating and will cease using the Distribution Centers on January 29, 2015.

5.2     The Purchaser shall have no obligation to enter into the Transition Services Agreement.

## SECTION 6– APPROVAL ORDER AND CLOSING DATE.

6.1     The Approval Order or any subsequent order shall be in a form and substance reasonably satisfactory to the Purchaser, Agent, and Merchant, in consultation with the Committee and Lender.

6.2     The Purchaser agrees to accept and comply with the recommendations from the Consumer Privacy Ombudsman appointed in the Chapter 11 Cases in respect of the personally identifiable information in the Customer List.

6.3     Agent and Merchant shall use commercially reasonable good faith efforts to

(a)     obtain entry of the Approval Order or other order of the Bankruptcy Court, acceptable to Agent, Merchant, and the Purchaser in each such party's reasonable discretion, approving the sale, acquisition, transfer, license, and/or designation of the Acquired Assets to the Purchaser, and waiving any stay under Federal Rules of Bankruptcy Procedure 6004(h), 6006(d), or otherwise, and

(b)     assist the Purchaser with closing the transactions contemplated by this Letter Agreement in respect of the Acquired Assets (the "Closing"). Agent and Merchant each hereby covenants that, from time to time after the Closing, at the Purchaser's reasonable request and without further consideration, Agent and Merchant will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all such further acts, conveyances, transfers, assignments, powers of attorney and assurances as reasonably may be required more effectively to convey, transfer to and vest in the Purchaser, and to put the Purchaser in possession of, any of the Acquired Assets; provided, however, that Purchaser shall be responsible for preparing all documents and other instruments at Purchaser's sole cost and expense.

6.4     The Closing shall occur on the Funding Date (the "Closing Date"), which shall occur no later than March 15, 2015 (the "Outside Closing Date"). If the Funding Date does not occur by the Outside Closing Date due to the failure of the Agent to satisfy certain of the Conditions, then the Purchaser may elect, in its discretion, either to (i) terminate its obligations under this Letter Agreement or (ii) extend the Outside Closing Date until the satisfaction of the Conditions (or the waiver of such Conditions by the Purchaser).

6.5     Prior to the consummation of the sale of the Acquired Assets pursuant to the Bidding Procedures, Merchant, in its capacity as a member of the Board of Managers of D Brand

and as the sole owner of the Membership Interests, shall not cause D Brand to transfer or assign any of its assets.

## SECTION 7 – STORE CLOSING SALE.

7.1     If the Closing occurs, the Purchaser hereby agrees that Agent shall be authorized to conduct, until the Sale Termination Date, the Sale at the Stores, the Distribution Centers, and corporate offices and, until the Closing Date, through the Direct Business Platform as a "sale on everything", "everything must go", "store closing," or "going out of business".

7.2     Effective on the Closing Date, the Agent shall discontinue the sale of goods through the Direct Business Platform; provided, however, until the Sale Termination Date, Purchaser hereby irrevocably grants Agent the right and otherwise authorizes Agent to reasonably promote the Sale at the Stores using one or more reasonably sized banners located at the top of the landing page(s) for the Direct Business Platform (including (without limitation) websites and social media sites such as Facebook and Twitter) and utilize the functionality of the Store locator feature, all of which shall be updated by the Purchaser at the Agent's expense, based on Agent's reasonable requests and otherwise operated and maintained by the Purchaser.

## SECTION 8 – INTELLECTUAL PROPERTY LICENSE.

8.1     The Purchaser hereby grants to Agent, effective as of the Closing Date and ending on the Sale Termination Date (or, in the case of Remaining Merchandise and MOOS Inventory, once sold), an irrevocable, non-transferable, royalty free license and right to use all Acquired IP and Customer Lists that constitute Acquired Assets in connection with the Sale, subject to reasonable restrictions requested by the Purchaser in order for the Purchaser to comply with its privacy policy (as well as Merchant's privacy policy) and applicable laws governing the use and dissemination of confidential consumer personal data (including those applicable to the Purchaser pursuant to Section 6.2 of this Letter Agreement).  Without limiting the generality of the foregoing, Agent shall be authorized to use the Intellectual Property and Customer Lists included as Acquired Assets to sell or otherwise dispose of the Merchandise (including (without limitation) the Remaining Merchandise), the MOOS Inventory, Owned FF&E (to the extent not set forth on Schedule 2.1(c) to this Letter Agreement), Excluded Goods, and Owned DC FF&E and otherwise advertise and promote the Sale, including (without limitation) the use of the trade names, logos, e-mail lists, customer lists, and e-commerce sites (including (without limitation) websites and social media sites such as Facebook and Twitter), all in accordance with the license to use such Acquired Assets granted to the Agent by the Merchant under the Agency Agreement subject to such reasonable quality control requirements mutually acceptable to the Purchaser and Agent.

8.2     With respect to Remaining Merchandise and MOOS Inventory, the Purchaser hereby grants the Agent the right to sell such Remaining Merchandise and MOOS Inventory on a wholesale basis with all logos, tags, and other intellectual property intact and grant purchasers thereof the right to sell such Remaining Merchandise and MOOS Inventory with such logos, tags, and other intellectual property intact and advertise the sale of such Remaining Merchandise and MOOS Inventory as "Authentic dELiA*s Branded Goods".

8.3     All goodwill associated with use of the Acquired Assets shall inure to the benefit of the Purchaser.

8.4     For the avoidance of doubt, "Intellectual Property" shall exclude software licenses relating solely to the operation of the Debtors' Stores.

8.5     To the extent the Transition Services Agreement, or any similar type of agreement, transfers to the Purchaser any software that the Debtors still require in order to conduct the wind down of their operations, the Purchaser agrees that it will license such software back to the Debtors at no charge until the closing of the Chapter 11 Cases or as otherwise agreed to in writing by the Purchaser and the Debtors.

**SECTION 9 – ACKNOWLEDGEMENT AS TO CONDITION.**

**9.1     EXCEPT AS EXPRESSLY SET FORTH BELOW IN THIS SECTION 9.1, THE PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT NEITHER MERCHANT NOR AGENT MAKES ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ACQUIRED ASSETS OR ANY MATTER RELATING TO THE ACQUIRED ASSETS.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, AGENT, ON BEHALF OF ITSELF AND MERCHANT, HEREBY DISCLAIMS ANY WARRANTY (EXPRESS OR IMPLIED) OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY ACQUIRED ASSET.  MERCHANT AND AGENT, TO THE BEST OF AGENT'S KNOWLEDGE, REPRESENT AND WARRANT THAT dELiA*s ASSETS CORP. OWNS ALL OF THE OUTSTANDING MEMBERSHIP INTERESTS IN D BRAND AND THERE ARE NO OTHER RIGHTS, OPTIONS OR WARRANTS TO PURCHASE MEMBERSHIP INTERESTS IN D BRAND.**

**9.2     THE PURCHASER FURTHER ACKNOWLEDGES THAT THE PURCHASER,**

**(a)     HAS CONDUCTED INDEPENDENT DUE DILIGENCE IN RESPECT OF THE ACQUIRED ASSETS AS THE PURCHASER DEEMED NECESSARY OR APPROPRIATE,**

**(b)     HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL AND OTHER CONDITIONS OF ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS THE PURCHASER DEEMED NECESSARY OR APPROPRIATE, AND**

**(c)     THAT IN PROCEEDING WITH THE PURCHASER'S ACQUISITION OF THE ASSETS, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT DUE DILIGENCE AND INDEPENDENT INSPECTIONS AND INVESTIGATIONS.**

**9.3     ACCORDINGLY, EXCEPT FOR THE LIMITED REPRESENTATION SET FORTH IN SECTION 9.1 ABOVE, PURCHASER IS, AND AT CLOSING SHALL**

**BE DEEMED TO BE, PURCHASING THE ASSETS ON AN "AS IS" AND "WHERE IS" BASIS.**

**SECTION 10 – CONFIDENTIALITY.**

10.1    Except with regard to the existence of this Letter Agreement and the identity of the parties hereto, each of Agent, the Purchaser and the Merchant, on behalf of themselves and their respective officers, directors, employees, agents, representatives, subsidiaries, and affiliates (collectively, the "Representatives"), acknowledges and understands that the terms and conditions of this Letter Agreement and its exhibits and schedules are confidential and proprietary in nature, and each of the Agent, the Purchaser and the Merchant, on behalf of itself and its respective Representatives, therefore covenants and agrees to maintain strict confidentiality with respect to such terms, and that neither Agent, the Purchaser, the Merchant nor their respective Representatives will use such information for any purpose or disclose such information to any person other than their respective Representatives, the official committee of unsecured creditors in the Chapter 11 Cases, and the Debtors' lender under their postpetition financing credit facility, without the express consent of the other party until such time as a motion is filed with the Bankruptcy Court to approve the Bidding Procedures  and sale of the Acquired Assets at which time the Agent and Merchant may disclose the terms and conditions of this Letter Agreement.

10.2    Nothing in this Section 10 shall prohibit the disclosure or use of any information (i) to the official committee of unsecured creditors in the Chapter 11 Cases, any lender to Agent or the Purchaser or to any investor in the Purchaser, (ii) to the extent required by law or regulation, or (iii) to enforce or defend any party's rights in connection with any dispute under this Letter Agreement.

**SECTION 11 – EXCLUSIVITY.**

11.1    In consideration of the sharing of confidential information and the agreements contained herein, from the date hereof through the date on which the Bankruptcy Court enters an order approving Bidding Procedures for the Acquired Assets (the "Bidding Procedures Order"),

      (a)    absent the written consent of the Agent, Merchant, and Purchaser, on behalf of itself and its Representatives, Purchaser agrees that neither the Purchaser nor its Representatives will solicit, negotiate or enter into any agreement with any party (other than Agent, Merchant or their Representatives) with respect to the transactions contemplated by this Letter Agreement; and

      (b)    absent the written consent of the Agent, Merchant and Purchaser, on behalf of itself and its Representatives, Agent and Merchant agree that neither Agent, Merchant nor their Representatives will solicit, negotiate or enter into an agreement with any party (other than the Purchaser or its Representatives) with respect to the Acquired Assets.

11.2    In consideration of the agreements contained herein, from the date hereof through and including the date of entry of the Bidding Procedures Order, absent the written consent of the Purchaser, the Agent shall not, on behalf of itself or its Representatives,

(a)    exercise its designation rights in respect of the Acquired IP or other Acquired Assets in favor of any party (other than the Purchaser);

(b)    fail to exercise the designation rights in favor of the Purchaser as provided in Section 1 above;

(c)    negotiate or enter into any agreement with any party (other than the Purchaser) regarding the assignment of all or any part of the Acquired Assets to such party.

11.3    Following the entry of the Bidding Procedures Order, the Merchant and Agent and their respective Representatives may solicit and negotiate with one or more third parties for the purchase of the Acquired Assets pursuant to procedures approved in the Bidding Procedures Order.

## SECTION 12– BREAK UP FEE AND EXPENSE REIMBURSEMENT.

12.1    If an alternative transaction with respect to the Acquired Assets (an "Alternative Transaction") is consummated, the Purchaser shall be entitled to a break up fee (the "Break Up Fee") in the aggregate amount of 3% of the cash portion of the Payment Amount and expense reimbursement for up to $50,000 in reasonable and documented out of pocket expenses (the "Expense Reimbursement").  The Break Up Fee and Expense Reimbursement shall be paid at the closing of, and shall be a condition to the consummation of, the Alternative Transaction, and the amounts used to pay the Break Up Fee and Expense Reimbursement shall not constitute Asset Proceeds.

## SECTION 13– INDEMNIFICATION.

13.1    Agent shall indemnify and hold the Purchaser and its Representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against the Purchaser or its Representatives resulting from, or in any way related to (i) Agent's failure to perform under or material breach of this Letter Agreement or the Agency Agreement or (ii) Agent's conduct in connection with the Merchandise, the Owned FF&E and the Assets (other than the Acquired Assets) on or after the Sale Commencement Date.

13.2    The Purchaser shall indemnify and hold Agent and its Representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent or its Representatives resulting from, or in any way related to (i) the Purchaser's failure to perform under or material breach of this Letter Agreement, or (ii) the Purchaser's conduct in connection with the Acquired Assets on or after the Closing Date.

13.3    Agent and the Purchaser shall each, as promptly as practical, provide the other with notice of any claim, suit or demand that in any way relates to or arises out of this Letter Agreement.  Such notice shall set forth whether the notifying party seeks, as of that time, indemnification from the other party for such claim, suit or demand.  Neither the Purchaser nor Agent shall compromise or settle any claim, suit or demand for which indemnification is sought without the prior written consent of the other party hereto.

## SECTION 14 – MISCELLANEOUS.

14.1    This Agreement shall be governed by the laws of the state of New York that apply to contracts made and performed entirely within such state.  Any action, suit or other proceeding (hereinafter, an "action") with respect to this Letter Agreement or any matter arising out of or in connection with this Letter Agreement shall be brought exclusively in the state and federal courts sitting in White Plains, New York.  By execution and delivery of this Letter Agreement, each party hereto hereby accepts for itself and in respect of its property, generally and unconditionally, the sole and exclusive jurisdiction of the aforesaid courts and appellate courts thereof.

14.2    EACH PARTY HERETO, FOR ITSELF AND ITS REPRESENTATIVES, HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ALL RIGHT TO TRIAL BY JURY IN ANY ACTION (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THE ACTIONS OF THE PARTIES HERETO OR THEIR RESPECTIVE REPRESENTATIVES PURSUANT TO THIS AGREEMENT OR IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

14.3    All notices and demands required and desired to be given by any party hereto shall be in writing and shall be delivered personally, sent by overnight courier service, prepaid or sent by United States registered or certified mail, return receipt requested, postage prepaid and addressed as provided herein, or any other address designated by such party which has been furnished in writing in accordance with this provision.  Notices shall be deemed given and served (i) upon receipt or refusal, if delivered personally or by certified or registered mail; or (ii) one business day after deposit with an overnight courier service.

| If to the Merchant: | |
|---|---|
| dELiA*s, Inc.<br>50 West 23rd Street<br>New York, New York 10010<br>Attn: Ryan A. Schreiber, Esq.<br>Telephone: (212) 590-6204<br>Facsimile: (212) 590-6500<br>Email: rschreiber@deliasinc.com | DLA Piper LLP (US)<br>1251 Avenue of the Americas, 25th Floor<br>New, York, New York 10020<br>Attn: Gregg Galardi, Esq.<br>          Dienna Corrado, Esq.<br>Telephone: (212) 335-4640<br>Facsimile: (212) 884-8540<br>Email: gregg.galardi@dlapiper.com<br>          dienna.corrado@dlapiper.com |

| If to the Agent: | |
|---|---|
| Gordon Brothers Retail Partners, LLC<br>Prudential Tower<br>800 Boylston Street<br>Boston, MA 02119<br>Attn: Michael Chartock<br>Telephone: 617.210.7116<br>Email: mchartock@gordonbrothers.com | Hilco Merchant Resources, LLC<br>5 Revere Drive, Suite 206<br>Northbrook, IL 60062<br>Attn: Ian S. Fredericks<br>Tel: 847.418.2075<br>Email: ifredericks@hilcotrading.com |
| **If to the Purchaser:** | |
| Butterfly Retail Acquisition LLC<br>50 West 23rd Street – 10th Floor<br>New York, NY 10010<br>Attn: Brian Lattman, President<br>Telephone: 212-590-6351<br>Email: blattman@alloymerch.com | Greenberg Traurig, P.A.<br>401 E. Las Olas Boulevard, Suite 2000<br>Fort Lauderdale, FL 33301<br>Attn: Mathew Hoffman, Esq.<br>Telephone: (954) 768-8203<br>Facsimile: (954) 759-5532<br>Email: hoffmanma@gtlaw.com |
| **If to the Committee:** | **If to the Lender:** |
| Kelley Drye & Warren LLP<br>101 Park Avenue<br>New York, NY 10178<br>Attn: Robert L. LeHane, Esq.<br>     Gilbert R. Saydah, Jr., Esq.<br>Email: rlehane@kelleydrye.com<br>     gsaydah@kelleydrye.com | Choate Hall & Stewart, LLP<br>Two International Place<br>Boston, MA 02110<br>Attn: John F. Ventola, Esq.<br>     Seth D. Mennillo, Esq.<br>Email: jventola@dchoate.com<br>     smennillo@choate.com |

14.4    This Agreement may be signed in two or more counterparts, any one of which need not contain the signature of more than one party, but all such counterparts taken together will constitute one and the same agreement.

14.5    Each party acknowledges that monetary damages would be an inadequate remedy for breach of its obligations under this Letter Agreement, and that any such breach will result in immeasurable and irreparable harm to the other party.  Subject to Section 12 above (Break Up Fee and Expense Reimbursement), each party shall be responsible for such party's attorney's and other professional's fees, costs, and expenses associated with this Letter Agreement and the transactions contemplated hereby.

14.6    This Agreement shall be binding upon, and inure to the benefit of, the Agent, the Purchaser, the Merchant and their respective successors and assigns.

14.7    Time is of the essence with respect to all dates and time periods in this Letter Agreement.

14.8    This Letter Agreement shall not be construed more strictly against one party than against the other, merely by virtue of the fact that it may have been prepared primarily by

counsel for one of the parties, it being recognized that the Merchant, Agent, and Purchaser have contributed substantially and materially to the preparation of this Letter Agreement.

14.9    No change, modification or amendment shall be made to this Letter Agreement unless set forth in writing and signed by all of the parties affected thereby.

14.10    As between the Merchant and Agent with respect to the "Sale" (as defined in the Agency Agreement), to the extent there is a conflict or discrepancy between the definitions set forth on Exhibit A to this Letter Agreement and the definitions in the Agency Agreement, the Agency Agreement shall control in all respects; provided, however, that the foregoing does not apply to the definition of Asset Proceeds, which shall be as defined in this Letter Agreement and Exhibit A.

*[Signature page follows]*

Please sign where indicated below and return a copy of this Letter Agreement to us.  We look forward to working with your organization in connection with this matter.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By: Ian Fredericks
Its: VP & Assistant General Counsel, Managing Member

GORDON BROTHERS RETAIL
PARTNERS, LLC

By: Michael Chartock
Its: Gen Counsel

ACCEPTED, AGREED AND ACKNOWLEDGED THIS
_____ DAY OF January, 2015

BUTTERFLY RETAIL ACQUISITION LLC


By:
Its:

ACCEPTED, AGREED AND ACKNOWLEDGED THIS
_____ DAY OF January, 2015

dELiA*s, INC., ON BEHALF OF ITSELF AND THE OTHER DEBTORS


By:
Its:

Please sign where indicated below and return a copy of this Letter Agreement to us. We look forward to working with your organization in connection with this matter.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

By: _____

Its:

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____

Its:

ACCEPTED, AGREED AND ACKNOWLEDGED THIS
_____ DAY OF January, 2015

BUTTERFLY RETAIL ACQUISITION LLC

By: Steven Russo

Its: Managing Member

ACCEPTED, AGREED AND ACKNOWLEDGED THIS
_____ DAY OF January, 2015

dELiA*s, INC., ON BEHALF OF ITSELF AND THE OTHER DEBTORS

By: _____

Its:

EAST\89854433.17

Please sign where indicated below and return a copy of this Letter Agreement to us.  We look forward to working with your organization in connection with this matter.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC

_____

By:
Its:

GORDON BROTHERS RETAIL
PARTNERS, LLC

_____

By:
Its:

ACCEPTED, AGREED AND ACKNOWLEDGED THIS
_____ DAY OF January, 2015

BUTTERFLY RETAIL ACQUISITION LLC

_____

By:
Its:

ACCEPTED, AGREED AND ACKNOWLEDGED THIS
_____ DAY OF January, 2015

dELiA*s, INC., ON BEHALF OF ITSELF AND THE OTHER DEBTORS

_____

By:
Its:

**SCHEDULE 2.1(b)**

**Acquired IP**

All of Merchant's right, title, and interest in and to the following:

1.    The Customer Lists, subject to section 7.9 of the Agency Agreement and such other restrictions or limitations as may be imposed by the Bankruptcy Court or the Consumer Privacy Ombudsman with respect to the transfer or maintenance of Personally Identifiable Information.

2.    The mark "dELiA*s" for use in respect of specialty-branded retail stores, an e-commerce business similar to the Direct Business Platform, and/or a direct to consumer catalog business and such other uses that Merchant has to use the mark "dELiA*s".

3.    All other Intellectual Property (i) owned by, licensed to, and transferrable by the Merchant to an unaffiliated third party and (ii) used in connection with, or necessary for, the operation of Merchant's specialty-branded retail stores, the Direct Business Platform, and/or Merchant's direct to consumer catalog business.

4.    The Trademark License Agreement, dated as of February 24, 2003, by and among dELiA*s Brand LLC, as Licensor, and Merchant, as Licensee, and the Merchant's interests in the trademarks listed on Exhibit 1 hereto.

5.    The Amended and Restated Media Services Agreement (the "Media Services Agreement") by and between Merchant and Defy Media, LLC (f/k/a Alloy, Inc.) and all of the Merchant's right, title and interest to the URL domain www.delias.com and the URL subdomain "store.delias.com".

6.    The URL domain name www.deliasinc.com, subject to Purchaser providing a sublicense to Merchant for the right to use such domain name through June 30, 2015.

7.    Assumption and Assignment of executory contracts and unexpired personal property leases necessary for the operation of the Direct Business Platform, such as web and server hosting agreements, as specified by the Purchaser, in its sole discretion.

8.    Permits associated with the operation of the Direct Business Platform, the Stores, or the direct to consumer catalog business, but solely to the extent transferrable.

**EXHIBIT 1 TO SCHEDULE 2.1(b)**

## TM Rights (Grouped by client)

Report Date:    12/5/2014        Page:        1

*Client:*    dELiA*s

50 West 23rd Street
New York, New York  10010

| ID | Country | Mark | Classes | App. # | App. Dt | Reg. # | Reg. Dt | Allow. Dt | ITU |
|----|---------|------|---------|--------|---------|--------|---------|-----------|-----|
| 17215 | Australia | dELiA*s and Design | 3, 25, 35 | 725,053 | 1/3/1997 | 725,053 | 12/16/1997 | | No |
| 17236 | Brazil | dELiA*s and Design | 25 | 825,126,665 | 11/18/2002 | | | | No |
| 17231 | Brazil | DELIA'S | 25 | 825,126,657 | 11/18/2002 | | | | No |
| 17184 | Canada | dELiA*s and Design | | 849,008 | 6/25/1997 | 506,959 | 1/22/1999 | | No |
| 17185 | Canada | Delia's 9 Point Design | | 851,637 | 7/29/1997 | 502,668 | 10/22/1998 | | No |
| 17234 | China (People's Republic Of) | DELIA'S | 35 | 970087658 | 8/21/1997 | 1,215,979 | 10/14/1998 | | No |
| 17221 | Hong Kong | DELIA'S dELiA*s DELIA'S dELiA*S and Design | 35 | | 8/20/1997 | 199902514 | 3/3/1999 | | No |
| 17263 | Japan | dELiA*s and Design | 25 | 1995-098373 | 9/26/1995 | 4,387,892 | 6/2/2000 | | No |
| 17271 | Japan | dELiA*s and Design | 3 | 1996-138473 | 12/10/1996 | 4,432,792 | 11/17/2000 | | No |
| 17273 | Japan | dELiA*s and Design | 16 | 1995-098372 | 9/26/1995 | 4,097,175 | 12/26/1997 | | No |
| 17265 | Japan | DELIA'S (STYLIZED) IN KATAKANA | 16 | 1996-138474 | 12/10/1996 | 4,190,967 | 9/25/1998 | | No |
| 17272 | Japan | DELIA'S (STYLIZED) IN KATAKANA | 25 | 1996-138475 | 12/10/1996 | 4,148,465 | 5/22/1998 | | No |
| 17266 | Japan | Delia's 9 Point Design | 16 | 1996-138477 | 12/10/1996 | 4,190,968 | 9/25/1998 | | No |
| 17262 | Japan | Delia's 9 Point Design | 25 | 1996-138478 | 12/10/1996 | 4,125,846 | 3/20/1998 | | No |
| 17261 | Japan | Delia's 9 Point Design | 3 | 1996-138476 | 12/10/1996 | 4,161,941 | 7/3/1998 | | No |
| 17210 | New Zealand | dELiA*s and Design | 3, 25, 42 | 280,487 | 8/4/1997 | 280,487 | 9/21/1998 | | No |
| 17239 | South Africa | DELIA'S | 3 | 1997/11754 | 8/5/1997 | 1997/11754 | 9/5/2000 | | No |
| 17241 | South Africa | DELIA'S | 42 | 1997/11756 | 8/5/1997 | 1997/11756 | 9/5/2000 | | No |
| 17240 | South Africa | DELIA'S | 25 | 1997/11755 | 8/5/1997 | 1997/11755 | 9/5/2000 | | No |
| 17216 | South Korea | dELiA*s and Design | 3, 16, 25 | | | 40-577897 | 3/18/2004 | | No |
| 17217 | United Kingdom | dELiA*s and Design | 25, 35 | 2,284,324 | 10/30/2001 | 2,284,324 | 5/3/2002 | | No |
| 17213 | United Kingdom | dELiA*s and Design | 3 | 2,144,536 | 9/9/1997 | 2,144,536 | 6/14/2002 | | No |
| 17214 | United Kingdom | DELIA'S | 3 | 2,144,538 | 9/9/1997 | 2,144,538 | 9/6/2002 | | No |
| 17174 | United States | DAISY BY DELIA'S | 25 | 78/677,218 | 7/25/2005 | 3,636,800 | 6/9/2009 | | No |
| 17258 | United States | dELiA*s and Design | 3 | 86/315,549 | 6/20/2014 | | | | No |
| 17181 | United States | DELIA'S | 18 | 74/644,799 | 3/10/1995 | 2,076,125 | 7/1/1997 | | Yes |
| 17186 | United States | DELIA'S | 25, 42 | 74/505,280 | 3/28/1994 | 1,908,572 | 8/1/1995 | | No |
| 17192 | United States | DELIA'S | 18 | 78,215,932 | 2/18/2003 | 3,360,344 | 12/25/2007 | | Yes |
| 17182 | United States | DELIA'S | 25 | 78/218,010 | 2/24/2003 | 3,265,620 | 7/17/2007 | | Yes |
| 17190 | United States | DELIA'S | 16, 18, 25 | 78/211,546 | 2/6/2003 | 3,392,697 | 3/4/2008 | | Yes |
| 17189 | United States | DELIA'S | 42 | 75/976,281 | 2/12/1996 | 2,092,322 | 8/26/1997 | | Yes |

| 17180 | United States | DELIA'S | 25 | 74/644,800 | 3/10/1995 | 1,943,039 | 12/19/1995 | No |
|---|---|---|---|---|---|---|---|---|
| 17179 | United States | DELIA'S | 25 | 74/644,797 | 3/10/1995 | 1,997,643 | 8/27/1996 | Yes |
| 17178 | United States | DELIA'S | 14 | 74/644,795 | 3/10/1995 | 2,011,083 | 10/22/1996 | Yes |
| 17193 | United States | Delia's 9 Point Design | 3 | 75/976,254 | 12/29/1995 | 2,104,334 | 10/7/1997 | Yes |
| 17197 | United States | Delia's 9 Point Design | 35 | 76/977,059 | 7/10/2002 | 2,907,137 | 11/30/2004 | No |
| 17198 | United States | DELIA'S POCKET DESIGN | 25 | 77/634,190 | 12/16/2008 | 3,884,488 | 11/30/2010 | No |
| 17194 | United States | MALLORY | 25 | 77/901,675 | 12/28/2009 | 4,020,123 | 8/30/2011 | Yes |
| 17196 | United States | STYLE GOSSIP | 35 | 77/607,037 | 11/4/2008 | 4,284,281 | 2/5/2013 | No |

**SCHEDULE 2.1(c)**

**See attached**

EAST\89854433.18

| Description 1 | Description 2 | Description 3 | Description 4 | Description 5 | QTY |
|---|---|---|---|---|---|
| **9th Floor MAC Equipment** | | | | | |
| I-Mac i5 | 3.2 Ghz | 32 GB | 1TB | D25M20P0F8J4 | 1 |
| I-Mac i5 | 3.4 Ghz | 32 GB | 1TB | D25MJ1VAF8JC | 1 |
| I-Mac i5 | 3.5 Ghz | 24 GB | 1TB | C02KDA2DDNCW | 1 |
| I-Mac i5 | 3.2 Ghz | 24 GB | 1TB | C02KD9WYDNCW | 1 |
| I-Mac i5 | 3.4 Ghz | 32 GB | 1TB | D25N42KDF8JC | 1 |
| i-Mac-i5 | 3.4 Ghz | 32 GB | 1TB | D25N42N1F8JC | 1 |
| i-Mac-i5 | 3.4 Ghz | 32 GB | 1TB | D25N42KGF8JC | 1 |
| I-Mac i7 | 3.4 Ghz | 16 GB | 1TB | D25KF0MHDNMP | 1 |
| i-Mac-i5 | 3.2 Ghz | 24 GB | 1TB | C02KDA3HDNCW | 1 |
| I-Mac i5 | 3.2 Ghz | 16 GB | 1TB | D25LJ0DAF8J9 | 1 |
| MacPro | 3.7 Ghz | 32 GB | 1TB | F5KMM0UUF9VN | 1 |
| 27" Thunderbolt Display | | | | | 1 |
| 27" Thunderbolt Display | | | | | 1 |
| I-Mac i5 | 3.2 Ghz | 32 GB | 1TB | D25M20MCF8J4 | 1 |
| I-Mac i5 | 3.2 Ghz | 32 GB | 1TB | D25M206WF8J4 | 1 |
| I-Mac i5 | 3.2 Ghz | 32 GB | 1TB | D25M2076F8J4 | 1 |
| I-Mac i5 | 3.2 Ghz | 24 GB | 1TB | C02KDA3PDNCW | 1 |
| MacPro5,1 In Poto Shop | 3.2 Ghz | 16 GB | 4 TB | C07JF01MF4MC | 1 |
| 27" Thunderbolt Display | in | | | | 1 |
| 27" Thunderbolt Display | | | | | 1 |
| MacBookPro5,1 | 2.4 Ghz | 4 GB | 500 GB | W8848H2H1G0 | 1 |
| **New Jersey Data Center** | | | | | |
| Hitachi SAN | HUS 130 | | | | 1 |
| APC Intellengent PDU | | | | | 2 |
| Cisco UCS Chassis | | | | | 1 |
| 5 Processor Blades | | | | | 5 |
| 2 Fiber Modules | | | | | 1 |
| HP Proliant Server | Proliant DL-360 | | | | 1 |
| HP Proliant Server | Proliant DL-380 | | | | 1 |
| HP Proliant Server | Proliant DL-380 G7 | | | | 1 |
| APC Intellengent PDU | | | | | 2 |
| Cisco Firewalls | ASA 5520 K9 | | | | 2 |
| Cisco Switches | Cisco 3750 | | | | 4 |
| Cisco Routers | Cisco 7206 | | | | 2 |
| Baracuda mail Spam Firewall | Baracuda FW 400 | | | | 1 |
| Foundry Load Balancer | Serveriron 4G ( not in use) | | | | 1 |
| IBM T60 Laptop | T60 | | | | 1 |
| APC Intellengent PDU | | | | | 2 |
| Tripplite KVM | | | | | 1 |
| HP Proliant Server | Proliant DL-360 G7 | | | | 1 |
| HP Proliant Server | Proliant DL-380 G7 | | | | 1 |
| HP Proliant Server | Proliant DL-580 G7 | | | | 1 |
| APC Intellengent PDU | | | | | 2 |
| Apple Mac Mini + Fiber Channel | Mac Mini (Mac File Server) | | | | 1 |
| HP Proliant Server | Proliant DL-360 G5 | | | | 1 |
| HP Proliant Server | Proliant DL-380 G6 | | | | 1 |
| HP Storage works Tape Library | MSL4048 | | | | 1 |
| HP Proliant Server | Proliant DL-380e Gen8 | | | | 1 |
| HP Proliant Server | Proliant DL-580 G7 | | | | 1 |
| Sun Netra 440 | Netra 400 | | | | 2 |
| HP Proliant Server | Proliant DL-380 G7 | | | | 3 |
| HP Proliant Server | Proliant DL-360 G5 | | | | 4 |
| HP Proliant Server | Proliant DL-320 | | | | 1 |
| HP Proliant Server | Proliant DL-360 G7 | | | | 2 |
| HP Proliant Server | Proliant DL-360 G6 | | | | 1 |
| HP Proliant Server | Proliant DL-360 | | | | 4 |
| HP Proliant Server | Proliant DL-120 G6 | | | | 2 |
| Juniper Firewalls | ISG-1000 | | | | 2 |
| Juniper firewall | Netscreen 204 | | | | 1 |
| Foundry Load Balancer | Serveriron 4G (not in use) | | | | 1 |
| Baracuda Load Balancer | 340 Load Balancer | | | | 1 |
| **9th Floor IT Room** | | | | | |
| Palo Alto application firewall, model PA500, requires subsription | IT | Firewall | | | 1 |
| Ruckus Zone Director controller for access points, model 1100 | IT | Controller | | | 2 |
| Cisco Small Business smart switch, model SG300 | IT | Switch | | | 14 |
| Juniper Netscreen 50 | IT | Firewall | | | 1 |
| Cisco core switch, model 6509e, year 2004 | IT | Switch | | | 1 |
| Lucent phone switch, year 2000 | IT | Switch | | | 1 |
| Cisco core switch, model 6506e, year 2004 | IT | Switch | | | 2 |
| HP Proliant DL and ML Server 350 to 380, G4 to G8, assorted | IT | Server | | | 23 |
| Apple Promise VTrak 16TB E-Class E610F FC Raid; 16x 1TB SATA for MAC, | IT | Storage system | | | 1 |
| Baracuda mail gateway Firewall 400, requires subscription | IT | Firewall | | | 1 |
| Coppmaq, HP | IT | Server rack | | | 7 |
| Synology network attached storage, 24 TB, Raid 10, model DS 1813+ | IT | Storage system | | | 1 |
| Tripp-Lite KVM | IT | Switch | | | 4 |
| HP tape drive model 4048, upgraded 3 years ago | IT | Drive | | | 1 |
| MSA 2000, expansion storage | IT | Storage system | | | 1 |
| of old SUN equipment with (1) Sunfire V215 | IT | Server Rack | | | 1 |
| HP storage works fiber switch model 820Q | IT | Switch | | | 1 |
| HP Procrure 1800, 24G network switch | IT | Switch | | | 1 |
| Cisco 2900 | IT | Switch | | | 5 |
| Cisco 2960s, 48 port | IT | Switch | | | 1 |
| Metro rack with casters | MHE | Shelving | | | 2 |
| Eaton Power, model 9355 | IT | UPS | | | 1 |

| Description 1 | Description 2 | Description 3 | Description 4 | Description 5 | QTY |
|---|---|---|---|---|---|
| **Alloy Furniture List #1** | | | | | |
| Office chairs w/arms | | | | | 38 |
| Office chairs no arms | | | | | 3 |
| stack chairs w/arms | | | | | 14 |
| stack chairs no arms | | | | | 4 |
| Wicka chair | | | | | 1 |
| cubical striaght | | | | | 33 |
| L cubicle | | | | | 4 |
| U cubicle | | | | | 2 |
| office desk | | | | | 1 |
| 2 drawer lat. File | | | | | 6 |
| 2 drawer vert. file | | | | | 1 |
| 3 drawer vert. file | | | | | 37 |
| 4 drawer lat. File | | | | | 1 |
| 5 drawer lat. File | | | | | 5 |
| 2 shelf book shelf | | | | | 1 |
| 3 shelf book shelf | | | | | 1 |
| 4 shelf book shelf | | | | | 1 |
| 5 shelf book shelf | | | | | 1 |
| 2 door storage 30" | | | | | 4 |
| 2 door storage 42" | | | | | 6 |
| combo cabinets | | | | | 14 |
| Blueprint cabinets | | | | | 2 |
| wood printer stand on rollers | | | | | 1 |
| hat rack | | | | | 1 |
| fans | | | | | 6 |
| dorm ref. | | | | | 2 |
| small ref. | | | | | 1 |
| water cooler w/jugs | | | | | 1 |
| plywood table on rollers | | | | | 6 |
| wood table app. 30" X 48" | | | | | 1 |
| folding table app. 30" X 72" | | | | | 1 |
| small sq. table | | | | | 1 |
| wicker room divider w/mirrow small | | | | | 1 |
| shipping cases for clothes | | | | | 5 |
| red duffal bag w/rollers | | | | | 1 |
| printers | | | | | 3 |
| PC's not apple w/monitors | | | | | 20 |
| **Office Furniture List #2 Alloy** | | | | | |
| HP Laser JET 4250M printer | | | | | 1 |
| Laserjet 8000N printer | | | | | 1 |
| Laserjet 8100N printer | | | | | 1 |
| The Judge Gretag macbeth | | | | | 1 |
| Large breakroon Ref. | | | | | 2 |
| conference room table | | | | | 1 |
| 3 drawer vert. files | | | | | 15 |
| 2 drawer lat. File | | | | | 4 |
| combo storage/file cabinets | | | | | 12 |
| L shape cub. | | | | | 3 |
| striaght cube desk | | | | | 12 |
| Nice sled chairs | | | | | 10 |
| vented back office chair w/arms w/rollers | | | | | 2 |
| office chairs w/arms w/rollers | | | | | 14 |
| 3 shelf book shelf | | | | | 1 |
| folding chairs | | | | | 2 |
| A-frame board | | | | | 1 |
| speaker set | | | | | 1 |
| NEC VE281X projector | | | | | 1 |
| Rolling Garment Rack | | | | | 35 |
| Cutting Tables | | | | | 2 |
| Superior Model Forms | | | | | 6 |
| **9th Floor Photo Studio** | | | | | |
| Mathews tripod with casters | | | | | 7 |
| Mathews tripod with turtle base | | | | | 8 |
| Avenger roller stand, model A5012 | | | | | 1 |
| Reel EFX Fan ll, varibeam | | | | | 1 |
| Manfrotto Auto Pole, assorted | | | | | 2 |
| Assorted wood riser | | | | | 10 |
| Heavy duty tripod with casters | | | | | 2 |
| Folding table, assorted size | | | | | 3 |
| SPT portable air conditioner | | | | | 2 |
| Jiffy steamer | | | | | 1 |
| Round table, 30"x36" | | | | | 4 |
| Residential Refrigerator | | | | | 1 |
| Black Auto Pole | | | | | 3 |
| Mark 5 111 | | | | | 1 |

# EXHIBIT A

## Definitions

"**3PL**" means a third party logistics company designated by the Agent, which shall be reasonably acceptable to the Merchant, Lender and the Committee.

"**3PL Expenses**" means the documents costs and expenses of the 3PL for the 3PL Services.

"**3PL Services**" means the 3PL's responsibilities for picking up the MOOS Inventory from the Merchant, receiving the MOOS Inventory at the 3PL's facility, processing, counting, sorting, and refurbishing the MOOS Inventory, and shipping the MOOS Inventory to buyers.

"**Additional Agent Merchandise**" means additional merchandise procured by the Agent which is of like kind and no lesser quality to the Merchandise located in the Stores that the Agent is entitled to include in the Sale.

"**Aged Merchandise**" means items of Merchandise located in the Stores and the Distribution Center Merchandise (but not Direct Business Merchandise) for which the "Style Last Receipt Date" was on or before May 31, 2014 as reflected on the applicable Cost File.

"**Allocation Schedule**" means the allocation schedule of Distribution Center Merchandise and In-Transit Merchandise that has been mutually agreed upon by Merchant and Agent.

"**Applicable General Laws**" means applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, permitting, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities.

"**Assets**" means the Membership Interests and the Merchant's rights, title and interests in and to the Intellectual Property.

"**Asset Proceeds**" means all cash and non-cash consideration received by Merchant or Agent from the sale or other disposition of the Assets, which for the avoidance of doubt shall exclude Proceeds, MOOS Proceeds, FF&E Proceeds and the "Break Up Fee" (as defined in the Letter Agreement to which this is attached) and "Expense Reimbursement" (as defined in the Letter Agreement to which this is attached).

"**Central Service Expenses**" means costs and expenses for Merchant's Central Services.

"**Central Services**" means those Merchant central administrative services necessary for the conduct and support of the Sale, including, but not limited to, use or and access to Merchant's: (i) inventory control system, (ii) payroll system, (iii ) accounting system, (iv) office facilities, (v) central MIS and POS services, (vi) cash reconciliation, (vii) central administrative services and personnel to process and perform sales audit, banking, and other normal course administrative services customarily provided to or for the benefit of operating the Distribution Centers and/or the Stores, (viii) such other central office services reasonably necessary for the Sale, and (ix) use by Agent reasonably sized offices located at Merchant's central office facility to effect the Sale.

"**Closing Locations**" means the Distribution Center and the Stores.

"**Committee**" means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

"**Cost Value**" means, with respect to each item of Merchandise, other than the Additional Agent Merchandise, the lower of (i)(x) the lower of the Merchant's actual cost of such item and (y) the cost of such item as reflected in the SKU for such item of Merchandise as reflected on (1) Merchant's inventory cost file attributable to the Merchandise (other than the Direct Business Merchandise) identified on Exhibit 5.3(a)(1) to the Agency Agreement; and (2) Merchant's inventory cost file attributable to the Direct Business Merchandise identified on Exhibit 5.3(a)(2); to the Agency Agreement and (ii) the Retail Price.

"**Cure Amounts**" means, with respect to each assumed contract acquired as part of the Acquired Assets, the amount required to cure pre-Petition Date monetary defaults or compensate a counterparty for actual pre-Petition Date pecuniary loss, as required by Bankruptcy Code sections 365(b)(1)(A) and (B).

"**Customer Lists**" means any and all lists of current and past customers of Merchant and/or any business of Merchant, including any and all information relating in any way to the use of such lists for or by Merchant and/or any business of Merchant, including (x) personal information, such as name, address, telephone number, email address, website and any other database information and (y) customer purchase history at a transaction level (including with respect to dollar amounts, dates, and items purchased) but excluding from the foregoing any credit card numbers or related customer payment source or financial information prohibited by law.

"**Defective Merchandise**" means any item of Merchandise identified and agreed upon by Merchant and Agent (with each party acting reasonably) as defective in that it is damaged, defective, scratched, soiled, ripped, torn, stained, faded, discolored, dented, out of box (if normally sold as new in-the-box), missing pieces, mismatched, mis-mated or near-sized, parts, items typically sold as a set which are incomplete, or gift with purchase items, or otherwise affected by other similar defenses rendering it not first quality.

"**Direct Business Merchandise**" means those items of inventory identified on Exhibit 5.2(b)(2) to the Agency Agreement that are located in Merchant's Distribution Center on the Sale Commencement Date, which have been ear-marked and/or ticketed in the ordinary course of business for sale through the Direct Business Platform.

"**Direct Business Platform**" means the Merchant's e-commerce based direct business platform.

"**Distribution Center**" means the Merchant's distribution center at 348 Poplar Street, Hanover, PA 17331.

"**Distribution Center Expenses**" means an amount up to (i) $25,000 per week (prorated for partial weeks) in respect of Merchant's provision of Distribution Center Services during the period of the Sale (during which the Agent is utilizing the Distribution Centers , in each case for the period commencing on the Sale Commencement Date and concluding on the earliest to occur of (x) the Sale Termination Date or (y) the Vacate Date for the applicable Distribution Center; plus (ii) incremental costs and expenses associated with Additional Agent Merchandise, including, without limitation, the receipt, tagging, processing and/or transfer of the Additional Agent Merchandise from the Distribution Centers to the Stores.

"**Distribution Center Merchandise**" means those items of inventory identified on Exhibit 5.2(b)(1) to the Agency Agreement that are located in Merchant's Distribution Center on the Sale Commencement Date that do not constitute Direct Business Merchandise.

"**Distribution Center Services**" means those services customarily performed by Merchant in operating and maintaining the Distribution Centers in the ordinary course of business and in the course of receiving and distributing goods and supplies to the Stores, including, but not limited to, with respect to (i) payroll and related employee benefits of all Distribution Centers employees; (ii) rent and other occupancy costs and expenses associated with the Distribution Centers; (iii) the handling, receiving, in-take, storage, ticketing and processing of any Merchandise, Distribution Center Merchandise, In-Transit Merchandise, or Additional Agent Merchandise at the Distribution Centers; (iv) any required supplies in connection with the foregoing; (v) any Central Services required to operate and maintain the Distribution Centers during the Sale Term applicable thereto; and (vi) costs and expenses of moving, transferring, or consolidating Merchandise or Additional Agent Merchandise between the Distribution Centers and the Stores. Merchant hereby covenants and agrees to provide the Distribution Center Services throughout the Sale Term and, except as provided and solely to the extent set forth in section 4.1(v) of the Agency Agreement, Merchant shall be responsible for the payment of all costs and expenses associated with the Distribution Centers and the Distribution Center Services.

"**Excluded Defective Merchandise**" means (a) any item of Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used or sold for its intended purpose, (b) any item of Defective Merchandise for which the parties cannot mutually agree upon a Cost Value, and/or (c) packaway merchandise.

"**Excluded Goods**" means all goods not included as "Merchandise."

"**Excluded Benefits**" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Benefits Cap, including, without limitation, any payments due under the WARN Act.

"**Excluded Price Adjustments**" means the following discounts or price adjustments offered by the Merchant by any means: (i) point of sale discounts or similar adjustments regardless of duration; (ii) employee discounts; (iii) member or customer appreciation points or coupons; (iv) multi-unit purchase discounts; (v) adjustments for damaged, defective or "as-is" items; (vi) coupons (Merchant's or competitors') or similar type coupons/promotions, "groupons", catalog, website, or circular prices, or "buy one get one" type discounts, or similar type discounts or promotions; (vii) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (viii) obvious ticketing or marking errors; (ix) instant (in-store) or mail in rebates; or (x) similar customer specific, temporary, or employee non-product specific discounts or pricing accommodations.

"**Expenses**" shall mean the Store-level (and where expressly applicable, Distribution Center-level) operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following (to the extent set forth in Exhibit 4.1 to the Agency Agreement):

a)   actual Occupancy Expenses for the Stores (that are in operation of each such date) on aggregate per diem basis in an amount up to the aggregate per diem amount; plus (ii) the portion of any percentage rent obligations allocable to the sale of Merchandise during the Sale, plus (iii) the portion of any percentage rent obligations attributable to the sale of Additional Agent Merchandise during the Sale;

b)   actual wages and commissions for all Store-level Retained Employees used in conducting the Sale; provided that, Agent shall only be obligated to pay 50% of the payroll wages for

Store-level Retained Employees used during the Inventory Taking, and Merchant shall pay the remaining 50% of the wages for Retained Employees used during the Inventory Taking;

c)      actual amounts payable by Merchant for benefits for Retained Employees (including payroll taxes, FICA, unemployment taxes, workers' compensation and health care insurance benefits, but excluding Excluded Benefits) for Store-level Retained Employees used in the Sale, in an amount up to sixteen percent (16.0%) of base payroll (including commissions) for all Retained Employees in the Stores (the "Benefits Cap");

d)      Retention Bonuses for Retained Employees;

e)      all costs and expenses associated with Agent's on-site supervision of the Closing Locations, including but not limited to any and all fees, wages, bonuses, deferred compensation, taxes, and third party payroll costs and expenses of Agent's field personnel, travel to, from or between the Closing Locations, and all out-of-pocket and commercially reasonable expenses relating thereto;

f)      all signage, banners, sign walkers, and in-Store signs that are produced for the Sale (inclusive of the Signage Costs);

g)      promotional costs including, without limitation, email blasts, television, and any other advertising and/or direct mail attributable to the Sale and ordered or requested by Agent;

h)      the costs and expenses of obtaining additional supplies used at the Stores as may be required by Agent in the conduct of the Sale;

i)      postage/overnight  delivery/courier charges to and from or among the Stores to the extent relating to the Sale;

j)      credit card and bank card fees, chargebacks, and discounts attributable to the Sale at the Stores;

k)      any and all costs of moving, transferring, or consolidating Merchandise and/or Additional Agent Merchandise and/or Direct Business Merchandise (to the extent such goods are included in the Sale and Agent elects to transfer Direct Business Merchandise to the Stores) between and among the Stores;

l)      a pro rata portion for the Sale Term of Merchant's premiums in respect of general liability, casualty, property, inventory, and other insurance policies attributable to the Merchandise and Additional Agent Merchandise;

m)      third-party payroll processing fees for the Stores and the Direct Business Platform;

n)      armored car service and security personnel;

o)      actual cost of Agent's capital, reasonable and documented legal expenses, letter of credit fees and insurance;

p)      cost of transferring the Distribution Center Merchandise to the Stores up to an aggregate amount of $100,000;

q)      Agent's 50% of the third party fees and costs of the Inventory Taking;

r)      actual Central Service Expenses in an amount equal to $10,000 per week (pro-rated for partial weeks) for the Sale Term (payable to Merchant) in respect of the cost of Merchant providing Central Services ;

s)      Store cash thefts and other Store cash shortfalls in registers;

t)      actual costs and expenses associated with operating the Direct Business Platform in an amount up to $45,000 per week (prorated for partial weeks);

u)      actual Distribution Center Expenses (prorated for partial weeks);

v)      actual costs and expenses of postage, overnight delivery or other shipping charges related to the delivery of Merchandise and Additional Agent Merchandise to the consumers;

w)      any costs and expenses incurred in connection with the acquisition (including costs of goods), shipping, delivery, processing and transfer of any Additional Agent Merchandise;

x)      costs and expenses associated with temporary labor requested or obtained by Agent for purposes of the Sale;

y)      All costs and expenses incurred by Agent in order to comply with Applicable General Laws and/or Liquidation Sale Laws unless and until entry of the Agency Order; and

z)      the actual costs and expenses of Agent providing such additional services as the Agent reasonably deems appropriate for the Sale.

"**Final Inventory Report**" means the final report of the aggregate Cost Value of the Merchandise counted by the Inventory Taking Service following the completion of the Inventory Taking, after review, reconciliation and mutual written verification thereof by Agent and Merchant, in consultation with Lender.

"**Gross Rings**" gross register receipts less applicable Sales Taxes but excluding any prevailing discounts for the Gross Rings Period.

"**Gross Rings Period**" means, if the Sale commences prior to the completion of the Inventory Taking at any Store or the Distribution Centers, the period from the Sale Commencement Date until the Inventory Date for such Store.

"**Guaranteed Amount**" means an amount equal to ninety-one percent (91%) (the "Guaranty Percentage") of the aggregate Cost Value of Merchandise.

"**In-Transit Merchandise**" means items of inventory purchased by Merchant prior to the date of the Agency Agreement, which goods are either subject to a Letter of Credit issued by Merchant and cannot be cancelled as of the date of this Agreement, and/or are already in transit to Merchant from the vendor as of the Sale Commencement Date.

"**Intellectual Property**" means any and all worldwide rights in and to all tangible and intangible intellectual property assets of Merchant (whether arising under statutory or common law, contract, or

otherwise), which include without limitation all of the following items owned by Merchant, for which Merchant is a licensee, sub-licensee, licensor, sub licensor, assignee, assignor, or in which Merchant has an interest or right (and Schedule 1 to the Agency Agreement lists all issued or registered Intellectual Property and applications therefor owned by Merchant): (a) inventions, discoveries, processes, designs, techniques, developments and related improvements whether or not patentable; (b) patents, patent applications, industrial design registrations and applications therefor, divisions, divisionals, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, or any such patents or patent applications, and any foreign or international equivalent of any of the foregoing; (c) trademarks (whether registered, unregistered or pending), trade dress, service marks, service names, trade names, brand names, product names, logos, domain names, internet rights (including, without limitation IP Addresses and AS numbers), corporate names, fictitious names, other names, symbols (including business symbols), slogans, translations of any of any of the foregoing and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith and (to the extent transferable by law) any applications and/or registrations in connection with the foregoing and all advertising and marketing collateral including any of the foregoing; (d) work specifications, databases and artwork; (e) technical, scientific and other know-how and information (including promotional material), trade secrets, confidential information, methods, processes, practices, formulas, designs, patterns, assembly procedures, specifications owned or used by Merchant; (f) rights associated with works of authorship including copyrights, moral rights, design rights, rights in databases, copyright applications, copyright registrations, rights existing under any copyright laws and rights to prepare derivative works; (g) work for hire; (h) any and all rights of Merchant to the name "dELiA*s" or any derivation thereof, (i) Merchant's entire customer list and database (including all Customer Lists), and all assets used or useful by Merchant in the conduct of its catalog business and its business over the internet and/or in any other electronic medium, including (without limitation) any websites, social media sites and accounts (including the content contained therein, user names and passwords), diagrams, drawings, domain names, and all advertising and marketing materials and collateral (including all physical, digital, or electronic imagery and design files), samples, product catalogs, product designs and specifications (including tech specifications) vendor and merchandise supplier data and information, (j) software used in the operation of the Direct Business Platform, (k) all goodwill, rights and contracts (including all licenses and sublicenses granted or obtained with respect thereto) related to the  foregoing, (k) the right to sue for infringement and other remedies against infringement of any of the foregoing, and (l) rights to protection of interests in the foregoing under the laws of all jurisdictions.

"**Inventory Taking**" means the SKU-level and Retail Price physical inventory of the Merchandise located at the Stores caused by the Merchant and Agent to be taken which shall count Distribution Center in accordance with the Agency Agreement.

"**Inventory Taking Service**" means RGIS or another independent inventory taking service mutually acceptable to the Merchant and Agent to conduct the Inventory Taking.

"**Lender**" means Salus Capital Partners, LLC, in its capacity as administrative agent and collateral agent.

"**Letter of Credit**" means an irrevocable standby letter of credit, substantially in the form attached to the Agency Agreement nan original stated amount equal to the aggregate of (x) twenty percent (20%) of the estimated Guaranteed Amount and MOOS Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course as of the date immediately preceding the Payment Date), and (y) three (3) weeks' estimated Expenses.

"**Liquidation Sale Laws**" means applicable laws, rules and regulations in respect of "going out of business," "store closing" or similar-themed sales.

"**Membership Interests**" means all of Merchant's rights, title, and interests in and to the ownership interests in dELiA*s Brand, LLC.

"**Merchandise**"  means all new, first quality (other than as expressly set forth below), finished goods inventory that is owned by Merchant and customarily sold to customers in the ordinary course of Merchant's business, including, but not limited to, (i) Merchandise subject to Gross Rings; (ii) Merchandise located in the Stores on the Sale Commencement Date (other than Direct Business Merchandise); (iii) Direct Business Merchandise; (iv) Distribution Center Merchandise received in the Stores on or before January 10, 2015 (the "Receipt Deadline") in accordance with the Allocation Schedule; (v) In-Transit Merchandise received at the Stores on or before the Receipt Deadline in accordance with the Allocation Schedule, (vi) Aged Merchandise; (vii) Defective Merchandise (to the extent Merchant and Agent can mutually agree on the Cost Value applicable thereto).  Notwithstanding the foregoing, "Merchandise" shall not include (i) goods that belong to sublessees, licensees, or concessionaires of Merchant; (ii) goods held by Merchant on memo, on consignment, or as bailee; (iii) Excluded Defective Merchandise; (iv) Additional Agent Merchandise; (v) MOOS Inventory; and (vi) furnishings, trade fixtures furniture, and equipment and improvements to real property that are located in the Closing Locations or the corporate offices; (vi) if applicable, Distribution Center Merchandise that is not received at the Stores on or before the Receipt Deadline; and/or (vii) In-Transit Merchandise that is not received at the Stores on or before the Receipt Deadline.

"**Merchant Consignment Goods**" Excluded Goods that, if Merchant so elects at the beginning of the Sale Term, Agent shall accept those goods not included as "Merchandise" and identified by Merchant for sale as "Merchant Consignment Goods."

"**MOOS Inventory**"  means those goods referenced in the file "MOOS Inventory.xlsx", which file was provided by Merchant to Agent by email on December 17, 2014 at 9:36 a.m. CT, and located at the "hilton annex" facility as of the Sale Commencement Date.

"**MOOS Guaranteed Amount**" means an amount equal to thirty-six percent (36%) of the aggregate Cost Value of the MOOS Inventory, plus payment of the 3PL Expenses.

"**MOOS Proceeds**" means the proceeds from the sale of the MOOS Inventory.

"**Occupancy Expenses**" means rent, percentage rent, common-area maintenance, landlord promotional fees, real estate and use taxes, HVAC, utilities, telecom/telephone charges, point-of-sale systems maintenance, store security systems, routine repairs and maintenance, taxes and licenses, costs of all local, long-distance, and international telephone, satellite broadband connections, T-1 lines, broadband internet, and other telecommunications services, trash removal (to the extent excluded as a fixed charge component of lease obligation), snow removal, and ordinary course third-party cleanings, pest control services, plus any percentage rent obligations incurred by Merchant under applicable leases or occupancy agreements that are allocable to the sales as part of the Sale during the Sale Term of: (x) Merchandise and (y) Additional Agent Merchandise included in the Sale.

"**Owned DC FF&E**" means furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment, conveyors, racking, and personal property (other than computers, servers, and hardware used or utilized in connection with or associated with the Direct Business Platform) owned by Merchant and located at the Distribution Center.

"**Owned FF&E**" means the items in the file entitled "FF&E Assets" provided by Merchant to Agent (exclusive in all instances of Owned DC FF&E referenced in such file).

"**Petition Date**" shall mean December 7, 2014 which is the date the Chapter 11 Cases were commenced.

"**Proceeds**" means the aggregate of (i) the total amount (in dollars) of all sales of Merchandise in the Stores and/or through the Direct Business Platform; (ii) all service revenue received by Merchant from the Stores and/or through the Direct Business Platform (if applicable), in each case during the Sale Term and exclusive of Sales Taxes; (iii) the total amount (in dollars) of all sales of Additional Agent Merchandise (exclusive of Sales Taxes); (iv) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term relating to the Merchandise and Additional Agent Merchandise; (v) all amounts received from customers or other third parties on account of postage, overnight delivery or other shipping charges related to the delivery of Merchandise and Additional Agent Merchandise to the consumers; and (vi) any and all proceeds received by Agent from the disposition of Remaining Merchandise.

"**Remaining Merchandise**" means all Merchandise and Additional Agent Merchandise remaining at the conclusion of the Sale.

"**Retail Price**" means, with respect to each item of Merchandise, the lowest of the lowest ticketed price, determined as of the Sale Commencement Date, "Style Chain Current Retail" as reflected on the Cost File other file price, marked price, shelf price, hang-tag price, stickered price, PLU price, or other hard-marked price, excluding Excluded Price Adjustments; provided, however, that, with respect to Aged Merchandise, the "Retail Price" shall be the lower of (x) the Retail Price as determined in accordance with the sentence to which this proviso is attached; or (y) the original retail price for such item of Aged Merchandise, multiplied by (y) fifty percent (50%).

"**Retained Employee**" means any such Store employee identified by the Agent to be used in connection with the Sale.

"**Retention Bonuses**" means retention bonuses paid to Retained Employees.

"**Returned Merchandise**" means returns of Merchandise sold by Merchant prior to the Sale Commencement Date in accordance with Merchant's return policies in effect at the time of purchase (to the extent presented in accordance with the foregoing terms) and returned during the first thirty (30) days of the Sale.

"**Sale**" means with respect to the Merchandise and Owned FF&E, a "sale on everything", "everything must go", or similarly themed sale, "store closing" or "going-out-of-business" sale.

"**Sale Commencement Date**" means the Sale commenced at each of the Stores on December 4, 2014.

"**Sale Termination Date**" means the earlier of (i) April 15, 2015; and (ii) the date that is 120 twenty days after entry of an order for relief in Merchant's bankruptcy case .

"**Sales Taxes**" means during the Sale Term, all sales, excise, gross receipts, and other taxes attributable to sales of Merchandise, Additional Agent Merchandise, Merchant Consignment Goods, and/or Owned FF&E as indicated on Merchant's point of sale equipment (other than taxes on income, but specifically including, without limitation, gross receipts taxes) payable to any taxing authority having jurisdiction

"**Sale Term**" means the period beginning on the Sale Commencement Date through and including the Sale Termination Date

"**Stores**" means the Merchant's retail store location(s) identified on Exhibit A-1 attached to the Agency Agreement.

"**Vacate Date**" means the date on which Agent shall vacate any Store or Distribution Center.

**EXHIBIT B**
**Form Assignment Agreement for Membership Interests**

EAST\89854433.18

## ASSIGNMENT OF MEMBERSHIP INTERESTS

This Assignment of Membership Interests (this "<u>Assignment</u>") is made and entered into this [__] day of [_____], 2015, by and between dELiA*s Assets Corp., a Delaware corporation ("<u>Assignor</u>"), and Butterfly Retail Acquisition LLC, a New York limited liability company, (hereinafter, "<u>Assignee</u>"), collectively termed the "<u>Parties</u>."

## RECITALS

WHEREAS, dELiA*s, Inc. and its affiliates, including Assignor, are debtors and debtors in possession (collectively, the "<u>Debtors</u>") in <u>In re dELiA*s, Inc., et al.</u>, Case No. 14-23678 (RDD) pending before the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

WHEREAS, dELiA*s Brand LLC ("<u>Brand</u>"), a Delaware Limited Company, was formed by filing a Certificate of Formation with the Secretary of State of the State of Delaware on February 5, 2003 and is governed by that certain Limited Liability Company Agreement, dated as of February 24, 2003 of Brand (the "<u>LLC Agreement</u>"), true and correct copies of which are attached hereto as <u>Exhibits A</u> and <u>B</u>, respectively.

WHEREAS, Assignor holds all of the issued and outstanding membership interests in Brand (the "<u>Membership Interests</u>") and desires to assign one hundred percent (100%) of the Membership Interests to Assignee (the "<u>Assigned Interest</u>").

WHEREAS, the Debtors entered into an Amended & Restated Agency Agreement, dated December 22, 2014 (the "<u>Agency Agreement</u>") with a joint venture comprising of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "<u>Agent</u>"), which Agency Agreement was approved by the Bankruptcy Court pursuant to the *Final Order (A)(I) Approving the Debtors' Assumption of Agency Agreement, (II) Authorizing the Debtors to Sell Certain Assets Through Store Closing Sales, (III) Authorizing the Debtors to Abandon Unsold Property, (IV) Waiving Compliance With Contractual Store Closing Sale Restrictions and Exempting the Debtors From Laws Restricting Store Closing Sales, and (V) Granting Related Relief* [Docket No. 98] entered on December 24, 2014 (the "<u>Agency Order</u>").

WHEREAS, the Agent has been granted designation rights under the Agency Agreement which apply to the Membership Interests;

WHEREAS, subject to the approval of the Bankruptcy Court and upon the direction of the Debtors, Assignor desires to sell, assign, convey and transfer all of its right, title and interest in and to the Assigned Interests, subject to the terms and conditions set forth herein and pursuant to the terms and conditions of that certain letter agreement, dated January [___], 2015 between the Debtors, the Agent, and the Assignee (hereinafter, the "<u>Letter Agreement</u>"), which is incorporated herein by reference; and

WHEREAS, Assignee desires to purchase and accept such assignment, conveyance, and transfer on the conditions set forth herein and in the Letter Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and the Assignee agree as follows:

Section 1.    **The Effective Date**.  The consummation of the transaction contemplated hereunder (the "Effective Date") shall take place, subject to the payment of the Payment Amount pursuant to the terms of the Letter Agreement and Assignor's delivery of the Assigned Interest pursuant to this Agreement.

Section 2.    **Assignment**.  Assignor hereby transfers and assigns to Assignee, effective as of the date hereof, the Membership Interests, which collectively constitute the Assigned Interest.

Section 3.    **Consideration**.  In consideration for said assignment, Assignor has been paid the amount specified in the Letter Agreement.

Section 4.    **Bankruptcy Court Approval**.  The Parties hereby acknowledge and agree that this Agreement, and the Effective Date contemplated hereunder, is subject to the review and approval of the Bankruptcy Court.  Assignor shall use all commercially reasonable efforts to obtain the Bankruptcy Court's approval of this Agreement and the assignment as contemplated herein.  This Agreement shall have no force and effect unless and until the Bankruptcy Court enters an order in form consistent with the terms and conditions of this Agreement and the Letter Agreement (the "Order"), which Order shall be either final and non-appealable, or which Order shall not be stayed.  The Order shall contain the protections of Bankruptcy Code section 363(m), approving the terms and conditions of this Agreement.

Section 5.    **Acceptance**.  Effective as of the Effective Date, Assignee hereby acquires the Assigned Interest and, in consideration therefor, agrees as of such effective date to become a substituted member of the Company in place of Assignor with respect to the Assigned Interest, and agrees to be bound by all of the terms and provisions of the LLC Agreement.

Section 6.    **Effect of Assignment**.  With respect to the Assigned Interest, from and after the Effective Date, (i) Assignee shall be the sole and exclusive owner of the Assigned Interest in accordance with this Assignment, (ii) such ownership shall hereby be deemed evidenced by this Assignment and this Assignment shall be included in the books and records of the Company, (iii) Assignor shall cease to have any right, title or interest in or to the Assigned Interest, and (iv) Assignor shall cease to have any rights as a member of the Company and waives any restrictions on transfer of the Assigned Interest in the LLC Agreement.

Section 7.    **Terms of the Letter Agreement**.  This Assignment is made, delivered and accepted pursuant to and subject to the terms and provisions of the Letter Agreement (including Section 9.1 thereof), which shall survive the delivery of this Assignment as provided in the Letter Agreement.  If there is a conflict between the terms of this Assignment and the Letter Agreement, the terms of the Letter Agreement shall control.

Section 8.    **Counterparts**.  This Assignment may be executed in a number of identical counterparts, each of which for all purposes is to be deemed an original, and all of which constitute, collectively, one agreement.  In addition, this Assignment may be executed in a number of counterparts, any one of which may contain the execution of either Assignor or Assignee, and all of such counterparts

taken together shall constitute one completely executed original agreement.  Delivery of an executed counterpart signature page by facsimile is as effective as executing and delivering this Assignment in the presence of the other parties to this Assignment.  This Assignment is effective upon delivery of one executed counterpart from each party to the other party hereto.

Section 9.    **Successors and Assigns**.  This Assignment shall be binding upon the parties hereto and their respective permitted successors and assigns.

Section 10.    **Governing Law**.  This Assignment shall be governed by the laws of the State of Delaware, without regard to any principles of conflict of laws that would require the application of the laws of any other jurisdiction.

IN WITNESS WHEREOF, the duly authorized signatory of each party hereto has executed this Agreement.

ASSIGNOR:

dELiA*s ASSETS CORP.

By:    _____
Name:  _____
Title: _____

ASSIGNEE:

BUTTERFLY RETAIL ACQUISITION LLC

By:    _____
Name:  _____
Title: _____

ACKNOWLEDGED WITH RESPECT
TO THE DESIGNATION TO ASSIGNEE:

HILCO MERCHANT RESOURCES, LLC

By: _____
Name:  _____
Title: _____

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Name:  _____
Title: _____

**Exhibit A to Assignment of Membership Interests**

**Certificate of Formation**

**Exhibit B to Assignment of Membership Interests**

**Limited Liability Company Agreement**

**EXHIBIT C**

**Form Assignment Agreement for Intellectual Property**

## SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (hereinafter called "Agreement"), made this __day of February, 2015, by and dELiA*s, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors" or "Assignor"), and Butterfly Retail Acquisition LLC, a New York limited liability company (hereinafter, "Assignee"), collectively termed the "Parties."

## RECITALS:

**WHEREAS**, the Debtors' Chapter 11 bankruptcy cases are being jointly administered under In re dELiA*s, Inc., et al., Case No. 14-23678 (RDD) pending before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS**, the Debtors entered into an Amended & Restated Agency Agreement, dated December 22, 2014 (the "Agency Agreement") with a joint venture comprising of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "Agent"), which Agency Agreement was approved by the Bankruptcy Court pursuant to the *Final Order (A)(I) Approving the Debtors' Assumption of Agency Agreement, (II) Authorizing the Debtors to Sell Certain Assets Through Store Closing Sales, (III) Authorizing the Debtors to Abandon Unsold Property, (IV) Waiving Compliance With Contractual Store Closing Sale Restrictions and Exempting the Debtors From Laws Restricting Store Closing Sales, and (V) Granting Related Relief* [Docket No. 98] entered on December 24, 2014 (the "Agency Order").

**WHEREAS**, the Agent has been granted certain designation rights under the Agency Agreement which apply to certain assets described in Exhibit A (said assets are hereinafter referred to as the "Assets");

**WHEREAS**, subject to the approval of the Bankruptcy Court, Assignor desires to sell, assign, convey and transfer all of its right, title and interest in and to the Assets on the terms and conditions herein and pursuant to that certain letter agreement, dated January [___], 2015 between the Debtors, the Agent, and the Assignee (hereinafter, the "Letter Agreement"), which is incorporated herein by reference;

**WHEREAS**, Assignee desires to purchase and accept such assignment, conveyance, and transfer on, subject to the terms and conditions set forth herein and in the Letter Agreement.

**NOW, THEREFORE,** in consideration of the consideration referenced herein, the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby reciprocally acknowledged, Assignor and Assignee agree as set forth below.[1]

1.    **Defined Terms**.  All initially capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Letter Agreement.

2.    **The Effective Date.**  The date the consummation of the transaction contemplated hereunder   shall take place (the "Effective Date"), subject to the payment of the Payment Amount

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Letter Agreement.

pursuant to the terms of the Letter Agreement and Assignor's delivery of the Assets pursuant to this Agreement.

3.        **Assumption by the Debtors and Assignment to Assignee.**  As of the Effective Date, pursuant to sections 363 and 365 of the Bankruptcy Code, the Debtors hereby assume all of their rights, title and interests in the Assets and, pursuant to the designation rights granted to Assignor under the Agency Agreement, hereby direct the Assignor to assign all of the Debtors' rights, title, interest, and obligations with respect to the Assets free and clear of all liens, claims and encumbrances (other than the Permitted Encumbrances).  Assignee, as and from the Effective Date, hereby accepts the assignment and assumes and agrees to make all of the payments and perform all of the covenants, conditions and agreements with respect to the Assets.

4.        **The Consideration**.  In consideration for said assignment, Assignor has been paid the amount specified in the Letter Agreement.

5.        **Bankruptcy Court Approval**.  The Parties hereby acknowledge and agree that this Agreement, and the Effective Date contemplated hereunder, is subject to the review and approval of the Bankruptcy Court.  Assignor shall use all commercially reasonable efforts to obtain the Bankruptcy Court's approval of this Agreement and the assumption and assignment as contemplated herein.  This Agreement shall have no force and effect unless and until the Bankruptcy Court enters an order in form consistent with the terms and conditions of this Agreement and the Letter Agreement (the "Order"), which Order shall be either final and non-appealable, or which Order shall not be stayed pursuant to Bankruptcy Rules 6004(h) and 6006(d).  The Order shall contain the protections of Bankruptcy Code section 363(m), approving the terms and conditions of this Agreement.

6.        **Terms of the Letter Agreement**.  This Agreement is made, delivered and accepted pursuant to and subject to the terms and provisions of the Letter Agreement, which shall survive the delivery of this Agreement as provided in the Letter Agreement.  If there is a conflict between the terms of this Agreement and the Letter Agreement, the terms of the Letter Agreement shall control.

7.        **Successors.**  This Agreement shall be binding upon the Parties hereto and their respective permitted successors and assigns.

8.        **Counterparts.**  This Agreement may be executed in a number of identical counterparts, each of which for all purposes is to be deemed an original, and all of which constitute, collectively, one agreement.  In addition, this Agreement may be executed in a number of counterparts, any one of which may contain the execution of either Assignor or Assignee, and all of such counterparts taken together shall constitute one completely executed original agreement.  Delivery of an executed counterpart signature page by facsimile is as effective as executing and delivering this Assignment in the presence of the other parties to this Assignment.  This Agreement is effective upon delivery of one executed counterpart from each party to the other party hereto.

9.        **Applicable Law.**  The performance and interpretation of this Agreement shall be controlled by the laws of the State of New York.  The Bankruptcy Court retains jurisdiction to hear and determine any and all disputes by and among the Parties concerning the interpretation and enforcement of this Agreement and the Letter Agreement, provided, however, in the event the Bankruptcy Court abstains from exercising or declines to exercise such jurisdiction, or is without jurisdiction with respect to any matter concerning this Agreement, such abstention, refusal or lack of jurisdiction shall have no effect upon, and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

IN WITNESS WHEREOF, the duly authorized signatory of each party hereto has executed this Agreement.

ASSIGNOR
dELiA*s, INC., on behalf of itself and its affiliated Debtors

By: _____
Name: _____
Title: _____


ASSIGNEE:
BUTTERFLY RETAIL ACQUISITION LLC


By: _____
Name: _____
Title: _____


ACKNOWLEDGED WITH RESPECT
TO THE DESIGNATION TO ASSIGNEE:

HILCO MERCHANT RESOURCES, LLC

By: _____
Name: _____
Title: _____

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Name: _____
Title: _____

# EXHIBIT A TO SALE, ASSUMPTION AND ASSIGNMENT AGREEMENT

## Assets Consisting of Assumed Contracts

**EXHIBIT D**

**Form Bill of Sale for Acquired IP (other than Assumed Contracts) and Other Assets**

# BILL OF SALE

This Bill of Sale (this "<u>Bill of Sale</u>") is executed and delivered this [___] of February, 2015, by and dELiA*s, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>" or "<u>Seller</u>"), and Butterfly Retail Acquisition LLC, a New York limited liability company (hereinafter, "<u>Purchaser</u>"), collectively termed the "<u>Parties</u>."

## RECITALS:

**WHEREAS**, the Debtors' Chapter 11 bankruptcy cases are being jointly administered under In re dELiA*s, Inc., et al., Case No. 14-23678 (RDD) pending before the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

**WHEREAS**, the Debtors entered into an Amended & Restated Agency Agreement, dated December 22, 2014 (the "<u>Agency Agreement</u>") with a joint venture comprising of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, the "<u>Agent</u>"), which Agency Agreement was approved by the Bankruptcy Court pursuant to the *Final Order (A)(I) Approving the Debtors' Assumption of Agency Agreement, (II) Authorizing the Debtors to Sell Certain Assets Through Store Closing Sales, (III) Authorizing the Debtors to Abandon Unsold Property, (IV) Waiving Compliance With Contractual Store Closing Sale Restrictions and Exempting the Debtors From Laws Restricting Store Closing Sales, and (V) Granting Related Relief* [Docket No. 98] entered on December 24, 2014 (the "<u>Agency Order</u>").

**WHEREAS**, the Agent has been granted certain designation rights under the Agency Agreement which apply to, among other assets, certain intellectual property set forth on <u>Exhibit A</u> attached hereto (the "<u>Sold IP</u>"), and certain assets described on <u>Exhibit B</u> attached hereto (the "<u>Fixed Assets</u>");

**WHEREAS**, subject to the approval of the Bankruptcy Court, Seller desires to sell, assign, convey and transfer all of its right, title and interest in and to the Sold IP and the Fixed Assets on the terms and conditions herein and pursuant to that certain letter agreement, dated January [___], 2015 between the Debtors, the Agent, and the Purchaser (hereinafter, the "<u>Letter Agreement</u>"), which is incorporated herein by reference;[2] and

**WHEREAS**, Purchaser desires to purchase and accept such assignment, conveyance, and transfer on the conditions set forth herein and in the Letter Agreement.

**NOW, THEREFORE**, in consideration of the consideration referenced herein, the mutual covenants herein contained and other good and valuable consideration, the receipt and

---

[2] The Sold IP consists of the Acquired IP (as defined in the Letter Agreement) *other than* the Assumed Contracts (as defined in the Letter Agreement), which Assumed Contracts are being assigned to Purchaser pursuant to the Letter Agreement and pursuant to that certain Sale, Assumption and Assignment Agreement, dated as of even date hereof.

sufficiency of which is hereby reciprocally acknowledged, Seller and Purchaser agree as set forth below.

1.   <u>Defined Terms</u>.   All initially capitalized terms used but not otherwise defined herein have the meaning given them in the Letter Agreement.

2.   <u>The Effective Date</u>.   The consummation of the transaction contemplated hereunder (the "<u>Effective Date</u>") shall take place, subject to the payment of the Payment Amount pursuant to the terms of the Letter Agreement and Seller's delivery of the Sold IP and the Fixed Assets pursuant to this Bill of Sale.

3.   <u>Transfer of Sold IP and Fixed Assets</u>.   As of the Effective Date, pursuant to section 363 of the Bankruptcy Code, the Seller hereby sells, conveys, transfers, assigns, and delivers to Purchaser all of the right, title, and interest of Seller in and to the Sold IP and Fixed Assets free and clear of all liens, claims and encumbrances (other than the Permitted Encumbrances).   Purchaser hereby purchases and accepts such conveyance, transfer, assignment, and delivery of the Sold IP and the Fixed Assets.

4.   <u>The Consideration</u>.   In consideration for said sale, Seller has been paid the amount specified in the Letter Agreement.

5.   <u>Bankruptcy Court Approval</u>.   The Parties hereby acknowledge and agree that this Bill of Sale, and the Effective Date contemplated hereunder, is subject to the review and approval of the Bankruptcy Court.   Seller shall use all commercially reasonable efforts to obtain the Bankruptcy Court's approval of this Bill of Sale and the purchase and sale contemplated herein.   This Bill of Sale shall have no force and effect unless and until the Bankruptcy Court enters an order in form consistent with the terms and conditions of this Bill of Sale and the Letter Agreement (the "<u>Order</u>"), which Order shall be either final and non-appealable, or which Order shall not be stayed pursuant to Bankruptcy Rules 6004(h) and 6006(d).   The Order shall contain the protections of Bankruptcy Code section 363(m), approving the terms and conditions of this Bill of Sale.

6.   <u>Terms of the Letter Agreement</u>.   This Bill of Sale is made, delivered and accepted pursuant to and subject to the terms and provisions of the Letter Agreement, which shall survive the delivery of this Bill of Sale as provided in the Letter Agreement.   If there is a conflict between the terms of this Bill of Sale and the Letter Agreement, the terms of the Letter Agreement shall control.

7.   <u>Successors</u>.   This Bill of Sale shall be binding upon the Parties hereto and their respective permitted successors and assigns.

8.   <u>Counterparts</u>.   This Bill of Sale may be executed in a number of identical counterparts, each of which for all purposes is to be deemed an original, and all of which constitute, collectively, one agreement.   In addition, this Bill of Sale may be executed in a number of counterparts, any one of which may contain the execution of either Seller or Purchaser, and all of such counterparts taken together shall constitute one completely executed original agreement.   Delivery of an executed counterpart signature page by facsimile is as effective as executing and delivering this Bill of Sale in the presence of the other parties to this

Bill of Sale.  This Bill of Sale is effective upon delivery of one executed counterpart from each party to the other party hereto.

9.  <u>Applicable Law</u>.  The performance and interpretation of this Bill of Sale shall be controlled by the laws of the State of New York.  The Bankruptcy Court retains jurisdiction to hear and determine any and all disputes by and among the Parties concerning the interpretation and enforcement of this Bill of Sale and the Letter Agreement; <u>provided</u>, <u>however</u>, in the event the Bankruptcy Court abstains from exercising or declines to exercise such jurisdiction, or is without jurisdiction with respect to any matter concerning this Bill of Sale, such abstention, refusal or lack of jurisdiction shall have no effect upon, and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

IN WITNESS WHEREOF, the undersigned hereby execute this Bill of Sale as of the day and year first above written.

SELLER:

dELiA*s, INC., on behalf of itself and its affiliated Debtors

By:
Name:  _____
Title:  _____


PURCHASER:

BUTTERFLY RETAIL ACQUISITION LLC

By:  _____
Name:  _____
Title:  _____

ACKNOWLEDGED WITH RESPECT
TO THE DESIGNATION TO SELLER:

HILCO MERCHANT RESOURCES, LLC

By: _____
Name:  _____
Title:  _____

GORDON BROTHERS RETAIL PARTNERS, LLC

By: _____
Name:  _____
Title:  _____

**EXHIBIT C**

**FORM OF SALE ORDER**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| dELiA*s, INC., *et al.*, | Case No. 14-23678 (RDD) |
| Debtors.[1] | Jointly Administered |

### <u>ORDER AUTHORIZING AND APPROVING THE SALE OF CERTAIN ASSETS</u>

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), for entry of an order pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, as amended (the "<u>Bankruptcy Code</u>"), Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Local Rules 6004-1 and 6006-1 of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Rules</u>") approving the sale of the Acquired Assets and the assumption and assignment of Assumed Contracts, all pursuant to the terms in the agreement attached hereto as <u>Exhibit A</u> (the "<u>APA</u>") with [_____] (the "<u>Purchaser</u>"), as more fully set forth in the Motion; and it appearing that notice of the Motion was adequate and proper under the circumstances of these Chapter 11 Cases and that no further or other notice need be given; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors and that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and after due deliberation thereon and good and sufficient cause appearing therefor,

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  dELiA*s, Inc. (7172); dELiA*s Distribution Company (9076); A Merchandise, LLC (7639); dELiA*s Operating Company (3765); dELiA*s Retail Company (0036); dELiA*s Group Inc. (4035); AMG Direct, LLC (9236); dELiA*s Assets Corp. (3754); DACCS, Inc. (0225).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  50 West 23rd Street, New York, NY 10010.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the

**IT IS HEREBY FURTHER FOUND AND DETERMINED, AS FOLLOWS:**

A.       **Jurisdiction and Venue**:  This Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 157 and 1334.  Venue of these Chapter 11 Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.       **Statutory Predicates**:  The statutory bases for the approval of the APA and the sale of the Acquired Assets are sections 105(a), 363, and 365 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rules 6004-1 and 6006-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

C.       **Opportunity to be Heard**:  A reasonable opportunity to object or be heard regarding the relief requested in the Motion and the transactions pursuant thereto has been afforded to all interested parties, including without limitation, (i) the Office of the United States Trustee for the Southern District of New York; (ii) counsel to Salus Capital Partners, LLC, as lender and administrative agent under the Debtors' postpetition credit facility (the "DIP Agent") ; (iii) counsel to General Electric Capital Corporation as the issuer of the prepetition letter of credit agreement; (iv) proposed counsel for the Committee; (v) the Internal Revenue Service; (vi) the United States Attorney for the Southern District of New York, (vii) the U.S. Securities and Exchange Commission; and (viii) any entities known or reasonably believed to have any such other party entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(b). The notice provided constitutes good, adequate and sufficient notice of the Motion and the hearing on the Motion (the "Sale Hearing") under the circumstances of these Chapter 11 Cases and no other or further notice of the Motion or the Sale Hearing or entry of this Order need be

given.  Objections, if any, to the Sale Motion have been withdrawn or resolved and, to the extent

not withdrawn or resolved, are hereby overruled.

      D.    **Marketing Process**: The Debtors have thoroughly marketed the Acquired Assets

and have conducted the bidding and auction process in accordance with the Bidding Procedures

Order [Docket No. ___].  The Debtors and their advisors have negotiated and undertaken their

roles leading to the APA in a diligent, non-collusive, fair and good faith manner.

      E.    **Highest and Best Offer**:  The APA and the consideration to be realized by the

Debtors (i) is the highest and best offer received by the Debtors; (ii) is fair and reasonable; and

(iii) is in the best interests of the Debtors, their estates, their creditors and all other parties in

interest.  There is no legal or equitable reason to delay entry into the transactions contemplated

by the Proposed Transaction.

      F.    **Business Judgment**:  The Debtors' decision to sell the Acquired Assets and

assume and assign the Assumed Contracts is a reasonable exercise of the Debtors' sound

business judgment consistent with their fiduciary duties and is in the best interests of the

Debtors, their estates, their creditors and all other parties in interest.

      G.    **Time of the Essence**:  Time is of the essence in effectuating the APA.  Based on

the record at the Sale Hearing and for the reasons stated on the record at the Sale Hearing, the

transactions contemplated by the APA must be closed rapidly following entry of this Order to

maximize the value that the Debtors may realize from the sale of the Acquired Assets.

Accordingly, cause exists to lift the stay imposed by Bankruptcy Rules 6004(h) and 6006(d) or

otherwise and permit the immediate effectiveness of this Order.

      62.    **Sale Free and Clear**:  The Acquired Assets may be sold free and clear of all

liens, claims and encumbrances (the "Encumbrances"), other than Permitted Encumbrances (as

defined in the APA).  A sale of the Acquired Assets other than one free and clear of all

Encumbrances, and without the protections of this Order, would hinder the Debtors' ability to

obtain the consideration provided for in the Acquired Assets and thus, would impact materially

and adversely the value the Debtors' estates would be able to obtain for the sale of the Acquired

Assets.  But for the protections afforded to of the Purchaser under the Bankruptcy Code and this

Order, the Purchaser would not have offered to pay the consideration contemplated in APA.  In

addition, any entity with an Encumbrance (other than Permitted Encumbrances) on the Acquired

Assets (a) has consented to the Sale; (b) could be compelled in a legal or equitable proceeding to

accept money satisfaction of such interest, or (c) otherwise falls within the provisions of section

363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth

in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  All Encumbrances on the

Acquired Assets will be satisfied or will attach to the proceeds of the sale with the same force,

effect and priority as such liens currently have, subject to the rights and defenses, if any, of the

Debtors and any party in interest with respect thereto.  Moreover, holders of Encumbrances

(other than Permitted Encumbrances) who did not object or who withdrew their objections to the

Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

Therefore, approval of the APA and consummation of the transactions contemplated therein free

and clear of Encumbrances is appropriate pursuant to section 363(f) of the Bankruptcy Code and

is in the best interests of the Debtors' estates, their creditors and other parties in interest.

Notwithstanding the foregoing, subject to the Challenge Period (as defined in the Final DIP

Order), that portion of the net proceeds of the sale of the Acquired Assets that is payable to the

Debtors shall be used in accordance with the terms of the DIP Facility and the Final DIP Order.

H.    **Arm's-Length Sale**: The consideration to be paid by the Purchaser was each

negotiated at arm's-length and constitute reasonably equivalent value and fair and adequate

consideration for the Acquired Assets under the Bankruptcy Code, Uniform Fraudulent Transfer

Act, the Uniform Fraudulent Conveyance Act and the laws of the United States, any state,

territory, possession thereof or the District of Columbia.  The terms and conditions set forth in

the APA are fair and reasonable under the circumstances and were not entered into for the

purpose of, nor do they have the effect of, hindering, delaying or defrauding the Debtors or their

creditors under any applicable laws.  The APA and the transactions contemplated therein may

not be avoided as a fraudulent conveyance.

I.    **Good Faith**:  The Debtors, the Purchaser and the Agents, and their respective

officers, members, management and board of directors, employees, agents and representatives

actively participated in the bidding process and acted in good faith.  The APA was negotiated

and entered into based upon arm's-length bargaining, without collusion or fraud, and in good

faith as that term is used in section 363(m) of the Bankruptcy Code.  The Purchaser shall be

protected by section 363(m) of the Bankruptcy Code in the event this Order is reversed or

modified on appeal.  The Debtors and the Agents were free to deal with any other party interests

in buying the Acquired Assets.  The Debtors, the Agents and the Purchaser have not engaged in

any conduct that would cause or permit the APA or any related action or transaction

contemplated thereby to be avoided under section 363(n) of the Bankruptcy Code, or prevent the

application of section 363(m) of the Bankruptcy Code.

J.    **Insider Status**:  The Purchaser is not an "insider" or "affiliate" of the Debtors as

those terms are defined in section 101(31) of the Bankruptcy Code.  No common identity of

directors or controlling stockholders exists between the Purchaser and the Debtors.

K.    **Corporate Authority**:  The Debtors have full corporate or other power to
(i) execute, deliver and perform their obligations under the APA, (ii) consummate the
transactions contemplated by the APA, and (iii) have taken all actions necessary to authorize and
approve the APA and the transactions contemplated thereby.  No consents or approvals, other
than those expressly provided for herein, are required for the Debtors to consummate the
transactions contemplated by the APA.

L.    **No Successor Liability**: Except as specifically provided for in the APA, no sale,
transfer or other disposition of the Acquired Assets to the Purchaser will subject the Purchaser to
any liability for, any  claims, obligations, debts, liabilities, obligations or expenses of any kind or
nature whatsoever of the Debtors or the Agents, by reason of such transfer under any law.  None
of the Purchasers is a successor to the Debtors or their estates.

## NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.    The relief requested in the Motion is granted as set forth herein.

2.    Any remaining objections to the Motion or the relief requested in therein that
have not been withdrawn, waived, or settled, and all reservation of rights included in such
objections are overruled in all respects and denied.

3.    The Debtors are authorized to enter into the APA and take all actions necessary to
consummate the transactions contemplated thereby.   Pursuant to sections 105(a) and 363(f) of
the Bankruptcy Code, the sale and transfer of the Acquired Assets to the Purchaser pursuant to
the APA are legal, valid and effective disposition of the Leases, and vests the Purchaser with all
right, title and interest of the Debtors to and in the Acquired Assets free and clear of all
Encumbrances (other than Permitted Encumbrances).

4.      All Encumbrances on the Acquired Assets will be satisfied or will attach to the

proceeds of the sale with the same force, effect and priority as such liens currently have, subject

to the rights and defenses, if any, of the Debtors and any party in interest with respect thereto.

Subject to the Challenge Period (as defined in the Final DIP Order), that portion of the net

proceeds of the sale of the Acquired Assets that is payable to the Debtors shall be used in

accordance with the terms of the DIP Facility and the Final DIP Order.

5.      The Debtors and the Purchaser have provided the counterparties to the Assumed

Contracts with adequate assurance of future performance within the meaning of 11 U.S.C. §§

365(b)(1), 365(b)(3) and 365(f)(2)(b).

6.      Upon payment of the cure amount for each Assumed Contract (the "Cure

Amount") and except as otherwise set forth in this Order and the APA, all persons and entities

holding claims of any kind and nature accruing, arising or relating to a period prior to the

Closing with respect to the Assumed Contracts are hereby barred from asserting such claims

against the Purchasers or any of its affiliates, successors, assigns, officers, directors or

employees, agents, representatives, and attorneys.  All other defaults, claims or other obligations

of the Debtors arising or accruing under the Assumed Contracts, if any, shall be deemed cured on

or prior to the closing of transactions contemplated by the APA (the "Closing").

7.      The assignment of the Assumed Contracts to the Purchaser pursuant to this Order

shall be valid and binding upon the Purchaser and the respective counterparties to the Assumed

Contracts notwithstanding any provision in the Assumed Contracts that (by reason of the

assignment of the Assumed Contracts or the release of the Debtors from liability) (i) restricts,

prohibits, conditions or limits the assignment of the Assumed Contracts, (ii) impacts the validity

of the Assumed Contracts following the assignment, or (iii) increases or reallocates payments

under, imposes any penalty, declares a default with respect to, terminates, modifies or cancels

any right or obligation thereunder.  Any such provision shall not be enforceable to restrict

condition or limit the assignment of the Assumed Contracts to the Purchaser pursuant to this

Order, but shall thereafter be fully binding on the Purchaser and continue in full force and effect

upon and after the assignment of the Assumed Contract.

8.      Except as specifically provided for in the APA, the sale, transfer or other

disposition of the Acquired Assets to the Purchaser will not subject the Purchaser to any liability

for, any  claims, obligations, debts, liabilities, obligations or expenses of any kind or nature

whatsoever of the Debtors or the Agents, by reason of such transfer under any law.

9.      The APA and the transactions contemplated thereby, including the assumption,

assignment and sale of the Assumed Contracts to Purchaser may not be avoided under 11 U.S.C.

§ 363(n).

10.     Upon the Closing, Purchaser will be deemed to have acted in good faith, as that

term is used in 11 U.S.C, § 363(m), with respect to entry into the APA and consummation of the

transactions thereby, and no reversal or modification of this Order on appeal will affect the

validity of the APA or the transactions contemplated thereby.

11.     This Order and the APA  shall inure to the benefit of and be binding on the

Purchaser, the Agents, the Debtors, their estates, their creditors, the counterparties to the

Assumed Contracts, and their respective successors and assigns, and any trustees, if any,

subsequently appointed in the Debtors' Chapter 11 Case or upon a conversion of the Chapter 11

Cases to Chapter 7 under the Bankruptcy Code.

12.     To the extent of any inconsistency between this Order or the APA, this Order

shall control.

13.     This Order shall be effective and enforceable immediately upon entry.  The stay

otherwise imposed by Bankruptcy Rules 6004(h) and 6006(d) is waived.

14.     This Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Order.

Dated: February [*], 2015
        White Plains, New York

_____
        UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A TO SALE ORDER**

**AGREEMENT**