## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| dELiA*s, INC., *et al.*, | Case No.  14-23678 (RDD) |
| Debtors.[1] | Jointly Administered |

### NOTICE OF SALE BY AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE** that, on February 27, 2015, dELiA*s, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned jointly administered cases (the "Chapter 11 Cases") filed a motion [Docket No. 290] (the "Bid Procedures Motion") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (a) authorizing and approving the bidding procedures for the sale of the Distribution Center, (b) approving the form and manner of notice of the Auction and Sale Hearing, (c) approving procedures for the assumption and assignment of Assumed Contracts and noticing of related cure amounts, and (d) scheduling an Auction and a Sale Hearing and setting other related dates and deadlines all as further described in the Bid Procedures Motion.  On March 20, 2015, the Bankruptcy Court entered an order [Docket No. 369] (the "Bidding Procedures Order")[2] approving certain bidding procedures attached thereto as Exhibit 1 (the "Bidding Procedures").

> **Copies of the Bid Procedures Motion, Bidding Procedures Order, and other documents related thereto are available free of charge on the website of the Debtors' noticing and claims agent, Prime Clerk LLC, at http://cases.primeclerk.com/delias, or upon request by contacting Prime Clerk, by telephone at (855) 842-4126, or by e-mail at deliasinfo@primeclerk.com.**

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of the Distribution Center, either with or without any fixtures, furniture and equipment (the "FF&E") located therein.  All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order.  To the extent there are any inconsistencies between this notice and the Bidding Procedures, the latter shall govern in all respects.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive competing Qualified Bids within the requirements and time frame specified by the Bidding Procedures, the Debtors

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  dELiA*s, Inc. (7172); dELiA*s Distribution Company (9076); A Merchandise, LLC (7639); dELiA*s Operating Company (3765); dELiA*s Retail Company (0036); dELiA*s Group Inc. (4035); AMG Direct, LLC (9236); dELiA*s Assets Corp. (3754); DACCS, Inc. (0225).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  50 West 23rd Street, New York, NY 10010.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

will conduct an auction (the "Auction") on **March 31, 2015 at 10:00 a.m (prevailing Eastern Time)** at the offices of counsel to the Debtors: DLA Piper LLP (US) 1251 Avenue of the Americas, 27th Floor, New, York, New York 10020.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the sale of the Distribution Center (either with or without any FF&E located therein) at a hearing scheduled to commence on **April 2, 2015 at10:00 a.m. (prevailing Eastern Time)** (the "Sale Hearing") or as soon thereafter as counsel may be heard, before the Honorable Robert D. Drain, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, Courtroom 118, White Plains, New York 10601.

**PLEASE TAKE FURTHER NOTICE** that objections to the proposed sale of the Distribution Center, if any, must: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules and the Order Establishing Certain Notice, Case Management, and Administrative Procedures and Omnibus Hearing Dates [Docket No. 107] entered in these Chapter 11 Cases; (iii) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (iv) filed with the Court and served so the objection is actually received **no later than the March 30, 2015 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") by the following parties (the "Notice Parties"):

| Debtors | Counsel to the Debtors |
|---|---|
| dELiA*s, Inc.<br>50 West 23rd Street<br>New York, New York 10010<br>Attn: Ryan A. Schreiber, Esq. | DLA Piper LLP (US)<br>1251 Avenue of the Americas, 25th Floor<br>New, York, New York 10020<br>Attn: Gregg Galardi, Esq.<br>      Dienna Corrado, Esq. |
| **United States Trustee** | **Counsel to the Committee** |
| Office of the United States Trustee for<br>the Southern District of New York<br>201 Varick Street, Suite 1006<br>New York, New York 10014<br>Attn: Richard C. Morrissey, Esq.<br>      Serene Nakano, Esq. | Kelley Drye & Warren LLP<br>101 Park Avenue<br>New York, NY 10178<br>Attn: Robert L. LeHane, Esq.<br>      Gilbert R. Saydah, Jr., Esq. |
| **Counsel to the DIP Agent** | |
| Choate, Hall & Stewart LLP<br>Two International Place<br>Boston, MA 02110<br>Attn: John F. Ventola, Esq.<br>      Seth Mennillo, Esq. | |

**CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION**

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE OF THE DISTRIBUTION CENTER AND ANY FF&E LOCATED THEREIN ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, SUBJECT TO THE PERMITTED EXCEPTIONS (AS DEFINED IN THE STALKING HORSE AGREEMENT) AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS TO THE SUCCESSFUL BIDDER AND ANY CURE AMOUNTS RELATED THERETO.**

---

**NO SUCCESSOR OR TRANSFEREE LIABILITY**

The proposed Order approving the Sale of the Distribution Center (including any FF&E located therein) provides that the Successful Bidder will have no responsibility for, and the Distribution Center (and any FF&E located therein) will be sold free and clear of, any successor liability, including: (a) any debt, liability or other obligation of the Debtors of any kind or nature whatsoever of the Debtors or related to the Distribution Center and any FF&E located therein other than as expressly set forth in the Stalking Horse Agreement or (b) any claims against the Debtors or any of their predecessors or affiliates.

---

Dated:  New York, New York
      March 23, 2015

*/s/ Gregg M. Galardi*
Gregg M. Galardi
Dienna Corrado
Arkady A. Goldinstein
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501

*Counsel for the Debtors and Debtors in Possession*

**EXHIBIT 1**

**BIDDING PROCEDURES**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>dELiA*s, INC., *et al.*,<br><br>                  Debtors.[1] | Chapter 11<br><br>Case No.  14-23678 (RDD)<br><br>Jointly Administered |

## BIDDING PROCEDURES

These bidding procedures (the "Bidding Procedures") have been approved by an order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered on March 20, 2015 [Docket No. 369] (the "Bidding Procedures Order") in the above-captioned jointly administered Chapter 11 cases of dELiA*s, Inc. and its debtor affiliates (collectively, the "Debtors").

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "Auction") for the sale (the "Sale") of the Debtors' distribution center located at 348 Poplar Street, Hanover, PA 17331 (the "Distribution Center"), on the terms substantially set forth in that certain Purchase and Sale Agreement between the Debtors and Conewago Contractors, Inc. (the "Stalking Horse Bidder"), a copy of which is attached hereto as Exhibit A (as amended, the "Stalking Horse Agreement"). As described below, any party interested in submitting a bid for the Distribution Center may also include any fixtures, furniture and equipment (the "FF&E") located in the Distribution Center in such bid.  Please take notice that all capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Stalking Horse Agreement.

For the avoidance of doubt, the Stalking Horse Agreement is an agreement to purchase solely the Distribution Center (without any FF&E).  Notwithstanding anything to the contrary in the Stalking Horse Agreement, in the event that the successful bid is one that involves solely the sale of the Distribution Center (without any FF&E), the order approving such sale shall provide that the Debtors may remove the FF&E from the Distribution Center within twelve (12) weeks following the closing of transaction.

> Copies of the Bidding Procedures Order, the Stalking Horse Agreement, and other documents related thereto are available free of charge on the website of the Debtors' noticing and claims agent, Prime Clerk LLC, at http://cases.primeclerk.com/delias, or upon request by contacting Prime Clerk, by telephone at (855) 842-4126, or by e-mail at deliasinfo@primeclerk.com.

### A.    Participation Requirements.

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person (other than the Stalking Horse Bidder) interested in submitting a Bid must, on or before March 25, 2015 at 12:00 p.m. (Eastern Time) (the "Preliminary Bid Deadline") deliver (unless previously delivered)

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  dELiA*s, Inc. (7172); dELiA*s Distribution Company (9076); A Merchandise, LLC (7639); dELiA*s Operating Company (3765); dELiA*s Retail Company (0036); dELiA*s Group Inc. (4035); AMG Direct, LLC (9236); dELiA*s Assets Corp. (3754); DACCS, Inc. (0225).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  50 West 23rd Street, New York, NY 10010.

a preliminary proof (a "Preliminary Bid Document") by the Potential Bidder of its financial capacity to close the proposed transaction, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which the Debtors and its advisors will determine in consultation with (i) the official committee of unsecured creditors in the Chapter 11 Cases (the "Committee"); and (ii) Salus Capital Partners, LLC, lender and administrative agent under the Debtors' postpetition credit facility (the "DIP Agent", and together with the Committee, the "Consultation Parties").

Each Potential Bidder's Preliminary Bid Document shall be delivered to the following parties (collectively, the "Notice Parties"):

| Debtors | Counsel to the Debtors |
|---|---|
| dELiA*s, Inc.<br>50 West 23rd Street<br>New York, New York 10010<br>Attn: Ryan A. Schreiber, Esq. | DLA Piper LLP (US)<br>1251 Avenue of the Americas, 25th Floor<br>New, York, New York 10020<br>Attn: Gregg Galardi, Esq.<br>Dienna Corrado, Esq. |
| **Counsel to the DIP Agent** | **Counsel to the Committee** |
| Choate, Hall & Stewart LLP<br>Two International Place<br>Boston, MA 02110<br>Attn: John F. Ventola, Esq.<br>Seth Mennillo, Esq. | Kelley Drye & Warren LLP<br>101 Park Avenue<br>New York, NY 10178<br>Attn: Robert L. LeHane, Esq.<br>Gilbert R. Saydah, Jr., Esq. |

Within two (2) days after a Potential Bidder delivers the Preliminary Bid Document, the Debtors shall determine, in consultation with its advisors and the Consultation Parties, and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Bid Document so that the Potential Bidder may conduct a due diligence review with respect to the Distribution Center and any FF&E located therein. Only those Potential Bidders that have submitted an acceptable Preliminary Bid Document (each, an "Acceptable Bidder") may submit Bids. The Stalking Horse Bidder shall at all times be deemed an Acceptable Bidder.

**B.    Access to Due Diligence.**

Only Acceptable Bidders shall be eligible to receive due diligence and access to additional non-public information. The Debtors shall provide to each Acceptable Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request, which information shall be commensurate with that information given to the Stalking Horse Bidder. To the extent the Debtors provide any information to any Acceptable Bidder that they had not previously provided to the Stalking Horse Bidder, the Debtors shall promptly provide such information to the Stalking Horse Bidder. The due diligence period will end on the Bid Deadline (as defined herein) and the Debtors shall have no obligation to furnish any due diligence information after the Bid Deadline.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not, except with respect to the Distribution Center, furnish any other confidential information relating to the Debtors, the Debtors' assets or liabilities, or the Sale to any person except an Acceptable Bidder or such Acceptable Bidder's duly-authorized representatives.

The Debtors along with their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided, however,* the Debtors may

decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment and following consultation with the Consultation Parties, have not established that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate their Bid. No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

Each Acceptable Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Debtors' assets and liabilities that are the subject of the Auction prior to making any such bids; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise regarding the Debtors' assets or liabilities, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or the Stalking Horse Agreement. Neither the Debtors nor any of their employees, officers, directors, affiliates, subsidiaries, representatives, agents, advisors or professionals are responsible for, and shall bear no liability with respect to, any information obtained by Acceptable Bidders in connection with the Sale.

The Debtors have designated Mike Matlat at A&G Realty Partners, LLC (mike@agrealtypartners.com; (631) 465-9508) to coordinate all reasonable requests for additional information and due diligence access.

## C.    Bid Requirements.

To be eligible to participate in the Auction, an Acceptable Bidder (other than the Stalking Horse Bidder) must deliver to the Debtors and their counsel, which shall be shared with the other Notice Parties within one (1) business day following receipt thereof, a written, irrevocable offer that must be determined by the Debtors, in consultation with the Consultation Parties, to satisfy each of the following conditions:

a.    **Bid Deposit.** Each Bid (other than the Stalking Horse Bid) must be accompanied by a 10% cash deposit of the proposed purchase price (the "Good Faith Deposit"), which shall be sent to the Debtors by wire transfer and held in a segregated non-interest bearing account;

b.    **Minimum Bid Amount.** The initial bid increment must be equal to or higher than $25,000. Each bid increment thereafter shall be other amount as determined by the Debtors, in consultation with the Consultation Parties (all of which must be in the form of cash) but no less than $10,000;

c.    **Good Faith Offer.** Each Bid must constitute a good faith, bona fide offer to purchase the Distribution Center (either with or without any FF&E located therein);

d.    **Same or Better Terms/Identification of Assumed Contracts**. Each Bid must be accompanied by clean and duly executed transaction documents (including schedules and exhibits thereto that identify with particularity which of the Debtors' contracts the Acceptable Bidder seeks to have assigned), along with a copy of the Stalking Horse Agreement that is marked to reflect the amendments and modifications from such agreement, which modifications (i) may not be materially more burdensome to the Debtors than the Stalking Horse Agreement or inconsistent with these Bidding Procedures and (ii) may not extend the closing deadline beyond the date specified in Section 6 of the Stalking Horse Agreement (i.e., one business day after entry of the order approving the Sale (the "Sale Order")) or eliminate such closing deadline;

    e.    **No Contingencies.**  A Bid must not be conditioned on any contingency, including, among others, on obtaining any of the following: (i) financing, (ii) shareholder, board of directors or other approval, (iii) the outcome or completion of a due diligence review by the Acceptable Bidder; or (iv) any third party consents;

    f.    **Irrevocable.**  Each Bid must remain irrevocable until 48 hours after entry of the Sale Order;

    g.    **Joint Bids.**  The Debtors will be authorized to approve joint Bids in the Debtors' exercise of their reasonable good faith business judgment, following consultation with the Consultation Parties, on a case-by-case basis;

    h.    **Adequate Assurance Information.**  Each Bid must be accompanied by sufficient and adequate financial and other information (the "Adequate Assurance Information") to demonstrate, to the satisfaction of the Debtors, following consultation with the Consultation Parties, that such Acceptable Bidder has the financial wherewithal and ability to consummate in the Sale of the Distribution Center and the assumption of the Debtors' liabilities as set forth the Stalking Horse Agreement, including payment of any cure amount with respect to any contract that may be assigned with respect to the Sale. The Bid shall also identify a contact person that counterparties to any lease or contract may contact to obtain additional Adequate Assurance Information;

    i.    **No Fees.**  The Bids must not be subject to any break up fee, transaction fee, termination fee, expense reimbursement or any similar type of payment or reimbursement.

**D.**    **Value of FF&E**

       The Debtors are in the process of determining the minimum acceptable value of the FF&E and will, after consultation with the Consultation Parties, inform Acceptable Bidders prior to the Auction of such value.

**E.**    **Qualified Bids.**

       Bids, or a combination of one or more Bids, fulfilling all of the preceding requirements shall be deemed to be "Qualified Bids," and those parties submitting Qualified Bids shall be deemed to be "Qualified Bidders."

       Within two (2) days after the Bid Deadline, the Debtors, in consultation with the Consultation Parties shall determine which Acceptable Bidders are Qualified Bidders after consultation with their advisors and will notify the Acceptable Bidders whether Bids submitted constitute, alone or together with other Bids, Qualified Bids so as to enable such Qualified Bidders to bid at the Auction (as defined below). Any Bid that is not deemed a "Qualified Bid" shall not be considered by the Debtors.

       The Stalking Horse Bidder shall be deemed to be a Qualified Bidder.  The Stalking Horse Agreement submitted by the Stalking Horse Bidder shall be deemed a Qualified Bid, qualifying the Stalking Horse Bidder to participate in the Auction.

**F.       Bid Deadline.**

Qualified Bids must be received by each of the Debtors, the Stalking Horse Bidder, their respective advisors and the advisors to the Committee and the DIP Agent, in each case so as to be actually **received no later than the March 30, 2015 at 12:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").

**G.       Evaluation of Qualified Bids.**

Prior to the Auction, the Debtors shall evaluate the Qualified Bids received and, in consultation with their advisors and the Consultation Parties, identify the Qualified Bid that is, in the Debtors' judgment, the highest or otherwise best bid (the "Starting Bid"). Within 24 hours of such determination, but in no event later than one (1) Business Day prior to the date of the Auction, the Debtors' shall notify the Stalking Horse Bidder and the other Qualified Bidders as to which Qualified Bid is the Starting Bid. The Debtors shall distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

**H.       No Qualified Bids.**

If no Qualified Bids (other than the Stalking Horse Agreement) are received by the Bid Deadline, then the Debtors may decide to not hold the Auction, the Stalking Horse Agreement may be deemed the Successful Bid (as defined herein) and the Debtors will pursue entry of an order by the Bankruptcy Court approving the Stalking Horse Agreement and authorizing the Sale of the Distribution Center to the Stalking Horse Bidder at the Sale Hearing.

**I.       Auction.**

If one or more Qualified Bids is received by the Bid Deadline, then the Debtors shall conduct the Auction for the Distribution Center (either with or without any FF&E located therein). The Auction shall commence on March 31, 2015 at 10:00 a.m. (Eastern Time) at the offices of DLA Piper LLP (US), 1251 Avenue of the Americas, 25th Floor, New York, New York 10020, or such later time (after consultation with the Consultation Parties) or other place as the Debtors shall timely notify the Stalking Horse Bidder and all other Qualified Bidders. The Debtors, in consultation with the Committee and DIP Agent, may conduct the auction telephonically.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

a.       the Auction will be conducted openly;

b.       only the Qualified Bidders, including the Stalking Horse Bidder, shall be entitled to bid at the Auction;

c.       the Qualified Bidders, including the Stalking Horse Bidder, shall appear in person or through duly-authorized representatives at the Auction;

d.       only such authorized representatives of each of the Qualified Bidders, the Stalking Horse Bidder, the Committee, the DIP Agent, the Debtors, and their respective advisors, shall be permitted to attend the Auction;

e.       bidding at the Auction shall begin at the Starting Bid and the initial bid increment must be equal to or higher than $25,000. Each subsequent bid increment thereafter shall be

other amount as determined by the Debtors, in consultation with the Consultation Parties (all of which must be in the form of cash) to be announced at the Auction;

f.    each Qualified Bidder will be informed of the terms of the previous Bids;

g.    the bidding will be transcribed or videotaped to ensure an accurate recording of the bidding at the Auction;

h.    each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale; and

i.    absent irregularities in the conduct of the Auction, the Bankruptcy Court will not consider Bids made after the Auction is closed; and the Auction shall be governed by such other Auction Procedures as may be announced by the Debtors after consultation with its advisors and the Consultation Parties from time to time on the record at the Auction; provided, that, any such other Auction Procedures shall not be inconsistent with any order of the Bankruptcy Court or with the provisions of the Stalking Horse Agreement with respect to these Bidding Procedures.

**J.    Acceptance of the Successful Bid.**

Upon the conclusion of the Auction (if such Auction is conducted), the Debtors, in the exercise of their reasonable, good-faith business judgment, and in consultation with the Consultation Parties, shall identify the highest or otherwise best Qualified Bid that in the exercise of their fiduciary duties the Debtors in good faith believe is materially more beneficial to the Debtors than the Stalking Horse Bid (the "Successful Bid"), which will be determined by considering, among other things:

a.    the number, type and nature of any changes to the Stalking Horse Agreement as appropriate;

b.    the total expected consideration to be received by the Debtors;

c.    the likelihood of the bidder's ability to close a transaction and the timing thereof; and

d.    the expected net benefit to the estate.

The Qualified Bidder having submitted a Successful Bid will be deemed the "Successful Bidder". The Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made.

The Debtors will present the results of the Auction to the Bankruptcy Court at the Sale Hearing (as defined below), at which certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that (a) the Auction was conducted, and the Successful Bidder was selected, in accordance with these Bidding Procedures, (b) the Auction was fair in substance and procedure, (c) the Successful Bid was a Qualified Bid as defined in these Bidding Procedures and (d) consummation of the Successful Bid will provide the highest or otherwise best value for the Debtors' assets and is in the best interests of the Debtors' estates.

If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when (1) such Qualified Bid is declared the Successful Bid at the Auction and (2) definitive documentation has been executed in respect thereof.  Such acceptance is conditioned upon approval by the Bankruptcy Court of the Successful Bid and entry of the Sale Order approving such Successful Bid.

**K.**      **Sale Hearing.**

A hearing to consider approval of the Qualified Bid submitted by the Successful Bidder (or to approve the Stalking Horse Agreement if no Auction is held) (the "Sale Hearing") is presently scheduled to take place on April 2, 2015 at 10:00 a.m. (prevailing Eastern Time), or as soon thereafter as counsel may be heard, before the Honorable Robert D. Drain, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, Courtroom 118, White Plains, New York 10601.

**The Sale Hearing may be adjourned to a later date by the Debtors, in consultation with the Consultation Parties, by the filing a notice of adjournment or making an announcement at the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.**

**L.**      **Designation of Back-Up Bidder.**

If for any reason the Successful Bidder fails to consummate the Qualified Bid within the time permitted after the entry of the Sale Order approving the Sale to the Successful Bidder, then the Qualified Bidder with the second highest or otherwise best Qualified Bid (the "Back-Up Bidder"), as determined by the Debtors after consultation with their advisors, and in consultation with the Consultation Parties, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein, will automatically be deemed to have submitted the highest or otherwise best Bid (the "Back-Up Bid").

The Debtors will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid as soon as is commercially reasonable without further order of the Bankruptcy Court upon at least twenty-four (24) hours advance notice, which notice will be filed with the Bankruptcy Court; it being understood that nothing herein shall require the Stalking Horse Bidder to be a Back-Up Bidder or its Bid to be a Back-Up Bid.  Upon designation of the Back-Up Bidder at the Auction, the Back-Up Bid shall remain open until the closing of the Successful Bid.

**M.**      **Return of Good Faith Deposit.**

The Good Faith Deposit of the Successful Bidder shall, upon consummation of the Successful Bid, be credited to the purchase price paid for Debtors' assets and liabilities.  If the Successful Bidder fails to consummate the Successful Bid, then the Good Faith Deposit shall be forfeited to, and retained irrevocably by, the Debtors.

The Good Faith Deposit of any unsuccessful Qualified Bidder will be returned within fifteen (15) days after consummation of the Sale approved by the Bankruptcy Court.

**N.**      **Reservation of Rights.**

The Debtors reserve their rights to modify these Bidding Procedures, in consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process (subject to any restrictions set forth in the Stalking Horse Agreement) or impose, in consultation with the Consultation Parties, at or prior to the Auction, additional customary terms and conditions on the Sale of the Distribution Center (either with or without any FF&E located therein).

Notwithstanding anything herein or in the Bidding Procedures Order to the contrary, nothing will in any way impair or enhance, alter or otherwise affect any and all rights that any secured lender may have to "credit bid" pursuant to section 363(k) of the Bankruptcy Code or other applicable law.

**EXHIBIT A**

**Stalking Horse Agreement**

EAST\96790180.2

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "Agreement") is entered into by and between dELiA*s Distribution Company, a Delaware corporation ("Seller"), and Conewago Contractors, Inc., a Pennsylvania corporation ("Purchaser").

WHEREAS, Seller is the fee owner of certain real property situated in Hanover, Pennsylvania more particularly described on Exhibit A attached hereto and made a part hereof, together with all buildings, improvements, and fixtures owned by the Seller attached to the Property; and all privileges and appurtenances pertaining thereto including any right, title and interest, if any, of Seller in and to adjacent streets, or rights-of-way (the "Property").

WHEREAS, Seller is subject to that certain voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code filed on December 7, 2014 in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") as Case No. 14-23678 (the "Bankruptcy Proceeding").

WHEREAS, Seller believes that the Property should be sold through an orderly sale and/or auction process as part of the Bankruptcy Proceeding.

WHEREAS, Seller desires to sell the Property and Purchaser desires to purchase the Property.

NOW THEREFORE, in consideration of the foregoing recitals and of the undertakings of the parties herein set forth, the parties mutually agree as follows:

1.    **SALE OF PROPERTY:**  On the terms and conditions set forth in this Agreement, Seller agrees to sell, and Purchaser agrees to purchase, the Property.

2.    **PURCHASE PRICE.**

A.    Seller is to sell and Purchaser is to purchase the Property for a total of Three Million, Six Hundred and Seventy-Six Thousand, Five Hundred and 00/100ths Dollars ($3,676,500.00) (the "Purchase Price").

B.    The Purchase Price for the Property (exclusive of closing adjustments and costs provided for herein) shall be paid in the following manner:

(i)    A deposit in the amount of $367,650.00 (the "Deposit") is due when Purchaser signs and submits this Agreement and is payable in immediately available funds and shall be delivered to the Seller, who shall hold such Deposit in a segregated, non-interest bearing account (unless Seller is required to pay interest at the banking institution where Seller maintains the account) (the "Account").

(ii)    The balance of the Purchase Price, exclusive of closing adjustments and costs (the "Balance"), is due at the closing of the transaction contemplated hereunder (the "Closing") and is payable in immediately available funds and shall be delivered to the Seller, who shall hold the Balance in the Account.

C.    The acceptance by Purchaser of the delivery of the deed at Closing shall be deemed to be full performance and discharge of every agreement and obligation (either express or implied) on the part of the Seller to be performed pursuant to this Agreement and no representation, warranty or agreement, express or implied, of Seller shall survive the Closing except those which are herein specifically stated to survive the Closing.

3.    **PURCHASE MONIES TO BE HELD BY SELLER:**

A.    Notwithstanding the foregoing or any other provision in this Agreement to the contrary, (x) in the event of any dispute concerning the Deposit, the Seller shall have the right, but not the obligation, to deliver the Deposit to the Bankruptcy Court (where it shall stay subject to further order of the Bankruptcy Court), and (y) all proceeds of the Purchase Price (including the Deposit) payable to the Seller at Closing shall be released from the Account in accordance with the Final Order (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Adequate Protection and (III) Granting Certain Related Relief entered by the Bankruptcy Court on January 9, 2015 (the "Final DIP Order"), and subject to the Challenge Period (as defined in the Final DIP Order).

B.    The provisions of this Section 3 shall survive the closing or termination of this Agreement.

4.    **ALL-CASH TRANSACTION:**  The parties expressly agree and acknowledge that this is an all-cash sale and purchase.  The sale of the Property is NOT contingent upon Purchaser obtaining financing.

5.    **CLOSING DELIVERIES:**

A.    At Closing, Seller shall deliver to Purchaser each of the following, executed and acknowledged, as appropriate: (a) a quit claim deed (in proper statutory form for recording) so as to transfer all of its right, title and interest in and to the Property, (b) an Owner's Title Affidavit in customary form, (c) a settlement sheet, and (d) such other documents as may commercially reasonably be requested by the title company handling the Closing (the "Title Company") and which are consistent with this Agreement and customarily executed in the State of Pennsylvania to effectuate the conveyance of real property.

B.    At Closing, Purchaser shall deliver to Seller each of the following, executed and acknowledged, as appropriate: (a) a settlement sheet, and (b) such other documents reasonably requested by the Title Company and which are consistent with this Agreement and customarily executed in the State of Pennsylvania to effectuate the conveyance of real property.  Purchaser shall also deliver the Balance of the Purchase Price in accordance with Section 2 hereof.

6.    **CLOSING DATE AND OFFICE:** The Closing shall take place within one (1) business day after entry of an order from the Bankruptcy Court approving the sale (the "Closing Date"), at 10:00 a.m. at the offices of the Seller's attorney, or at such other location as may be mutually agreed by the parties, at a time mutually convenient for all parties. Time is of the essence with respect to Closing.

7.    **SUBJECT TO PROVISIONS:** At Closing, Seller shall convey title to the Property, subject to all easements, covenants, restrictions, declarations or agreements of record set forth on Exhibit B attached hereto and made a part hereof, but expressly excluding any mortgages, deeds of trust, tax liens, judgments, mechanics' liens or other monetary encumbrances against the Property ("Permitted Exceptions", and the condition of the title subject only to the Permitted Exceptions is referred to herein as "Acceptable Title").

8.    **TITLE COMPANY APPROVAL:** Purchaser shall accept title subject to the Permitted Exceptions. If Purchaser desires to purchase title insurance from the Title Company (or any other title company), Purchaser may do so, at Purchaser's discretion and at its sole cost and expense. Seller shall not be obligated to cause the Title Company to omit any Permitted Exception, including, but not limited to, the satisfaction of any exception to title relating to the filing of Seller's federal or state tax return. Purchaser shall not have the right to terminate this Agreement if Seller is able to provide Acceptable Title.

9.    **OTHER RIGHTS:** This sale includes all of Seller's ownership and rights, if any, in any land lying in the bed of any street or highway, opened and proposed, in front of or adjoining the Property to the center line thereof. It also includes any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Property by reason of change of grade of any street or highway.

10.    **ACCEPTANCE OF STATE AND MUNICIPAL DEPARTMENT VIOLATIONS AND ORDERS:** Purchaser accepts the Property subject to all notes or notices of violations, known or unknown, of law or municipal ordinances, orders or requirements noted in or issued by any governmental department having authority as to lands, housing, buildings, fire and health and labor conditions affecting the Property. This provision shall survive Closing.

11.    **CLOSING ADJUSTMENTS AND COSTS:**

A.    Purchaser shall pay the cost of all documentary stamps, recordation taxes, transfer taxes and any other similar tax related to the conveyance of title to Property.

B.    If at the time of Closing the Property is affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this Agreement all the unpaid installments shall be payable by Purchaser when each installment as to such assessment is due and payable after the Closing.

C.    Each of the following items are to be apportioned as of midnight the day before Closing: (a) real estate taxes on the basis of the fiscal period for which assessed; (b) special assessment liens in accordance with the preceding paragraph; (c) utilities; (d) water and sewer

3

charges; and (e) any other charges customarily prorated in similar transactions.  If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the old tax rate for the preceding period applied to the latest assessed valuation.

**12.    USE OF PURCHASE PRICE TO PAY EMCUMBRANCES:**    If there is any monetary encumbrance which is capable of being reduced to a sum certain affecting the sale which Seller is obligated to pay and discharge at Closing pursuant to this Agreement, Seller may, to the extent permitted by the Final DIP Order, use any portion of the balance of the Purchase Price to discharge it.  As an alternative, Seller may, to the extent permitted by the Final DIP Order, deposit money with the Title Company in such amount as reasonably required by the Title Company to assure its discharge.  Upon request made within a reasonable time before Closing, Purchaser agrees to provide separate certified checks to assist in clearing up these matters.

**13.    PERSONAL PROPERTY:**  Notwithstanding anything to the contrary contained herein, unless otherwise indicated by Seller during the auction held pursuant to the Bankruptcy Proceeding, the sale does not include personal property, inventory, or other furnishings or equipment located on the Property, whether or not owned by Seller.  In the event that Seller elects to include any of the foregoing in the sale of the Property, Purchaser accepts such property in its "as-is" condition, without representation as to quantity, quality, or any other matter; provided, that none of the foregoing shall be included in the sale of the Property without the prior written consent of the Statutory Committee and the DIP Agent (as each such term is defined in the Final DIP Order).

**14.    EVENTS OF DEFAULT.**

A.    Purchaser shall be in default under this Agreement if Purchaser (1) fails to pay the balance of the Purchase Price on or before the Closing Date, (2) fails to pay, perform or observe any of Purchaser's obligations hereunder, or (3) assigns this Agreement, or records any written instrument regarding this Agreement, without the consents set forth in Section 30 of this Agreement.

B.    If any payment or any other material covenant of this Agreement hereof is not made, tendered or performed by either Seller or Purchaser, as herein provided, then this Agreement, at the option of the party who is not in default, may be terminated by such party.

(i)    In the event of such default by Seller, if Purchaser elects to treat this Agreement as terminated, then, as Purchaser's sole remedy, the Deposit shall be returned to Purchaser and Seller shall be released from any and all liability hereunder. Purchaser expressly waives its right to seek damages in the event of Seller's default hereunder.

(ii)    In the event of such default by Purchaser, if Seller elects to treat this Agreement as terminated, then all payments made hereunder shall be forfeited to and retained by Seller and Seller shall be entitled to the retention of the Deposit as liquidated damages and not a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such breach are impractical to ascertain and the amount of the Deposit is a reasonable estimate

thereof, and Seller shall retain all rights to bring such other causes of action against seller as are allowed by law as a result of the Purchaser's default.

C.    Notwithstanding the occurrence of an event of default hereunder by Purchaser, the Seller, may, in its sole discretion, keep this Agreement in effect and proceed to Closing.

D.    If Purchaser breaches this Agreement and Seller institutes a judicial action to enforce its rights or obtain remedies hereunder, the Purchaser shall pay to the Seller the reasonable attorneys' fees, court costs and expenses incurred by the Seller.

## 15.    NO REPRESENTATION; PURCHASER'S DUTY TO REVIEW:

IT IS UNDERSTOOD AND AGREED THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE PROPERTY INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE PROPERTY WITH GOVERNMENTAL LAWS (INCLUDING, WITHOUT LIMITATION, ACCESSIBILITY FOR HANDICAPPED PERSONS), THE TRUTH, ACCURACY OR COMPLETENESS OF ANY PROPERTY DOCUMENTS OR ANY OTHER INFORMATION PROVIDED BY OR ON BEHALF OF SELLER TO PURCHASER, OR ANY OTHER MATTER OR THING REGARDING THE PROPERTY.  PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND TRANSFER TO PURCHASER AND PURCHASER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS", EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT.  PURCHASER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY OR RELATING THERETO (INCLUDING SPECIFICALLY, WITHOUT LIMITATION, PROPERTY INFORMATION PACKAGES DISTRIBUTED WITH RESPECT TO THE PROPERTY) MADE OR FURNISHED BY THE SELLER OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, UNLESS SPECIFICALLY SET FORTH IN THIS AGREEMENT.  PURCHASER REPRESENTS TO SELLER THAT PURCHASER HAS CONDUCTED, OR WILL CONDUCT PRIOR TO CLOSING, SUCH INVESTIGATIONS OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS PURCHASER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE PROPERTY AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE PROPERTY, AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION

PROVIDED BY OR ON BEHALF OF SELLER OR ITS AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN SUCH REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER AS ARE EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING.

16.   **BROKER'S COMMISSION:**   Any commission or fee of any type due and payable to a broker on behalf of Purchaser as a result of this Agreement or related to the sale of the Property shall be paid solely by Purchaser.  Seller shall have no obligation to fund or cause the funding of any commission or fee due to any broker acting on behalf of Purchaser.  Purchaser indemnifies Seller and A&G Realty Partners, LLC in this regard including, without limitation, for any such fee and for all expenses incurred in respect of any litigation or claims brought seeking the payment of such fee.  This paragraph shall survive Closing.

17.   **NOTICES:** Any notice pursuant to this Agreement shall be given in writing by (a) personal delivery, or (b) reputable overnight delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, return receipt requested, or (d) legible facsimile transmission sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given either at the time of personal delivery, or, in the case of expedited delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or, in the case of facsimile transmission, as of the date of the facsimile transmission provided that an original of such facsimile is also sent to the intended addressee by means described in clauses (a), (b) or (c) above.  Unless changed in accordance with the preceding sentence, the addressees for notices given pursuant to this Agreement shall be as follows:

> If to Seller:      dELiA*s Distribution Company
> c/o Ryan A. Schreiber, Esq.
> President, General Counsel & Secretary
> 50 W. 23rd Street, 10th Floor
> New York, NY 10010
> rschreiber@deliasinc.com
>
> With a copy to:
>
> DLA Piper
> 1251 Avenue of the Americas
> New York, NY 10020-1104
> Attn: Gregg M. Galardi, Esq.
>
> And a copy to counsel to the DIP Agent at:
>  Choate, Hall & Stewart LLP
>  Two International Place
>  Boston, MA 02110
>  Attn: John F. Ventola, Esq.
>       Seth Mennillo, Esq.

And a copy to counsel to the Statutory Committee at:
  Kelley Drye & Warren LLP
  101 Park Avenue
  New York, NY 10178
  Attn: Robert L. LeHane, Esq.
      Gilbert R. Saydah, Jr., Esq.

If to Purchaser:    Conewago Contractors, Inc.
                    610 Edgegrove Road
                    P.O. Box 688
                    Hanover, PA 17331
                    Attn: Allen M. Smith, President

                    With a copy to:

                    Rhoads and Sinon LLP
                    One South Market Square, 12th Floor
                    P.O. Box 1146
                    Harrisburg, PA 17108-1146
                    Attn: John Coles, Esq.


18.    **ADDITIONAL PROVISIONS:**

       A.    This Agreement shall be governed and construed in accordance with the laws of the State of Pennsylvania without regard to conflicts of laws principles.

       B.    The parties agree that neither this contract nor any memorandum thereof shall be recorded or filed in the Recorder of Deeds Office for the County of York in the State of Pennsylvania, and such office is instructed to refuse to accept same for recordation or filing.

19.    **STRICT COMPLIANCE:** Any failure by either party to insist upon strict performance by the other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, irrespective of the number of violations or breaches that may occur, and each party, notwithstanding any such failure, shall have the right thereafter to insist upon strict performance by the other of any and all of the provisions of this Agreement.

20.    **WAIVER OF JURY TRIAL:** EXCEPT AS PROHIBITED BY LAW, THE PARTIES SHALL, AND THEY HEREBY DO, EXPRESSLY WAIVE TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF, CONNECTED WITH, OR RELATING TO THIS AGREEMENT, OR THE RELATIONSHIP CREATED HEREBY. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived. The parties submit to the exclusive jurisdiction and venue of the Bankruptcy Court with respect to any dispute, claim or issue arising out of this Agreement.

7

21. **ENTIRE AGREEMENT:** All prior understandings and agreements between Seller and Purchaser are merged in this Agreement. It completely expresses their full agreement; neither party is relying upon any statements made by anyone else that are not set forth in this Agreement.

22. **SINGULAR ALSO MEANS PLURAL:** Any singular word or term herein shall also be read as in the plural whenever the sense of this Agreement may require it.

23. **GENDER:** A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context requires otherwise.

24. **CERTAIN REFERENCES:** The term "herein", "hereof" or "hereunder" or similar terms used in this Agreement shall refer to this entire Agreement and not to the particular provision in which the term is used. Unless otherwise stated, all references herein to Paragraphs, subparagraphs or other provisions are references to Paragraph, subparagraphs or other provisions of this Agreement.

25. **NO ORAL CHANGES:** This Agreement cannot be changed or any provision waived orally. ANY CHANGES OR ADDITIONAL PROVISIONS OR WAIVERS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES.

26. **DATE OF PERFORMANCE:** If any date for performance hereunder falls on a Saturday, Sunday or other day which is a federal holiday or holiday under the laws of the state where the Property is located, the date for such performance shall be the next succeeding business day.

27. **SEVERABILITY:** If any clause or provision of this Agreement is held to be invalid or unenforceable by any court of competent jurisdiction as against any person or under any circumstances, the remainder of this Agreement and the applicability of any such clause or provision to other personal or circumstances shall not be affected thereby. All other clauses or provisions of this Agreement, not found invalid and unenforceable, shall be and remain valid and enforceable.

28. **COUNTERPARTS:** This Agreement may be executed in multiple counterparts all of which when taken together shall constitute an Agreement for the sale of real estate under the laws of the State of Pennsylvania. It is binding upon and insures to the benefit of the parties hereto and their respective heirs, devisees, executors, administrators, successors and assigns, and may be canceled, modified or amended only by a written instrument executed by both the Seller and the Purchaser.

29. **FACSIMILE EXECUTION:** For the purposes of executing this Agreement, a document signed and transmitted by facsimile machine or electronic (PDF) mail shall be treated as an original document. The signature of any party thereon shall be considered as an original signature, and the document transmitted shall be considered to have the same binding legal effect

8

as an original signature on an original document. At the request of either party, any facsimile or electronic (PDF) mail document shall be re-executed by both parties in original form. No party hereto may raise the use of a facsimile machine or electronic (PDF) mail or the fact that any signature was transmitted through the use of a facsimile machine or electronic (PDF) mail as a defense to the enforcement of this Agreement or any amendment executed in compliance with this paragraph. This paragraph does not supersede the requirements of the Section 17 hereof.

30.    **ASSIGNMENT:** Purchaser shall not assign this Agreement without the prior written consent of the Seller, the DIP Agent and the Statutory Committee, each such consent to be given in such person's sole discretion. Any purported assignment by Purchaser in violation of this Agreement shall be voidable at the option of the Seller, the DIP Agent or the Statutory Committee, as the case may be. The refusal of any such person to consent to an assignment shall not entitle Purchaser to cancel this Agreement nor give rise to any claim for damages against the Seller, the DIP Agent or the Statutory Committee. Any assignment by Purchaser, even if consented to by Seller, the DIP Agent and the Statutory Committee, shall not act to limit, reduce or impact in any way any of Purchaser's obligations to perform all of its obligations under this Agreement including, without limitation, its obligation to pay the Purchase Price.

31.    **BANKRUPTCY COURT APPROVAL AND SALE ORDER:** The parties' obligations set forth in this Agreement are expressly subject to approval by the Bankruptcy Court ("Bankruptcy Court Approval") pursuant to an Order (the "Sale Order") approving the sale to the Purchaser. The Sale Order shall include factual findings and ordering provisions that provide (i) title to the Property shall be transferred to the Purchaser free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, with all such liens, claims and encumbrances to attach to the proceeds of the sale; (ii) the Purchaser is purchasing the Property in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections offered thereby; (iii) the Agreement was negotiated, proposed, and entered into by the parties without collusion, in good faith and arms' length bargaining position; and (iv) that stay provided under the Rule 6004(g) of the Federal Rules of Bankruptcy Procedure shall be waived to the extent necessary to permit a Closing to occur as soon as possible after entry of the Sale Order.

32.    **BIDDING PROCEDURES ORDER:** The Purchaser's right to purchase the Property is governed by certain procedures established by an order of the Bankruptcy Court (the "Bidding Procedures Order"), attached hereto as Exhibit C. Where the terms of this Agreement and the Bidding Procedures Order conflict, the terms of the Bidding Procedures Order will prevail.

33.    **IRREVOCABLE OFFER:** Purchaser further acknowledges that this Agreement is executed and delivered by Purchaser pursuant to a sale and/or auction process conducted on behalf of Seller. In consideration of each of the following: (a) preserving the integrity of the auction process and assuring that all offers are made in conformity therewith and in reliance thereon; (b) the monies spent by Seller to arrange for the auction; (c) the opportunity of the Purchaser to bid for the Property; (d) the promise by the Seller to sell the Property to purchaser if this Agreement is accepted by Seller and approved by the Bankruptcy Court; and (e) for other good and valuable consideration, the receipt and adequacy of which is expressly acknowledged by Purchaser, including the mutual promises made by each party, this Agreement constitutes an

irrevocable offer to purchase by Purchaser in accordance with this Agreement.  Such offer to purchase shall not be deemed accepted by Seller until executed by Seller or Seller's duly authorized agent. Notice from Seller or its duly authorized agent to accept or reject Purchaser's offer under this paragraph may be given pursuant to Section 17 hereof, or by telephone and confirmed at a later date by notice given pursuant to Section 17 hereof.

In the event Seller rejects this offer, the Deposit shall be returned to Purchaser.  The Parties shall then have no further obligation under this Agreement.

**34.    CONSTRUCTION OF AGREEMENT:** This Agreement is a negotiated agreement, as Seller and Purchaser have each been represented, and had the benefit of, legal counsel, and shall not be construed in the event of any ambiguity therein against either party, solely by virtue of the Agreement being drafted by counsel for that party.

*[SIGNATURE PAGE FOLLOWS]*

10

IN WITNESS HEREOF, Purchaser and Seller agree that the date of this Agreement shall be the date the Seller executes this Agreement.

**PURCHASER:**

Conewago Contractors, Inc., a Pennsylvania corporation

By: _____

Allen M. Smith, President

**SELLER:**

dELiA*s Distribution Company, a Delaware corporation

By: _____

Ryan A. Schreiber, Esq., President, General Counsel & Secretary

The attached Exhibits are hereby incorporated herein by reference:

| Exhibit A | - | Legal Description |
| Exhibit B | - | Permitted Exceptions |
| Exhibit C | - | Bidding Procedures Order |

## EXHIBIT A

### Legal Description

*[See Attached]*

## EXHIBIT B

### Permitted Exceptions

*[See Attached]*

# EXHIBIT C

## Bidding Procedures Order

*[See Attached]*